Brian A. Sun (State Bar No. 089410)
basun@jonesday.com
Frederick D. Friedman (State Bar No. 73620)
ffriedman@jonesday.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071-2300
Telephone:   (213) 489-3939
Facsimile:    (213) 243-2539

David C. Scheper (State Bar No. 120174)
dscheper@scheperkim.com
Angela Machala (State Bar No. 224496)
amachala@scheperkim.com
SCHEPER KIM & OVERLAND LLP
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone:   (213) 613-4655
Facsimile:    (213) 613-4656

Attorneys for Defendant
ALFRED NASH VILLALOBOS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALFRED NASH VILLALOBOS,<br><br>Defendant. | Case No. 09-00824-GHK<br><br>**JOINT STIPULATION RE MOTION OF DEFENDANT ALFRED NASH VILLALOBOS TO DISMISS COUNT TWO OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE; DECLARATION OF FREDERICK D. FRIEDMAN; EXHIBITS**<br><br>Hearing Date:   February 22, 2010<br>Hearing Time:   3:30 p.m.<br>Hearing Place:   Courtoom of the<br>Hon. George King |

LAI-3078476v1

# TABLE OF CONTENTS

**Page**

I.      MR. VILLALOBOS' PRELIMINARY STATEMENT ...................................1

II.     GOVERNMENT'S PRELIMINARY STATEMENT ................................4

    A.      Introduction ........................................................................4

    B.      Background.........................................................................6

III.    MR. VILLALOBOS' ARGUMENT ..........................................................10

    A.      A Motion to Dismiss is Appropriate Where the Indictment Fails to State an Offense..................................................................10

    B.      Count Two Fails to State an Offense...............................................10

    C.      Even if This Were A Doubtful Case, the Rule of Lenity and the Doctrine of Constitutional Avoidance Require Dismissal .................17

        1.      The Rule of Lenity ......................................................17

        2.      The Doctrine of Constitutional Avoidance ..............................18

IV.     CONCLUSION.................................................................................19

V.      GOVERNMENT'S ARGUMENT ......................................................20

    A.      Legal Standards (Response to Defendant's Statement Concerning Legal Standards Applicable to Motions to Dismiss)......20

    B.      This Case Does Not Fall Within the Narrow Civil Litigation Exception to Prosecution Under the Hobbs act (Response to Defendant's Argument That "Count Two Fails to State and Offense") ....................................................................................22

    C.      The Hobbs Act Provision With Which Defendant Is Charged Is Neither Ambiguous Nor Vague (Response to Defendant's Arguments Concerning the "Rule of Lenity" and "Constitutional Avoidance" .........................................................26

    D.      Defendant's Motion Depends on Disputed Facts and Therefore Should Not Be Decided Pretrial ...........................................30

VI.     CONCLUSION...............................................................................31

VII.    MR. VILLALOBOS' REPLY ...........................................................32

    A.      Introduction .......................................................................32

    B.      Argument ..........................................................................34

        1.      This Motion Presents a Pure Question of Law .........................34

        2.      Count Two Does Not State An Offense...................................35

        3.      The Cases Excluding From the Scope of the Hobbs Act Threats to Bring Baseless or Fraudulent Civil Litigation Are Instructive.................................................................38

        4.      The Rule of Lenity Applies.................................................40

        5.      The Doctrine of Constitutional Avoidance Also Applies.........41

    C.      Conclusion ........................................................................42

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Broadrick v. Oklahoma,*
   413 U.S. 601 (1973) ................................................................................. 19

*Cheek v. United States,*
   498 U.S. 192 (1991) ................................................................................. 18

*Deck v. Engineered Laminates,*
   349 F.3d 253 (10th Cir. 2003) ................................................................. 15

*First Pac. Bancorp, Inc. v. Bro,*
   847 F.2d 542 (9th Cir. 1988) ................................................................... 14

*G-I Holdings, Inc. v. Baron & Budd,*
   179 F.Supp.2d 233 (S.D.N.Y. 2001) ....................................................... 15

*Grauberger v. St. Francis Hosp.,*
   169 F.Supp.2d 1172 (N.D.Cal. 2001)...................................................... 15

*I.S.Joseph Co., Inc. v. Lauritzen A/S,*
   751 F.2d 265 (8th Cir. 1984) .............................................................. 15, 18

*Lightbourne v. Dugger,*
   829 F.2d 1012, (11th Cir. 1987), *cert. denied,* 488 U.S. 934 (1988) ............. 12, 16

*McNally v. United States,*
   483 U.S. 350 (1987) ................................................................................. 17

*Roberts v. United States,*
   445 U.S. 552 (1980) ........................................................................ 12, 16, 18

*Sanchez v. Triple-S Management Corp.,*
   492 F.3d 1, *cert. denied,* 552 U.S. 1076 (2007) (1st Cir.)...................... 11

*Sosa v. Directv, Inc.,*
   437 F.3d 923 (9th Cir. 2006) .............................................................. 11, 12

*United States v. Bass,*
   404 U.S. 336 (1971) ................................................................................. 17

*United States v. Caldes,*
   457 F.2d 74 (9th Cir. 1972) ................................................................ 17, 18

*United States v. Capo,*
   791 F.2d 1054 (2d Cir. 1986), *vacated in part on other grounds,* 817 F.2d 947
   (2d Cir. 1987) *(en banc)* ......................................................................... 12

*United States v. Castillo,*
   965 F.2d 238 (7th Cir.), *cert. denied,* 506 U.S. 873 (1992) .................. 16

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3
*United States v. Daane,*
475 F.3d 1114 (9th Cir.), *cert. denied,* 552 U.S. 924 (2007) ................................ 11

4

*United States v. Du Bo,*
5
186 F.3d 1177 (9th Cir. 1999) ................................................................ 10

6
*United States v. Emmons,*
410 U.S. 396 (1973) .......................................................................... 13

7

*United States v. Laub,*
8
385 U.S. 475, 87 S.Ct. 574, 17 L. Ed. 2d 526 (1967) .......................................... 10

9
*United States v. Ocegueda,*
564 F.2d 1363 (9th Cir. 1977) ................................................................ 19

10

*United States v. Pendergraft,*
11
297 F.3d 1198 (11th Cir. 2002) ....................................................... 13, 14, 15

12
*United States v. Resnick,*
299 U.S. 207 (1936) .......................................................................... 18

13

*United States v. Sampson,*
14
371 U.S. 75, 83 S.Ct. 173, 9 L. Ed. 2d 136 (1962) ............................................ 10

15
*United States v. Santos,*
128 S. Ct. 2020 (2008) ........................................................................ 17

16

*United States v. Sturm,*
17
870 F.2d 769 (1st Cir. 1989) .................................................................. 12

18
*United States v. Ward,*
914 F.2d 1340 (9th Cir. 1990) ................................................................ 11

19

*United States v. Wiltberger,*
20
18 U.S. (5 Wheat) 76 (1820) .................................................................. 17

21
*Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.) ....................................... 15

22
*Zadvydas v.Davis,*
533 U.S. 678 (2001) .......................................................................... 18

23

## Statutes

24
18 U.S.C. § 1503(a) ............................................................................. 1

25
18 U.S.C. § 1546(a) .......................................................................... 1, 11

26
18 U.S.C. § 1951(a) ........................................................................ 1, 2, 12

27
18 U.S.C. § 1951(b)(2) ...................................................................... 2, 10

28

**TABLE OF AUTHORITIES**
(continued)

Page

<u>**Rules**</u>

F.R.Crim.P. Rule 12(b)(2) ....................................................................... 10

F.R.Crim.P. Rule 12(b)(3)(B) .................................................................. 10

<u>**Other Authorities**</u>

Criminal Resource Manual, § 2403 ........................................................ 13

1            **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.     MR. VILLALOBOS' PRELIMINARY STATEMENT**[1]

3         The government has charged defendant Alfred Nash Villalobos ("Mr.

4  Villalobos") in a two-count Indictment.  Count One alleges obstruction of justice

5  (18 U.S.C. section 1503(a)); Count Two alleges extortion (18 U.S.C. section

6  1951(a)).

7         The counts arise from conduct by Mr. Villalobos, a duly licensed California

8  attorney, in his efforts to settle a legitimate claim for his client, Orit Anjel, an

9  employee of the Chabad Israeli Center (the "Center").  The Center is operated by

10  Rabbi Amitai Yemini.  Ms. Anjel had worked for the Center for several years.  The

11  Center had made payments to Ms. Anjel for her work but had then forced her to

12  kick that compensation back to the Center.  The defense understands that the Center

13  also forced other employees besides Ms. Anjel to kick back the compensation paid

14  to them by the Center.

15         Mr. Villalobos undertook to represent Ms. Anjel and to negotiate a resolution

16  of her claim for unpaid compensation against the Center and the Rabbi.  Over a

17  period of several weeks, Mr. Villalobos negotiated with the lawyer for the Center

18  and the Rabbi, Benjamin N. Gluck of the law firm of Bird, Marella, Boxer,

19  Wolpert, Nessim, Drooks & Lincenberg ("Bird Marella").

20         Meanwhile, as Mr. Villalobos was negotiating the settlement of his client's

21  claim, the government was investigating the Center and the Rabbi for visa fraud.

22  The government's theory appears to be that the Center was involved in obtaining

23  visas for Center employees as religious workers when allegedly those employees

24  did not qualify for that status.  Notably, the Rabbi has now been charged under 18

25  U.S.C. section 1546(a) with making false statements to the immigration authorities

---

26      [1] In this section, we set forth the basic facts giving rise to the case.  We do
27  not expect these facts to be in dispute in that they are based largely on the government's discovery materials.  In any case, Mr. Villalobos' Motion to Dismiss attacks the legal sufficiency of Count Two and would not be affected by any factual
28  disputes about the background of the case as may exist.

1   about the eligibility of one of the Center's employees for religious worker status.

2   *United States v. Yemini,* United States District Court, Central District of California,

3   Case No. CR 09-01191, filed November 10, 2009.  (See Declaration of Frederick

4   D. Friedman ("Friedman Decl."), Exhibit A.)

5        Unbeknownst to Mr. Villalobos during the time he was negotiating with

6   Gluck, Mr. Gluck was cooperating with the government in an apparent attempt to

7   obtain a better disposition of potential criminal charges against the Rabbi.  In

8   cooperation with the government, Mr. Gluck recorded certain conversations with

9   Mr. Villalobos.  The government contends that these conversations show that Mr.

10   Villalobos solicited a payment from Mr. Gluck in return for agreeing to cause his

11   client Ms. Anjel to testify falsely before the grand jury (Count One).  The

12   government also contends that Mr. Villalobos attempted to extort the Rabbi by

13   demanding a payment from Mr. Gluck upon the threat that, if the payment was not

14   made, Ms. Anjel would incriminate the Rabbi in the ongoing federal criminal

15   investigation of the Rabbi for visa fraud (Count Two).

16        Mr. Villalobos vigorously disputes these charges.  As to Count One, the

17   recorded conversations do not show an attempt to obstruct justice but simply reflect

18   an attorney's good-faith attempt to negotiate the resolution of a legitimate civil

19   claim.  Mr. Villalobos expects to challenge Count One at a later point in the

20   proceedings.

21        Count Two, however, may now be disposed of as a matter of law.  Count

22   Two is charged under the Hobbs Act (18 U.S.C. section 1951(a)).  The Hobbs Act

23   prohibits (*inter alia*) the obstruction of interstate commerce by means of extortion.

24   The Act defines extortion as "the obtaining of property from another, with his

25   consent, induced by wrongful use of actual or threatened force, violence, or fear . . .

26   ."  18 U.S.C. section 1951(b)(2).

27        Here, the government is not alleging the use or threat of force or violence but

28   is relying on actual or threatened fear.  The allegation is that Mr. Villalobos

1   attempted to obtain property from Rabbi Yemini by "wrongful use of fear"

2   (Indictment at 3:12)—specifically, the fear that, if the demanded payment was not

3   made, Mr. Villalobos' client, Ms. Anjel, "would help incriminate [the Rabbi] in a

4   federal grand jury investigation." (Indictment at 3:14-15.)  In other words, the

5   allegation is that Mr. Villalobos threatened that, if he was not paid, his client Ms.

6   Anjel would truthfully tell the federal authorities of the Rabbi's visa fraud.

7        However, as will be shown below, as a matter of law, a threat to offer truthful

8   testimony to expose a crime is not cognizable under the Hobbs Act.  Put another

9   way, putting a lawbreaker in fear that a witness will offer truthful testimony against

10  him is not the "wrongful use" of fear barred by the Hobbs Act.  As far as is known,

11  no court has ever countenanced such a theory in a Hobbs Act case and indeed no

12  Hobbs Act prosecution has ever been brought on such a theory.  Accordingly,

13  Count Two must be dismissed.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I.   GOVERNMENT'S PRELIMINARY STATEMENT

2         A.   Introduction

3         Defendant Alfred Nash Villalobos ("defendant") is charged in

4    count two of the indictment with interfering with commerce by

5    extortion, in violation of Title 18, United States Code, Section

6    1951(a).  This charge arises from defendant's attempt to extort

7    over $100,000 in cash and other funds from the target of a grand

8    jury investigation, by threatening to have his client provide

9    unspecified but damaging information to the United States

10   Attorney's Office and a federal grand jury unless the blackmail

11   was paid.  Defendant now moves to dismiss this charge, before the

12   presentation of evidence, on the ground that there is nothing

13   wrongful in a witness conditioning the substance of his testimony

14   before the grand jury on whether the target paid over $100,000 in

15   blackmail.  Defendant's motion should be denied.

16        First, regardless of whether the defendant's client's

17   testimony would have been truthful absent payment, defendant's

18   demand for payment was wrongful in at least three respects:

19   first, by expressly tying the substance of his client's grand

20   jury testimony to whether he received over $100,000 in blackmail;

21   second, by promising that, in return for the blackmail payment,

22   defendant's client would lie in a manner favorable to the target;

23   and third, by implying that, absent payment, the target would be

24   "throwing the dice" as to what defendant's client would say to

25   the Assistant United States Attorney directing the investigation

26   of the target.  Defendant's motion relies by analogy on a narrow

27   line of cases holding that threatening to file a meritless

28   civil lawsuit is insufficient by itself to support a criminal

1  charge of extortion.  Those cases, which are based primarily on

2  the importance of giving civil litigants a wide berth in

3  commencing and litigating their claims, have nothing to do with

4  the facts here.  In this case, defendant was not filing a

5  lawsuit, but rather, was a witness in a criminal (not civil) case

6  who offered to sell his testimony to an individual fearing

7  indictment and imprisonment (and not simply monetary damages).

8      Second, defendant argues that the Hobbs Act is somehow

9  either ambiguous or vague, and that the "rule of lenity" or canon

10  of constitutional avoidance therefore requires that the extortion

11  statute be interpreted in a way that bars this prosecution.  This

12  argument fails because there is nothing in the phrase "wrongful

13  use of fear," or any other portion of the extortion statute, that

14  is either ambiguous or vague, at least as applied to the facts of

15  this case.  Whether the government can meet its burden in this

16  case will not turn on how to interpret this statute, but rather,

17  on the facts found to be true based on the evidence presented at

18  trial.

19      Third, even assuming that defendant's motion had any legal

20  merit, it should nevertheless be denied without prejudice or held

21  in abeyance, because it rests on disputed factual matters and is

22  therefore inappropriate for pretrial ruling.  In particular,

23  defendant asserts throughout his motion that the only alleged

24  threat he made was that, if he did not receive payment, his

25  client would "testify truthfully" about the target's involvement

26  in visa fraud.  That characterization of how defendant's client

27  would testify absent payment is contradicted by numerous recorded

28  conversations in which defendant stated to the target, among

1  other things, that failure to pay would amount to "throwing the
2  dice" as to how defendant's client would testify.  Insofar as
3  defendant's motion may turn on such contested factual issues, his
4  motion should not be decided before the Court has had an
5  opportunity to hear the evidence at trial.

6      For all these reasons, which are explained in greater detail
7  below, defendant's motion to dismiss count two of the Indictment
8  should be denied.

9      B.   Background

10     The government intends to prove the following facts at
11 trial:

12     In 2009, the government began investigating a religious
13 worker visa fraud scheme involving A.Y., who operated a
14 religious-based organization in this District.  A central issue
15 in the grand jury investigation was whether A.Y. and the
16 organization had provided false proof of employment to assist
17 immigrants in fraudulently obtaining religious worker visas.
18 B.G. represented A.Y. in the grand jury investigation.

19     Defendant represented O.A., one of the purported religious
20 workers of the organization who was a potential witness against
21 A.Y.  Prior to mid-July 2009, the government attorney handling
22 the grand jury investigation ("AUSA") had made efforts to
23 interview O.A., but the interview had not yet occurred.  By
24 mid-July 2009, the grand jury investigation of A.Y. was at least
25 partially overt, and the grand jury investigation had been
26 discussed with defendant.

27     After receiving information that defendant had approached
28 B.G. and solicited a payoff from B.G. and A.Y. in connection with

-6-

1   O.A.'s statements to the government, the Federal Bureau of

2   Investigation ("FBI") began conducting an investigation that

3   included consensually monitoring and recording several meetings

4   and telephone conversations to which defendant was a party.

5   During these conversations, defendant demanded money and other

6   items of value in connection with O.A.'s statements to the

7   government, and stated that, in exchange for those payments, he

8   would have O.A. make statements falsely exculpating A.Y.

9   Specifically, defendant made clear that, assuming they had a

10  "deal," O.A. would make false statements during an interview with

11  the AUSA and would repeat those false statements during

12  anticipated grand jury testimony.  Among other things, defendant

13  "guaranteed" that O.A. would falsely inform the AUSA that O.A.

14  had overhead another witness and purported religious worker,

15  M.D., state that she (M.D.) was personally biased against A.Y.,

16  despite the fact that defendant knew nothing about M.D or

17  discussed M.D. with O.A.

18       Defendant also informed B.G., during a recorded

19  conversation:

20       All I need to know is what we'll need [O.A.] to say [to
         the AUSA] . . . if there is anything that can be shaded
21       in a gray area, she's going to say it exactly the way
         she should say it.  I don't know what it is she could
22       possible give you to help you, but if there is anything
         she'll do it.

23

24       Also recorded is a discussion between defendant and B.G.

25  about whether O.A. would state that O.A. had returned to the

26  organization monies from the paychecks that O.A. had received

27  from the organization, in order to make it appear as though O.A.

28  was legitimately working for the organization as a religious

1   worker and that her visa had not been fraudulently obtained.
2   Both B.G. and defendant agreed that, although it was true that
3   O.A. had, in fact, returned the money from her paychecks,
4   defendant could have his client say otherwise:

5       B.G.:   Well we both know what their looking at here.
                They're looking at whether these people came
6               to America, uh, and got these visas.  Um uh,
                legitimately or not.  That's what they're
7               looking at.

8       Def't:  How many of them?

9       B.G.:   I, I don't know exactly.  I know of two or
                three people.  Uh, but I know absolutely
10              there are more.  I don't know their names.

11      Def't:  She's going to say he is the number one super
                great guy.  He's very tough, he's very good
12              at business.  She's not very good at
                business.  He requires her to work her ass
13              off.  And she's going to use Hebrew language
                and it's going to take forever to say that.
14
        B.G.:   Is she going to say, what is she going to say
15              about when she was paid?

16      Def't:  She is going to say she was paid every year
                according to what she reported on her taxes.
17              And she does have tax returns.

18      B.G.:   Right.  And is she going to say that she gave
                the money back?
19
        Def't:  No.  Not if we don't want her to.
20

21      In the same conversation, while discussing what, if
22  anything, O.A. would tell the AUSA about recently receiving a
23  monetary payment from A.Y. (if the AUSA discovered the payment
24  defendant was demanding), defendant stated, "I don't give a shit
25  what [the AUSA] threatens me or her.  [O.A.] will never say a
26  freakin' thing, and neither will I."  This particular
27  conversation ended with defendant requesting that further
28  discussions with B.G. be conducted by telephone, and not by

1   email, because the government "can't subpoena telephone

2   conversations . . . you're on a hard-line, I'm on a cell-phone,

3   there's no way anyone knows what you and I are talking about."

4        In the course of his recorded conversations with B.G.,

5   defendant also made clear what would happen to A.Y. if

6   defendant's extortionate demands were not met.  When asked

7   specifically by B.G. what would happen if defendant and O.A. did

8   not receive the amount of money defendant was demanding,

9   defendant replied that A.Y. would be "throwing the dice when we

10  get in front of [the AUSA] . . . [A.Y.] is going to have to run

11  the risk.  I'm not going to tell you what [O.A. is] going to

12  say."  In the same conversation, defendant told B.G. that A.Y.

13  and A.Y.'s organization had "Uncle Sam's foot up it's [sic] ass

14  right now," and defendant made clear that he (defendant) was

15  there to take advantage of that situation by blackmailing A.Y.

16  into paying defendant.

17

18

19

20

21

22

23

24

25

26

27

28

III.   **MR. VILLALOBOS' ARGUMENT**

A.   **A Motion to Dismiss is Appropriate Where the Indictment Fails to State an Offense**

Under F.R.Crim.P. Rule 12(b)(2), "[a] party may raise by pretrial motion any defense, objection or request that the court can determine without a trial of the general issue." Under F.R.Crim.P. Rule 12(b)(3)(B), such a motion may include a claim that the indictment fails to invoke the court's jurisdiction or to state an offense.

Case law reinforces the dictates of the Federal Rules. Failure to allege a crime is a jurisdictional defect in an indictment, requiring dismissal. *See United States v. Laub*, 385 U.S. 475, 486, 87 S.Ct. 574, 17 L. Ed. 2d 526 (1967) (affirming the dismissal of an indictment because "the indictment [did] not allege a crime."); *United States v. Sampson*, 371 U.S. 75, 76, 78-79, 83 S.Ct. 173, 9 L. Ed. 2d 136 (1962) (on a motion to dismiss, an indictment is evaluated in light of the sufficiency of its allegations to charge an offense); *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) ("[I]f properly challenged prior to trial, an indictment's complete failure to recite an essential element of the charged offense is . . . a fatal flaw requiring dismissal of the indictment.").

B.   **Count Two Fails to State an Offense**

The statute at issue in Count Two is 18 U.S.C. section 1951, referred to as the Hobbs Act. The statute proscribes obstruction of commerce by "extortion . . . ." Section 1951(a). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. section 1951(b)(2).

It is clear from the language of Count Two that the government is not alleging that Mr. Villalobos used actual or threatened force or violence in dealing with Mr. Gluck, Rabbi Yemini's lawyer. Rather, according to the Indictment, Mr. Villalobos attempted to obtain property (cash and other compensation) "induced by

1    wrongful use of fear . . . ."  (Indictment at 3:12.)  The fear Mr. Villalobos allegedly

2    tried to instill in Rabbi Yemini is that, if the demanded property was not given to

3    him, his client Ms. Anjel "would help to incriminate [the Rabbi] in a federal grand

4    jury investigation."  (Indictment at 3:14-15.)  In other words, the Rabbi was fearful

5    that Ms. Anjel—who was in a position to know based on her employment at the

6    Center—would testify truthfully about the Rabbi's involvement in a visa fraud

7    scheme involving nonimmigrant religious worker visas for Center employees.  As

8    stated earlier, the Rabbi has now been charged under 18 U.S.C. section 1546(a)

9    with making false statements to the immigration authorities about the eligibility of

10   one of the Center's employees for religious worker status.  *United States v. Yemini,*

11   United States District Court, Central District of California, Case No. CR 09-01191,

12   filed November 10, 2009 (Exhibit A hereto).

13        Extortion by instilling fear is a permissible theory of prosecution under the

14   Hobbs Act.  Obviously, given that the Act proscribes actual or threatened "force"

15   and "violence," there are many cases where the fear involved is the victim's

16   physical fear for his safety.  *E.g., United States v. Daane,* 475 F.3d 1114 (9th Cir.)

17   (upholding Hobbs Act conviction based on threats of physical violence), *cert.*

18   *denied,* 552 U.S. 924 (2007).  It is also clear that a victim's fear of economic

19   consequences can be the basis of a Hobbs Act prosecution.  *E.g., Sanchez v. Triple-*

20   *S Management Corp.,* 492 F.3d 1, 12 (1st Cir.), *cert. denied,* 552 U.S. 1076 (2007);

21   *United States v. Ward,* 914 F.2d 1340, 1345 (9th Cir. 1990).

22        However, the courts have carefully limited the economic fear cases to ensure

23   that the use of economic fear is "wrongful," as the statute requires.  As the Ninth

24   Circuit said in construing the Hobbs Act in an economic fear context in *Sosa v.*

25   *Directv, Inc.,* 437 F.3d 923, 939 (9th Cir. 2006), "extortion requires more than

26   fear," as "[t]he use of the fear must be wrongful."  *Id.*  The Courts of Appeals have

27   recognized that "fear of economic loss plays a role in many business transactions

28   that are entirely legitimate; awareness of that fear and use of it as leverage in

1    bargaining, in which each side offers the other property, services, or rights it

2    legitimately owns or controls, is not made unlawful by the Hobbs Act." *United*

3    *States v. Capo,* 791 F.2d 1054, 1062 (2d Cir. 1986), *vacated in part on other*

4    *grounds,* 817 F.2d 947 (2d Cir. 1987) (*en banc*); *United States v. Sturm,* 870 F.2d

5    769, 773 (1st Cir. 1989) ("there is nothing inherently wrongful about the use of

6    economic fear to obtain property").

7            Cases of non-physical, non-economic fear in a Hobbs Act context are rare.

8    As far as we know, there is no reported opinion holding that instilling fear that is

9    both non-physical and non-economic can be a violation of the Hobbs Act.  We have

10   certainly seen no cases where the fear allegedly instilled was a fear by the victim

11   that, if he did not pay the defendant, the defendant or someone under his control

12   would assist the government by offering truthful testimony of criminal conduct by

13   the victim.

14           Of course, it would make no sense at all to permit fear of that kind to be the

15   basis for a Hobbs Act prosecution.  As we have already seen, the use of fear by the

16   defendant must be "wrongful."  18 U.S.C. section 1951(a); *Sosa v. Directv, supra.*

17   What is "wrongful" about threatening to assist the government in a criminal case by

18   implicating a criminal?  Indeed, to the contrary, there is a strong public policy of

19   encouraging citizens to assist law enforcement agencies by reporting criminal

20   activities and by cooperating with the authorities in criminal investigations.  *See,*

21   *e.g., Roberts v. United States,* 445 U.S. 552, 557-58 (1980) (discussing the "deeply

22   rooted social obligation" to report wrongdoing to the authorities and noting that

23   "gross indifference to the duty to report known criminal behavior remains a badge

24   of irresponsible citizenship"); *see also Lightbourne v. Dugger,* 829 F.2d 1012, 1020

25   (11th Cir. 1987) ("we should keep in mind the duty that is imposed upon all citizens

26   to report criminal activity to the appropriate authorities"), *cert. denied,* 488 U.S.

27   934 (1988).

28           Significantly, the Department of Justice's own Criminal Resource Manual

LAI-3078476v1

- 12 -

1    (part of the United States Attorneys' Manual) suggests that the only viable bases of

2    a Hobbs Act prosecution based on the victim's fear are fear of physical injury and

3    fear of economic harm.  Section 2403 of the Criminal Resource Manual (Friedman

4    Decl., Exhibit B) poses four questions that must be answered affirmatively before a

5    Hobbs Act case can be brought based on extortion by force, violence or fear.  Only

6    one of the questions relates to the fear element.  That question reads: "Did the

7    defendant use or attempt to use the victim's reasonable fear of *physical injury or*

8    *economic harm* in order to induce the victim's consent to give up property?"

9    (Emphasis added.)  Clearly, the Department of Justice's own policy manual does

10   not contemplate a Hobbs Act prosecution based on any other fears than the alleged

11   victim's fear for his physical safety and his fear of economic loss.

12         Since there are no known Hobbs Act cases involving a defendant's alleged

13   instilling of fear in the victim by threatening to cooperate with the authorities in an

14   ongoing criminal investigation of the victim, we should look for helpful analogies.

15   The economic fear cases are instructive here.  Numerous courts have held that a

16   threat by the defendant to bring a lawsuit against the victim—even if the lawsuit is

17   frivolous and even if the defendant genuinely experiences fear of the economic

18   consequences of such litigation—cannot be the basis of a Hobbs Act claim.

19         One example is *United States v. Pendergraft,* 297 F.3d 1198 (11th Cir.

20   2002).  In that case, the defendants attacked the legal sufficiency of the Hobbs Act

21   charge against them.  The indictment alleged that the defendants conspired to extort

22   money from Marion County, Florida by threatening to file a civil action against the

23   County supported by false affidavits unless the County settled with them.  297 F.2d

24   at 1205.

25         The issue before the court was whether a threat to file a lawsuit, which threat

26   put the victim in economic fear, was "wrongful" within the meaning of the Hobbs

27   Act.  The court took note of the Supreme Court's holding in *United States v.*

28   *Emmons,* 410 U.S. 396 (1973), that the Hobbs Act required "using a wrongful

1   means to achieve a wrongful objective." *United States v. Pendergraft, supra.* The

2   court assumed that the defendants' threatened lawsuit was frivolous and that

3   therefore the defendants' objective was unlawful. *Id.* at 1206.

4       The court then turned to the "wrongful means" element. The court noted the

5   indictment alleged that the defendants used false affidavits in their litigation against

6   the County to instill in the County the fear of economic loss. However, the court

7   said, instilling a fear of economic loss "is not inherently wrongful." *Id.* Further,

8   the court said, a threat to litigate "is not necessarily 'wrongful' within the meaning

9   of the Hobbs Act." *Id.* The law encourages resort to the courts, the court observed.

10  *Id.* at 1206-07.

11      The court went on to note that the government had alleged that the

12  defendants "fabricated evidence to support their suit." *Id.* at 1207. But even this

13  did not make their conduct "wrongful" under the Hobbs Act, the court said. A

14  litigant could face perjury or related charges for false testimony. But

15  "[c]riminalizing false testimony via the Hobbs Act would expand the scope of

16  witness liability." *Id.* "Such a possibility," the court said, "is unsettling." *Id.* "The

17  law jealously guards witnesses who participate in judicial proceedings," the court

18  stated. *Id.* The court added: "While the case before us involves a threat to sue a

19  government, we are troubled by *any* use of this federal criminal statute to punish

20  civil litigants." *Id.* (emphasis in the original).

21      The court concluded:

22      > We hold that [defendants'] threat to file litigation against
        > Marion County, even if made in bad faith and supported
23      > by false affidavits, was not "wrongful" within the
        > meaning of the Hobbs Act. Thus, we conclude that the
24      > allegations in the indictment for conspiracy to commit
        > extortion and for the substantive offense of attempted
25      > extortion fail to charge offenses as a matter of law.

26  *Id.* at 1208.

27      Many other cases have affirmed and applied this same rule. *See, e.g., First*

28  *Pac. Bancorp, Inc. v. Bro,* 847 F.2d 542, 547 (9th Cir. 1988) (threat to file

1   shareholder derivative suit not an extortionate act); *I.S.Joseph Co., Inc. v. Lauritzen*

2   *A/S,* 751 F.2d 265, 267 (8th Cir. 1984) (threat to bring a civil action, however

3   groundless, is not within Hobbs Act); *Deck v. Engineered Laminates,* 349 F.3d

4   1253, 1258 (10th Cir. 2003) ("we join a multitude of other courts in holding that

5   meritless litigation is not extortion under § 1951"); *Vemco, Inc. v. Camardella,* 23

6   F.3d 129, 134 (6th Cir.) ("A threat of litigation if a party fails to fulfill even a

7   fraudulent contract [] does not constitute extortion"), *cert denied,* 513 U.S. 1017

8   (1994); *Grauberger v. St. Francis Hosp.,* 169 F.Supp.2d 1172, 1178 (N.D.Cal.

9   2001) ("the weight of authority holds that the filing of a legal claim does not

10   implicate the 'fear' provision of the Hobbs Act"); *G-I Holdings, Inc. v. Baron &*

11   *Budd,* 179 F.Supp.2d 233, 259 (S.D.N.Y. 2001) ("Threats of litigation, and even

12   threats of meritless litigation or the actual pursuit of such litigation, have been held

13   not to constitute acts of extortion").

14        The lesson from these cases is obvious.  If threatening litigation—even

15   baseless litigation supported by false affidavits—is not a "wrongful" instilling of

16   fear under the Hobbs Act, then threatening to "help to incriminate" the alleged

17   victim "in a federal grand jury investigation" (Indictment at 3:14-15) also cannot be

18   "wrongful" under the Act.  This is all the clearer here, given that the Rabbi's fear

19   was not that he would be falsely charged but that Ms. Anjel would testify truthfully

20   and that he would be rightly charged in view of his illegal acts.  As in *United States*

21   *v. Pendergraft, supra,* where the court noted that the defendant might be subject to

22   perjury or related charges for false testimony, here there may be other statutes (such

23   as the obstruction of justice statute charged in Count One) that criminalize the

24   conduct alleged against Mr. Villalobos.  The Hobbs Act is simply not one of them.

25        In any case, it would be truly absurd to argue that a threat to cooperate with

26   the authorities in a criminal case is a threat to commit a "wrongful" act.  As we

27   have previously shown, there is a strong public policy of encouraging citizens to

28   assist law enforcement agencies by reporting criminal activities and by cooperating

1    with the authorities in criminal investigations.  *See, e.g., Roberts v. United States,*

2    *supra,* 445 U.S. at 557-58 (1980); *see also Lightbourne v. Dugger, supra,* 829 F.2d

3    at 1020.

4         The government is apparently relying on *United States v. Castillo,* 965 F.2d

5    238 (7th Cir.), *cert denied,* 506 U.S. 873 (1992), for the proposition that non-

6    physical, non-economic fear is covered by the Hobbs Act.  That case involved a

7    threat by the publisher of a community newspaper to continue publishing negative

8    articles about the publisher of a rival paper unless a payment of $26,000 was made.

9    The only issue in that case was whether the defendant Castillo was entitled to a new

10   trial because he did not adequately waive his right to separate representation

11   (Castillo and his co-defendant had joint counsel at their trial).  The defendant did

12   not raise the issue of whether the alleged conduct was covered by the Hobbs Act

13   and the court's discussion of blackmail (which it wrongly conflated with Hobbs Act

14   extortion) was pure dictum.

15        Indeed, other than *Castillo*, Mr. Villalobos' counsel has been unable to find

16   any reported opinions where the fear involved was anything other than the victim's

17   fear for his or his family's physical safety or his fear of economic consequences.

18   Nor have we found any case where the threat was a threat by the defendant to

19   present truthful testimony to the authorities about a crime committed by the alleged

20   victim.

21        With both the law and Department of Justice policy against it, it is no

22   surprise that, so far as we can tell, the government has never before charged a

23   defendant with a Hobbs Act violation based on a threat to help incriminate the

24   alleged victim in an ongoing criminal investigation.  Such a charge is inappropriate

25   as a matter of law and must be dismissed.

26

27

28

LAI-3078476v1

- 16 -

### C.  Even if This Were A Doubtful Case, the Rule of Lenity and the Doctrine of Constitutional Avoidance Require Dismissal

#### 1.  The Rule of Lenity

Last year, Justice Scalia reiterated that:

> Under a long line of our decisions, the tie must go to the defendant. *The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.* . . . This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.  It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead. . . . . *We interpret ambiguous criminal statutes in favor of defendants, not prosecutors.*

*United States v. Santos*, 128 S. Ct. 2020, 2025 (2008) (plurality opinion) (emphasis added and citations omitted); *see also United States v. Bass*, 404 U.S. 336, 347 (1971) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity").  Put another way, under the rule of lenity, "when there are two rational readings of a criminal statute, one harsher than the other, [the court is] to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States,* 483 U.S. 350, 359-60 (1987).  The rule of lenity is fundamental to principles of due process.  *See United States v. Wiltberger*, 18 U.S. (5 Wheat) 76, 95 (1820) ("The rule that penal laws are to be construed strictly . . . is founded on the tenderness of the law for the rights of individuals, and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.").

Because of the statute's potential breadth and its ambiguity in terms of the outer reach of its coverage, the Ninth Circuit and other courts have applied the rule of lenity to the Hobbs Act to confine the meaning of the statute to reasonable bounds.  Thus, in *United States v. Caldes,* 457 F.2d 74, 78 (9th Cir. 1972), the Ninth Circuit invoked the rule of lenity to hold that acts of violence during labor

1    negotiations could not be considered extortion for purposes of the Act.  In so ruling,

2    the court observed that "[a] fundamental rule of statutory construction is that

3    criminal statutes must be strictly construed." *Id., citing United States v. Resnick,*

4    299 U.S. 207, 209 (1936).  Similarly, in *I.S.Joseph Co., Inc. v. Lauritzen A/S,*

5    *supra,* 751 F.2d at 267, the Eighth Circuit invoked the rule of lenity in holding that

6    a groundless threat to sue could not be the basis for the kind of "fear" that would

7    support a Hobbs Act charge.  As the court said there: "[C]riminal statutes are to be

8    strictly construed, and only the most liberal construction of the word 'fear' in the

9    extortion statute could make it apply to the conduct alleged in the complaint."

10         The rule of lenity requires any question about the interpretation of section

11   1951 to be resolved in Mr. Villalobos' favor.  As in *I.S.Joseph Co., Inc.,* "only the

12   most liberal construction of the word 'fear' in the extortion statute" could make the

13   statute apply to a threat by the defendant to assist in incriminating the target of a

14   federal criminal investigation.  Fear by a criminal of being held to account for his

15   crimes is hardly the kind of fear that the Hobbs Act can cover.  To hold that such a

16   fear is encompassed by the Hobbs Act would be in derogation of the "deeply rooted

17   social obligation" to report wrongdoing to the authorities.  *Roberts v. United States,*

18   *supra,* 445 U.S. 552 at 557-58.  At minimum, there is ambiguity on this point, and

19   such ambiguity must be resolved in favor of the accused.

20              **2.       The Doctrine of Constitutional Avoidance**

21         In addition, under the doctrine of constitutional avoidance, the Court must

22   interpret section 1951 to avoid creating grave constitutional questions.  "It is a

23   cardinal principle of statutory interpretation . . . that when an Act of Congress raises

24   a serious doubt as to its constitutionality, this Court will first ascertain whether a

25   construction of the statute is fairly possible by which the question may be avoided."

26   *Zadvydas v.Davis,* 533 U.S. 678, 689 (2001) (quotations omitted); *see, e.g., Cheek*

27   *v. United States,* 498 U.S. 192, 203 (1991) (interpreting criminal statute to avoid

28   constitutional issue).

1        The doctrine of constitutional avoidance has particular force here.  If the

2    Court were to rule that the "fear" contemplated by the Hobbs Act includes not just

3    the alleged victim's fear for his or his family's safety and economic fear but fear

4    that the defendant or someone allegedly under his control will help to incriminate

5    the victim, then a serious constitutional question of vagueness and notice arises.

6        Here, these constitutional questions—if the Court were to reach them—

7    would have to be resolved in Mr. Vilallobos' favor.  "A criminal statute may not be

8    so vague that men of ordinary intelligence must necessarily guess as to its

9    meaning." *United States v. Ocegueda,* 564 F.2d 1363, 1365 (9th Cir. 1977), *citing*

10   *(inter alia) Broadrick v. Oklahoma,* 413 U.S. 601, 607 (1973).  To expand the kinds

11   of threats encompassed by the Hobbs Act to cover the alleged threat here would

12   render the Act unconstitutionally vague.  Rather than place the federal judiciary in

13   the position of striking down an Act of Congress, the Court should read the statute

14   as narrowly as its language permits.  Such a reading here would do nothing more

15   than confine the Act to the understanding of its reach held by the Department of

16   Justice (fear of physical injury and fear of economic harm), as evidenced by the

17   Department's own policy guidance.  See Part II(B) above.

## IV.   CONCLUSION

19       For the reasons stated above, the Motion should be granted.

20   Dated:     January 15, 2009      JONES DAY

22                        By: _____

23                           Frederick D. Friedman

24                       Attorneys for Defendant
                         ALFRED NASH VILLALOBOS

1   II.   GOVERNMENT'S ARGUMENT

2         A.   Legal Standards (Response to Defendant's Statement
             Concerning Legal Standards Applicable to Motions to
3             Dismiss)

4         [A]n indictment is sufficient if: (1) it contains the
          elements of the offense charged and fairly informs a
5         defendant of the charge against which he must defend;
          and (2) it enables him to plead an acquittal or
6         conviction in bar of future prosecutions for the same
          offense.

7

8   United States v. Hill, 279 F.3d 731, 741 (9th Cir. 2002) (citing

9   Hamling v. United States, 418 U.S. 87, 117 (1974)); see also Fed.

10  R. Crim. P. 7(c)(1).  Failure to allege a required element of the

11  charged offense is a fatal flaw requiring dismissal.  See United

12  States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999) ("[I]f

13  properly challenged prior to trial, an indictment's complete

14  failure to recite an essential element of the charged offense is

15  not a minor or technical flaw subject to harmless error analysis,

16  but a fatal flaw requiring dismissal.").  When reviewed for

17  sufficiency, an indictment must be read in its entirety,

18  construed according to common sense, and read to include facts

19  which are necessarily implied.  United States v. Anderson, 532

20  F.2d 1218, 1222 (9th Cir. 1976).

21        Although Federal Rule of Criminal Procedure 12(b)(3)(B)

22  allows a defendant to file a motion "alleging a defect in the

23  indictment," dismissal under that Rule is inappropriate where the

24  motion involves disputed facts.  See United States v. Nukida, 8

25  F.3d 665, 669 (9th Cir. 1993) ("a motion to dismiss is generally

26  'capable of determination' before trial 'if it involves questions

27  of law rather than fact.'"); compare United States v. Phillips,

28  367 F.3d 846, 855 (9th Cir. 2002) (indictment may be dismissed

1  for insufficient evidence when the facts are essentially

2  undisputed).  Moreover, a defendant generally may not move pre-

3  trial to dismiss an indictment on "sufficiency of the evidence"

4  grounds, because such a dismissal would usurp the role of the

5  jury.  See United States v. Jensen, 93 F.3d 667, 669 (9th Cir.

6  1995); accord United States v. Alonso, 143 F.3d 772, 776-77 (2d

7  Cir. 1998) ("Unless the government has made what can fairly be

8  described as a full proffer of the evidence it intends to present

9  at trial to satisfy the jurisdictional element of the offense,

10  the sufficiency of the evidence is not appropriately addressed on

11  a pretrial motion to dismiss an indictment.").  Generally, Rule

12  12(b) motions are appropriate to consider "such matters as former

13  jeopardy, former conviction, former acquittal, statute of

14  limitations, immunity, [and] lack of jurisdiction."  Nukida, 8

15  F.3d at 669.

16

17

18

19

20

21

22

23

24

25

26

27

28

B.     <u>This Case Does Not Fall Within the Narrow Civil</u>
         <u>Litigation Exception to Prosecution Under the Hobbs Act</u>
         <u>(Response to Defendant's Argument That "Count Two Fails</u>
         <u>to State and Offense")</u>

Defendant argues that, because there is nothing "wrongful" about threatening to assist the government in a criminal case by providing truthful testimony, the conduct alleged in the Indictment may not be charged under the Hobbs Act. (Motion at 5-6.) Although defendant concedes that there is no case directly supporting his argument, defendant relies by analogy on a line of cases holding that threatening to file a civil lawsuit cannot form the basis of a Hobbs Act prosecution. (Motion 6-8).

Defendant frames the relevant issue incorrectly. In his motion, defendant rhetorically asks what is "'wrongful' about threatening to assist the government in a criminal case by implicating a criminal." (Motion at 6.) Defendant misses the point. Obviously it is not wrongful to assist the government by providing truthful testimony in an investigation. What is "wrongful" is defendant's express <u>conditioning</u> of that cooperation on whether or not the target paid him over $100,000 in blackmail, coupled with threat that, if payment was not made, the target would be "throwing the dice" about what defendant's client would say to the AUSA directing the investigation of the target. In essence, defendant sought to exploit the target's fear of indictment and imprisonment by threatening to have his client (a) inculpate the target, whether by testimony that was truthful or not, if defendant was not paid; or (b) exculpate the target falsely, if defendant was paid. Such use of fear was "wrongful" in both its objective (obtaining money to which

1  defendant was not entitled) and its means (conditioning the
2  substance of defendant's client's testimony on payment by the
3  target).  See United States v. Enmons, 410 U.S. 396, 399-400
4  (1973) (interpreting "wrongful").

5      Defendant concedes that there is no case supporting his
6  position that a Hobbs Act prosecution may not be brought on these
7  facts.  Instead, he relies by analogy on a line of cases holding
8  that threatening to file a civil lawsuit, even though meritless,
9  cannot constitute a violation of the Hobbs Act.  See United
10 States v. Pendergraft, 297 F.3d 1198, 1205 (11th Cir. 2002)
11 (citing cases).  Extrapolating from those cases, defendant argues
12 that, if it is not actionable under the Hobbs Act to file a
13 meritless lawsuit, then it certainly cannot be actionable to
14 cooperate with the government, since that too is socially
15 beneficial.  (Motion at 8.)

16     Defendant reads these cases incorrectly.  Those cases do not
17 stand for some generalized proposition that, whenever the threat
18 in a case is to perform a legal or beneficial act, the Hobbs Act
19 permits one to demand payment in return for doing nothing.  Such
20 a proposition not only would be inconsistent with case law, see,
21 e.g., United States v. Castillo, 965 F.2d 238 (7th Cir. 1992)
22 (publication of true information absent payment can still be
23 actionable under Hobbs Act), but would gut the statute's plain
24 language and occasion absurd results.  For example, under
25 defendant's reasoning, it would not violate the Hobbs Act for the
26 observer of a car accident to approach the wrongdoer and threaten
27 to tell the police what occurred unless the wrongdoer paid him
28 off.  More pertinently, defendant's expansive interpretation of

1  these cases what would permit any potential witness in a grand
2  jury investigation or other criminal matter to approach the
3  target of the investigation to sell the substance of the
4  witness's testimony.

5      Contrary to defendant's overly broad reading, the cases on
6  which he relies simply carve out a narrow exception to the plain
7  language of the Hobbs Act, based on recognition of the vital role
8  played by the civil litigation process, the importance of
9  maintaining broad access to it, and the numerous ways in which
10  the civil litigation system already protects itself against
11  meritless claims.  See, e.g., Pendergraft, 297 F.3d at 1205-08
12  ("our holding is a narrow one").  None of those particular
13  considerations warrant broadening this narrow exception to the
14  facts here.  Defendant is not charged with threatening to file a
15  lawsuit if the target did not pay him over $100,000, but rather,
16  with trying to condition the substance and veracity of his
17  client's testimony on the receipt of that payment and threatening
18  what the client's testimony might be if payment was not made.
19  Such conduct, unlike filing a lawsuit that may or may not possess
20  merit, is inherently wrongful.

21      Defendant also suggests that count two should be dismissed
22  because the fear that is alleged is neither economic nor
23  physical.  In support of this argument, defendant cites his
24  inability to find any Hobbs Act cases involving both non-physical
25  and non-economic fear, as well as an internal Department of
26  Justice Criminal Resource Manual referring to "physical injury or
27  economic harm" in a checklist relating to Hobbs Act violations.
28  Defendant's argument is both incorrect and irrelevant.  The fear

1   alleged here -- a public indictment and potential imprisonment --

2   in fact has both economic and physical dimensions.  Defendant's

3   argument is irrelevant in that neither the statutory language nor

4   the case law confines the requisite fear to those two categories.

5   For example, in <u>United States v. Castillo</u>, 965 F.2d 238 (7th Cir.

6   1992), a Hobbs Act case, the fear involved an individual's

7   reputational interests.[1]

---

22      [1]  In any event, the very first section of the USAM
       provides:

23

24          The Manual provides only internal Department of Justice
            guidance.  It is not intended to, does not, and may not
25          be relied upon to create any rights, substantive or
            procedural, enforceable at law by any party in any
26          matter civil or criminal.  Nor are any limitations
            hereby placed on otherwise lawful litigative
27          prerogatives of the Department of Justice.

28   USAM § 1-1.100.

1      C.   The Hobbs Act Provision With Which Defendant Is Charged
2           Is Neither Ambiguous Nor Vague (Response to Defendant's
            Arguments Concerning the "Rule of Lenity" and
3           "Constitutional Avoidance")

4       Defendant also argues that the rule of lenity should be

5 applied to resolve any ambiguity in the Hobbs Act.  (Motion at

6 10-11.)  But this rule of statutory construction is "applicable

7 only where 'there is a grievous ambiguity or uncertainty in the

8 language and structure of [an] Act, such that even after a court

9 has seize[d] every thing from which aid can be derived, it is

10 still left with an ambiguous statute.'"  <u>United States v.</u>

11 <u>Bendtzen</u>, 542 F.3d 722, 728-29 (9th Cir. 2008) (quoting <u>Chapman</u>

12 <u>v. United States</u>, 500 U.S. 453, 463 (1991) (second alteration in

13 original, internal quotation marks and citations omitted)); <u>see</u>

14 <u>also</u> <u>United States v. Technic Servs., Inc.</u>, 314 F.3d 1031, 1052

15 (9th Cir. 2002) (noting that application of the rule of lenity is

16 appropriate only if the statutes are "truly ambiguous").  "A

17 statute is not ambiguous simply because it is possible to

18 construe a statute narrowly . . . .  Rather, the rule of lenity

19 is reserved 'for those situations in which a reasonable doubt

20 persists about a statute's intended scope even after resort to

21 the language and structure, legislative history, and motivating

22 policies of the statute.'"  <u>United States v. LeCoe</u>, 936 F.2d 398,

23 402 (9th Cir. 1991) (quoting <u>Moskal v. United States</u>, 498 U.S.

24 103, 108 (1990)).

25       Defendant's reliance on the rule of lenity fails because he

26 has not identified any ambiguity in the text, grammar, or meaning

27 of any of the relevant portions of the Hobbs Act, and there is

28 none.  Defendant does cite cases in which courts have indicated

1   that they would strictly construe the term "fear," but defendant

2   fails to demonstrate any ambiguity in that term as applied to the

3   facts in this case.  (Motion at 11.)  It is undeniable that any

4   rational person, whether guilty or not, would fear indictment and

5   imprisonment.

6        Defendant also asserts that fear of "being held to account"

7   for one's crimes is "hardly the kind of fear" that could be

8   covered by the Hobbs Act, and that allowing a prosecution based

9   on such a fear would violate the "deeply rooted social

10  obligation" to report wrongdoing to the authorities.  (Motion at

11  11.)  But those broad policy assertions, whatever their merits,

12  fall far short of identifying any interpretive ambiguity in the

13  statute, at least as applied to the facts of this case.  As

14  discussed above, defendant's motion does not require the Court to

15  choose between two rational interpretations of the statutory

16  text.  Defendant's motion fails based on a plain reading of the

17  statute, a straightforward analysis of the relevant case law, and

18  a rudimentary understanding of the facts that will be presented

19  at trial.  See Gwaltney of Smithfield, Inc. v. Chesapeake Bay

20  Found., Ltd., 484 U.S. 49, 56 (1987) ("It is well settled that

21  'the starting point for interpreting a statute is the language of

22  the statute itself.'"); see also United States v. Beaudion, 416

23  F.3d 965, 968 (9th Cir. 2005).

24       Finally, defendant argues that this Court should agree with

25  his interpretation of the statute in order to avoid the

26  constitutional question whether the statute is constitutionally

27  vague.  (Motion at 11-12.)  The avoidance canon instructs courts

28  to reject those "plausible statutory constructions" that "would

1  raise a multitude of constitutional problems," <u>Clark v. Martinez</u>,
2  543 U.S. 371, 380-81 (2005), as long as an alternative
3  construction exists that is "fairly possible" and less troubling,
4  <u>Crowell v. Benson</u>, 285 U.S. 22, 62 (1932).  Defendant's reliance
5  on the canon of constitutional avoidance is misplaced, because no
6  "multitude of constitutional problems," at least none that is
7  serious, are raised by interpreting and applying the Hobbs Act
8  according to its plain language.  <u>See Harris v. United States</u>,
9  536 U.S. 545, 555 (2002) (canon of constitutional avoidance
10  "applies only when there are serious concerns about the statute's
11  constitutionality"); <u>Reno v. Flores</u>, 507 U.S. 292, 314, n. 9
12  (1993); <u>United States ex rel. Attorney General v. Delaware &</u>
13  <u>Hudson Co.</u>, 213 U.S. 366, 408 (1909) (when "a statute is
14  susceptible of two constructions, by one of which grave and
15  doubtful constitutional questions arise and by the other of which
16  such questions are avoided, our duty is to adopt the latter.").
17      Defendant claims that reading the statute as written
18  presents a constitutional vagueness problem.  The vagueness
19  doctrine bars enforcement of "a statute which either forbids or
20  requires the doing of an act in terms so vague that men of common
21  intelligence must necessarily guess at its meaning and differ as
22  to its application." <u>Connally v. Gen. Constr. Co.</u>, 269 U.S. 385,
23  391 (1926).  But here, a person of ordinary intelligence would
24  know after reading the Hobbs Act's proscription against
25  "extortion" -- defined as "obtaining of property from another,
26  with his consent, induced by wrongful use of . . . fear" -- that
27  approaching the target of a grand jury investigation who feared
28  indictment and offering to provide either (a) false exculpatory

1  statements and testimony if blackmail was paid; or (b) damaging
2  testimony of an unspecified nature, if demanded blackmail was not
3  paid, constitutes the wrongful use of the target's fear.
4  Moreover, there is no ambiguity in the statute in the first place
5  that would either avoid or raise this purported problem of
6  vagueness.  Because no substantial constitutional question is
7  presented by interpreting and applying the Hobbs Act according to
8  its plain meaning, there is no basis to interpret the statute to
9  exclude the conduct that has been charged here.

1          D.   Defendant's Motion Depends on Disputed Facts and
                Therefore Should Not Be Decided Pretrial
2

3          In the event that the Court is disinclined for any reason to

4     deny defendant's motion with prejudice, the Court should deny it

5     without prejudice or take it under submission pending the

6     presentation of evidence at trial.  Defendant's motion stresses

7     that his client would have testified "truthfully" if defendant

8     had not been paid over $100,000, because -- under his theory --

9     that assertion supports his argument that there was nothing

10    inherently "wrongful" about the alleged threat.  This

11    characterization of how his client would have testified absent

12    payment, however, will be contested at trial.  Recorded

13    conversations with defendant establish that defendant never

14    threatened the target that his client would provide "truthful"

15    testimony if defendant was not paid.  Rather, those recordings

16    indicate that defendant either did not know or did not care what

17    was or was not truthful or untruthful, as opposed to what would

18    hurt the target or help him.  At one point, after the target's

19    lawyer inquired directly about what defendant's client would say

20    absent payment of the blackmail defendant demanded, defendant

21    studiously avoided providing an answer and instead stated simply

22    that the target would be "throwing the dice" if he did not pay

23    the blackmail.

24         Because these factual matters are disputed, insofar as the

25    Court believes that defendant's motion may require further

26    factual determination of any of them, the government requests

27    that ruling on defendant's motion be deferred under the evidence

28    is presented at trial.

1  IV.   CONCLUSION

2        For the foregoing reasons, defendant's motion to dismiss

3  count two of the Indictment should be denied.

1    **VII.   MR. VILLALOBOS' REPLY**

2        **A.   Introduction**[2]

3        The government mischaracterizes Mr. Villalobos' argument.  The

4    government says that Mr. Villalobos is arguing that "there is nothing wrongful in a

5    witness conditioning the substance of his testimony before the grand jury on

6    whether the target paid over $100,000 in blackmail."  (Government's Preliminary

7    Statement at 4:12-15.)[3]

8        That is not Mr. Villalobos' argument, as the government knows.  Mr.

9    Villalobos is arguing that, whatever the blameworthiness may be of a threat to

10   testify against someone unless money is paid, the Hobbs Act does not criminalize

11   such conduct.  As one court has pointed out, "the Hobbs Act does not police all

12   disgraceful, offensive, and ethically repugnant behavior . . . ."  *United States v.*

13   *Albertson,* 971 F.Supp. 837, 850 (D.Del. 1997), *aff'd,* 156 F.3d 1225 (3d Cir.

14   1998).

15       Indeed, as shown in Mr. Villalobos' earlier discussion (Mr. Villalobos'

16   Argument at 10:20-16:21), while the Hobbs Act sanctions the "wrongful use of . . .

17   fear" (18 U.S.C. section 1951(b)(2)), the only known reported Hobbs Act extortion

18   cases based on fear involve instilling fear of physical harm or fear of economic

19   ────────────────────

20       [2] The government lards its Preliminary Statement with selective quotations
     from transcripts prepared by the government of recorded conversations between
21   Mr. Villalobos and Benjamin Gluck, the lawyer for Rabbi Yemini, the alleged
     victim of Mr. Villalobos' alleged extortion.  (Government's Preliminary Statement
22   at 7:5-9:16.)  We note that the defense has asked the government for months for
     copies of the transcripts of these recorded conversations.  The government has
23   promised to provide the defense with these transcripts but has represented that the
     transcripts have not been finalized.  Yet the government apparently has the
24   transcripts in sufficiently good form to be able to quote from them in its papers to
     the Court.  In any case, because this Motion presents a pure question of law and is
25   not dependant on what Mr. Villalobos said to Mr. Gluck, we will not point out the
     selectivity of the quotes or provide the full context necessary for an understanding
26   of them.

27       [3] The government's language suggests that it has a statement from Mr.
     Villalobos' client Ms. Anjel that she was going to condition the substance of her
28   testimony on whether she was paid.  The defense notes that we have not received
     any discovery from the government to this effect.  However, a resolution of this
     issue of fact is not necessary for a determination of this Motion.

loss.[4]  The fear involved in this case is not fear of physical harm or fear of economic loss.  Rather, the fear that Mr. Villalobos allegedly instilled in Rabbi Yemini was a fear that, if payment was not made, Mr. Villalobos' client Ms. Anjel "would help to incriminate [the Rabbi] in a federal grand jury investigation." (Indictment, Count Two.)  As far as is known, fear of adverse testimony in a criminal investigation has never before served as the basis for a criminal Hobbs Act prosecution.  The government does not deny this.

Accordingly, the government's discussion of the wrongfulness of tying grand jury testimony to a payment of money (Government's Preliminary Statement at 4:16-26) is beside the point.  Soliciting cash for false exculpatory testimony is clearly wrong and may be criminalized by any number of statutes, including arguably 18 U.S.C. 1503(a), the obstruction of justice charge in Count One.  But the question for decision here is not whether that conduct is wrong but whether obtaining money by instilling fear of incriminating testimony is indictable under the Hobbs Act, as alleged in Count Two.[5]

Given that this is a brand new theory of liability, the Court should rightfully hesitate to allow Count Two to stand.  While the government proclaims that "there is nothing in the phrase 'wrongful use of fear,' or any other portion of the extortion statute, that is either ambiguous or vague" (Government's Preliminary Statement at 5:12-14), in fact the courts have struggled with the issue of what kinds of economic fear may legitimately be instilled and what kinds may not be. *See, e.g., Viacom International, Inc. v. Icahn,* 747 F.Supp. 205, 210-214 (S.D.N.Y. 1990) (so-called

---

[4] The only arguable exception is *United States v. Castillo,* 965 F.2d 238 (7th Cir.), *cert. denied,* 506 U.S. 873 (1992), in which the Hobbs Act charge was based on a threat by the defendant to publish negative articles about the victim.  But the issue of whether the Act covered fear of negative publicity was not raised in that case and therefore was not part of the case's holding.  Further, as the court recognized in *United States v. Albertson,* 971 F.Supp. at 848, *Castillo*'s discussion of the elements of the Hobbs Act was pure dictum.

[5] As noted in footnote 2 above, we await discovery as to whether the government actually has a witness—namely, Ms. Anjel, Mr. Villalobos' client— who will testify that she agreed to exchange false testimony for a payment of money.

1  "greenmail" is not the wrongful use of economic fear under the Hobbs Act), *affid,*

2  946 F.2d 998 (2d Cir. 1991), *cert. denied,* 502 U.S. 1122 (1992). Where—as

3  here—we are dealing not with fear of physical harm or economic fear but a fear of

4  incriminating testimony, we are going beyond the reported cases and indeed beyond

5  the traditional understanding of the reach of the statute held by the Department of

6  Justice itself. Denying this Motion would mean a significant expansion of the

7  traditionally-understood bases of liability under the Act.

8       There is simply no basis for radically expanding the reach of Hobbs Act

9  extortion. At minimum, given the ambiguity of the language and the absence of

10  supporting case law, the Court must apply the rule of lenity. The Supreme Court

11  and the Ninth Circuit have often applied the rule of lenity in Hobbs Act cases where

12  new theories of liability were advanced. *E.g., Scheidler v. National Organization*

13  *for Women, Inc.,* 537 U.S. 393, 409 (2003) (applying rule of lenity to Hobbs Act to

14  confine Act to obtaining victim's property as opposed to restricting his freedom of

15  action); *United States v. Enmons,* 410 U.S. 396, 410 (1973) (applying rule of lenity

16  to Hobbs Act so as not to criminalize violence during a strike to achieve legitimate

17  collective bargaining objectives); *United States v. McFall,* 558 F.3d 951, 957 (9th

18  Cir. 2009) (observing that *Scheidler* "makes clear that the rule of lenity applies to

19  ambiguous applications of the Hobbs Act . . ."). That rule should be applied here,

20  and the Motion granted.

21      **B.**    **Argument**

22          **1.**    **This Motion Presents a Pure Question of Law**

23       The government argues that Mr. Villalobos' Motion "rests on disputed

24  factual matters, and is therefore inappropriate for pretrial ruling." (Government's

25  Preliminary Statement at 5:21-22.) The government points to Mr. Villalobos'

26  argument in his Motion that the alleged threat was that, if the Rabbi did not pay,

27  Ms. Anjel would testify truthfully about the Rabbi's immigration offenses. The

28  government says that "[t]his characterization of how [Ms. Anjel] would have

1   testified absent payment, however, will be contested at trial." (Government's

2   Argument at 30:10-12.)  The government says that Mr. Villalobos's threat was to

3   have Ms. Anjel testify in a way that would harm the Rabbi and that Mr. Villalobos

4   did not know or care whether such testimony would be truthful or untruthful.  (*Id.*

5   at 30:15-18.)[6]

6        We believe that the testimony will show that the Rabbi committed multiple

7   acts of immigration fraud (for some of which he is now being prosecuted) and that

8   what the Rabbi feared was Ms. Anjel's truthful and incriminating testimony about

9   those crimes.

10        But it is not necessary to resolve any factual disputes to determine this

11   Motion.  Even if Ms. Anjel's testimony would have been false absent a payment

12   from the Rabbi, the government does not and cannot dispute the basic fact that this

13   prosecution is based on a *fear of incriminating testimony,* not a fear of physical

14   harm or a fear of economic harm.  Indeed, Count Two proclaims that the threat was

15   that, unless payment was made, Ms. Anjel "would help to incriminate" the Rabbi.

16   The defense's contention is that the Hobbs Act does not cover the instilling in the

17   victim of fear of incriminating testimony, whether that testimony is true or false.

18   Thus, whether Mr. Villalobos intended to have Ms. Anjel testify truthfully or

19   falsely, or whether he did not care one way or the other, does not have to be decided

20   to grant this Motion.

21             **2.**    **Count Two Does Not State An Offense**

22        As stated earlier, with the exception of *United States v. Castillo,* 965 F.2d

23   238 (7th Cir.)*, cert. denied* 506 U.S. 873 (1992) the reported cases do not include a

24   single Hobbs Act prosecution based on extortion where the fear allegedly instilled

25   was a fear other than of physical harm or economic harm.  *Castillo* itself (which

26         [6] The government suggests that it is going to try to show at trial that there
was a plan to have Ms. Anjel testify falsely about the Rabbi if the Rabbi paid her

27   and possibly to have her testify falsely but in a way helpful to the Rabbi if there
was a payment.  However, as noted in footnote 2 above, to date we have no

28   discovery from the government on the topic of how Ms. Anjel planned to testify.

1    involved fear of negative publicity) did not discuss the issue of whether a Hobbs

2    Act prosecution can be based on such a fear, let alone make any such holding.  *See*

3    *United States v. Albertson, supra,* 971 F.Supp. at 848 (*Castillo*'s statements about

4    the elements of extortion are dicta).

5        Accordingly, the government's statement that Mr. Villalobos "concedes that

6    there is no case supporting his position that a Hobbs Act prosecution may not be

7    brought on these facts" (Government's Argument, 23:5-7) has it exactly backwards.

8    What is significant is the utter lack of case law supporting the *government's*

9    position that Hobbs Act extortion may be based on anything other than fear of

10   physical harm or fear of economic harm.[7]

11       Indeed, in speaking of Hobbs Act extortion, the cases and the treatises limit

12   themselves to those two kinds of harm.  Further, a review of the pattern jury

13   instructions for the various Circuit Courts shows that those instructions that define

14   fear for purposes of Hobbs Act extortion refer exclusively to those two fears—of

15   physical harm and of economic harm.  *See* Third Circuit Criminal Jury Instructions

16   6.18.1951-4 ("Fear exists if a victim experiences anxiety, concern, or worry over

17   expected personal (*physical*) (*economic*) harm") (emphasis and parentheses in the

18   original); Fifth Circuit Criminal Jury Instructions 2.73 ("The term 'fear' includes

19   fear of economic loss or damage, as well as fear of physical harm"); Eighth Circuit

20   Model Criminal Jury Instructions 6.18.1951 ("Fear includes fear of economic loss

21   or injury, as well as fear of physical violence"); Eleventh Circuit Pattern Jury

22   Instructions (Criminal Cases) 66.1 ("The term 'fear' means a state of anxious

23   concern, alarm, or apprehension of harm, and it includes fear of economic loss as

24   well as fear of physical violence").  (Copies of these instructions are attached

25

26

27       [7] As previously stated, *United States v. Castillo,* 965 F.2d 238 (7th Cir. 1992), the only case cited by the government for the proposition that a Hobbs Act charge may be based on the infliction of fear other than fear for the victim's

28   physical safety or economic fear, does not so hold.

1   collectively as Exhibit C hereto.)[8]

2        In addition, as stated in the original Motion, the Department of Justice itself

3   has long understood and acknowledged that Hobbs Act extortion is limited to fear

4   of physical injury and fear of economic harm.  The Department of Justice's own

5   Criminal Resource Manual poses a series of questions that a prosecutor must

6   answer before bringing a Hobbs Act case.  The question relating to the fear element

7   reads: "Did the defendant use or attempt to use the victim's reasonable fear of

8   *physical injury or economic harm* in order to induce the victim's consent to give up

9   property?"  (Exhibit B hereto.) (Emphasis added.)  The prosecutor is not invited to

10  consider the existence of any other kind of fear.

11       The government notes that the Manual confers no rights on a criminal

12  defendant.  (Government's Argument at 25 n.1.)  This is true but irrelevant.  The

13  Manual shows that it has been the traditional and long-standing understanding of

14  the Justice Department that Hobbs Act extortion may be based only on fear of

15  physical injury or fear of economic harm.  That is what the cases repeatedly say.

16  That is what accepted pattern jury instructions from the federal courts provide.  In

17  the face of this common and shared understanding by prosecutors and courts of the

18  scope of Hobbs Act extortion, if the statute is to be expanded to include fear other

19  than of physical harm or economic harm, then, as in *Scheidler v. National*

20  *Organization for Women, Inc., supra,*  537 U.S. at 409, "such a significant

21  expansion of the law's coverage must come from Congress, and not from the

22  courts."[9]

23      [8] The Ninth Circuit Model Criminal Jury Instructions do not include an
instruction for Hobbs Act extortion by fear.

24      [9] The conclusory suggestion in the government's brief that the fear alleged
25  here somehow has "both economic and physical dimensions" (Government's
Argument at 24:28-25:2) does not transform Count Two into a charge based on
26  economic or physical fear.  The government did not allege economic or physical
fear but only a fear that, if money was not paid, Mr. Villalobos' client "would help
27  to incriminate" Rabbi Yemini in a federal criminal investigation. (Indictment,
Count Two.)  As shown in the text, fear of incrimination has never been used as the
28  basis of a Hobbs Act extortion charge.

3.     **The Cases Excluding From the Scope of the Hobbs Act Threats to Bring Baseless or Fraudulent Civil Litigation Are Instructive**

In his Motion, Mr. Villalobos cited and discussed cases such as *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), which stand for the proposition that a threat to file a lawsuit—even a frivolous lawsuit supported by false testimony—is not the kind of threat cognizable under the Hobbs Act, even though such a threat causes economic fear.

The government says that Mr. Villalobos is engaging in an "overly broad reading" of these cases. (Government's Argument at 24:5.) According to the government, *Pendergraft* and the other cases reaching the same result "simply carve out a narrow exception to the plain language of the Hobbs Act, based on recognition of the vital role played by the civil litigation process, the importance of maintaining broad access to it, and the numerous ways in which the civil litigation system already protects itself against meritless claims." (*Id.* at 24:6-11.) The government claims that "[n]one of [the] particular considerations" that supports *Pendergraft* warrant applying its reasoning to our case. (*Id.* at 24:12-14.)

In fact, the same considerations apply. As the government observes, *Pendergraft* and the other cases aligned with it stress the importance of fostering access to the courts even if the lawsuit in question is fraudulent or supported by false testimony. *E.g., Pendergraft*, 297 F.3d at 1207-1208. These cases also express reluctance to subject a litigant to additional penalties under the Hobbs Act above and beyond what he or she may face for perjury, obstruction or other violations that directly address misconduct in litigation. *Id. Accord, Deck v. Engineered Laminates*, 349 F.3d 1253, 1257-1258 (10th Cir. 2003).

These considerations obviously apply here. It is at least as important to foster access to the courts in criminal cases as it is in civil cases. Moreover, if false testimony is given to investigators or to courts in criminal cases, there are abundant sanctions by way of perjury and obstruction of justice that can be applied to such

1    conduct.  It is therefore hardly necessary to make a threat to incriminate someone

2    into a Hobbs Act violation.  If the incrimination turns out to be false, such conduct

3    will be harshly dealt with under a panoply of other provisions clearly targeted at

4    such misconduct.

5           The government also tries to distinguish this case from cases such as

6    *Pendergraft* by characterizing Mr. Villalobos' conduct as "trying to condition the

7    substance and veracity of his client's testimony on the receipt of payment and

8    threatening what the client's testimony might be if payment was not made."

9    (Government's Argument at 24:16-18.)  Such conduct, the government says,

10   "unlike filing a lawsuit that may or may not possess merit, is inherently wrongful."

11   (*Id.* at 24:19-20.)

12          Again, the issue is not the moral culpability of the alleged conduct but rather

13   whether the infliction of fear at issue here—a fear of incrimination—is covered by

14   the Hobbs Act.  That aside, even if we can agree that selling testimony is wrong

15   (while denying that Mr. Villalobos did any such thing), there are other statutes that

16   cover such conduct, including arguably the obstruction charge in Count One.

17   Further, the filing of baseless litigation supported by perjurious affidavits—which

18   is what the defendants allegedly threatened to do in such cases as *Pendergraft* and

19   *Deck*—is also wrong—indeed, in the words of *Deck,* "reprehensible."  349 F.3d at

20   1257.  Nevertheless, as numerous cases have held, threats to undertake such

21   "reprehensible" conduct are not within the Hobbs Act.  So the supposed "inherent

22   wrongfulness" of the conduct threatened is just not part of the analysis.

23          *Pendergraft* and the other cases reaching the same result show that, even in

24   situations that clearly involve economic fear, the courts carve out exceptions for

25   certain threats that should not be covered by the Act.  It is all the clearer that, when

26   the government files a Hobbs Act charge on a theory not involving economic fear

27   or fear of physical harm, the courts should not expand the reach of the Act beyond

28   long-established and historically understood limits.  This conclusion is even plainer

LAI-3082767v2

1  here, where the same policies that led to the result in *Pendergraft* are in play and

2  require the same kind of limited reading of the Act.

3  ### 4.    The Rule of Lenity Applies

4      Mr. Villalobos believes that, given the above, it is clear that Hobbs Act

5  extortion does not include a threat by the defendant to incriminate the victim if

6  money is not paid.  But, if the Court entertains a doubt about the matter, that doubt

7  should be resolved in Mr. Villalobos' favor by the rule of lenity.

8      The government argues that Mr. Villalobos's reliance on the rule of lenity

9  "fails because he has not identified any ambiguity in the text, grammar, or meaning

10 of any of the relevant portions of the Hobbs Act, and there is none."

11 (Government's Argument at 26:25-28.)  This is not accurate.  The statute defines

12 extortion as, *inter alia,* the "wrongful use of . . . fear . . . ."  This is an inherently

13 ambiguous phrase.  However, as shown above, case law, jury instructions, history

14 and practice show that, for the fear to be wrongful under the Act, it has to involve a

15 threat of physical harm or economic harm.

16     *United States v. Enmons, supra,* provides a good example of how the courts

17 apply the rule of lenity in the Hobbs Act context.  That case involved the provision

18 in the Act defining extortion as the "wrongful use of actual or threatened force . . .

19 ."  From the language itself, one might conclude that it proscribes the use of

20 violence during a strike.  Indeed, that is just what the government contended in that

21 case.  410 U.S. at 410.  However, the Supreme Court found the language

22 ambiguous and applied the rule of lenity to exclude from the definition of extortion

23 under the Hobbs Act uses of force during strikes aimed at achieving higher wages.

24 *Id.* at 411.  In so doing, the Court stated: "In the nearly three decades that have

25 passed since the enactment of the Hobbs Act, no reported case has upheld the

26 theory that the Act proscribes the use of force to achieve legitimate collective-

27 bargaining demands." *Id.* at 408.

28     Another example of how the rule of lenity is applied in a Hobbs Act setting is

1 *I/S Joseph, Inc. v. J. Lauritzen A/S,* 751 F.2d 265, 267 (8th Cir. 1984).  This was a

2 civil case based alleged under the Racketeer Influenced and Corrupt Organizations

3 Act ("RICO"), 18 U.S.C. section 1961, *et seq.*  The complaint alleged that the

4 defendant had committed Hobbs Act violations as the RICO predicates.  Seeming

5 to presage the Eleventh Circuit's subsequent holding in *United States v.*

6 *Pendergraft, supra,* the Eight Circuit held that a threat to file a civil lawsuit,

7 however groundless, did not constitute the infliction of fear within the meaning of

8 the Hobbs Act.  In reaching this result, the court said that one factor that it had in

9 mind was that "criminal statutes are to be strictly construed, and only the most

10 liberal construction of the word 'fear' in the Hobbs Act could make it apply to the

11 conduct alleged in the complaint." 751 F.2d at 267.

12      Here, the issue before the Court is the meaning and scope of the phrase

13 "wrongful use of . . . fear."  In the over 60 years since the passage of the Hobbs

14 Act, no reported case has upheld the theory that the Act proscribes the use of fear

15 beyond fear of physical harm or economic loss.  At minimum, the Act is ambiguous

16 as to whether instilling fear in the victim that he will be incriminated in a criminal

17 case is within the scope of the statute.  As the Ninth Circuit recently reaffirmed,

18 "the rule of lenity applies to ambiguous applications of the Hobbs Act . . . ."

19 *United States v. McFall,* 558 F.3d at 957.  This is such an ambiguous application,

20 and the rule of lenity requires a narrow reading of the Act.

     **5.**     **The Doctrine of Constitutional Avoidance Also Applies**

22      As Mr. Villalobos argued in the Motion, the Court must interpret the Hobbs

23 Act to avoid creating grave constitutional questions.  If the statute can be read to

24 avoid such problems, such a reading should be adopted. *Zadvydas v. Davis,* 533

25 U.S. 678, 689 (2001).

26      The government dismisses this concern as applied to this case, saying that no

27 "serious" constitutional problem is "raised by interpreting and applying the Hobbs

28 Act according to its plain language."  (Government's Argument at 28:5-8.)  The

LAI-3082767v2

- 41 -

government goes on to say that there is no vagueness problem here because anyone would know that approaching the target of a grand jury investigation and offering to provide false exculpatory testimony if money was paid or damaging testimony— true or false—if it wasn't "constitutes the wrongful use of the target's fear." (Government's Argument at 28:23-29:3.)

The government again ignores the history of Hobbs Act prosecutions, which have been limited since the day the Act was passed to threatened infliction of fear of physical harm and threatened infliction of economic harm.  The Supreme Court has held time and again that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope . . . ." *United States v. Lanier,* 520 U.S. 259, 266 (1997), citing, *inter alia, Marks v. United States,* 430 U.S. 188, 191-192 (1977) and *Rabe v. Washington,* 405 U.S. 313 (1972).  To rule that the Hobbs Act encompasses a threat by the defendant to incriminate the victim would be just such a "novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier, supra.*  This Court should therefore adopt a construction of the Act that avoids creating this serious constitutional problem.

**C.     Conclusion**

For the reasons stated above, the Motion to Dismiss should be granted.

Dated:        January 2  2009

JONES DAY

By: _____
        Frederick D. Friedman

Attorneys for Defendant
ALFRED NASH VILLALOBOS

LAI-3082767v2

- 42 -

DECLARATION OF FREDERICK D. FRIEDMAN

I, Frederick D. Friedman, hereby declare:

1. I am an attorney admitted to practice in the State of California and before this Court. I am a member of the firm of Jones Day, counsel for defendant Alfred Nash Villalobos. I make this Declaration in support of the Motion of Mr. Villalobos to dismiss Count Two of the Indictment herein. Except as otherwise indicated, I make this Declaration on personal knowledge and, if called as a witness, could and would competently testify to the facts stated herein.

2. Attached as Exhibit A hereto is a true and correct copy of the Information filed by the government in the case entitled *United States v. Yemini*, Central District of California Case No. CR 09-01191, filed November 10, 2009.

3. Attached as Exhibit B hereto is a true and correct copy of Section 2403 of the Department of Justice's Criminal Resource Manual.

4. Attached hereto as Exhibit C are copies of certain model jury instructions, as follows: Third Circuit Criminal Jury Instructions 6.18.1951-4; Fifth Circuit Criminal Jury Instructions 2.73; Eighth Circuit Model Criminal Jury Instructions 6.18.1951; and Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 66.1.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 25th day of January 2010, at Los Angeles, California.

_____
Frederick D. Friedman

LAI-3082767v2

- 43 -