1   ANDRÉ BIROTTE JR.
    United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    JOSEPH N. AKROTIRIANAKIS (Cal. Bar No. 197971)
4   Assistant United States Attorney
    Public Corruption & Civil Rights Section
5     1300 United States Courthouse
      312 North Spring Street
6     Los Angeles, California 90012
      Telephone: (213) 894-2467
7     Facsimile: (213) 894-6436
      Email:    joseph.akrotirianakis@usdoj.gov
8
    Attorneys for Plaintiff
9   UNITED STATES OF AMERICA

10  RICHARD M. STEINGARD
    STEPHEN A. SADOWSKY
11  LIGHTFOOT STEINGARD & SADOWSKY
    800 Wilshire Blvd, Suite 1050
12  Los Angeles, California 90017
      Telephone: (213) 260-9449
13    Facsimile: (213) 260-9450
      Email: rsteingard@lsslaw.com
14
    Attorneys for Defendant
15  ALFRED NASH VILLALOBOS

16                  UNITED STATES DISTRICT COURT

17              FOR THE CENTRAL DISTRICT OF CALIFORNIA

18  UNITED STATES OF AMERICA,        ) NO. CR 09-00824-GHK
                                     )
19                  Plaintiff,       ) JOINT SUBMISSION RE: (1)
                                     ) GOVERNMENT'S MOTION *IN LIMINE*
20          v.                       ) TO PRECLUDE QUESTIONING OF
                                     ) GOVERNMENT WITNESS CONCERNING
21  ALFRED NASH VILLALOBOS,          ) PRIVILEGED COMMUNICATIONS AND
                                     ) WORK PRODUCT; (2) DEFENDANT'S
22                  Defendant.       ) MOTION *IN LIMINE* RE EXCLUSION
                                     ) OF TEXT MESSAGES; (3)
23                                   ) DEFENDANT'S MOTION *IN LIMINE* TO
                                     ) EXCLUDE RECORDED CONVERSATIONS
24                                   )
                                     ) Hearing Date: March 28, 2011
25                                   ) Hearing Time: 3:30 p.m.
26  _____

27       Plaintiff United States of America, by and through its

28  counsel of record, the United States Attorney for the Central

1  District of California and Assistant United States Attorney

2  Joseph N. Akrotirianakis, defendant Alfred Nash Villalobos,

3  through his counsel of record, Richard Steingard, and Interested

4  Non-Parties Chabad Israeli Center and Rabbi Amitai Yemini,

5  through their attorney, Gary S. Lincenberg, hereby file this

6  Joint Submission regarding (1) the government's Motion in Limine

7  to Preclude Questioning of Government Witnesses Concerning

8  Privileged Communications and Work Product; (2) the defendant's

9  Motion in Limine to exclude text messages; and (3) the

10 defendant's Motion in Limine to exclude selected portions of

11 recorded conversations.

12      These motions are based on the attached memorandum of points

13 and authorities, the files and records in this case, and any

14 information or argument presented at any hearing on these

15 motions.

16

17 DATED: February 28, 2011  Respectfully submitted,

18                          ANDRÉ BIROTTE JR.
                            United States Attorney
19
                            ROBERT E. DUGDALE
20                          Assistant United States Attorney
                            Chief, Criminal Division
21

22                          _____

23                          JOSEPH N. AKROTIRIANAKIS
                            Assistant United States Attorney
24                          Public Corruption & Civil Rights Section

25                          Attorneys for Plaintiff
                            UNITED STATES OF AMERICA

26

27

28

                                    2

1   DATED: February 28, 2011 LIGHTFOOT, STEINGARD & SADOWSKY

2

3

4                                   _____
                                    RICHARD STEINGARD

5                                   Attorneys for Defendant
                                    ALFRED NASH VILLALOBOS
6

7   DATED: February 28, 2011 BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                             DROOKS & LINCENBERG, P.C.
8

9

10                                  _____
                                    GARY S. LINCENBERG

11                                  Attorneys for Interested Non-Parties
                                    RABBI AMITAI YEMINI and
12                                  CHABAD ISRAELI CENTER

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

This joint filing addresses three pre-trial motions.  The first concerns whether the attorney-client privilege bars the defense from asking two witnesses certain questions at trial.  The second concerns whether some text messages sent or received by the defendant, or portions thereof, should be excluded.  The third concerns whether certain portions of recorded conversations of the defendant should be excluded.

On January 28, 2011, counsel met and conferred pursuant to the Court's January 24, 2011 order.  As to the attorney-client privilege motion, counsel were joined by the attorney representing the Interested Non-Parties, Chabad Israel Center and Rabbi Amitai Yemini.  Both before this meeting and after, all counsel have engaged in an on-going dialogue to resolve as many areas as possible.  As a result of these discussions, the parties have narrowed the scope of the issues.  However, disputes among the three motions remain.

This brief provides points and authorities for the first two motions, referenced above, regarding the attorney-client privilege and the text messages, respectively.  As to the third motion concerning the exclusion of recorded conversations, the parties agree to submit that matter to the Court on the previously filed brief (Docket #84).

### II.

### THE CHARGES

The indictment in this case charges defendant Alfred N.

1  Villalobos ("defendant") with violating (1) 18 U.S.C. § 1503(a),

2  endeavoring to obstruct the due administration of justice; and

3  (2) 18 U.S.C. § 1951(a), which proscribes interference and

4  attempted interference with commerce by extortion.   These charges

5  are based upon an allegation that defendant solicited cash and

6  other benefits from Rabbi Yemeni, the target of a federal grand

7  jury investigation, in return for certain testimony, by

8  defendant's client, that would falsely exculpate Rabbi Yemeni.

9                                  III.

10           GOVERNMENT'S MOTION RE ATTORNEY CLIENT PRIVILEGE

11      A.   Introduction

12      The government may call Rabbi Amitai Yemeni and likely will

13  call Rabbi Yemeni's attorney, Benjamin Gluck, as a witness at the

14  trial of this matter.   Defendant has indicated that he may ask

15  both Rabbi Yemeni and Mr. Gluck questions that, if permitted by

16  the Court, would not only include information provided by Rabbi

17  Yemini to Mr. Gluck that was intended for disclosure to a third

18  party, but also Mr. Gluck's legal analysis of issues related to

19  Rabbi Yemeni or Chabad Israeli Center ("CIC"), the religious

20  organization operated by Rabbi Yemeni, legal advice to Rabbi

21  Yemeni, client consultation, impressions, and attorney-client

22  communication of information that was never conveyed to the

23  government or third parties, Mr. Gluck's state of mind with

24  respect to matters that remain protected by the privilege or the

25  work product doctrine, and other matters learned by Mr. Gluck

26  during his internal investigation.   In other words, the

27  government seeks a ruling that, by authorizing Mr. Gluck to

28  cooperate in the government's investigation of defendant,   Rabbi

                                  3

1  Yemeni has not made a "subject matter" waiver of his attorney-
2  client privilege with Mr. Gluck, as defendant contends.

3        On behalf of its clients, Rabbi Yemeni and CIC, the Bird
4  Marella firm intends to assert the attorney-client privilege in
5  response to such questions.  For the reason set forth below, the
6  government moves to preclude such questioning.  The parties, and
7  interested non-parties Rabbi Yemeni and CIC, all agree that this
8  issue concerning the scope of permissible examination of these
9  two potential witnesses should be resolved prior to trial and, in
10  any event, outside the presence of the jury.  The parties also
11  have agreed upon a broad range of permissible areas of
12  examination, as set forth below.[1]

13        B.  Government's Statement of Facts

14        In the latter part of 2008, the United States Department of
15  Homeland Security, Immigration and Customs Enforcement ("ICE")
16  began investigating a suspected religious worker visa fraud
17  scheme that related, _inter alia_, to certain foreign workers who
18  obtained visas based on their association with CIC, a
19  religious-based organization operated by Rabbi Yemeni.  Although
20  not the main target of the ICE investigation, Rabbi Yemeni was
21  ultimately identified as a target.  Central issues in the grand
22  jury investigation of Rabbi Yemeni were whether, and to what if
23  any extent, foreign workers actually worked at CIC.  Rabbi Yemini
24  retained Mr. Gluck and the Bird Marella law firm to represent him

25  _____

26        [1]  It is the government's position that defendant has not
   specified any specific question(s) he would like to ask or even
27  identified particular areas of questioning, and argues only that
   he should be permitted to ask any question without regard to the
28  potentially privileged nature of it.

1  in the grand jury investigation.[2]

2      In early February 2009, defendant contacted Rabbi Yemeni by

3  letter.  Defendant's letter related to defendant's representation

4  of Orit Anjel, one of the foreign workers at issue in the

5  investigation of Rabbi Yemeni.  The letter included a veiled

6  threat to expose the visa fraud scheme.[3]

7      Mr. Gluck responded to defendant's letter, including a

8  reference to the California Penal section proscribing extortion.

9  Thereafter, Mr. Gluck had several verbal and email communications

10 with defendant.  During the course of those communications,

11 defendant also informed Mr. Gluck that Orit Anjel was scheduled

12 to be interviewed by the government,[4] and that unless Rabbi Yemini

13 met defendant's blackmail demands, Orit Anjel would not only tell

14 the government that she tell the government not only that she

15 repaid the money given to her by CIC, but that she was "forced"

16 to do so by Rabbi Yemeni, which would have been even more

17

18

---

19      [2] Rabbi Yemeni ultimately negotiated a pre-indictment

20 disposition of the charges against him and agreed to cooperate in
   this investigation.

21

22      [3] According to Avi Anjel, Rabbi Yemeni informed him about
   the grand jury investigation in the later part of 2008.  Text

23 messaging between defendant and Avi Anjel made clear that
   defendant's February 5, 2009 letter was a collaborative effort by

24 defendant and Avi Anjel.

25      [4] During the summer of 2009, the AUSA directing the grand
   jury investigation of Rabbi Yemeni made efforts to interview Ms.

26 Anjel, but was unsuccessful in scheduling the interview with Ms.
   Anjel's then-attorney, Ted Behlendorf.  In mid-July 2009,

27 defendant contacted the AUSA and informed her that defendant was
   now representing Ms. Anjel.  Defendant and the government

28 attorney agreed on a date for Ms. Anjel to be interviewed.

problematic for Mr. Gluck's client than the truth would be.[5]

Eventually, defendant informed Mr. Gluck that Ms. Anjel was going to be interviewed imminently.  In light of this, Rabbi Yemini authorized Mr. Gluck to communicate to the government that the story it was about to hear from Ms. Anjel was not completely true, and that defendant was attempting to blackmail Rabbi Yemini.  The government asked Mr. Gluck if he would be willing to cooperate with an investigation of this suspected blackmail.  Mr. Gluck agreed, and all further communications between Mr. Gluck and defendant were undertaken at the direction of the FBI, and were either audio recorded or in writing.

With Rabbi Yemini's authorization, Mr. Gluck informed the government of the underlying facts concerning Ms. Anjel's relationship with CIC.  Rabbi Yemini then met with the ICE agents (and prosecutor) investigating the underlying visa issue and directly informed him of these same facts.  Rabbi Yemini also met with the FBI agents (and prosecutor) investigating defendant and again directly disclosed the same facts.[6]

---

[5] Defendant suggested that the blackmail payment could be disguised as the settlement of a claim for unpaid wages.  During the investigation of this matter, defendant alternatively suggested that the payment could be disguised as a sexual harassment claim, a hostile work environment claim, or a breach of contract claim.

[6] The government's documentary evidence, in the form of bank statements, employment records, and the statements of Mr. Gluck, Rabbi Yemeni, several CIC workers, collectively establish that, prior to 2004, CIC "employed" a handful of fake religious workers who did no work and returned all monies paid to them. After an inquiry by the Israeli consulate, Rabbi Yemeni "fired" all of the fake religious workers.  Orit Anjel and another worker, M.D., asked others to intercede with Rabbi Yemeni, and Rabbi Yemeni agreed to let them work in limited (part-time)

1        C.   <u>The Government's Proposed Direct Examination</u>

2        At the trial of this matter, the government intends to call

3    Mr. Gluck to (1) describe his oral and written communications

4    with defendant, beginning in February 2009; (2) provide some

5    context for those communications; (3) describe the events that

6    led the FBI to commence its investigation in this case; and (4)

7    introduce the recorded conversations and meetings that he

8    subsequently had with defendant.

9        The government may also call Rabbi Yemeni as a witness at

10   trial.  To the extent the government does not call Rabbi Yemeni

11   as a witness, defendant has indicated that he may seek to do so.

12       D.   <u>Agreed-Upon Scope of Defendant's Examination</u>

13       The parties and interested non-parties agree that

14   information provided to an attorney with the intention that it be

15   disclosed to a third party is not protected by the attorney-

16   client privilege.  <u>See, e.g.</u>, <u>United States v. Sudikoff</u>, 36 F.

17   Supp. 2d 1196, 1204-05 (C.D. Cal. 1999) (Pregerson, J.,) (citing

18   cases); Epstein, <u>The Attorney-Client Privilege and the Work</u>

19   <u>Product Doctrine</u>, 246 (5th ed. 2007) (citing cases).

20       The parties and interested non-parties agree that the

21   permissible scope of defendant's cross-examination of Mr. Gluck

22   would include: (1) any information that Mr. Gluck provided to

23   third parties at the request of Rabbi Yemini, including the

24   prosecutors, agents, or any other party; (2) any facts that Mr.

25

26   capacities with the agreement that they would return all monies
     paid for hours not actually worked.  After October 2008, when the
27   grand jury investigation of Rabbi Yemeni became overt, Orit Anjel
     was paid only for work she actually performed, and she was
28   required to "punch" time cards to record her hours worked.

1  Gluck transmitted to Rabbi Yemini; and (3) Mr. Gluck's state of
2  mind with respect to his contact and cooperation with the
3  government.

4      The parties and interested non-parties agree that the
5  permissible scope of defendant's examination of Rabbi Yemini
6  would include his state of mind and any facts that Mr. Gluck may
7  have relayed to him.[7]

8      The parties and interested non-parties agree that Mr. Gluck
9  had discussions with defendant on Rabbi Yemini's behalf, and that
10  Mr. Gluck conveyed to Rabbi Yemini factual reports of these
11  discussions.  Mr. Gluck agrees to testify about these reports.
12  Similarly, Mr. Gluck had discussions with the government on Rabbi
13  Yemini's behalf and conveyed to Rabbi Yemini factual reports of
14  these discussions.  Mr. Gluck agrees to testify about these
15  reports.  Mr. Gluck would also testify voluntarily about his
16  state of mind with respect to the communications disclosed to
17  third parties at the request of Rabbi Yemini.

18      E.   Discussion

19      The parties agree that the analytical path described below
20  should be applied to this motion in limine.  The parties
21  disagree, however, about the relevance or irrelevance of the
22  evidence defendant seeks to offer through his examination of Mr.
23  Gluck and Rabbi Yemeni.  If the Court determines that attorney-

24

25      [7]   The government believes that the permissible scope of
26  defendant's examination Rabbi Yemeni would differ, dependent upon
   whether Rabbi Yemeni is called by the government or the
27  defendant, i.e., whether the examination is direct examination or
   cross-examination.  This does not, of course, affect whether
28  privilege precludes the asking of a particular question.

8

1  client privileged communications between Rabbi Yemeni and Mr.
2  Gluck are relevant, the parties also disagree about whether Rabbi
3  Yemeni has made a "subject matter" waiver of his attorney-client
4  privilege with Mr. Gluck and the Bird Marella law firm.  Finally,
5  assuming there has been no "subject matter" waiver, the parties
6  disagree about whether defendant's Confrontation Clause rights
7  require the Court to pierce Rabbi Yemeni's attorney-client
8  privilege in order to preserve defendant's Sixth Amendment right
9  to cross-examine witnesses against him.

10       1.   <u>Relevance</u>

11            a.   <u>Introduction</u>

12       The parties agree that, as the proponent of the evidence
13  sought to be admitted, defendant bears the burden of establishing
14  the relevance of Rabbi Yemeni's attorney-client privileged
15  communications with Mr. Gluck.

16       The defendant contends that evidence of Rabbi Yemeni's
17  attorney-client communications with Mr. Gluck are relevant to two
18  elements of count two[8]:  (1) Rabbi Yemeni's "actual fear"; and (2)
19  defendant's "claim of right" to the property he intended to
20  obtain from Mr. Gluck and Rabbi Yemeni.  Defendant also contends
21  that evidence of Rabbi Yemeni's attorney-client communications
22  with Mr. Gluck are relevant to Mr. Gluck's or Rabbi Yemeni's
23  biases or motives in connection with their cooperation with the
24  government.

25       The government's position is that evidence of Rabbi Yemeni's
26  attorney-client privileged communications with Mr. Gluck do not

27  _____

28       [8]  Count two charges a violation of 18 U.S.C. § 1951(a).

1  meet the legal definition of relevance because the government is
2  not required to prove actual fear or disprove entitlement to the
3  money demanded as elements of the offense.  Fed. R. Evid. 401
4  (defining relevance in terms of facts that are "of consequence to
5  the determination of the action").  Because it is irrelevant,
6  this evidence is inadmissible.  Fed. R. Evid. 402 ("Evidence
7  which is not relevant is not admissible.").  As to the issues of
8  bias and motive, the government believes that defendant has not
9  demonstrated that questioning about Mr. Gluck's legal analysis
10 and strategy, thoughts and impressions, attorney-client
11 privileged communications with Rabbi Yemeni would establish these
12 points or would not distract the jury, confuse the issues before
13 them, and waste time.  Fed. R. Evid. 403.

14     2.   Rabbi Yemeni's "Actual Fear"

15          a.   Defendant's Position

16     "The term 'extortion' means the obtaining of property from
17 another, with his consent, induced by wrongful use of actual or
18 threatened . . . fear, or under color of official right." 18
19 U.S.C. § 1951(a) (emphasis added).  See, e.g., Ninth Circuit
20 Model Jury Instruction 8.143 ("in order for a defendant to be
21 found guilty of attempted extortion in violation of § 1951, the
22 government must prove each of the following elements beyond a
23 reasonable doubt: (1) the defendant induced the victim to part
24 with property by the wrongful use of fear. . .").  In order to
25 prove defendant guilty of Hobbs Act extortion, the government
26 must prove that Defendant' actions reasonably generated actual
27 fear in Rabbi Yemini.  Carbo v. United States, 314 F.2d 718, 740
28 (9th Cir. 1963) ("In cases of extortion based upon fear of

violence the facts of fear, actual or anticipated, and of its
reasonableness, are vital factors.  To prove a substantive act of
extortion it is essential to show the generation of fear in the
victim") (footnote omitted); <u>United States v. Billingsley</u>, 474
F.2d 63, 66 (6th Cir. 1973) ("[E]xtortion is an essential element
of the Hobbs Act and to prove extortion, it is essential to show
that there was a generation of fear in the victim.  The
reasonableness of actual or anticipated fear is a vital element
in these cases. . .").  The defense may challenge the
government's claimed fearfulness.  <u>See, e.g.</u>, <u>United States v.</u>
<u>Furey</u>, 491 F. Supp. 1048, 1064 (D.C. Pa. 1980) ("The proper
defense inquiry is . . . that the fear . . . on the part of the
victim was unreasonable under the circumstances").

     To prove Rabbi Yemeni's actual fear, defendant anticipates
that the government will call Rabbi Yemini as a witness, and that
Rabbi Yemeni would testify that defendant's comments about Ms.
Anjel's possible cooperation with the government made him
fearful.  Yet, as detailed below, Rabbi Yemini had no direct
dealings with defendant, other than his receipt of a single,
"plain vanilla" letter discussed below.  All other information
regarding defendant's claims and demands was provided by Mr.
Gluck to Rabbi Yemini.  In other words, the purported basis for
Rabbi Yemini's claimed fear is what Mr. Gluck said to Rabbi
Yemini.  To the extent that the government calls Rabbi Yemeni as
a witness, therefore, Mr. Gluck's statements to Rabbi Yemeni are
relevant.

     In February, 2009, Rabbi Yemini received a brief letter from
Defendant, who said he was writing on behalf of *Mr.* Anjel.  The

11

1  letter did little more than make Rabbi Yemini aware that

2  Defendant had been retained by *Mr*. Anjel about "the various

3  issues that have arisen from the employment of his wife with your

4  Chabad Israel Center," and suggested that Rabbi Yemini consult

5  his policies and procedures and/or contact his attorney.   The

6  letter did not make a monetary demand, refer to the criminal

7  investigation or make a veiled threat, and could not reasonably

8  have instilled the requisite fear.   Rabbi Yemini provided the

9  letter to Mr. Gluck, and thereafter had no contact, written or

10 oral, with defendant.   Further, based on conversations with his

11 attorney, Rabbi Yemini was aware from Mr. Gluck that he was the

12 target of a federal criminal investigation of serious felonious

13 misconduct that could result in significant penalties, including

14 lengthy incarceration, public humiliation, and the possible

15 termination of the Chabad Israel Center's non-profit status.

16 Thus, to the extent Rabbi Yemini claims to have been fearful of

17 defendant's statements, or Ms. Anjel's possible cooperation in

18 the government's investigation, defendant contends that Rabbi

19 Yemeni's fear was solely based on his communications with Mr.

20 Gluck.[9]  Thus, to explore Rabbi Yemini's claimed fear, the defense

21 should be permitted to inquire into his conversations with his

22 attorney.

23      The defendant disagrees with the government's argument,

24 below, that Rabbi Yemini's actual fear is irrelevant because

25 _____

26      [9]   As an example, on July 2, 2009, Mr. Gluck forwarded an
   email to Rabbi Yemini relating certain statements Defendant made
27 to Mr. Gluck during their conversation earlier that day.   Mr.
   Gluck later produced this email to the government, and the
28 government provided it to the defense.

1  count two of the indictment actually charges <u>attempted</u> extortion.

2  The government has always characterized this charge as involving

3  "extortion" and not "attempted extortion." <u>See, e.g.</u>, Govt case

4  summary (Dkt. 13); Govt ex parte motion re identity of

5  confidential informants (Dkt. 35, page 2 lines 7-8); Govt motion

6  to preclude inquiry into privileged communications (Dkt. 79, page

7  2, lines 7-8); Joint submission re bill of particulars (Dkt. 44,

8  page 1, lines 5-6).[10]  Similarly, defendant consistently referred

9  to count two as charging extortion without a response or

10 challenge by the government.  <u>Id.</u>  And, the Court has stated in

11 its rulings that count two charges "extortion by blackmail, 18

12 U.S.C. § 1951(a)."  (Dkts. 47, 63 and 71).  Indeed, this appears

13 to be the first time that the government has ever claimed that

14 count two actually charges attempted extortion.

15      In addition, even in attempted extortion cases, the victim's

16 fear, or lack thereof, is relevant, admissible evidence.  <u>See,</u>

17 <u>e.g.</u>, <u>United States v. Goodoak</u>, 836 F2d 708, 712 (1st Cir 1988)

18 ("In deciding whether the defendant's words and acts amounted to

19 an attempt to induce fear, the jury is surely entitled to know

20 whether those words and acts did in fact induce fear.  Evidence

21 that the defendant's conduct frightened the victim makes it more

22 likely that the defendant was in fact attempting to frighten the

23 victim.  Conversely, evidence that the victim was not frightened

24 makes it less likely that the defendant made such an attempt");

25

26 ─────────────

27      [10]    In the government's portion of the Bill of Particulars
   motion, it states, "In sum, the indictment is quite detailed and
   certainly it places defendant on notice of the charges he faces."
28 (Page 12, lines 1-2)

1    United States v. Stivers, Slip Copy, 2010 WL 2365307 (E.D.Ky.

2    June 11, 2010) ("While the victim's state of mind is not an

3    essential element of the offense in attempted-extortion cases,

4    evidence regarding the victim's reaction to the alleged extortion

5    attempt is relevant to show whether the defendant possessed the

6    requisite intent.").

7           b.   Government's Position

8         The government contends that it is irrelevant whether Rabbi

9    Yemeni was actually afraid of defendant and that evidence of

10   statements Mr. Gluck may have made to Rabbi Yemeni that could

11   have made Rabbi Yemeni afraid do not meet the legal definition of

12   relevance, which requires evidence, as a predicate to

13   admissibility, to have some tendency to make more or less

14   probable the existence of a "fact that is of consequence to the

15   determination of the action." Fed. R. Evid. 401.  The extortion

16   herein alleged is an attempted extortion, as to which the

17   government need not prove any actual fear of Rabbi Yemeni or Mr.

18   Gluck.  Rather, the government need only establish: (1) defendant

19   intended to induce Mr. Gluck or Rabbi Yemeni to part with

20   property by the wrongful use of fear; (2) defendant knew he was

21   not entitled to receive the property; (3) a de minimis effect on

22   interstate commerce; and (4) defendant's commission of a

23   substantial step toward committing the crime of extortion.  Cf.

24   9th. Cir. Crim. Jury Instr. 5.3 (general attempt) with 8.142

25   (Hobbs Act extortion).[11]

26   _____

27        [11]  The attempt language in Ninth Circuit Model Criminal
     Jury Instruction 8.142 does not address the circumstances, here
28   present, where the theory of the attempted extortion is that

1    Whether or not the government is required to prove actual

2  fear on the part of Rabbi Yemeni, moreover, the government need

3  not prove that it was any act by defendant that "reasonably

4  generated actual fear in" Rabbi Yemeni, or that defendant's

5  "comments about [Ms. Anjel's] possible cooperation with the

6  government made [Rabbi Yemeni] fearful."[12]  Under the Hobbs Act,

7  otherwise lawful acts, such as testifying or providing

8  _____

9  factual impossibility would prevent a conviction of the completed
   offense of extortion.  Accordingly, the government references the
10 general attempt instruction, Ninth Circuit Model Criminal Jury
   Instruction 5.3, which does address this situation.  This issue
11 relating to Instruction 8.142 is in the process of being
   addressed to the Ninth Circuit Jury Instructions Committee.
12

13    At least as it relates to extortionate threats in certain
   circumstances, the law makes very clear that the government need
14 not prove a victim's actual fear, even where a defendant is not
   charged with an inchoate offense.  O'Malley, Grenig & Lee,
15 Federal Jury Practice and Instructions, § 37:17 (6th ed. 2009)
   (collection of credit by extortionate means, 18 U.S.C. § 894);
16 United States v. Polizzi, 801 F.2d 1543, 1547–1548 (9th Cir.
   1986) (approving § 894 instruction which provided, in part, "The
17 government need not prove that the victim was actually afraid of
   the defendant, since actual fear is not an element of the
18 offense.  Rather, it is the intent to create fear of harm which
   is prohibited." (emphasis added)); see also United States v.
19 Natale, 526 F.2d 1160, 1168 (2d Cir. 1975) ("[A]ctual fear is not
   an element of [18 U.S.C. § 894] . . . . Convictions have been
20 sustained under this statute even where the person threatened has
   denied at trial that he was put in fear by the threat . . . .
21 Actual fear need not be generated, so long as the defendants
   intended to take actions which reasonably would induce fear in an
22 ordinary person.  In other words, it is the conduct of the
   defendant, not the victim's individual state of mind, to which
23 the thrust of the statute is directed.); Seventh Circuit Manual
   of Model Jury Instructions - Criminal - No. 894 (Definition of
24 Threat).
25

26    [12]  Defendant's February 5, 2009 letter to Rabbi Yemeni, in
   the government's view, does contain a veiled threat.  That threat
27 was apparent to Mr. Gluck, who informed defendant, in a February
   23, 2009 letter that he understood the letter to be an
28 extortionate threat.

information to authorities or the withholding of such testimony or information, are unlawful when undertaken to exploit fear. O'Malley, Grenig & Lee, Federal Jury Practice and Instructions, §§ 53.06, 53.08 (6th ed. 2009) [Extortion by Fear of Physical Violence—Defined, Wrongful Use of Economic Fear--Defined].[13]   The fear being exploited need not be created by the extortioner.  See United States v. Lisinski, 728 F.2d 887, 891 (7th Cir. 1984).  A victim's fear can be preexisting; the extortioner need only exploit that fear.  Id. at 890-92; see United States v. Gerald, 624 F.2d 1291, 1299 (5th Cir. 1980) ("In the instant case, the decisive question under 18 U.S.C. § 1951 (the Hobbs Act) is whether Gerald [the defendant] intended to cause Carter [the victim] to pay the $25,000 by exploiting Carter's fear of economic loss . . . .  The fear need not have been actually caused by Gerald; the statute is satisfied if Gerald intended to exploit that fear."); United States v. Sander, 615 F.2d 215, 218 (5th Cir. 1980) ("The case law is . . . clear that the government did not have to show either that the fear was a direct consequence of the threat of economic loss or that [the victim] personally feared Sander."); see also Callahan v. United States,

_____

[13]   See United States v. Alfred Nash Villalobos, CR09-824-GHK (Order Denying Defendant's Motion to Dismiss Count Two at 2-3) (citing United States v. Enmons, 410 U.S. 396, 400 (1973); United States v. Miltov, 460 F.3d 901 (7th Cir. 2006); Hy Cite Corp. v. BadBusinessBureau.com, LLC, 418 F. Supp. 2d 1142 (D. Ariz. 2005)); see also United States v. Clemente, 640 F.2d 1069, 1077 (2d Cir. 1981) (extortion where defendant not otherwise entitled to money paid to remove defamatory comments from his website).

1   223 F.2d 171, 174-76 (8th Cir. 1955).[14]

2       Defendant's "actual fear" argument, therefore, does not make

3   relevant evidence of Rabbi Yemeni's confidential communications

4   with Mr. Gluck, including what Mr. Gluck related to Rabbi Yemeni

5

---

6       [14]   Defendant cites <u>United States v. Goodoak</u>, 836 F.2d 708,
    712 (1st Cir. 1988) and <u>United States v. Stivers</u>, <u>Slip Copy</u>, 2010
7   WL 2365307 (E.D. Ky. June 11, 2010) as support of his argument.
    Neither stands for the proposition for which it is cited.
8

9       <u>Goodoak</u> involved the defendant seeking to exclude evidence
    of the effect on the victim, rather than arguing for its
10  inclusion.   The First Circuit recognized that "[i]t is settled
    that to prove extortion it is necessary to show the generation of
11  fear in the victim," and that "[i]t is equally well-settled that
    to prove attempted extortion it is sufficient merely to show an
12  attempt to generate fear in the victim."   836 F.2d at 712.   In an
    attempted extortion case, "[t]he key question remains that of
13  whether there was an attempt to frighten, not whether fear
    actually was produced," and "state-of-mind evidence will be most
14  relevant to that question where the defendant knew or reasonably
    should have known that his actions would produce such a state of
15  mind in the victim," <u>id.</u>, which is not at issue here, since the
    defendant openly proclaimed to Mr. Gluck that Rabbi Yemeni should
16  be scared.   The court in <u>Goodoak</u> ultimately held that there was
    "no error in permitting [the victim] to testify" about his fear,
17  but cautioned that, in trials of attempted extortion charges:
18

        The focus should remain on the attempt rather than the
19      result, and the court should exercise its discretion
        under Rule 403 of the Federal Rules of Evidence to
20      exclude state-of-mind evidence where it would produce
        unfair prejudice, confusion, or waste of time.
21

22  <u>Id.</u>

23      <u>Stivers</u> does not apply because that decision was based on
    the alleged victim's statements to the defendant that she was not
24  afraid, statements the Court found relevant to the defendant's
    intent.   2010 WL 2365307 at *3.   This is not defendant's
25  proffered purpose of the evidence of the Rabbi's fear.   As an
    aside, <u>Stivers</u> actually supports the government's position,
26  inasmuch as it recognizes that the government may prove an
    attempted extortion with evidence of the defendant's exploitation
27  of existing fear rather than the defendant creating the fear in
    the first instance.
28

17

1  about what defendant said during the conversations recorded by

2  the FBI as part of its investigation of defendant.[15]

3

4        In response to defendant's assertion that defendant is not

5

6        [15]  Defendant's recorded statements with Mr. Gluck clearly
    establish that defendant did intend to induce Mr. Gluck or Rabbi
7   Yemeni to part with property by the exploiting Rabbi Yemeni's
    fear of the government's investigation of him and the potential
8   consequences that flowed from that investigation.  Defendant made
    one such statement on July 27, 2009, when Mr. Gluck, acting at
9   the direction of the government, informed defendant that the
    entire idea of participating in the "purchasing" of a witness'
10  testimony scared Mr. Gluck:

11       I would never be having a discussion about this subject
         with anyone else on behalf of any of my other clients.
12       Alright, so I'm very worried about this here and
         frankly, over the weekend, I spent a lot of time
13       thinking about it and... um, well, I don't know what
         else to say other than this whole thing scares me.
14
    Defendant responded:
15
         Well, it ought to scare the Rabbi, I'm not sure how
16       much it ought to scare you.  . . .
17
    Later, defendant confirmed that he understood that the Rabbi was
18  afraid:
19
         The bottom line is that the Rabbi has . . . has
20       troubles, I can deal with the troubles with my client,
         I cannot help him beyond what we've discussed and
21       that's his problem.  So, you know, coming back to your
         issue, I understand that he, he... he may be in some
22       jeopardy.

23       Defendant's statements to Mr. Gluck also make clear that
    defendant intended to exploit Rabbi Yemeni's fear.  During
24  recorded conversations with Mr. Gluck, when asked specifically by
    Mr. Gluck what would happen if defendant's extortionate demands
25  were not met, defendant replied that Rabbi Yemeni would be
    "throwing the dice when we get in front of [the AUSA] . . .
26  [Rabbi Yemeni] is going to have to run the risk.  Phrased
    differently in the same conversation, defendant told Mr. Gluck
27  that Rabbi Yemeni and the religious organization Rabbi Yemeni
    runs had "Uncle Sam's foot up its ass right now."
28

                                     18

1  charged with an attempted extortion, but with the completed crime
2  of extortion, the government argues that the indictment plainly
3  charges the inchoate crime of attempted extortion, as is
4  ordinarily the case in covert operations, where factual
5  impossibility would prevent a conviction of the completed offense
6  of extortion.[16]  It is, of course, the language of the indictment,
7  and not the parties' (or the Court's) previous "shorthand"
8  references to a charge that governs.  Finally, even to the extent
9  that a witness' actual fear may be relevant, defendant could not
10 properly call Rabbi Yemeni as a witness for the purposes of (1)
11 impeaching him by claiming he was never afraid[17]; or (2) asking
12 Rabbi Yemeni what legal advice he sought and received from his
13 attorney.

14      3.   Defendant's "Claim of Right"

15           a.   Defendant's Position

16      The extortion statute also requires that the government
17 prove that Defendant acted with the intent to obtain property
18 that he knew he was not entitled to receive.  18 U.S.C.
19 § 1951(a).  See, e.g., United States v. Villalobos, CR 09-824-
20 GHK, March 19, 2010 minute order at 4 (noting that "obtaining
21 property by means of threat is wrongful, and constitutes
22 extortion, where the person making the threat does not otherwise

---

[16]  Count two of the indictment plainly charges that
defendant "attempted to obstruct, delay, and affect commerce and
the movement of articles and commodities in commerce, by
extortion . . . ."

[17]  Rabbi Yemeni described his fears and the cause of them
to the FBI.  That report has long since been produced to
defendant.  The government is not aware of any inconsistent
statement by Rabbi Yemeni.

1  <u>have a right to the property</u>") (emphasis added).[18]  To prove this

2  element, defendant anticipates that the government will present

3  (a) the testimony of Rabbi Yemini, as well as (b) Mr. Gluck's

4  recorded statements with defendant which were based, presumably,

5  on information provided by Rabbi Yemini.  A chronological review

6  of Rabbi Yemini's statements regarding Ms. Anjel's employment at

7  Chabad, and Mr. Gluck's recorded statements to defendant based on

8  what Rabbi Yemini probably told him, supports the defense's right

9  to inquire into Mr. Yemini's conversations with Mr. Gluck.

10     •     In *April, 2004*, Rabbi Yemini exchanged several emails

11           with a representative of the U.S. State Department

12           regarding the religious worker visas issued to Chabad

13           employees.  Rabbi Yemini represented that Orit Anjel

14           "work[s] for us on a full time basis."

15     •     In *October, 2008*, Rabbi Yemini was interviewed by ICE

16           agents (outside the presence of counsel) about the

17           issuance of religious worker visas to Chabad employees.

18           Rabbi Yemini stated, in relevant part, that Chabad

19           "needed  between six and eight part-time employees to

20           run a community outreach program," and named Ms. Anjel

21           as one of the employees.  According to the report of

22           the interview, "Yemini told agents that some of the

─────────────

[18]     The government's assertion, below, that the defendant's
claim of right to the property is not a defense to extortion is
clearly wrong.  The government bases its position on a "new"
Ninth Circuit Model Jury Instruction, No. 8.142, which only
applies to extortion <u>by force</u>.  See *United States v. Daane*, 475
F.3d 1114, 1120 (9th Cir. 2007) (distinguishing the applicability
of claim of right defenses in cases of economic extortion and
extortion by force).

individuals were paid, while others were provided
housing in exchange for their work at Chabad." Yemini
stated that most of the individuals were fired, but
"[o]nly Orit Anjel and Malka Dasa remained employed by
Chabad."

- Between *October, 2008 and July 16, 2009*, Mr. Gluck was
advised that Rabbi Yemini was a target of a federal
criminal investigation into visa fraud at Chabad, the
government issued a grand jury subpoena for Chabad's
immigration files and other related documents, and the
government sought Rabbi Yemini's fingerprints and
handwriting exemplars. Presumably, Mr. Gluck, an
experienced criminal practitioner, made his client
aware of these developments. Based on Mr. Gluck's
emails with and statements to federal prosecutors and
Defendant, it is reasonable to assume that Mr. Gluck
had numerous discussions with his client during this
time period and obtained information regarding the
underlying visa fraud investigation and Ms. Anjel's
employment at Chabad.

- On *July 17, 2009*, based on information presumably
provided by Rabbi Yemini, Mr. Gluck told Defendant,
"Orit worked for my guy. . . .She wasn't there 40 hours
a week."

- On *July 21, 2009*, Mr. Gluck made several statements to
Defendant about Ms. Anjel's employment which appears to
be based on information from Rabbi Yemini:

  a.   "What [Rabbi Yemini] was paying [Orit Anjel], was

just a round trip.  It wasn't costing him
anything.  He was paying her . . . she was paying
it back to him. So he wasn't actually out of
pocket."

b.  "That's the reason he actually paid her and if she
returned the money, it was so she can have the
1099 to show that she's got, uh, in order to get
the green … work, you know, the R-1, or whatever
it is."

c.  "At some point [Ms. Anjel's payments] did change,
yes, it did change and then, in fact she was
allowed to keep the whole salary.  She was allowed
to keep the $1800 a month, that's correct.
Because she wasn't working 40 hours, she was
working like 5 hours or something.  That's why it
was 1800 hundred."

• On *August 4, 2009*, Rabbi Yemini was again interviewed
by ICE agents, this time in the presence of counsel.
Rabbi Yemini stated that when religious workers were
paid, he "insisted that the Chabad receive[] the same
amount back in cash as what was written on the
paycheck."  Regarding Orit Anjel, Rabbi Yemini stated
she "worked on a very part time basis and performed few
if any duties for the Chabad Israel Center."  Rabbi
Yemini said Ms. Anjel would keep a portion of the
paycheck if she had actually worked during the pay
period, and that she "worked so little that she kept
only $500 in 2005 and returned the rest to Yemini in

22

cash."

• On *January 10, 2010*, Rabbi Yemini was interviewed by
  FBI agents, again in the presence of counsel.
  According to Rabbi Yemini, from 2003 to 2008, Ms. Anjel
  was paid approximately $2000 per month as if she was a
  full time employee.  Rabbi Yemini stated that in 2003
  Ms. Anjel did not perform any work at Chabad and
  returned all of the funds "paid" to her.  Rabbi Yemini
  stated that from 2004 to 2008, Ms. Anjel worked at
  Chabad about three hours per day, four days per week,
  and was allowed to keep $500 per month (later increased
  to $800), while returning the balance of funds "paid"
  to her.

It is apparent that Rabbi Yemini's and Mr. Gluck's
statements about Ms. Anjel's employment at Chabad have changed
over time, and that Mr. Gluck's different accounts of Ms. Anjel's
employment were a product of the evolving input provided to him
by his client.  Defendant should be permitted to explore and
elicit the inconsistent statements made by Rabbi Yemini to Mr.
Gluck which were the basis for Mr. Gluck's statements.

Further, throughout Defendant's conversations with Mr.
Gluck, he (Villalobos) consistently stated that Ms. Anjel was
owed $120,000, the amount reflected on tax documents that Chabad
paid to her.  Mr. Gluck, in response, presented an evolving
account of the extent of Mr. Anjel's employment at Chabad,
asserting that "[s]he wasn't there 40 hours a week," "[w]hat
[Rabbi Yemini] was paying her was just a round trip.  It wasn't
costing him anything.  He was paying her . . . she was paying it

23

back to him.  So he wasn't actually out of pocket," and
"she was allowed to keep the whole salary.  She was allowed to
keep the $1800 a month."  Neither Defendant nor Mr. Gluck had
first-hand knowledge of Ms. Anjel's employment at Chabad, and
their respective positions were based on their communications
with their respective clients.  Rabbi Yemini's various
prevarications to the government and Mr. Gluck were motivated by
his desire to lessen his and Chabad's criminal and financial
exposure.  His misstatements to Mr. Gluck inferentially support
Defendant's defense that he demanded nothing more than that to
which he believed his client, Ms. Anjel, was entitled.  That
Rabbi Yemini made those false statements to his own attorney only
makes their force as exculpatory evidence even more profound.

        b.   <u>Government's Position</u>

Defendant's "claim of right" argument fails, as his attempts
to bring his conduct within case law recognizing a "claim of
right" defense are unavailing.  Defendant argues that "[t]he
extortion statute also requires that the government prove that
Defendant acted with the intent to obtain property that he knew
he was not entitled to receive."  In the last several months
(after this Court's March 19, 2010 order denying defendant's
motion to dismiss count two, also cited by defendant), the Ninth
Circuit has revised Model Criminal Jury Instruction 8.142, the
Comment to which now makes abundantly clear:

    A defendant's claim of right to the property is not a
    defense.  "'Congress meant to punish as extortion any
    effort to obtain property by inherently wrongful means,
    such as force or threats of force . . . regardless of

1        the defendant's claim of right to the property . . .

2        .'"  United States v. Daane, 475 F.3d 1114, 1120 (9th

3        Cir. 2007) (quoting with approval from United States v.

4        Zappola, 677 F.2d 264, 268-69 (2d Cir. 1982).  There is

5        an exception to this proposition, but it is confined to

6        cases involving certain types of labor union activity.

7        Id. at 1119-20.

8   This principle is not altered by the fact that the means of

9   defendant's extortion was "fear" rather than "force," because the

10  exploitation of fear in this case -- in which defendant sought to

11  exploit Rabbi Yemeni's fear of the potential loss of freedoms and

12  reputation -- is not limited to fear of economic harm.[19]

13  Obviously, the case also does not involve labor union activity.

14       Also incorrect, as a factual matter, is defendant's

15  assertion that "throughout Defendant's conversations with Mr.

16  Gluck, he (Villalobos) consistently stated that Ms. Anjel was

17  owed $120,000, the amount reflected on tax documents that Chabad

18  paid to [Orit Anjel]."  To begin with, defendant and Mr. Gluck

19  discussed various amounts, with defendant even agreeing to

20  $100,000 before reneging on that deal based on an expressed

21  assertion of "seller's remorse."  Defendant also did not tie any

22  of his monetary demands to Orit Anjel's tax returns.  Defendant

23  and Mr. Gluck only discussed taxes in connection with (1)

24  defendant's promise that Orit Anjel would falsely tell the AUSA

25  _____

26       [19]  Defendant's reliance upon United States v. Daane, 475
    F.3d 1114, 1120 (9th Cir. 2007), is misplaced.  The "claim of
27  right" defense discussed in Daane is unavailable to defendant
    because the fear defendant sought to exploit was not merely fear
28  of economic harm.

                                 26

1  investigating Rabbi Yemeni that Orit Anjel was paid (and that she
2  did not return to the Rabbi) the amount shown on her tax returns;
3  and (2) defendant's request for a fraudulent tax deductible
4  receipt that falsely claimed he had made a $20,000 in kind
5  donation to CIC.

6      As for defendant's argument based on the veracity of what
7  Mr. Gluck told defendant during their recorded conversations, it
8  is irrelevant whether Mr. Gluck believed he was telling the truth
9  or not when he engaged in recorded conversations with defendant
10 while Mr. Gluck was acting as a government informant.   Although
11 defendant's subjective views on whether Ms. Anjel was in fact
12 fully employed at Rabbi Yemeni's Center may be relevant, Mr.
13 Gluck's state of mind and knowledge on these issues are not.   In
14 any event, defendant can clearly ask Mr. Gluck which, if any of
15 his statements to defendant were false without probing the
16 substance of Mr. Gluck's attorney-client privileged
17 communications with Rabbi Yemeni, so it is unclear how attorney-
18 client privileged communications would be relevant.

19     In addition, although defendant appears to acknowledge that
20 Mr. Gluck has no percipient knowledge of Orit Anjel's employment
21 at CIC (and surmises that Mr. Gluck learned everything he knows
22 based on conversations with Rabbi Yemeni), defendant does not
23 explain why Mr. Gluck's testimony about Orit Anjel's work at CIC
24 would be admissible, even assuming that testimony would otherwise
25 be relevant.   According to defendant, Mr. Gluck's testimony about
26 Orit Anjel's employment at CIC would be inadmissible hearsay.

27     The government acknowledges that defendant may call Rabbi
28 Yemeni as a witness if he has any proper purpose in doing so.   It

27

is the government's position, however, that defendant could not properly call Rabbi Yemeni as a witness for the sole purpose of asking Rabbi Yemeni what legal advice he received from his attorney, what statements he made to his attorney without the intent that those statements be disclosed to third parties, or any other matter ordinarily protected by the attorney-client privilege.

The defense appears to argue that Rabbi Yemeni's attorney-clients communications to Mr. Gluck could be used to impeach any testimony by Rabbi Yemeni that Orit Anjel did not have a legitimate employment claim against CIC, or to show that the purported claim was legitimate and that Mr. Gluck's statements to defendant were therefore false. This argument also fails. Defendant has no good faith basis for asserting that Rabbi Yemeni ever told Mr. Gluck that Ms. Anjel had a legitimate employment claim and any claim to the contrary is a request that the Court sponsor a fishing expedition into Rabbi Yemeni's attorney-client privileged communications with Mr. Gluck.

4. <u>Biases and Motivations</u>

a. <u>Defendant's Position</u>

A witness' biases and motives are relevant cross examination, and Mr. Gluck's and Rabbi Yemeni's biases and motives will be exposed by examining either about attorney-client communications between them. The "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678-79 (1986) (internal quotation marks omitted). When dealing with an informant, a

28

1  defendant is entitled to let the jury know how much the witness

2  has to gain by testifying for the government.  See United States

3  v. Larson, 495 F.3d 1094, 1105-06 (9th Cir. 2007). Further, with

4  key prosecution witnesses who are cooperating with the

5  government, the Ninth Circuit has "repeatedly insisted that wide

6  latitude be given to defendants in their cross-examination,"

7  United States v. Vasquez, 977 F.2d 594, __ (9th Cir. 1992),

8  quoting United States v. Uramoto, 638 F.2d 84, 86 (9th Cir.

9  1980).  In such circumstances, the defendant is entitled to let

10 the jury know how much the witness has to gain by testifying for

11 the government.  United States v. Larson, 495 F.3d 1094, 1105-06

12 (9th Cir. 2007).

13      Here, Mr. Gluck and Rabbi Yemini, the government's chief

14 witnesses, were both government informants.  Mr. Gluck agreed to

15 cooperate with the government by acting in an undercover capacity

16 in his dealings with defendant.  Rabbi Yemini also agreed to

17 cooperate with the government and claimed to be a victim of

18 extortion, thereby engendering both compassion and consideration

19 from the prosecutors.  It only follows that the defense is

20 entitled to explore on cross-examination Mr. Gluck's and Rabbi

21 Yemini's biases and motivations for cooperating and testifying.

22 In doing so, the defense should be permitted to explore

23 conversations between Mr. Gluck and Rabbi Yemini in which they

24 discussed and strategized how to maximize their intended

25 cooperation with the government.

26          b.   Government's Position

27      Mr. Gluck was a cooperator and is a likely trial witness.

28 Rabbi Yemeni cooperated with the government's investigation of

1   him, but Rabbi Yemeni made no contacts with defendant, either at

2   the government's direction or otherwise.  The government's proof

3   at trial will be based principally on defendant's recorded

4   statements, probably to be offered through the agents who

5   monitored and recorded those statements.  Mr. Gluck will likely

6   testify at trial.  Rabbi Yemeni probably will not.[20]

7        In the government's view, this case is really not very

8   complicated.  The government anticipates that it will call an

9   agent witness to testify that the government was contacted by Mr.

10  Gluck, who reported facts suggesting that defendant was

11  endeavoring to obstruct the grand jury investigation and/or

12  attempting to extort money from Mr. Gluck and Rabbi Yemeni.

13       The government, in essence, treated this information as a

14  "tip," and conducted an undercover investigation, including

15  telephone calls to defendant, meetings with defendant, and email

16  to defendant, all accomplished at the direction of the

17  government.  The FBI supervised, monitored, and recorded all

18  telephone conversations and meetings between Mr. Gluck and

19  defendant.  During these conversations, defendant offered that,

20  in exchange for monetary payments and other items of value, he

21  would have his client, Ms. Anjel, make statements that would

22  falsely exculpate Rabbi Yemeni.  Specifically, defendant stated

23  that, assuming that he and Mr. Gluck had a "deal," Ms. Anjel

24  would make false statements during an interview with the AUSA and

25  _____

26       [20]  To the extent that Rabbi Yemeni is called as a defense
    witness, defendant's proffered examination of him cannot, without
27  more, be based on any of defendant's argument that the proposed
    examination is proper cross-examination, such as Rabbi Yemeni's
28  biases and motives.

would repeat those false statements during anticipated grand jury
testimony.  Defendant also agreed to have his client falsely
discredit M.D., another anticipated government witness against
Rabbi Yemeni, suggested several ways that the payoff could be
disguised as the settlement of a legal claim, and promised that
he would lie to the government about the existence of the payoff
if the matter ever came to light.

It is clear that Mr. Gluck's communications with defendant -
- both before and after he contacted the FBI -- as well as the
role that Mr. Gluck played in the FBI's commencement of its
investigation, are relevant in this case.  The government
acknowledges that Mr. Gluck may be questioned about his hopes or
expectation that his client would receive some kind of "credit"
for Mr. Gluck's assistance to the government.[21]

Insofar as the defense wishes to attempt to impeach Mr.
Gluck's testimony with questions about the issue whether Mr.
Gluck expected that his cooperation in the investigation would
inure to the benefit of his client, the government acknowledges
that defendant may do so.  Defendant has not demonstrated that
questioning about Mr. Gluck's legal analysis and strategy,
thoughts and impressions, attorney-client privileged
communications with Rabbi Yemeni would establish this point or
would not distract the jury, confuse the issues before them, and

---

[21]  Without some expectation of credit, reporting
defendant's crimes to the government would make no sense.  A
person cannot report that he is being blackmailed without there
being something to be blackmailed about.  Reporting defendant to
the authorities without an expectation of credit would simply
drive home the point that Rabbi Yemeni had done something wrong.

31

1   waste time.  Fed. R. Evid. 403.  The government's charges in this
2   case are based principally on the conversations between Mr. Gluck
3   and defendant, and it is those conversations -- most of which
4   occurred through email or were audio-recorded -- that will and
5   should be the focus of the jury's deliberations in this case.
6   Defendant's requested fishing expedition should not be permitted.
7   B.   Privilege
8        Rabbi Yemeni and the Chabad Israeli Center ("CIC") assert
9   that his attorney-client communications with Mr. Gluck are
10  privileged against disclosure, even assuming that those
11  statements are relevant.  See Fed. R. Evid. 501.  Rabbi Yemini
12  and CIC join this joint submission as interested non-parties and
13  respectfully request that the Court protect their attorney-client
14  privilege[22] by: (1) precluding any party from asking any question
15  that invades the attorney-client privilege or the work product
16  doctrine; (2) implementing a procedure by which privilege
17  objections to particular questions or areas of questioning may be
18  ruled on in advance; and (3) ruling that the testimony described
19  by Rabbi Yemeni herein would not constitute a waiver of the
20  attorney-client privilege or the work product doctrine.
21       The parties and interested non-parties agree that "[t]he
22  attorney-client privilege protects confidential disclosures made
23  by a client to an attorney in order to obtain legal advice, . . .
24  as well as an attorney's advice in response to such disclosures."
25   United States v. Chen, 99 F.3d 1495, 1501 (9th Cir. 1996)
26  _____

27       [22] For convenience, when this brief refers to the privilege,
     it means both the attorney-client privilege and the work product
28  doctrine.

32

1  (quoting In re Grand Jury Investigation (Corporation), 974 F.2d

2  1068, 1070 (9th Cir. 1992)).

3      1.   Defendant's Position

4      Defendant submits that a party asserting the attorney-client

5  privilege bears the burden of proving each essential element.

6  United States v. Munoz, 233 F.3d 1117, 1128 (9th Cir. 2000); Weil

7  v. Inv./Indicators, Research & Mgmt., 647 F.2d 18, 25 (9th Cir.

8  1981) (citing United States v. Bump, 605 F.2d 548, 551 (10th

9  Cir. 1979); United States v. Landof, 591 F.2d 36, 38 (9th Cir.

10 1978)).  One of the elements the asserting party must establish

11 is that it has not waived the privilege.  Weil, 647 F.2d at 25

12 (citing Landof, 591 F.2d at 38; In re Grand Jury Proceedings, 517

13 F.2d 666, 670 (5th Cir. 1975)).

14     Defendant submits that Rabbi Yemeni has made a subject

15 matter waiver of his attorney-client privilege with Mr. Gluck and

16 the Bird Marella law firm based upon statements Mr. Gluck made to

17 defendant between February and August 2009.  During this time

18 period, Mr. Gluck disclosed to defendant information that had

19 been provided to Mr. Gluck by Rabbi Yemeni.  Under Ninth Circuit

20 law, when there has been a disclosure of what would otherwise be

21 a privileged attorney-client communication, that communication,

22 along with all other such communications on the same subject, is

23 not protected by the attorney-client privilege because the

24 disclosure "extinguishes the element of confidentiality that one

25 must show in order to claim the privilege." Weil, 647 F.2d at 24

26 (citing, e.g., United States v. Cote, 456 F.2d 142, 144-45 (8th

27 Cir. 1972); Handgards, Inc. v. Johnson & Johnson, 413 F. Supp.

28 926, 929 (N.D.Cal. 1976); Duplan Corp. v. Deering Milliken, Inc.,

33

397 F. Supp. 1146, 1161, 1191 (D.S.C. 1974); *Haymes v. Smith*, 73
F.R.D. 572, 576-77 (W.D.N.Y. 1976); *ITT Corp. v. United Tele-*
*phone of Florida*, 60 F.R.D. 177, 185-86 (M.D.Fla. 1973); *United*
*States v. Bump*, 605 F.2d at  551; *In re Horowitz*, 482 F.2d 72, 81
(2d Cir. 1973), cert. denied, 414 U.S. 867 (1973); *United States*
*v. Aronoff*, 466 F.Supp. 855, 860-62 (S.D.N.Y. 1979); *In re Grand*
*Jury Subpoena*, 438 F.Supp. 1176, 1177-78 (S.D.N.Y. 1977);
McCormick's Handbook on the Law of Evidence s 93, at 194-95 (E.
Cleary 2d ed. 1972)).

As noted in *Weil*, other courts have reached the same result
on a different basis, concluding that the voluntary disclosure of
the content of a privileged communication constitutes a waiver of
the privilege as to all other such communications on the same
subject.  647 F. 2d at 24, n. 11 (citing *In re Langswager*, 392
F.Supp. 783, 786 (N.D.Ill. 1975); *United States v. Pauldino*, 487
F.2d 127, 130 (10th Cir. 1973), cert. denied, 415 U.S. 981
(1974); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973), cert.
denied, 414 U.S. 867 (1973)).

Defendant submits that, under either approach, as applied to
the facts of this case, the defense should be afforded the
opportunity to inquire into the communications between Rabbi
Yemini and Mr. Gluck.

Beginning in February, 2009, defendant and Mr. Gluck had
several conversations about Ms. Anjel's employment at Chabad.
During those conversations, the defense believes Mr. Gluck
disclosed information provided to him by his client.  However,
because those conversations were not recorded or memorialized,
the defense is unaware of the complete scope of those statements.

On July 15, 2009, Mr. Gluck contacted Assistant U.S. Attorney Keri Axel, who was conducting the investigation of Rabbi Yemini, and advised her of some of his conversations with Defendant. Mr. Gluck told Ms. Axel that Defendant was demanding a large sum of money to resolve an employment dispute between the Chabad Israel Center and Rabbi Yemini on the one hand, and Orit Anjel, one of Defendant's clients and a potential witness in the investigation of Rabbi Yemini, on the other hand. According to Mr. Gluck, Defendant had conditioned the date on which Ms. Anjel was to meet with Ms. Axel on whether a monetary settlement of the dispute had been reached. Mr. Gluck offered to cooperate with the government against Defendant. In doing so, Mr. Gluck emphasized that he would "have to supply information that is adverse to my client in his case" and asked therefore that his client "get[] some kind of credit for compromis[ing] [his] legal strategy." [Handwritten notes of interview of Assistant U.S. Attorney, Keri Axel.] The government agreed, leading to Mr. Gluck's recording of conversations and meetings with Defendant.

Thereafter, during Mr. Gluck's conversations with Defendant, Mr. Gluck "suppl[ied] information that [was] adverse to [his] client" by disclosing what appear to be his client's statements about Ms. Anjel's employment at Chabad. Mr. Gluck also made admissions – in context and in words – of his client's involvement in the visa fraud scheme under investigation, such as confirming Ms. Anjel's claim that she had been required to refund her salary to Rabbi Yemini. Some representative statements are

as follows:[23]

- On July 16, 2009, in response to Defendant's claim that
  Rabbi Yemini had forced Ms. Anjel to give back $120,000
  in earnings, Mr. Gluck told Defendant that he had
  spoken to Rabbi Yemini but that Rabbi Yemini did not
  have the $120,000.

- On July 17, 2009, in response to Defendant's demand to
  resolve the employment dispute, Mr. Gluck told
  Defendant, "The Rabbi has now told me that he can get
  access to some money . . . .  The Rabbi doesn't have
  any money personally.  He's got people who will donate.
  He's got some people who he went to and he didn't tell
  them exactly what it's for but [said], 'hey there is a
  crisis, we need some money.'"

- On that same date, in discussing Ms. Anjel's
  employment, Mr. Gluck revealed his client's position
  that Ms. Anjel had not worked full-time at Chabad,
  stating, "Orit worked for my guy.  I mean my guy is,
  you know, she wasn't there 40 hours a week."

- On July 21, 2009, Mr. Gluck made several statements
  about Ms. Anjel's employment which were clearly
  admissions of his involvement in the visa fraud scheme

---

[23]   Disclosures made in the course of settlement discussions
are treated no differently.  *See, e.g.*, *United States v. Martin*,
773 F.2d 579, 584 (4th Cir. 1985) ("[I]nformation given with the
intent that it be used, for example, to compromise tax liability,
is inconsistent with the confidentiality asserted); *Attorney-
Client Privilege in the United States*, 2 Ed., section 9:91 ("When
disclosures are made in the context of negotiations, most courts,
consistent with the requirement of confidentiality, have held the
privilege to be waived").

1    and appear to be based on information from Rabbi

2    Yemini:

3    a.    "What [Rabbi Yemini] was paying [Orit Anjel], was

4          just a round trip.  It wasn't costing him

5          anything.  He was paying her . . . she was paying

6          it back to him.  So he wasn't actually out of

7          pocket."

8    b.    "That's the reason he actually paid her and if she

9          returned the money, it was so she can have the

10         1099 to show that she's got, uh, in order to get

11         the green … work, you know, the R-1, or whatever

12         it is."

13   c.    "At some point [Ms. Anjel's employment] did

14         change, yes, it did change and then, in fact she

15         was allowed to keep the whole salary.  She was

16         allowed to keep the $1800 a month, that's correct.

17         Because she wasn't working 40 hours, she was

18         working like 5 hours or something.  That's why it

19         was 1800 hundred."

20   Applying either test set forth above, Mr. Gluck's

21   disclosures to Defendant about Ms. Anjel's employment and the

22   visa fraud scheme, *and all other such communications on the same*

23   *subject,* are not protected by the privilege.  *Hernandez v.*

24   *Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) (quoting *Weil,* 647

25   F.2d at 24) ("voluntary disclosure of the content of a privileged

26   attorney communication constitutes waiver of the privilege as to

27   all other such communications on the same subject").  As the

28   Ninth Circuit has stated, "[W]hen [the privilege holder's]

37

conduct touches a certain point of disclosure, fairness requires
that his privilege shall cease whether he intended that result or
not.   He cannot be allowed, after disclosing as much as he
pleases, to withhold the remainder.   He may elect to withhold or
disclose, but after a certain point his election must remain
final." *Weil*, 647 F.2d at 24 (citations omitted).   Thus, the
defense is entitled to inquire into Rabbi Yemini's and Mr.
Gluck's conversations about the above excerpts and all other such
communications on the same subject.[24]

Further, as noted above, Mr. Gluck specifically advised the
government that his cooperation against Defendant would require
that he "supply information that is adverse to my client" and
that would "compromise [his] legal strategy."   Thereafter, Mr.
Gluck repeatedly made statements to Defendant about Rabbi
Yemini's involvement in the visa fraud scheme and his employment
of Ms. Anjel.   Those statements, unless utterly fictitious, could
only have originated with Rabbi Yemini and their disclosure must
have been approved and authorized by Rabbi Yemini.

It must be emphasized that the dynamic at issue – Mr.
Gluck's revelation of his client's statements – was the
deliberate and intentional effort of a lawyer and his client to
respond to a federal criminal investigation and, through the

---

[24]      Indeed, the Bird Marella law firm, in its Interested
Non-Parties brief, concedes that "[i]nformation provided [by a
client] to an attorney *with the intention that it be disclosed to
a third party* is not protected by the attorney-client privilege."
(Interested Non-Parties Chabad Israeli Center and Rabbi Amitai
Yemini's Position Regarding Attorney-Client Privilege and Work
Product, Dkt. No. 88, at 4 n.4) (citations omitted; emphasis
added).

1  attorney's cooperation, obtain a favorable result for the client.
2  Based on the foregoing and that which counsel expect to produce
3  should the Court order an evidentiary hearing, the defense should
4  be allowed to inquire into Rabbi Yemini's  communications with
5  his attorneys concerning the visa fraud scheme and Ms. Anjel's
6  employment.

7       The Interested Non-Parties' position, set forth below, fails
8  in two respects.  First, there is a difference between the
9  following two scenarios: *Scenario One*: Client tells Lawyer, "You
10 are authorized to disclose the following: I, the Client,
11 participated in the visa fraud/kickback scheme." *Scenario*
12 *Two*: Client says to Lawyer, "I previously told you about my
13 involvement in the visa fraud/kickback scheme. You are authorized
14 to disclose the portion of our discussions where I came 'clean'
15 and 'fessed up.'" In *Scenario One*, many courts would find that
16 disclosure not to be privileged in the first instance.  Arguably,
17 that would not be a waiver, although considerations of fairness
18 might dictate that the entire subject matter is now fair
19 game. *Scenario Two* is very different and, the defense submits,
20 encompasses the instant situation.  Here, the prior discussions
21 between Client and Lawyer were privileged.  The subsequent
22 disclosure of those privileged communications effects a broad
23 subject matter waiver.  Second, the Interested Non-Parties's
24 position is premised on the factual claim that Mr. Gluck's
25 statements to Mr. Villalobos were underlined authorized by Rabbi Yemini and,
26 therefore, do not constitute a waiver of the privilege (e.g.,
27 "Mr. Gluck, at Rabbi Yemini's direction, asserted certain facts
28 to defendant;" "at Rabbi Yemini's direction, Mr. Gluck made

1  certain communications to defendant;" "Mr. Gluck, at the
2  direction of his client, made statements about the case;"
3  "neither Rabbi Yemini nor Mr. Gluck ever disclosed to third
4  parties attorney-client communications that had been intended to
5  be confidential;" Mr. Gluck "act[ed] as a conduit for statements
6  and information at the direction of his client;" Mr. Gluck
7  "simply made authorized communications as a conduit of his
8  client;" after Mr. Gluck began cooperating with the government,
9  his "statements to the defendant were at the government's
10 direction, not Rabbi Yemini's;" and "neither Rabbi Yemini nor Mr.
11 Gluck disclosed any privileged communications to anyone").  The
12 Interested Non-Parties make these factual assertions without
13 confirming declarations or other support.  As such, the defense
14 submits that they are insufficient as a factual basis for the
15 Court to make a finding upholding the privilege.  If the Court is
16 disinclined to find a waiver of the privilege on the current
17 record, the defendant respectfully requests an evidentiary
18 hearing to ascertain the underlying facts.

19      2.   Interested Non-Parties' Position

20      Defendant argues that Rabbi Yemini waived his attorney-
21 client privilege when Mr. Gluck, at Rabbi Yemini's direction,
22 asserted certain facts to defendant.  According to defendant, Mr.
23 Gluck's assertion of these facts was a disclosure of privileged
24 communications, which acted to waive the privilege on the entire
25 "subject matter" of Mr. Gluck's representation.  The argument
26 fails.  Mr. Gluck's statements to defendant were not a disclosure
27 of any otherwise privileged information.  In turn, this means
28 that there was no waiver.

40

1          a.   <u>No privileged communication has ever been disclosed</u>

2        Defendant's waiver argument entirely depends on the

3  incorrect premise and assumption that Mr. Gluck disclosed "what

4  would otherwise be a privileged attorney-client communication."

5  (Brief, p. 23.)  This is wrong.  "Not all communications between

6  attorney and client are privileged."  *Clarke v. American Commerce*

7  *Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992).  Of the

8  "disclosures" that Defendant contends operated to waive the

9  privilege, none involved information or communications that were

10 privileged in the first instance.

11       Defendant contends that Rabbi Yemini waived privilege by

12 discussing with government agents the same facts that he

13 purportedly discussed with Mr. Gluck.  The attorney-client

14 privilege, however, does not protect underlying facts.  *Upjohn*

15 *Co. v. United States*, 449 U.S. 383, 395-96 (1981).  "The

16 privilege only protects disclosure of communications; it does not

17 protect disclosure of the underlying facts by those who

18 communicated with the attorney."  *Id.*   For this reason, while a

19 client "cannot be compelled to answer the question, 'What did you

20 say or write to the attorney?' but may not refuse to disclose any

21 relevant fact within his knowledge merely because he incorporated

22 a statement of such fact into his communication to his attorney."

23 *Id.* (internal quotation marks and citation omitted).   Thus, to

24 the extent Rabbi Yemini discussed with the government the

25 underlying facts at issue in this case, such discussions do not

26 implicate the attorney-client privilege simply because Rabbi

27 Yemini may have separately discussed the same facts with his

28 attorney.

1    Similarly, "[i]t is axiomatic that no privilege can attach
2 to a communication that was not intended to be confidential."
3 *GTE Directories Service, Corp. v. Pacific Bell Directory*, 135
4 F.R.D. 187, 191 (N.D. Cal. 1991).   Indeed, all parties agree with
5 this premise.   Here, at Rabbi Yemini's direction, Mr. Gluck made
6 certain communications to defendant.   The disclosures made by Mr.
7 Gluck as a conduit of information, however, did not implicate
8 privileged communication because where "a client communicates
9 with his lawyer for the purpose of having that lawyer relay that
10 communication to a third party, the communication is not
11 'confidential' and not protected by lawyer-client privilege."
12 *United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal. 1999);
13 *see also United States v. Bauer*, 132 F.3d 504, 508-09 (9th Cir.
14 1997) (finding that attorney-client privilege does not extend to
15 communication wherein an attorney merely serves as a "conduit"
16 and passes along information to the client, but does extend to
17 communication wherein the attorney provides legal advice to the
18 client relating to such information); *United States v. Edison*,
19 2008 WL 170660 at *2 (N.D. Cal. 2008) ("communications made to an
20 attorney with the understanding that the information will be
21 conveyed to third parties is not protected by the attorney-client
22 privilege.").
23    Here, similar to counsel in almost every disputed case, Mr.
24 Gluck, at the direction of his client, made statements about the
25 case.   Such statements occur during settlement discussions, meet-
26 and-confer proceedings, in briefings and arguments, and trial.
27 Such statements are not intended to be confidential.   Similarly,
28 here, neither Rabbi Yemini nor Mr. Gluck ever disclosed to third

42

parties attorney-client communications that had been intended to
be confidential.  Accordingly, neither Rabbi Yemini nor Mr. Gluck
ever disclosed privileged communications here.

     b.   <u>No waiver results from disclosure of non-privileged
information</u>

Because the information conveyed by Mr. Gluck was never
privileged to begin with, it does not operate to waive the
privilege for otherwise privileged communications.
The disclosure of <u>non-privileged</u> information – the only type of
disclosure that occurred in this case – does not effectuate a
waiver of the privilege as to communications intended to be and
actually kept confidential.  *GTE Directories Service, Corp. v.
Pacific Bell Directory*, 135 F.R.D. 187 (N.D. Cal. 1991).  For
example, in *GTE Directories*, the defendant voluntarily produced
copies of correspondence between its in-house counsel and counsel
for a non-party.  *Id.* at 191.  Plaintiff argued that the non-
party was an agent of the defendant, that the correspondence at
issue would otherwise be privileged, and that production of the
correspondence "waived the privilege with respect to all
communications related to the subject matter covered by the
produced documents."  *Id.*  Defendant, however, argued that "the
privilege never attached to the documents in question, and,
therefore, that producing these documents cannot constitute a
waiver."  *Id.*  The Court examined the correspondence produced by
defendant, found that defendant and its counsel did not intend
such communications to be confidential, and concluded that
"[b]ecause privilege never attached to them, disclosing them

43

1    cannot constitute a waiver."[25]  *Id.* at 191-192.  Among other

2    reasons, the Court noted that the defendant intended the

3    communication to be relayed to the *opposing party*, which was

4    hardly consistent with the idea that the communication was

5    intended to remain confidential.  *Id.*, at 192.

6        The same reasoning applies in this case.  As detailed above,

7    in acting as a conduit for statements and information at the

8    direction of his client, Mr. Gluck never disclosed any attorney-

9    client communications that were intended to be confidential.  As

10   to communications not intended to be confidential, "privilege

11   never attached to them, [and] disclosing them cannot constitute a

12   waiver" of other communications that were intended to be

13   confidential and kept confidential.  *Id.; see also Medimmune, LLC*

14   *v. PDL Biopharma, Inc.*, 2010 WL 2925390 at *2 (N.D. Cal. 2010)

15   (rejecting waiver argument because disclosed email "was never

16   intended to be a privilege communication," and as a result, "the

17   attorney-client privilege does not apply to this particular email

18   [and] its disclosure… did not result in a waiver."); *U.S. v.*

19   *Edison*, 2008 WL 170660 at *3 (N.D. Cal. 2008) (differentiating

20

---

21       25  Contrary to defendant's assertions about the burdens,
     where the "the party seeking discovery is asserting that the
22   privilege has attached, and then been waived, by the party
     resisting discovery, the burden of showing the existence of the
23   privilege is, at best, apportioned between the parties."  *GTE*
     *Directories Service, Corp.*, 135 F.R.D. at 192, n. 2.  As further
24   elaborated in a later case, "the party asserting the attorney-
     client privilege bears the initial burden of proving that the
25   communication in question is privileged. If the party seeking
     discovery asserts that the privilege which initially attached to
26   the communication in question was subsequently waived, that party
     must bear the burden of production on the issue of waiver."
27   *United States v. Chevron Corp.*, 1996 WL 444597 (N.D. Cal., May
     30, 1996).
28

                                    44

attorney-client communication intended to be conveyed to the
government from communication intended to remain within the
attorney-client relationship, and finding the latter
"presumptively privileged").

Defendant also appears to contend that Mr. Gluck waived
privilege by arguing the relative merits of the parties'
positions with respect to Ms. Anjel's employment status.  Again,
in conversations between Mr. Gluck and Defendant, Mr. Gluck did
not disclose any privileged communications with Rabbi Yemini, but
simply made authorized communications as a conduit of his client
(and later as a conduit for and at the direction of the
government).  Mr. Gluck's advocacy does not result in a waiver of
the privilege:

> a party cannot waive privilege merely if its lawyer,
> bargaining on its behalf, contends vigorously and even
> in some detail that the law favors his client's
> position on a point in issue – whether that point is
> the contested validity of a patent or the contested
> validity of a contract or some other matter...  Clients
> and lawyers should not have to fear that positions on
> legal issues taken during negotiations waive the
> attorney-client privilege so that the confidential
> facts communicated to the attorney and the private
> opinions and reports drafted by an attorney for his
> client becomes discoverable.

*Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454
(N.D. Ill. 1974), *aff'd without op.*, 534 F.2d 330 (7th Cir.
1976).

In short, counsel's statements at his client's direction do not implicate the privilege at all, much less waive it. The cases cited by Defendant do not lead to a different conclusion. Defendant cites *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18 (9th Cir. 1981), for the general principle of subject matter waiver. In *Weil*, however, the party asserting privilege disclosed and relied on the advice of counsel as part of its defense; the case did not address whether disclosure of <u>non-privileged</u> attorney-client communication results in a waiver of privileged communication. *Id*. at 23-24. Likewise, the other cases cited by defendant addressed waiver arising from disclosure of or reliance on undisputedly privileged communications; none stand for the proposition that an attorney's non-privileged communications on behalf of the client waive the privilege as to confidential and undisclosed attorney-client communications. *See e.g.*, *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 929 (N.D.Cal. 1976) (find that the "deliberate injection of the advice of counsel into a case waives the attorney client privilege"); *Haymes v. Smith*, 73 F.R.D. 572, 577 (W.D.N.Y. 1976) (same); *ITT Corp. v. United Telephone of Florida*, 60 F.R.D. 177, 185-86 (M.D. Fla.1973) (same); *Hernandez v. Tanninen*, 604 F.3d 1095 (9th Cir. 2010) ("raising a claim that requires disclosure of a protected communication results in waiver"); *In re Horowitz*, 482 F.2d 72, 81 (2nd Cir. 1973) (finding waiver where client granted third-party access to undisputedly privileged communications with attorney); *In re Grand Jury Subpoena*, 438 F. Supp. 1176, 1178 (S.D.N.Y. 1977) (finding waiver where clients unhesitatingly answered questions

1  concerning privileged communications); *U.S. v. Pauldino*, 487 F.2d
2  127, 130 (10th Cir. 1973) (finding waiver where client testified
3  to statements that were previously made by attorney *in camera* and
4  stricken from the record).

5      In fact, many of the cases cited by defendant actually
6  support Rabbi Yemini's position and confirm that the privilege
7  does not attach to and is not waived by disclosure of information
8  that was not intended to be kept confidential.  *See, e.g., United*
9  *States v. Cote*, 456 F.2d 142, 145, n.3 ("In tax cases waiver is
10 often not even an issue since the privilege is said not to attach
11 to information which the taxpayer intends his attorney to report
12 in the contents of a tax return."); *Duplan Corp. v. Deering*
13 *Milliken, Inc.*, 397 F. Supp. 1146, 1191 (D.S.C. 1974) ("The
14 voluntary waiver by a client, even without limitation, of one or
15 more nonprivileged documents passing between the same attorney
16 and the same client discussing the same subject does not waive
17 the privileged communications between the same attorney and the
18 same client on the same subject."); *United States v. Bump*, 605
19 F.2d 548, 551 (10th Cir. 1979) ("When a matter is communicated to
20 the lawyer with the intention or understanding it is to be
21 repeated to another, the content of the statement is not within
22 the privilege."); *United States v. Aronoff*, 466 F.Supp. 855, 860
23 (S.D.N.Y. 1979) (finding client does not waive privilege "by
24 failing to object to his lawyer's disclosure of unprivileged
25 information"); *In re Langswager*, 392 F.Supp. 783, 786 (N.D. Ill.
26 1975) (finding privilege has not been established as to
27 communications to the attorney that were not intended to be
28 confidential); *U.S. v. Martin*, 773 F.2d 579, 583 (4th Cir. 1985)

1  (distinguishing privileged information intended to remain
2  confidential from "information given with the intent that it be
3  used ... to compromise tax liability").

4       Two further points bear mention.  First, much of the
5  defendant's premise is simply factually wrong.  Specifically,
6  defendant explicitly assumes that any statements made by Mr.
7  Gluck were based on information he must have learned from Rabbi
8  Yemini.  (Brief p.27.)  But most of the communications referred
9  to in the defendant's statement occurred after Mr. Gluck began
10 cooperating with the government.  At that point, Mr. Gluck's
11 statements to the defendant were at the government's direction,
12 not Rabbi Yemini's.

13      Second, even if one were to believe it were a closer
14 question than it is here, doubts in this type of case would be
15 resolved in favor of finding no waiver.  Whatever may be the rule
16 with respect to construing privileges in the first place, waivers
17 are construed narrowly and doubts as to waivers are resolved in
18 favor of the pre-existing privilege.  *GTE Directories*, 135 F.R.D.
19 at 192 ("We feel constrained to approach contentions that a party
20 has waived the protections of privilege or the work product
21 doctrine cautiously, resolving doubts against finding waiver.").

22      In short, the defendant's waiver argument fails.  He has not
23 and cannot point to any disclosure of privileged information that
24 could trigger a waiver.  Instead, defendant only points to
25 communications made by counsel at his client's direction or at
26 the government's direction. Because the content of such
27 communications is not intended to be confidential, it is not
28 privileged to begin with and is thus irrelevant to the waiver

48

1 argument.   Neither Rabbi Yemini nor Mr. Gluck disclosed any

2 privileged communications to anyone and no waiver occurred.[26]

3        3.   Government's Position

4        The government responds that defendant has presented no

5

6        [26]   In the eleventh hour, defendant added two new arguments
to the parties' brief.   First, defendant presents two

7 hypothetical scenarios and contends that one type of attorney-as-
conduit communication results in waiver of the privilege while

8 another type does not.   Defendant's argument – made without
citing any authority – is a distinction without a difference.

9 The cases Interested Non-Parties cite amply demonstrate that
attorney-client communications intended to be disclosed to other

10 parties are not privileged in the first instance, and thus their
disclosure does not waive the privilege as to communications

11 intended to be confidential.   These cases focus on the intent of
the client in authorizing attorney communications to third

12 parties, not on the particular wording or phrasing of the
instruction.   It is not the law that a communication intended by

13 the client for a third party must be repeated by the attorney
word-for-word.   No matter the specific words used in the client's

14 instruction – whether they are spelled out, summarized, or
"incorporated by reference" – a communication intended for a

15 third party is not privileged.

16

17        Defendant also contends – again, without any reference to
applicable authority – that Interested Non-Parties have not made

18 a sufficient factual showing concerning privilege.   However, the
Interested Non-Parties are not contending that the statements

19 made by Mr. Gluck are privileged; in fact, Interested Non-Parties
argue the exact opposite.   Defendant, as the party contending

20 that privilege has attached, bears and (fails to meet) the burden
of proof on that issue.   See GTE Directories Service, Corp. v.

21 Pacific Bell Directory, 135 F.R.D. 187, 192, n. 2 (N.D. Cal.
1991); United States v. Chevron Corp., 1996 WL 444597 (N.D. Cal.,

22 May 30, 1996).   Moreover, to the extent that Defendant has now
reversed course and contends that Rabi Yemini never authorized

23 Mr. Gluck to make the statements at issue, no waiver could result
from any such unauthorized disclosure of purportedly privileged

24 communications, because "the privilege belongs solely to the
client and may only be waived by him."   In re von Bulow, 828 F.2d

25 94, 100 (2nd Cir. 1987) ("absent a client's consent or waiver,
the publication of confidential communications by an attorney

26 does not constitute a relinquishment of the privilege by the
client.").   So whether or not Mr. Gluck's statements were

27 authorized, they did not waive any privilege.   Defendant's
conjecture is irrelevant.

28

1  evidence of any "subject matter" waiver related to Rabbi Yemeni's

2  attorney-client privileged communications with Mr. Gluck or Mr.

3  Gluck's attorney work product.  Defendant's argument to the

4  contrary is based largely, if not exclusively, on defendant's

5  supposition and surmise about the source of Mr. Gluck's knowledge

6  of events related to Orit Anjel's employment with CIC.

7       As far as Mr. Gluck's statements about Rabbi Yemeni saying

8  he did not have the money to pay defendant or, later, that he

9  found away to put the money together, Mr. Gluck made those

10  statements (as with all his post-July 15, 2009 statements to

11  defendant) at the direction of the government.  These particular

12  statements were part of Mr. Gluck's role in the undercover

13  operation and not strictly based upon fact.  Accordingly, they

14  are not disclosures of Rabbi Yemeni's statements to Mr. Gluck.[27]

15

16       [27]  Contrary to defendant's contentions related to any
acknowledgment of any debt by Mr. Gluck, the government submits
17  that Mr. Gluck never acknowledged that Ms. Anjel was entitled to
any money in settlement of an employment dispute.  Rather, Mr.
18  Gluck made repeated references to the limited nature of the work
Orit Anjel did for CIC, and he did so without protest from
19  defendant.

20
       Defendant's assertion that Mr. Gluck called AUSA Axel and
21  said Villalobos was "demanding a large sum of money to resolve an
employment dispute" is also defendant's invention.  From the
22  beginning, Mr. Gluck never referred to defendant's extortion as
an actual dispute rather than a false cover story for the payment
23  defendant demanded.  Also false is defendant's assertion that Mr.
Gluck confirmed to AUSA Axel that Orit Anjel "had been required
24  to refund her salary to Rabbi Yemini."  Mr. Gluck informed AUSA
Axel that Orit Anjel did indeed return money but Orit Anjel
25  desired to do it, requested to do it, and asked other to beg
Rabbi Yemeni to allow her to do it after Rabbi Yemini initially
26  terminated all of the fake religious workers, including Orit
Anjel.  To the extent that defendant's argument anywhere implies
27  that Mr. Gluck ever agreed with defendant's claim that Orit Anjel
28  was a victim who was owed money, defendant is factually

1  C.    Defendant's Right of Confrontation

2        1.    Defendant's Position

3        Under the Confrontation Clause, the facts and circumstances

4  of the case and the nature of the charges, he should be permitted

5  to inquire into Rabbi Yemeni's communications with Mr. Gluck,

6  even if those communications are privileged against disclosure.

7  The Confrontation Clause is a "bedrock procedural guarantee . . .

8  ." Crawford v. Washington, 541 U.S. 36, 42 (2004).  Indeed,

9  "[t]here are few subjects, perhaps, upon which [the Supreme

10 Court] and other courts have been more nearly unanimous than in

11 their expressions of belief that the right of confrontation and

12 cross-examination is an essential and fundamental requirement for

13 the kind of fair trial which is this country's constitutional

14 goal." Pointer v. Texas, 380 U.S. 400, 405 (1965).  Denial of

15 the right of effective cross-examination "would be constitutional

16 error of the first magnitude and no amount of showing of want of

17 prejudice would cure it." Davis v. Alaska, 415 U.S. 308, 318

18 (1974) (quoting Smith v. Illinois, 390 U.S. 129, 131 (1968)).

19      "'Even the attorney client privilege . . .  hallowed as it

20 is, yet not found in the Constitution, might have to yield in a

21 particular case if the right of confrontation . . . would be

22 violated by enforcing the privilege.'" Murdoch v. Castro, 365

23 F.3d 699, 703 (9th Cir. 2004) (quoting United States v. Rainone,

24 32 F.3d 1203, 1206 (7th Cir. 1994)); see also Clutchette v.

25 Rushen, 770 F.2d 1469, 1471 (9th Cir. 1985) ("Standing alone, the

26 attorney-client privilege is merely a rule of evidence; it has

27 _____

28  incorrect.

not yet been held a constitutional right") (citing *Maness v. Meyers*, 419 U.S. 449, 466 n.15 (1975)). Under the appropriate circumstances, "the law requires that the privilege yield where its invocation is incompatible with a criminal defendant's Sixth Amendment rights." *United States v. W.R. Grace*, 439 F.Supp.2d 1125, 1145 (D. Mont. 2006).

In *Murdoch v. Castro,* 609 F.3d 983, 995 (9th Cir. 2010) (en banc), the Ninth Circuit "acknowledge[d] the possibility that the Supreme Court may in the future well decide that the Confrontation clause in some cases" overrides the attorney-client privilege, but was not called upon to decide the issue. In dissent, Judge Kozinski forcefully stated the view that Supreme Court precedent already compelled the conclusion that the Confrontation Clause did not permit prosecution witnesses to hide behind the attorney-client privilege. 609 F.3d at 996-1011.[28]

Here, the defendant seeks to question witnesses about potentially privileged communications in order to fully and effectively challenge two elements of the extortion charge, the

---

[28] The government, below, cites to several cases from other circuits in which courts did not permit inquiry into attorney-client communications. *United States v. Rainone*, 32 F.3d 1203 (7th Cir. 1994); *Mills v. Singletary*, 161 F.3d 1273 (11th Cir. 1998); *United States ex rel Blackwell v. Franzen*, 688 F.2d 496 (7th Cir. 1982). (Pages 59-60) In *Rainone* and *Blackwell*, the Courts noted that in the appropriate case, the Confrontation Clause may "trump" the attorney-client privilege and require inquiry into privileged communications, but the circumstances presented did not warrant such a result. 32 F.3d at 1206; 688 F.2d at 501. However, none of these cases (including *Wells*) involved the extraordinary situation in which an attorney representing a client under criminal investigation became a cooperating witness for the government against a third party in order to obtain a benefit for the client.

1   "fear" factor and the "property/claim of right" factor, discussed

2   *supra*.[29]

3      2.   Interested Non-Parties' Position

4          a.   There is no dispute that defendant will have a

5               broad ability to cross-examine both Rabbi Yemini

6               and Mr. Gluck based on non-privileged information

7   All parties agree that even before piercing any privilege,

8   defendant already has broad ability to cross-examine both Rabbi

9   Yemini and Mr. Gluck.  Defendant can cross-examine Rabbi Yemini

10  about (1) the underlying facts of the case; (2) all statements

11  Rabbi Yemini made to the government during his multiple

12  interviews; (3) all communications Rabbi Yemini made to Mr. Gluck

13  with the intention that Mr. Gluck convey them to third parties;

14  and (4) all factual reports made to Rabbi Yemini by Mr. Gluck.

15  Defendant can cross-examine Mr. Gluck about (5) all

16  communications made to Mr. Gluck by Rabbi Yemini with the

17  intention that Mr. Gluck convey them to third parties; and (6)

18  all factual reports made by Mr. Gluck to Rabbi Yemini.  As

19  demonstrated below, these non-privileged areas of cross-

20  examination are sufficient to satisfy the Confrontation Clause.

21          b.   The Ninth Circuit has never ruled that the

22               attorney-client privilege must yield to the

23               Confrontation Clause

24  _____

25      [29]    The defense appreciates Mr. Gluck's and Rabbi Yemini's
    interest in maintaining their attorney-client privilege, but we
26  do not believe that they are, as adversarial witnesses, in a
    position to assess the defendant's right to confrontation at
27  trial.  However, in light of the joint nature of this filing, we
    submit to the Court how much weight, if any, to give to their
28  position on this issue.

1    Defendant claims that "[e]ven the attorney client privilege
2  . . . might have to yield in a particular case if the right of
3  confrontation . . . would be violated by enforcing the
4  privilege." (Brief at p.31-32 (quoting *Murdoch v. Castro*
5  (*"Murdoch I"*), 365 F.3d 699, 703 (9th Cir. 2004)).  Defendant
6  argues that this is such a "particular" case.  But defendant is
7  wrong on both the general principal and in the purported
8  principle's application.

9              (i)  The Ninth Circuit has explicitly refused to
10                  assume that the attorney-client privilege
11                  could ever be forced to yield to the
12                  Confrontation Clause

13    The first problem with defendant's Confrontation Clause
14  argument is that the Ninth Circuit has overruled the source
15  defendant relies on, namely *Murdoch I*'s assumption that the
16  Confrontation Clause could require the privilege to give way.
17  *Murdoch v. Castro (Murdoch III)*, 609 F.3d 983, 995 (9th Cir.
18  2010) (en banc).  In *Murdoch III*, the Ninth Circuit first noted
19  that the Supreme Court has never ruled that the attorney client
20  privilege must yield to the Confrontation Clause.  *Id.*, at 993-
21  95.  Instead, the Supreme Court considered confrontation only
22  with respect to the marital privilege, the Fifth Amendment
23  privilege, and the confidentiality of juvenile records.  *Id.*, at
24  995.

25    The en banc panel in *Murdoch III* then pointed out that the
26  attorney-client privilege is distinguishable from these other
27  privileges, first because it is "one of the oldest recognized
28  privileges for confidential communications," *id.*, at 995, and may

1  therefore enjoy greater protections, and second because contrary
2  to other types of privileges, the attorney client privilege
3  "'only protects disclosure of [the] communications [themselves];
4  it does not protect disclosure of underlying facts,'" *id.*,
5  (*quoting Upjohn*, 449 U.S. at 395) (alterations in original).
6  Because of these distinctions, the *en banc* panel held that
7  although the Supreme Court might someday decide that the attorney
8  privilege hypothetically could yield, as of now a reasonable
9  court could conclude that the privilege never yields. *Id.* To
10 the extent *Murdoch I* assumed the contrary, *Murdoch III* holds it
11 "overruled." *Id.*, at 996, *see also* Vapnek, et al., *California*
12 *Practice Guide: Professional Responsibility* § 7:325 (Rutter
13 2010).

14        Thus, the Ninth Circuit expressly refused to assume the
15 validity of the first principle of defendant's argument.
16 Instead, the court held that a reasonable court could find that
17 the privilege never yields to a Confrontation Clause argument.

18                    (ii) <u>Even under the now-overruled, more lenient</u>
19                          <u>assumption from *Murdoch I*, the privilege</u>
20                          <u>would not need to yield in this case</u>

21        In addition to getting the general principle wrong,
22 defendant wrongly applies it. Even under the now-overruled, more
23 lenient assumption from *Murdoch I*, the privilege is not pierced
24 willy-nilly. Instead, *Murdoch I* assumed that the privilege might
25 yield only "in a particular case" and this is not such a case.
26 Defendant shows neither a need to pierce the privilege nor
27 anything but speculation about what he might find if the
28 privilege were pierced. Either of this is fatal to defendant's

1  demand to pierce the privilege.

2          (a)   Defendant has sufficient non-privileged

3                bases on which to cross-examine Rabbi

4                Yemini and Mr. Gluck

5      *Murdoch III*'s recognition of the limited scope of the

6  attorney-client privilege is the simplest reason why defendant's

7  claim here must be denied.  Like the cases cited below that have

8  considered this issue, a review of the already available evidence

9  here shows that defendant has ample bases for cross examination

10 without piercing any privilege.  As discussed earlier, defendant

11 can already cross-examine the witnesses about the underlying

12 facts, about communications intended for third parties, and about

13 statements to the government.  As pointed out by *Murdoch III*,

14 this means that even protecting attorney-client communications

15 typically leaves defendant with sufficient grounds for cross-

16 examination.

17     Defendant's right to cross-examine is not unlimited.  "[T]he

18 confrontation clause guarantees only 'an opportunity for

19 effective cross-examination, not cross-examination that is

20 effective in whatever way, and to whatever extent, the defense

21 might wish.'" *United States v. Owens*, 484 U.S. 554, 559 (1988)

22 (*quoting Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)).  Here,

23 the defense seems to argue that it would like to inquire into

24 attorney-client communication in order assess credibility and

25 perhaps bias.  But the Ninth Circuit has long held that to prove

26 a Confrontation Clause violation, defendant must show that he had

27 no other sources from which he could give the jury sufficient

28 information to assess the witness's credibility.  *See, e.g.,*

*United States v. James*, 139 F.3d 709, 714 (9th Cir. 1998). Here, defendant's other non-privileged sources of cross-examination on credibility and bias satisfy the Confrontation Clause. Defendant can already cross examine the government witnesses about their prior statements and their motives for cooperating or testifying.

Many courts have rejected Confrontation Clause arguments because defendant already had sufficient non-privileged bases on which to cross-examine. Indeed, *Murdoch II*, which adopted the now-overruled assumption of *Murdoch I*, nevertheless rejected Murdoch's habeas petition because the defendant had sufficient grounds for cross-examination without the privileged material. *Murdoch v. Castro ("Murdoch II")*, 489 F.3d 1063, 1069 (9th Cir. 2007). And *Murdoch I* court noted with approval Seventh and Eleventh Circuit cases in which the courts found no error in the protection of the privilege because the defense had sufficient opportunity to cross-examine the witness based on other material. *Id.* 365 F.3d at 703 (*citing United States v. Rainone*, 32 F.3d 1203 (7th Cir. 1994), *Mills v. Singletary*, 161 F.3d 1273 (11th Cir. 1998), and *Blackwell v. Franzen*, 688 F.2d 496 (7th Cir. 1982), which all found no error in refusing to invade the privilege because the defense had alternative bases for effective cross-examination).[30]

---

[30] Many other courts reach the same conclusion. *See e.g.*, *United States v. Smith*, 454 F.3d 707 (7th Cir. 2006) (affirming conviction because even without privileged material, the defense was able to question witness about biases arising from plea deal); *United States v. Fox*, 396 F.3d 1018 (8th Cir. 2005) (same); *Jenkins v. Wainwright*, 763 F.2d 1390, 1392-93 (11th Cir. 1985) ("In sum, the cross-examination was more than adequate to expose the witnesses' bias and self-interest. The abrogation of the attorney-client privilege was unnecessary to present a

1    A recent order from the Hon. James V. Selna of this Court
2 accepted a Report and Recommendation rejecting a Confrontation
3 Clause claim on just this logic.  In *Allison v. McDonald*, 2010 WL
4 5563567 (C.D. Cal. 2010), the petitioner pointed to evidence
5 raising questions about cooperators' statements to investigators.
6 The petitioner sought to interview the cooperators' lawyers,
7 claiming that their testimony would be relevant to the
8 petitioner's efforts to undercut the cooperators' credibility.
9 *Id.*, at *5.  Magistrate Judge Suzanne H. Segal recommended
10 denying the petition, finding that, first, *Murdoch III* held that
11 there is no established constitutional principle requiring the
12 attorney-client privilege to yield and that, second, the excluded
13 testimony was harmless to petitioner's Confrontation Clause
14 rights because petitioner had ample other bases on which to
15 explore the cooperators' biases and credibility.  *Id.*, at *10.
16 Judge Selna adopted Magistrate Judge Segal's Report and
17 Recommendation and denied the petition.  *Allison v. McDonald*,
18 2011 WL 91030 (C.D. Cal. 2011).

19                    (b)  Defendant's demand to pierce the
20                         privilege is based on sheer speculation
21    Even *Murdoch I*'s now-overruled assumption that the privilege
22 might yield was only in a case where the defendant makes a
23 "substantial showing" that the privileged information was
24 critical to cross-examination.  *Murdoch I*, 365 F.3d at 702.  This
25 underscores another problem with defendant's claim, namely,
26 nowhere does defendant say what it is he thinks he will find by
27 ─────────────────────
28  complete picture to the jury.")

58

piercing the privilege.  And it is certainly not the law that the privilege must yield to sheer speculation.  Especially where, as here, the witness is already subject to cross-examination based on non-privileged statements, this speculation does not support an invasion of the privilege.

Contrasting defendant's speculation in the present case to the "substantial showing" in *Murdoch I* reveals just how far short defendant's claim falls.  *Murdoch* was a murder case based largely on accomplice testimony some eleven years after the event. *Murdoch I* noted that "the record strongly suggests that without [the] accomplice testimony, the prosecution's case against Murdoch was weak."  *Id*., at 701.  Just before opening statements, the prosecution revealed to the court and defense counsel that she had discovered "[t]he existence of a letter, apparently written by [the accomplice] to his attorney, in which [the accomplice] allegedly exonerated Murdoch and claimed that his own statements to the contrary had been coerced by the police."  *Id.* The accomplice's lawyer invoked the attorney-client privilege and the trial court took possession of the letter but refused to disclose it to Murdoch's defense team.  *Id*., at 702.  The accomplice testified against Murdoch and Murdoch was convicted.

On habeas appeal, *Murdoch I* described the issue: "Today, we address a situation where a <u>substantial showing has been made</u> that, depending on the content of [the accomplice's] letter, the Confrontation Clause and attorney-client privilege are potentially at odds – a set of facts the Supreme Court has not yet examined."  *Id.* (emphasis added).  This highlighted phrase is the key to even the now-overruled holding in *Murdoch I*: the

1  defendant had already made a "substantial showing" that critical
2  cross-examination material was unavailable due to the privilege.
3  *Murdoch I* makes abundantly clear that the privilege does not
4  yield just because a defense attorney speculates that he might
5  learn something interesting from discovery of privileged
6  communications.  Indeed, if this were true, Murdoch-type cases
7  would occur every day: as a matter of course, defense counsel
8  would demand to pierce the privilege of every cooperating witness
9  to see if he or she might learn something interesting.  Even
10 defendant must concede that this is not the law.

11           (c)   Defendant's claim that he can pierce the
12                 privilege on the witness stand is
13                 inconsistent even with the now-overruled
14                 standard of *Murdoch I*

15        Defendant seeks a pre-trial ruling that the privilege must
16 yield and he seeks to cross-examine Rabbi Yemini and Mr. Gluck
17 about privileged material.  Apart from the other fatal defects
18 with this argument discussed above, even the now-overruled
19 *Murdoch I* refused to simply pierce the privilege, even after a
20 "substantial showing" had been made.  Instead, it required an in
21 camera review of the privileged material.  *Id.*, at 706.  Indeed,
22 after that review, *Murdoch II* held the privilege did not yield,
23 even under the rather extreme facts of that case.  *Murdoch II,*
24 489 F.3d at 1069.  No court has ever endorsed the cavalier and
25 public invasion of the privilege that defendant demands here.

26        In conclusion, interested non-parties respectfully submit
27 that defendant's demand to pierce the attorney-client privilege
28 must be rejected.  It has never been established that the

attorney-client privilege must ever yield.   Defendant already has
more than sufficient non-privileged bases on which to cross-
examine the government's witnesses.   And defendant fails entirely
to make any "substantial showing" of what supposedly critical
evidence he expects to learn from piercing the privilege.

Defendant's arguments would fail even under the more lenient
and now-overruled standard of Murdoch I.   Now that the Ninth
Circuit has rejected Murdoch I's more lenient assumption, they
fail *a fortiori*.   Defendant can sufficiently cross-examine the
government's witnesses and his Confrontation Clause argument must
be rejected.

3.   <u>Government's Position</u>

For its part, the government concurs with Interested Non-
Parties' analysis of the Confrontation Clause issues and
incorporates that argument as though fully set forth here.   For
the sake of brevity, the government does not simply repeat the
same argument for the purpose of circumventing defendant's
request that the Court discount the weight that should be given
the argument for the reason that it appears in a different
section of the same brief, which already exceeds 100 pages in
length.   The government writes separately only to point out only
that several federal courts of appeals have, like the Ninth
Circuit in the <u>Murdoch</u> cases, similarly labored to avoid the
troubling conclusion that a defendant's Sixth Amendment right of
confrontation required violation of the attorney-client
privilege.   <u>See</u> <u>United States v. Rainone</u>, 32 F.3d 1203, 1206-07
(7th Cir. 1994) (holding that notes written by witness to his
counsel were not necessary for effective cross-examination, where

61

defense counsel "spent three days cross-examining [the witness] and brought out among other things that he had committed perjury on a number of occasions, had bribed politicians and police officers, had engaged in extortion and loansharking, and had committed six murders") Mills v. Singletary, 161 F.3d 1273, 1288 (11th Cir. 1998) (holding that defendant could effectively cross-examine witness without attorney-client privileged materials that were cumulative of other inconsistent statements); United States ex rel. Blackwell v. Franzen, 688 F.2d 496, 501 (7th Cir. 1982) (upholding state courts' decision that defendant's right to cross-examine was not violated because the courts "balanced the interests served by the attorney-client privilege against what they determined to be the [low] probative value of the offered testimony").

    The government believes that, in this case, there is no basis for believing that defendant's Sixth of Amendment right of confrontation would be violated by protecting Mr. Gluck's privileged communications with Rabbi Yemeni, as well as Mr. Gluck's work product. As discussed above, those communications, as well Mr. Gluck's motives in informing the government of defendant's conduct, have little if any probative value to the charges and issues to be decided by the jury. Insofar as the defense wishes to probe Mr. Gluck's possible bias in this matter, they may do easily without violating the attorney-client privilege or upsetting the work-product doctrine.

    At bottom, the government believes that there is no reason why the defense cannot explore Mr. Gluck's motivations to help his client and hope that his client would receive a benefit

1  without questioning Mr. Gluck or Rabbi Yemeni about their

2  attorney-client privileged communications.[31]

3                              IV.

4          DEFENDANT'S MOTION RE EXCLUSION OF TEXT MESSAGES

5          The government seeks to introduce in its case-in-chief text

6  messages seized from the defendant's Blackberry.  Although

7  telephone toll records indicate that Mr. Villalobos sent or

8  received thousands of text messages during the time period

9  relevant to this case, only 87 text messages were transmitted

10 from the government "filter" team to the prosecution team.[32]  Of

11 these 87, the government seeks to introduce up to 68 messages at

12 trial.  Most of the 68 text messages are between the defendant

13 and his client, Avi Angel; a few are between the defendant and

14

_____

15     [31]  Of relevance, Rabbi Yemeni has <u>already</u> received a
   pretrial diversion agreement partly as a result of Mr. Gluck's
16 assistance.  It is therefore unclear how Mr. Gluck's future
   assistance to the government, i.e., by testifying at trial, or
17 Mr. Gluck's motivation(s) to provide that assistance, now bear on
   the credibility of Mr. Gluck's trial testimony.  In addition,
18 defendant gives no thought at all to other ways in which Mr.
   Gluck's motives could be explored, such as by calling as a
19 witness the AUSA with whom Mr. Gluck had discussions concerning
   Rabbi Yemeni's case.
20
       [32]  Based on the state of the law at the time of the seizure
21 of defendant's BlackBerry and, additionally, because defendant is
   an attorney, the initial search of the BlackBerry was performed
22 by a "filter" team of an FBI agent and an Assistant United States
   Attorney who are "walled off" from the prosecution team.  The
23 entire download of <u>all</u> text messages recovered from defendant's
   BlackBerry at the time of the seizure of that device have been
24 produced to defendant in discovery.  The filter team provided
   only 87 messages to the prosecution team, including all
25 recoverable messages to/from defendant and Orit Anjel's husband,
   Avi Anjel. Defendant has agreed to produce to the government, a
26 reasonable period prior to trial, anything on the BlackBerry that
   defendant intends to use at trial which was retained by the
27 "filter" team and not provided to the prosecution team.

28

other persons, whom the government believes to be members of defendant's family.

    As noted above, on January 28, 2011, the parties met in person and discussed the text messages.  Through an on-going dialogue, the parties have agreed on a number of messages that the government will not seek to introduce, and others which the government will seek to introduce but which are not objectionable to the defense.  There remain numerous text messages which the government will seek to offer in evidence in its case-in-chief but, in whole or in part, are objectionable to the defense.

    The parties agree that, as the proponent of the evidence sought to be admitted, the government bears the burden of establishing the relevance of the text messages.

    Below, the parties present each text message in dispute in chronologic order, as well as other relevant events surrounding the disputed text message (e.g., telephone calls, emails, etc).  After the text message, the government sets forth its position on admissibility, followed by the defendant's objections.  The text messages to which defendant objects appear in bold.  Where the defense objects to only a portion of a text message, the objectionable language is in bold and italicized.  The text messages appear below with the abbreviations, grammatical errors and misspellings contained in the actual messages.[33]

---

[33] The defense believes many of the text messages between the defendant and Avi Anjel are attorney-client privileged communications.  However, the government has advised that Mr. Anjel waived the attorney-client privilege for his communications with the defendant. The government provided the defense with a copy of Mr. Anjel's and his attorney's signed privilege waiver.  Accordingly, the defense does not assert that the text messages

| 2/5/09 | 12:29 p | Villalobos text to Avi Angel | "*Get your fat ass up*.  Come to my house at 10 am please we drink coffee and you see the letter *yala* by" Text #3353 |
|--------|---------|------------------------------|---------------------------------------------------------------------------------------------------------------------------|

1.  <u>Government's Position</u>

    a.  <u>The Investigation and the Charges</u>

Defendant is charged with endeavoring to obstruct justice and attempted extortion in connection with defendant's representation of Avi Anjel's wife, Orit Anjel, as a witness in a federal grand jury investigation of suspected religious worker visa fraud by Rabbi Yemeni.  Mr. Gluck, who represented Rabbi Yemeni in the grand jury investigation, reported to the government that he believed that defendant was attempting to extort Rabbi Yemeni and to "sell" Rabbi Yemeni false exculpatory statements Orit Anjel would make to the federal grand jury and the Assistant United States Attorney directing the investigation of Rabbi Yemeni.  Mr. Gluck reported that defendant was using his client Orit Anjel's statement to the government and anticipated grand jury testimony to leverage the settlement of a supposed employment claim Orit Anjel had against Rabbi Yemeni.

Mr. Gluck agreed to act as an informant in an undercover operation intended to determine whether defendant was endeavoring to obstruct the grand jury investigation and/or attempting to extort money from Mr. Gluck and Rabbi Yemeni.  During the course of the ensuing investigation, the government monitored and

_____

are inadmissible because they are privileged.

1  recorded several telephone conversations and meetings between Mr.
2  Gluck and defendant.

3       During these conversations, defendant offered that, in
4  exchange for monetary payments and other items of value, he would
5  have Orit Anjel make statements that would falsely exculpate
6  Rabbi Yemeni.  Specifically, defendant made clear that, assuming
7  that he and Mr. Gluck had a "deal," Orit Anjel would make false
8  statements during an interview with the Assistant United States
9  Attorney and would repeat those false statements during
10 anticipated grand jury testimony.  Defendant also suggested
11 several ways that the payoff could be disguised as the settlement
12 of a legal claim, and ways law enforcement detection could be
13 avoided.

14          b.   The Government and Defense Theories of the Case

15      Defendant claims that he never had the intent to obstruct
16 the grand jury investigation of Rabbi Yemeni, and that at all
17 times he was merely trying to settle a legitimate employment
18 claim for his client, Orit Anjel, for unpaid wages owed to Orit
19 Anjel based on her former employment with CIC.  As to the
20 attempted extortion count, moreover, defendant claims that his
21 exploitation of Rabbi Yemeni's fear was not "wrongful" because he
22 and Orit Anjel had a legitimate claim to the money and other
23 things of value he demanded of Mr. Gluck during the recorded
24 conversations.

25      Orit Anjel has informed the government that she never
26 discussed business or legal matters with defendant, and any such
27 communications would have been between defendant and Avi Anjel.
28 The text messages represent the only communications in the

1  government's possession between defendant, on the one hand, and
2  Avi Anjel, on the other.  In general, the text messages establish
3  that defendant was in contact with Avi Anjel throughout the time
4  period beginning with defendant's first approach to Rabbi Yemeni
5  (in February 2009) and ending with defendant's arrest (on August
6  4, 2009).  The text messages also tend to establish that
7  defendant and Avi Anjel discussed defendant's initial approach to
8  Rabbi Yemeni and later dealings with Mr. Gluck throughout this
9  period.

10       The specific content of the text messages (including this
11  text message) also show the nature of the defendant's
12  relationship with Avi Anjel -- a matter of significance in light
13  of defendant's defense, which seeks to portray defendant's
14  relationship with Avi Anjel as an arm's length attorney-client
15  relationship, with the sole objective, vis-a-vis Rabbi Yemeni and
16  the Center, of settling Orit Anjel's supposed claim against the
17  Center for unpaid wages.  Accordingly, evidence of the nature of
18  defendant's relationship with Avi Anjel is relevant to proving
19  defendant's extortion scheme and his endeavors to obstruct the
20  administration of justice.

21       The government's theory of the case is that defendant and
22  Avi Anjel discovered an opportunity to exploit Rabbi Yemeni's
23  fear of an ongoing investigation of him to achieve what each of
24  them wanted -- much needed money for defendant (as to whom the
25  government's evidence will establish was, although from a wealthy
26  family, personally destitute and far behind on his debts), and a
27  visa for Avi Anjel (as to whom the evidence will establish wished
28  to remain in the United States, but whose only basis for doing so

1  was through a religious worker visa fraud scheme then in the

2  process of being exposed) -- and defendant then executed an

3  extortion scheme he and Avi Anjel devised.

4          c.   Admissibility of Defendant's Text Messages

5        Defendant takes the position that the jury should not be

6  permitted to review the complete, unredacted, and unfiltered

7  versions of his text messages with Avi Anjel and others, and that

8  the Court should excise from those messages profanities and other

9  selections by defendant.  In doing so, defendant asks the Court

10 to exclude evidence that is both relevant (1) proof of

11 defendant's crimes; and (2) cross-examination of Avi Anjel, who

12 defendant has indicated will be a critical defense witness.

13 Defendant argues that evidence concerning the nature of

14 defendant's relationship with Avi Anjel is, alternatively,

15 "character evidence," or "not an element of either charged

16 offense."  Both arguments are misplaced.

17        To begin with, count one of the indictment charges defendant

18 on an "endeavor" theory.  An endeavor is less than an attempt.

19 The term "endeavor" means to knowingly and deliberately act or to

20 knowingly and deliberately make any effort which has a reasonable

21 tendency to bring about a particular result.  O'Malley, Grenig &

22 Lee, Federal Jury Practice and Instructions, § 48.05 (6th ed.

23 2009) ["Endeavors"—Defined] (first sentence); United States v.

24 Russell, 255 U.S. 138, 143 (1921).  Any of defendant's text

25 messages could establish the element of an "endeavor" if sent

26 "with a corrupt motive."  See e.g., United States v. Cintolo, 818

27 F.2d 980, 991 (1st Cir. 1987) ("any act by any party -- whether

28 lawful or unlawful on its face -- may abridge Section 1503 if

68

performed with a corrupt motive").  Count two charges defendant, over the course of a six-month period, with attempted extortion, in violation of the Hobbs Act.  Defendant's text messages collectively prove that defendant committed a "substantial step" towards the crime of extortion and that his actions were not limited to "mere preparation."  Ninth Circuit Model Crim. Jury Instr. 8.142 (Hobbs Act extortion).  Accordingly, defendant's text messages are direct evidence of an element of each of the charges against defendant.

In addition, the legal relevancy of an item of evidence is not determined based upon whether it establishes an element of an offense, but whether it has "any tendency to make the existence of any fact that is of consequence . . . more or less probable." Fed. R. Evid. 401.  Evidence concerning the nature of defendant's relationship with Avi Anjel is relevant under Rule 401 because it establishes the government's theory of the case, as described above, even if every text message sought to be admitted does not directly establish an "element of either charged offense."

As to defendant's character evidence argument, defendant's text messages are simply not "character evidence" within the meaning of Federal Rule of Evidence 404.  The messages generally, including this particular text message, are not being offered by the government on the theory that defendant is rude and uses profanity, and is therefore a criminal.  Rather, defendant's text messages with Avi Anjel, and this message particularly, are direct evidence that (1) supports the government's theory that defendant and Avi Anjel together contrived a scheme to extort Rabbi Yemeni for both monetary payments and the continued

69

sponsoring of a fraudulent religious worker visa for Orit Anjel;
and (2) refutes defendant's theory that he is a licensed attorney
merely trying to negotiate a settlement of a disputed employment
claim on behalf of a client.  In addition to be direct evidence
of elements of charged offenses, the evidence is admissible as
substantive evidence not subject to limitation under Federal Rule
of Evidence 404, because, at a minimum, it is "inextricably
intertwined" with charged offenses.  <u>United States v. Lilliard</u>,
354 F.3d 850, 854 (9th Cir. 2003); <u>United States v. Sayakhom</u>, 186
F.3d 928, 937-38 (9th Cir. 1999).

Evidence is "inextricably intertwined" with a charged crime
if it (1) "constitutes a part of the transaction that serves as
the basis for the criminal charge," or (2) is necessary "to
permit the prosecutor to offer a coherent and comprehensible
story regarding the commission of the crime." <u>United States v.</u>
<u>Matthews</u>, 240 F.3d 806, 817 (9th Cir. 2000), <u>overruled on other</u>
<u>grounds</u>, 278 F.3d 880 (9th Cir. 2002) (internal quotation marks
omitted).[34]

In sum, the text messages are direct evidence that establish

_____

[34] Similarly, where a scheme is at issue, evidence of
conduct not expressly charged in the indictment may still be
direct evidence of a defendant's involvement in the charged
scheme and is therefore admissible regardless of Rule 404(b).
<u>United States v. Williams</u>, 989 F.2d 1061, 1070 (9th Cir. 1993)
(methamphetamine purchases that predated the charged conspiracy
were part of "single criminal episode" and was therefore
admissible as evidence that was "inextricably intertwined" with
the charged scheme); <u>United States v. Boone</u>, 951 F.2d 1526, 1540
(9th Cir. 1991).  Thus, "the policies underlying [Rule 404(b)]
are simply inapplicable when some offenses committed in a single
criminal episode become 'other acts' because the defendant is
indicted for less than all of his actions." <u>United States v.</u>
<u>Soliman</u>, 813 F.2d 277, 279 (9th Cir. 1987).

1  elements of crimes charged.  Separately, they are inextricably

2  intertwined with evidence of offenses charged, and their

3  admission is not precluded under Rule 404 because they are not

4  offered as propensity evidence.  There is a vehicle by which

5  defendant could seek the exclusion of evidence -- Rule 403's

6  "although relevant" standard.  Defendant has utterly failed,

7  however, to articulate any basis for exclusion under Rule 403 or

8  to develop any arguments based upon Rule 403 despite the Court's

9  continued patience in allowing defendant every opportunity to do

10  so.

11                 i.   Defendant's Use of "Yala"

12       "Yala," typically transliterated "yalla," is Israeli/Arabic

13  slang for "let's go," "OK," or "next."  It is said to move things

14  along and it is slightly condescending to the person to whom it

15  is said.  As an example, one might say "yala" to a service worker

16  who is moving to slowly, but one would not say it to a superior,

17  or to a person with whom one has a formal business relationship.[35]

18  As used in defendant's text messages with Avi Anjel, the word

19  does not appear to have a particularly offensive meaning, and

20  defendant does not argue otherwise.  Defendant's use of "yala" is

21  certainly not the entire basis for the government's case, but it

22  does incrementally tend to establish defendant's and Avi Anjel's

23  familiarity and informality with one another, and these points

24  are themselves important -- and meet the legal definition of

25  _____

26       [35]  Defense counsel has informed the government that,
    although defendant seeks to have the Court redact "yala" from
27  defendant's text messages, the defense has no position on the
    meaning of the word.  According to defense counsel, the same is
28  true of "baboso," a Spanish word discussed below.

relevance, Fed. R. Evid. 401 -- in a case where the defense intends to cast defendant's relationship with Avi Anjel and a straightforward, arm's length attorney-client relationship.   In any event, the use of "yala" (either here or elsewhere in defendant's text messages) is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Fed. R. Evid. 403, and defendant does not articulate any reason why he believes it would be.   Defendant instead rests his argument on the "broad brush" and undeveloped statement that "yala" is "irrelevant, inflammatory, prejudicial, cumulative and [does] not tend to prove any of the elements for either the obstruction of justice or extortion counts" without any analysis at all or, for that matter, even acknowledgment of the meaning of the word.   The redactions defendant proposes, moreover, create a risk that the jury to speculate as to what was has been excised from the text messages.[36]

### ii.   "Get Your Fat Ass Up"

In straightforward, arm's length attorney-client relationship, attorney's do not ordinarily bid their clients good morning with a text message that reads "Get your fat ass up," followed by instructions that the client come to the attorney's home to review the letter that was used to kick off defendant's

---

[36]   Defendant need not be concerned that the "jury would only speculate on [the] meaning" of yala and other foreign words used by defendant in his text messaging.   If the parties are unable to reach an agreement on the meaning of a foreign language term, the government will call a witness to establish the meaning of that foreign term.

extortion scheme.   It is true that this text message is crude language by defendant, but it is usage that supports the government's theory that defendant and Avi Anjel discovered -- and then availed themselves of -- an opportunity to exploit Rabbi Yemeni to achieve what each of them wanted -- much needed money for defendant and a visa for Avi Anjel.   Defendant then executed that scheme, beginning with the February 5, 2009 letter referenced in this text message.   Defendant is, therefore, incorrect in his assertion that this text message is not probative.

Defendant is also incorrect that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, such that the Court should selectively sanitize the this text message and preclude the jury from hearing the manner in which defendant and Avi Anjel interact with one another. Although it is not polite society to greet a familiar person (or anyone) with "Get you fat ass up," this text message hardly presents a realistic risk that, owing to whatever delicate sensibilities some jurors may possess, the jury as a whole would be so emotionally provoked by defendant's crass language that they would convict him of extortion or obstruction of justice because of it.  Cf. United States v. Ramirez-Jiminez, 967 F.2d 1321, 1327 (9th Cir. 1992) ("Unfair prejudice is measured by the extent to which the testimony makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or

73

1  innocence of the crime charged").[37]

2      2. <u>Defendant's Position</u>

3      Defendant moves to exclude the italicized portions of this

4  message because they are irrelevant, inflammatory, prejudicial,

5  cumulative and do not tend to prove any of the elements for

6  either the obstruction of justice or extortion counts.  Rule 403,

7  FRE; *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992)

8  ("Where the evidence is of very slight (if any) probative value,

9  it's an abuse of discretion to admit it if there's even a modest

10 likelihood of unfair prejudice or a small risk of misleading the

11 jury"); *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327

12 (9th Cir. 1992) ("Unfair prejudice is measured by the extent to

13 which the testimony makes conviction more likely because it

14 provokes an emotional response in the jury or otherwise tends to

15 affect adversely the jury's attitude toward the defendant wholly

16 apart from its judgment as to his guilt or innocence of the crime

17 charged"); *United States v. Brown*, 720 F,2d 1059, 1069 (9th Cir.

18 1983) (testimony by a government witness solely about the

19 defendant's offensive language was "inherently likely to inject

20 prejudice an animosity into [the defendant's trial]").

21      The government's lengthy explanation, while difficult to

22 follow, appears to assert that the objected to language (in this

23 and numerous other text messages) demonstrates the nature of the

24 defendant's relationship with his client, and refutes the claim

---

25      [37]  Finally, the circumstances here present are hardly

26 similar to those in <u>United States v. Brown</u>, 720 F.2d 1059, 1069
   (9th Cir. 1983), cited by defendant, in which the Court of Appeal

27 found erroneous the admission of testimony the "sole content of
   [which] was to depict [defendant] as a bad man because of his

28 vulgar [racist] statements" to police.  <u>Id.</u>

1  that the defendant had a "straightforward, arm's length attorney-
2  client relationship."  The logical sequence, according to the
3  government, is: (1) Defendant and Mr. Anjel, attorney and client,
4  use "swear words" and comfortable-sounding, but foreign words in
5  communicating with each other; (2) attorneys and clients who
6  converse in such a manner have something other than a
7  "straightforward" or "arm's length" relationship; (3) attorneys
8  who foster or engage in relationships with clients that are other
9  than "straightforward" or "arm's length" are more apt to commit
10 extortion or to endeavor to obstruct justice than are attorneys
11 whose client relationships are more "traditional;" and (4)
12 therefore, defendant use of such language shows that he is more
13 likely to have committed the crimes of extortion and obstruction
14 of justice as charged here.  This, however, is nothing more than
15 inadmissible character evidence.  *See* FRE 404.

16     The defendant's relationship with his client is not an
17 element of either charged offense, nor does the defendant's
18 relationship tend to prove whether the defendant committed the
19 offenses.  Further, the claim that this language shows that the
20 defendant's relationship with Avi Anjel was not "straightforward,
21 arm's length" - whatever those terms mean - is precisely the
22 type of speculation that a jury should avoid.

23     The terms "yala" and "babosa" appear frequently throughout
24 the text messages.  They appear to be salutations common only to
25 the defendant and Mr. Angel.  The defense objects to the
26 introduction of these terms in, as the jury would only speculate
27 on their meaning.  Because the salutations are irrelevant to the
28 case, and the jury would only speculate on their meaning and

1  inclusion, they should be excluded from the government's case-in-

2  chief.  The government's advisement that it will call one or more

3  witnesses solely to translate these terms to the jury only adds

4  weight to the defendant's objection under Rule 403.

| 6/9/09 | 6:04 p | Avi Angel text to Villalobos | No content provided. |
|--------|--------|------------------------------|----------------------|
|        | 6:07 p | Avi Angel text to Villalobos | No content provided. |
|        | 6:08 p | Avi Angel text to Villalobos | No content provided. |
|        | 6:17 p | Villalobos to Avi Angel | No content provided. |
|        | 7:41 p | Villalobos to Avi Angel | **"what happened to my money vavaso"** Text #1581 |
|        | 7:43 p | Avi Angel text to Villalobos | No content provided. |
|        | 7:43 p | Villalobos to Avi Angel | **"Almost???"** Text #1580 |
|        | 8:05 p | Villalobos to Avi Angel | No content provided. |
|        | 8:07 p | Villalobos to Avi Angel | No content provided. |
|        | 8:09 p | Villalobos to Avi Angel | No content provided. |
|        | 8:18 p | Villalobos to Avi Angel | No content provided. |
|        | 8:24 p | Avi Angel text to Villalobos | No content provided. |
|        | 8:24 p | Villalobos to Avi Angel | **"Fack yu yala by"** Text #1579 |

    1.  <u>Government's Position</u>

    A conversation in which defendant demands money from his

"client" and then ends by telling his client "fuck you . . . bye"

is highly relevant to show that defendant is destitute and

1  therefore has a financial motive for committing the extortion

2  alleged.

3        Defendant's arguments regarding the use of the word "baboso"

4  fail for the same reason as his earlier arguments about "Get your

5  fat ass up."  "Baboso" (spelled/mispelled in a number of ways in

6  the text messages), is a Spanish word that refers to an idiot or

7  moron, and connotes a person who drools on himself.[38]  It is a

8  typical way that Spanish speaking men address one another in a

9  jocularly insulting way.  In the same way that a lawyer would not

10 greet his client by telling him to "get [his] fat ass up," he

11 would also not refer to him as "baboso."  Similarly, attorney-

12 client relationships are not typically characterized by an

13 attorney bidding his client "fuck you . . . bye," no matter how

14 spelled.  This conversation is, accordingly, relevant to

15 establish the nature of defendant's relationship with Avi Anjel

16 and that the relationship was is not the arm's length attorney-

17 client relationship defendant would have the jury believe it was.

18       Defendant complains that, because some text messages are

19 missing (including the majority of the Avi Anjel half of the text

20 message "conversations"), the so-called "rule of completeness,"

21 Fed. R. Evid. 106, requires the exclusion of these text messages.

22 Defendant's legal analysis is incorrect.

23       Rule 106 provides:

24       When a writing or recorded statement or part thereof is

25          introduced by a party, an adverse party may require the

26 _____

27       [38]  As indicated above, defense counsel has informed the
   government that defendant has no position on the meaning of
28 "baboso."

1    introduction at that time of any other part or any

2    other writing or recorded statement which ought in

3    fairness to be considered contemporaneously with it.

4 Fed. R. Evid. 106.   In other words, Rule 106 allows a party to

5 seek the introduction of evidence that would otherwise be

6 inadmissible at that time when "fairness" requires the

7 introduction of the other evidence to prevent a trier of fact's

8 view from being distorted.   The rule is not an exclusionary

9 rule.[39]   If defendant believes that the text messages leave

10 ─────────────────

11        [39]   The single authority cited by defendant in support of
his Rule 106 argument -- a district court opinion from the

12 Northern District of New York -- is inapposite.   The defendant
in *Yevakpor* was charged with the importation of heroin from

13 Canada.   419 F. Supp. 2d at 243.   The government's evidence
against him included segments of a video of the search of the

14 defendant.   *Id.* at 244.   The entirety of the video of the search
was deliberately recorded over by the government and was never

15 made available to the defense.

16        The defendant filed a motion challenging the government's
use of three one-minute video segments taken from a 25-minute

17 video, arguing that the "surveillance provided to the defendant
to date is not complete and only represents a small clip of the

18 entire time the defendant was recorded in and about the secondary
inspection area."   *Id.*

19
        The district court found that the government had

20 affirmatively chosen to preserve the three video segments,
representing 12.5% of the total video the government had taken,

21 "to the exclusion of the rest [87.5%] of the video surveillance."
*Id.* at 245, 251.   Given this finding and the facts supporting it,

22 the Court was unable to make a ruling on the "rule of
completeness" argument defendant raised.   The basis for the

23 Court's decision excluding the video was the government's failure
to meet "its duty to preserve discoverable evidence," despite

24 several times having "long been on notice of its duty to [do so]"
and after being "repeatedly warned of the jeopardy in which it

25 places its prosecutions when it disregards this obligation."   *Id.*
at 248.   Given the court's finding that the destruction was

26 deliberate, sanctions were appropriate unless the government was
able to "bear the heavy burden of demonstrating that no prejudice

27 resulted to the defendant."   *Id.*   In *Yevakpor*, that sanction was

28

1  matters "misunderstood or distorted," defendant can offer other

2  evidence to clarify whatever he believes is unclear.  Rule 106

3  does not, however, in and of itself, provide a basis for

4  exclusion of evidence.

5       Even if Rule 106 provided a basis for the exclusion of

6  evidence, the "incompleteness" of which defendant complains is

7  his own doing, and he cannot, therefore, be heard to complain

8  about completeness or lack thereof.  The reason for the missing

9  text messages, including the Avi Anjel's portion of the

10 conversation, is defendant's deletion of almost all of Avi

11 Anjel's text messages from defendant's text message "inbox."  It

12 appears either to have neglected or simply forgotten to do the

13 same with at least parts of defendant's text message "outbox."[40]

14 _____

15 the court's exclusion of the video, but the basis for exclusion
   was not Federal Rule of Evidence 106, as defendant argues to this

16 Court.  Id. at 251-52 ("The affirmative directive to preserve
   only 12.5% of video, to the exclusion of the remaining 87.5%,

17 smacks of impropriety by an investigatory agency involved in the
   prosecution of the case currently at bar.   . . .This Court finds

18 that there exists sufficient bad faith to warrant sanctions.  . .
   . Exclusion is an appropriate sanction given the government

19 agency's deliberate destruction of evidence, in light of its
   knowledge that the evidence could have been used in prosecution

20 or defense. Therefore, the video segments are excluded.")

21      Here, moreover, the government was in no way responsible for
   the inability to recover the "missing" text messages.  Rather,

22 the government preserved all the evidence it seized and has
   produced to defendant the entirety of the content of defendant's

23 BlackBerry -- including items not possessed even by the

24 government prosecution team.  What is "missing" are messages
   defendant deleted prior to his arrest and the seizure of the

25 BlackBerry.

26      [40]  Throughout the extortion scheme, defendant repeatedly
   took steps to prevent law enforcement detection of the scheme,

27 including attempting to conceal his and Mr. Gluck's identities by
   the use of pseudonyms and coded language, requesting that Mr.

28 Gluck not create written evidence of defendant's crimes and

1  The remaining content of defendant's text message "outbox," i.e.,

2  defendant's "sent" text messages are what the government intends

3  to offer (together with some limited "inbox" content defendant

4  did not delete).   Defendant cannot simply assert the other

5  messages are "unavailable" and pretend that he had nothing to do

6  with their unavailability.

7       Finally, defendant has once again fails to articulate why

8  these text messages are "irrelevant,  inflammatory, prejudicial,

9  cumulative," and merely asserts that they are.

10      2.   Defendant's Position

11      Defendant moves to exclude these messages because they are

12  irrelevant, inflammatory, prejudicial, cumulative and do not tend

13  to prove any of the elements for either the obstruction of

14  justice or extortion counts.   In fact, the messages are largely

15  unintelligible and likely do not relate to any of the facts at

16  issue in this case.  *Hitt, supra, Ramirez-Jiminez, supra, Brown,*

17  *supra.*  The government's subjective observations of what a lawyer

18  would or would not do, or how an attorney client relationship is

19  "typically characterized," have no basis in fact and are

20  irrelevant to this action.

21  _____

22  contact him by telephone only (reminding Mr. Gluck that
    authorities could not "subpoena a telephone conversation"), and
23  agreeing to deny he receipt of the extortion payment should
    defendant ever be questioned about the matter.  Defendant's
24  deletion of his incriminating text messages is, of course,
    consistent with this pattern.
25

26      The government will present evidence at trial concerning the
    recovery of text messages from defendant's BlackBerry.
27  Accordingly, defendant's concern that "[t]he government
    attributes the missing text messages to defendant, but offers no
28  factual basis for this claim" is unfounded.

1    Further, the recovered text messages are each preceded by
2  other text messages that are unavailable, but ought in fairness
3  be considered contemporaneously with these exchanges.  Pursuant
4  to Rule 106, FRE, "When a writing or recorded statement or part
5  thereof is introduced by a party, an adverse party may require
6  the introduction at that time of any other part or any other
7  writing or recorded statement which ought in fairness to be
8  considered contemporaneously with it."  The Supreme Court has
9  interpreted Rule 106 to mean that when excluded portions of
10 documentary evidence are necessary to avert a "misunderstanding
11 or distortion," those portions are *ipso facto* admissible under
12 Rules 401 and 402.  *See Beech Aircraft Corp. v. Rainey,* 488 U.S.
13 173 (1988) (citing 1 J. Weinstein & M. Berger, Weinstein's
14 Evidence ¶ 106, p. 106-20 (1986)).  When the excluded portions of
15 a writing are unavailable, the remaining evidence should be
16 deemed inadmissible when it is necessary to explain the admitted
17 portion, place it into context, ensure a fair and impartial
18 understanding of the admitted portion, or to correct a misleading
19 impression.  *See United States v. Yevakpor,* 419 F.Supp.2d 242,
20 249-50 (N.D.N.Y. 2006), *citing United States v. Rivera,* 61 F.3d
21 131, 135-36 (2d Cir. 1995) ("The government cannot make use of
22 video segments that have been cherry-picked when the remainder of
23 the recording has been erased or recorded-over subsequent to a
24 defendant's arrest").
25    Here, the government seeks to introduce intermittent
26 statements of a text message conversation, but the balance of the
27
28

81

1  dialogue which places those statements in context are unknown.[41]

2  The nature of these messages, without the benefit of the

3  preceding messages, results in an unintelligible or ambiguous

4  understanding of the actual exchange.

5     As the Court will see, the balance of the text messages

6  contain statements and language which are similarly

7  objectionable.  The defendant does not see the need to provide

8  lengthy discussions of the inadmissibility of each message, or

9  portion thereof, when the analyses under Rules 403 and 106 are

10 the same.

11

| | | | |
|---|---|---|---|
| 6/10/09 | 6:49 p | Villalobos text to Avi Anjel | No content provided. |
| | 6:49 p | Villalobos text to Avi Anjel | No content provided. |
| | 6:57 p | Villalobos text to Avi Anjel | "I will tell two ladies to come to lunch tomorrow to Sushi, two cute ladies" #1553 |
| | 6:57 p | Villalobos text to Avi Anjel | No content provided. |
| | 6:58 p | Villalobos text to Avi Anjel | **"youi pay fahker"** Text #1552 |

20     1.  <u>Government's Position</u>

21     In a text message defendant sent Avi Anjel at 6:45 p.m. on

22 the same day, defendant demanded from Avi Anjel $100 Avi Anjel

23 apparently owes him.  This context makes relevant "you pay

24 fucker," which is a second or subsequent demand for the money,

25 and it is relevant to defendant's financial motive to commit the

26

27 _____

28    [41]  The government attributes the missing text messages to
   defendant, but offers no factual basis for this claim.

extortion alleged.  Defendant's language is also probative of the
nature of his relationship with Avi Anjel.

Defendant's "rule of completeness" objection is misplaced
for the reasons, set forth in greater detail above, that
defendant would free to fill in any necessary background to
prevent a misunderstanding or distortion through any permissible
means (including his own testimony), and that Rule 106 is not an
exclusionary rule, but a rule that provides for the inclusion of
other, otherwise then inadmissible evidence, when considerations
of fairness would require the admission of such evidence.

Defendant provides no analysis of the Rule 403 objections he
makes.

2.  <u>Defendant's Position</u>

Defendant moves to exclude this message because it is
irrelevant, inflammatory, prejudicial, cumulative and does not
tend to prove any of the elements for either the obstruction of
justice or extortion counts.  In fact, the message is largely
unintelligible and likely does not relate to any of the facts at
issue in this case.  *Hitt, supra, Ramirez-Jiminez, supra, Brown,
supra.*

Further, pursuant to Rule 106, the recovered text message is
preceded by other text messages that are unavailable, but ought
in fairness be considered contemporaneously with this message.
Because the explanatory text messages are not available, the
recovered text message should be excluded.  *Beech Aircraft
Corp., supra; Yevakpor, supra; Rivera, supra.*

| 7/1/09 | 12:25 a | Villalobos text to Avi Angel | "Still at my sister in laws house *f u* sorry talking with my sister in laws and brother in laws sorry trying to deal with family problems for my little brother in law.  Family is very important and I need to help with this problem.  I will see you tomorrow. *Yala* by" Text #1479 |

1.  Government's Position

It is pretty obvious from the context that defendant and Avi do not have the arm's length attorney-client relationship defendant is attempting to portray.  This message is relevant to establish the true nature of their relationship.

Again, no analysis by defendant.

2.  Defendant's Position

For the reasons previously set forth above, the defendant moves to exclude the italicized portions of this message because it is prejudicial, inflammatory, irrelevant, cumulative and does not tend to prove any of the elements for either the obstruction of justice or extortion counts.  *Hitt, supra, Ramirez-Jiminez, supra, Brown, supra.*

| 7/6/09 | 4:41 p | Villalobos text to Avi Angel | **"I just left a present for you with the babysitter fuck you yala by"** Text #1377 |
| | 5:02 p | Villalobos text to Avi Angel | **"Avi meet me at victory and platt I just had a car accident my car is fucked up yala by"** Text #1376 |

1.  Government's Position

It is pretty obvious from the context that defendant and Avi Anjel do not have the arm's length attorney-client relationship defendant is attempting to portray, however, and these text

84

1  messages are relevant to establish the nature of their
2  relationship.
3       Again, no analysis from defendant.
4       2.   Defendant's Position
5       For the reasons previously set forth above, the defendant
6  moves to exclude these messages because they are irrelevant,
7  inflammatory, prejudicial, cumulative and do not tend to prove
8  any of the elements for either the obstruction of justice or
9  extortion counts.  The first message is largely unintelligible;
10 neither message relates to any of the facts at issue in this
11 case.  *Hitt, supra, Ramirez-Jiminez, supra, Brown, supra.*
12

| 7/10/09 | 9:47 a | Villalobos text to Avi Angel | "OK Monday let's get it done **yala be careful at Isabella**" Text #1261 |
|---------|--------|------------------------------|--------------------------------------------------------------------------|

15      1.   Government's Position
16
17      July 10, 2009 was a Friday.  At the time of the extortion
18 scheme, Avi Anjel lived in the San Fernando Valley.  Lake
19 Isabella is approximately two and one-half hours north of Los
20 Angeles, in Kern County.  Many people, apparently including Avi
21 Anjel, go to Lake Isabella to fish, camp, etc., on summer
22 weekends.  The is no unfair prejudice associated with Lake
23 Isabella, and defendant does not even attempt to articulate any.
24 Defense counsel has informed the government that defendant does
25 not have a position about the meaning what defendant's use of
26 "Isabella."
27      In this message, "let's get it done" appears to refer to
28 matters related to the extortion scheme, in light of the greater

context of this text message, which includes defendant's veiled threat, as described in response to the next message. Inclusion of evidence related to Avi Anjel's trip to Lake Isabella, moreover, will be useful in direct Mr. Anjel to the relative dates and times of events relevant to the government's case.

Defendant offers no analysis of the objections he asserts.[42]

2.   Defendant's Position

For the reasons previously set forth above, the defendant moves to exclude the italicized portion of message because it is irrelevant, prejudicial, cumulative and does not tend to prove any of the elements for either the obstruction of justice or extortion counts. *Hitt, supra, Ramirez-Jiminez, supra, Brown, supra.* If presented in the government's case-in-chief, the jury would not know whether "Isabella" referred to an individual or a location, and would likely speculate on its inclusion in the message.

| 7/13/09 | 11:39 a | Villalobos text to Avi Angel | "***Are you at Isabella?*** Call me!" Text #1151 |
|---------|---------|------------------------------|--------------------------------------------------|

1.   Government's Position

The content of this message again makes clear that "Isabella" is a reference to a location and not a person.

Inclusion of evidence related to Avi Anjel's trip to Lake Isabella will be useful in direct Mr. Anjel to the relative dates

---

[42] Defendant's assertion that "[i]f presented in the government's case-in-chief, the jury would not know whether "Isabella" referred to an individual or a location, and would likely speculate on its inclusion in the message" is completely a red herring, as defendant's use of "at Isabella" makes pretty obvious that "Isabella" refers to a place and not a person.

and times of events relevant to the government's case.  Moreover, defendant takes this text message completely out of its (highly relevant) context.  This message was immediately preceded by an email, six minutes earlier, from defendant to Mr. Gluck.  In the email, defendant threatened Mr. Gluck that Rabbi Yemeni had to "get a framework of an understanding regarding [Orit Anjel] and [Rabbi Yemeni] today" because Orit Anjel "has an appointment with the investigating office tomorrow morning and it seemed to be in both of our interests to have at least a clear understanding of how your client would accept responsibility for his actions" (i.e., defendant is clearly tying Orit Anjel's statement to the government to payments from Rabbi Yemeni).

        Defendant continues, "Our inability to obtain any response from your client is discouraging.  But, what can I do but attempt to offer a branch.  I will be available to discuss today, otherwise tomorrow will be what it is for both or our clients.  My clients are prepared to go wherever the truth takes them (here, or Israel).  I hope the Rabbi is as well."  The reference to the Orit and Avi Anjel going "wherever the truth takes them" is a threat. It means that, if Avi Anjel does not get what he wants out of the extortion scheme, Orit Anjel will inform the government of Rabbi Yemeni's involvement in a visa fraud scheme even if by doing so, she would be exposing the fraudulent nature of her religious worker visa (and therefore Avi Anjel's derivative visa) and, therefore, ensuring the Anjel families removal from the United States to Israel.

        Defendant's text message, moreover, was followed by five telephone calls between defendant and Avi Anjel over the course

1  of approximately the next hour, followed by a series of emails

2  between defendant and Mr. Gluck.  This context raises a pretty

3  clear inference that Mr. Anjel was "tuned in" to defendant's

4  intentions.  The government's theory of the case is that

5  defendant sought Avi Anjel's input and approvals throughout the

6  scheme, and this text message incrementally proves that theory.

7       The Lake Isabella part of the message will also be relevant

8  to pointing Avi Anjel to a date which likely would not otherwise

9  stand out in his memory, should Avi Anjel be called as a defense

10  witness.

11       Once again, defendant does not even attempt to articulate

12  any unfair prejudice associated with Lake Isabella.

13       2.   Defendant's Position

14       For the reasons previously set forth above, the defendant

15  moves to exclude the italicized portion of the message because it

16  is irrelevant, prejudicial, cumulative and does not tend to prove

17  any of the elements for either the obstruction of justice or

18  extortion counts.  *Hitt, supra, Ramirez-Jiminez, supra, Brown,*

19  *supra.*  The government again confuses the instant motion – which

20  is solely directed at the government's presentation of evidence

21  in its case-in-chief – with questions it may pose to possible

22  defense witnesses like Avi Anjel.

23

24

| 7/14/09 | 7:47 p | Villalobos text to Avi Anjel | "Just called him left message *fuck you yala* by.  If I come down can you please pay for my gas and overnight hotel.  Total will be about 500.00 homeboy?  Let me know before I commit to Ted!"  Text #1097 |
|---------|--------|------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

| | 7:59 p | Villalobos text to Avi Anjel | "Just called Teds house spoke with wife or child and left message!!!! Gas plus hotel *fucker!!!!* I need address to US Attorney's office" Text #1095 |
| | 8:02 p | Avi Angel text to Villalobos | "I. Will. Call u. Soon. . . *f.u.* By" Text #1106 |

1.  <u>Government's Position</u>

Defendant's profanities in these messages establish his familiarity with Avi Anjel and that their relationship is not the attorney-client relationship defendant would like to portray at trial. "Gas plus hotel fucker!!!!," moreover, establishes that defendant is desperate, even for $500 to pay for his hotel and gas, and that he must insist, in strong language, that his "client" advance money for these expenses. The Court should not selectively sanitize these text messages and preclude the jury from hearing the manner in which defendant and Avi Anjel interact with one another. The redactions defendant proposes would cause the jury to speculate as to what was left out of the text messages, and unnecessarily so, given that these text messages hardly present a realistic risk that a jury as a whole would be so emotionally provoked by defendant's profanity that they would convict him of extortion or obstruction of justice because of it.

Defendant's another boilerplate objection without any analysis.

Defendant's suggestion that "redacted text messages . . . be presented to the jury in such a way that they would not be aware that anything had been excised" should be rejected. The jury is entitled to see real evidence, i.e., the text message downloads

89

1  it would expect to see and expect the government to produce, not

2  sanitized "evidence" contrived by defendant.  See, e.g., Old

3  Chief v. United States, 519 U.S. 172, 188-89 (1997) ("The use of

4  witnesses to describe a train of events naturally related can

5  raise the prospect of learning about every ingredient of that

6  natural sequence the same way.  If suddenly the prosecution

7  presents some occurrence in the series differently, as by

8  announcing a stipulation or admission, the effect may be like

9  saying, "never mind what's behind the door," and jurors may well

10 wonder what they are being kept from knowing.  A party seemingly

11 responsible for cloaking something has reason for apprehension,

12 and the prosecution with its burden of proof may prudently demur

13 at a defense request to interrupt the flow of evidence telling

14 the story in the usual way.")

15     2.  Defendant's Position

16     Defendant moves to exclude the italicized portions of these

17 messages because they are irrelevant, inflammatory, prejudicial,

18 cumulative and do not tend to prove any of the elements for

19 either the obstruction of justice or extortion counts.  *Hitt,*

20 *supra, Ramirez-Jiminez, supra, Brown, supra.*  Further, the

21 redacted text messages can be presented to the jury in such a way

22 that they would not be aware that anything had been excised,

23 thereby obviating the government's concern about jury

24 speculation.

| 7/15/09 | 10:52 a | Avi Angel text to Villalobos | "Send money *fucker yala* by" Text #1081 |
|---------|---------|------------------------------|------------------------------------------|
|         | 11:09 a | Villalobos text to Avi Anjel | "Who is going to save your wife? ME *fucker!*" Text #1076 |

1        1.   <u>Government's Position</u>

2        In general, defendant's profanities in these messages

3   establish his familiarity with Avi Anjel and that their

4   relationship is not the attorney-client relationship defendant

5   would like to portray to the jury at trial.  "Send money fucker,"

6   moreover, establishes that defendant is desperate, even for $500

7   to pay for his hotel and gas, and that he must insist, in strong

8   language, that his "client" advance him money for these expenses.

9        In the second message, the profanity in "Who is going to

10  save your wife? ME fucker!" is itself used to add emphasis to

11  defendant's statement, as a sort-of additional exclamatory

12  punctuation.  This message goes directly to the heart of the

13  government's case and should be permitted to be shown in its

14  unvarnished state, as it is probative of Avi Anjel's motive to

15  "save his wife['s]" visa status, in turn allowing him and his

16  family to remain in the United States, albeit fraudulently.

17       The Court should not selectively sanitize the this text

18  message and preclude the jury from hearing the manner in which

19  defendant and Avi Anjel interact with one another.  The

20  redactions defendant proposes, moreover, would cause the jury to

21  speculate as to what was left out of the text messages, and

22  unnecessarily so, given that these text messages hardly present a

23  realistic risk that a jury as a whole would be so emotionally

24  provoked by defendant's profanity that they would convict him of

25  extortion or obstruction of justice because of it.

26       Defendant once again does not articulate why these text

27  messages are "irrelevant, inflammatory, prejudicial, cumulative"

28  but merely asserts that they are.

91

1       2.   Defendant's Position

2       For the reasons previously set forth above, the defendant

3   moves to exclude the italicized portions of these messages

4   because they are irrelevant, inflammatory, prejudicial,

5   cumulative and do not tend to prove any of the elements for

6   either the obstruction of justice or extortion counts.  *Hitt,*

7   *supra, Ramirez-Jiminez, supra, Brown, supra.*

8

9

| 7/16/09 | 10:19 p | Villalobos text to Avi Anjel | "Someone can pick me up *if you can't a chicken*" Text #1032 |
|---------|---------|------------------------------|--------------------------------------------------------------|
|         | 10:20 p | Avi Angel text to Villalobos | "*F.U. Boboso*" Text #1050 |
|         | 10:21 p | Villalobos text to Avi Anjel | "HEY!!!!!! *Fucker* I need ride to Rabbi's attorney. *Did you pick up the sunglasses????*" Text #1029 |
|         | 10:24 p | Villalobos text to Avi Anjel | No content provided |
|         | 11:07 p | Avi Angel text to Villalobos | "*So what?*" Text #1048 |
|         | 11:07 p | Villalobos text to Avi Anjel | "I arrive 1030 southwest lax *fucker*" Text #1027 |
|         | 11:11 p | Villalobos text to Avi Anjel | "So pick me up 1030 drive me to century city *I have ride after meeting to lunch with chicken.  Did you pick up the sunglasses?*" Text #1026 |
|         | 11:13 p | Villalobos text to Avi Anjel | "*Fuck you* do you want me to tell Rabi to *fuck off* we don't want money?????*yala* pick me p at 1030 lax southwest on bottom!!!!!! *Yala* good night" Text #1025 |
|         | 11:21 p | Avi Angel text to Villalobos | "*I'm. going. To. Pick. Up your. Shicken. . . . .* sorry.  Good night. *Boboso. . . . .*" Text #1046 |
|         | 11:26 p | Villalobos text to Avi Anjel | "Good night *loco*" Text #1024 |

27

28

1   1. <u>Government's Position</u>

2  The references to "Boboso," "F.U. Boboso," "HEY!!!!!! 

3 Fucker," "fucker," "fuck you," and "loco" (which means "crazy" in

4 Spanish) are also probative of the nature of defendant's

5 relationship with Avi Anjel, as described above.

6  The reference to telling Rabbi Yemeni "fuck off we don't

7 want money" is relevant to prove that Avi Anjel's principal

8 objective related to maintaining Orit Anjel's immigration status

9 in the United States and his own status, which derived from his

10 Ms. Anjel's status.  Accordingly, this message goes directly to

11 the heart of the government's case.  The defendant's obviously

12 strong feeling about also extorting money from Rabbi Yemeni -- as

13 expressed through his use of profanity as exclamatory punctuation

14 -- is obviously relevant to this issue.

15  The references to picking defendant up at LAX are relevant

16 to prove Avi Anjel's knowledge of defendant's meetings with Mr.

17 Gluck and the purpose of them.  It is natural that defendant and

18 Avi Anjel would discuss the scheme during the drive from LAX to

19 Mr. Gluck's office in Century City.  Why else (except, perhaps,

20 defendant's lack of money to pay for transportation), would it

21 make sense for Avi Anjel to drive from his home in West Hills to

22 LAX simply to give defendant a ride to Century City, particularly

23 where defendant does not require a ride back from the meeting?

24  Like "baboso" and "yala," defendant also takes no position

25 on the meaning of the term "chicken," although the context in

26 which these text messages are sent makes clear that "chicken"

27 refers to a woman other than defendant's wife.  (The day

28 following the text messages, defendant flew from Nevada to Los

1  Angeles to meet with Mr. Gluck.  During the meeting, Mr. Gluck

2  offered defendant Diet Coke.  During the meeting, defendant

3  repeatedly referred to a woman who would pick him up from Mr.

4  Gluck's office in order to have lunch with defendant.  At the end

5  of the meeting, Mr. Gluck offered defendant a second Diet Coke.

6  Defendant refused, saying "No, no, no.  If I drink too many Diet

7  Cokes, then I won't be hungry and she'll be pissed off," making

8  apparent that his lunch plans are of a personal, rather than

9  business nature.)

10

11      In an ordinary attorney-client relationship, a client would

12  not be joking with his attorney that he (the client) was going to

13  go "pick up" (i.e., seduce) the attorney's "chicken"

14  (girlfriend).[43]

15  _____

16      [43]    In an interview with the government, Avi Anjel informed
    the government -- the government believes falsely -- that the use

17  of "chicken" in these text messages is a reference to Mr. Gluck,
    whose last name rhymes with "cluck," i.e., a sound made by a

18  chicken.  According to Avi Anjel, defendant would also refer to
    Mr. Gluck as "chicken" in conversation.  "Chicken" is therefore

19  also plainly relevant to cross-examining Avi Anjel.  If Avi
    Anjel's statement to the government is true, defendant's

20  references to "chicken" tend to show that defendant and Avi Anjel
    discussed defendant's dealings with Mr. Gluck throughout

21  defendant's "negotiations" with Mr. Gluck, a fact that is
    relevant, at a minimum, to defendant's assertion that he did not

22  have the intent to obstruct the grand jury's investigation of
    Rabbi Yemeni for the reason that (as defendant claimed in his

23  post-arrest statement) he did not tell Orit or Avi Anjel about
    his "negotiations" with Mr. Gluck or that he was negotiating for

24  Orit Anjel to make false statements to the government and the
    federal grand jury (despite his recorded representations to Mr.

25  Gluck that he would do so).

26

27      If, on the other hand, Avi Anjel's statements about
    "chicken" being a reference to Mr. Gluck  are untrue, those

28  statements can be used to impeach Avi Anjel, who defendant has
    indicated will be a critical defense witness.

The reference to the sunglasses, according to Avi Anjel, is to a pair of sunglasses belonging to defendant's wife.  In an ordinary attorney-client relationship, the attorney would not have his client running such errands for him.

Defendant once again does not articulate why these text messages are "irrelevant, inflammatory, prejudicial, cumulative" but merely asserts that they are.  The redactions defendant proposes would cause the jury to speculate as to what was left out of the text messages, and unnecessarily so, given that these text messages hardly present a realistic risk that a jury as a whole would be so emotionally provoked by defendant's profanity that they would convict him of extortion or obstruction of justice because of it.

2.  Defendant's Position

For the reasons previously set forth above, the defendant moves to exclude the italicized portions of these messages because they are irrelevant, inflammatory, prejudicial, cumulative and do not tend to prove any of the elements for either the obstruction of justice or extortion counts.  *Hitt, supra, Ramirez-Jiminez, supra, Brown, supra.*

| 7/17/09 | 4:04 p | Villalobos text to Avi Angel | **"Send me money fucker!!!! I know you love me fuck you yala by!!"** Text #983 |
|---------|--------|------------------------------|-------------------------------------------------------------------------------|

1.  Government's Position

This text message is probative of the nature of defendant's relationship with Avi Anjel, as described above.  It also demonstrates defendant's financial motive for committing the

95

1 extortion alleged, as defendant is haranguing Avi Anjel about

2 paying his travel expenses from a flight defendant took to Los

3 Angeles that day to meet with Mr. Gluck.

4     Defendant once again does not articulate why this text

5 message is "irrelevant, inflammatory, prejudicial, cumulative"

6 but merely asserts that it is.

7     2.   <u>Defendant's Position</u>

8     For the reasons previously set forth above, the defendant

9 moves to exclude this message because it is irrelevant,

10 inflammatory, prejudicial, cumulative and does not tend to prove

11 any of the elements for either the obstruction of justice or

12 extortion counts. *Hitt, supra, Ramirez-Jiminez, supra, Brown,*

13 *supra.*

14

| 7/20/09 | 9:49 p | Villalobos text to Avi Angel | "Call me please when you are not *fucking* busy!!!!!" Text #865 |
|---|---|---|---|
| | 10:17 p | Villalobos text to Avi Angel | "Call me please when you are not *fucking* busy!!!!!" Text #864 |

18

19     1.   <u>Government's Position</u>

20     This text message is probative of the nature of defendant's

21 relationship with Avi Anjel, as described above.

22     Defendant once again does not articulate why these text

23 messages are "irrelevant, inflammatory, prejudicial, cumulative"

24 but merely asserts that they are.

25     2.   <u>Defendant's Position</u>

26     For the reasons previously set forth above, the defendant

27 moves to exclude the italicized portions of these messages

28 because they are irrelevant, inflammatory, prejudicial,

1  cumulative and do not tend to prove any of the elements for

2  either the obstruction of justice or extortion counts.  *Hitt,*

3  *supra, Ramirez-Jiminez, supra, Brown, supra.*

4

| 7/21/09 | 12:01 p | Villalobos text to Avi Angel | "Hey do you want to pay me all cash based on 120,000 or do you want to pay with cash and percentage of tax deductible contribution.  My fee of 30% would be as follows:  from 100,000 you pay me 30,000 then from 20,000 Israeli Chabad would pay me with a tax deduction of 6,000.  Or you could just pay me 25% of 120,000 all cash, I give you big 5% discount.  Hurry let me know **yala fuck you** by." Text #830 |
| | 12:22 p | Villalobos text to Avi Angel | "**Fuck you** I'm working for you on vacation **yala.**" Text #828 |
| | 1:29 p | Villalobos text to Avi Angel | "Hey call me now I'm off phone, I have good news and bad news **damn it!!!**" Text  #820 |
| | 1:30 p | Villalobos text to Avi Angel | "**Fak you.**  Call me.  *I cannot walk I need surgery costs money verrrry expensive yala* call me." Text #819 |
| | 11:58 p | Villalobos text to Avi Angel | "Hey I will call you tomorrow I'm sleepy **yala**" Text #800 |

    1.  <u>Government's Position</u>

    The gratuitous profanities in these messages, once again,

establish the nature of defendant's relationship with Avi Anjel,

and that the relationship was not what defendant would like to

have the jury believe.

    The context in which all but the last of these text messages

are sent is defendant either about to call Mr. Gluck, on the

phone with Mr. Gluck, or having just completed a recorded

telephone conversation with Mr. Gluck.  Defendant's "damn it"

1  comment goes directly to the heart of the case.  The "good news"

2  to which defendant refers is that Mr. Gluck (acting at the

3  direction of the government) had agreed to pay defendant's

4  extortion demand.  The "bad news" defendant is cursing is that

5  Mr. Gluck had not agreed to find Orit Anjel another fake

6  religious worker job so that Avi Anjel will be able to maintain

7  his fraudulent visa.  Without achieving what Avi Anjel most

8  wanted out of the deal (an ability to remain in the United

9  States), defendant was not going to get what he wanted (the

10 blackmail money), and defendant is cursing that reality.

11      The "surgery costs money" and "verrrry expensive" references

12 are obviously relevant to defendant's financial motive for

13 attempting to extort money from Mr. Gluck.

14      Defendant once again offers no analysis of his objections

15 and does not even attempt to tie them to the text messages he

16 challenges.  Defendant again fails to articulate why any of these

17 relevant text messages are inflammatory, prejudicial, or

18 cumulative, but merely asserts that they are.

19      2.   Defendant's Position

20      For the reasons previously set forth above, the defendant

21 moves to exclude the italicized portions of these messages

22 because they are irrelevant, inflammatory, prejudicial,

23 cumulative and do not tend to prove any of the elements for

24 either the obstruction of justice or extortion counts.  *Hitt,*

25 *supra, Ramirez-Jiminez, supra, Brown, supra.*

26

27

| 7/22/09 | 5:37 p | Villalobos text to Avi | "***Fuck you!*** 30%. ***I'm Jewish to! Or I will not let you take me to*** |
| --- | --- | --- | --- |

| | | | |
|---|---|---|---|
| | | Angel | ***Israel for even 2 days!!"*** <br> Text # 756 |
| | 5:49 p | Villalobos text to Avi Angel | ***"For 10% I can call Mossad"*** <br> Text #752 |
| | 10:54 p | Villalobos text to Avi Angel | **"*Fuck you*** 30%!  I did the job and this case has many complicated issues!  It is not over when we sign this agreement.  I still have to deal with the US attorney! Don't be greedy I love you too but work is work and money is money! ***Yala I'm dead, I have crutches for walking now and more medications. Yala mossad comes for you!!!"*** <br> Text #732 |
| | 10:54 p | Villalobos text to Avi Angel | No content provided. |
| | 10:54 p | Villalobos text to Avi Angel | No content provided. |
| | 10:56 p | Villalobos text to Avi Angel | **"**I'm tired now going to sleep. ***Send me your wife please by August 1st, just for two days.  Send your daughter also she will have fun. If I don't have a chance to help prepare Orit this is gonna be tough.  Yala*** I'm tired goodnight." <br> Text #731 |
| | 10:56 p | Villalobos text to Avi Angel | No content provided. |
| | 11:21 p | Avi Anjel text to Villalobos | **"*F U*……go to.  Sleep.  Good Nite. t.t.u. Tomorrow……..by" <br> Text #765 |

1.   <u>Government's Position</u>

The content of these text messages, in context, is clearly relevant, probative evidence.  The initial discussions about "30%" and "Mossad" are clearly defendant and Avi Anjel haggling over how they will divide the proceeds of the extortion.

Defendant's "I'm Jewish" comment appears to be a reference to a negative stereotype about stinginess.  Mossad is Israel's national intelligence agency, the activities of which are often

1  claimed to include targeted killings outside Israel.  Clearly, an
2  attorney in an arm's length relationship with a client would not
3  use anti-Semitic stereotypes with a Jewish client; neither would
4  he playfully refer to having his client killed by the Israeli
5  intelligence agency.  These comments, with the usual profanities,
6  are probative of the nature of defendant's relationship with Avi
7  Anjel.

8       Defendant's crutches and "more medications" comments, in
9  context, are clearly relevant to defendant's financial motive to
10 commit extortion.

11      Defendant's request that Avi Anjel "[s]end [defendant his]
12 wife please by August 1st, just for two days" and the need to
13 "prepare Orit this is gonna be tough" refers to defendant's need
14 to prepare Orit Anjel to lie to the government in a way that is
15 consistent with the version of events that Mr. Gluck, acting at
16 the government's direction, informed defendant that Rabbi Yemeni
17 would give the government in order to conceal the visa fraud
18 scheme in connection with which Rabbi Yemeni was being
19 investigated.  (Defendant discussed his intention to prepare Orit
20 Anjel in defendant's recorded conversation with Mr. Gluck.)  All
21 of these text messages go directly to the heart of the
22 government's case.

23      Defendant once again offers no analysis of his Rule 403
24 objections and does not even attempt to tie them to the text
25 messages he challenges.

26      Defendant's Rule 106 objection should also be overruled.
27 That objection is misplaced for the reasons, set forth in greater
28 detail above, that defendant would free to fill in any necessary

1  background to prevent a misunderstanding or distortion through

2  any permissible means (including his own testimony), and that

3  Rule 106 is not an exclusionary rule, but a rule that provides

4  for the inclusion of other, otherwise then inadmissible evidence,

5  when considerations of fairness would require the admission of

6  such evidence.

7      2.   Defendant's Position

8      For the reasons previously set forth above, the defendant

9  moves to exclude the italicized portions of these messages

10 because are irrelevant, inflammatory, prejudicial, cumulative and

11 do not tend to prove any of the elements for either the

12 obstruction of justice or extortion counts.  *Hitt, supra,*

13 *Ramirez-Jiminez, supra, Brown, supra.*

14     Further, pursuant to Rule 106, some of the recovered text

15 messages are preceded by other text messages that are

16 unavailable, but ought in fairness be considered

17 contemporaneously with these messages.  Because the explanatory

18 text messages are not available, the recovered text messages

19 should be excluded.   *Beech Aircraft Corp., supra; Yevakpor,*

20 *supra; Rivera, supra.*

21

| 7/24/09 | 10:17 a | Villalobos text to Avi Angel | "I have tried to discuss with the Rabbis attorney for two days now but nothing.  I don't know if we have an agreement yet, so please don't count on this yet. He sent me a text message that he would call me this evening, but he promised me already that he would have money ready, but he has not agreed to what you and I discussed about changing the Valley.  I will call you after he calls me if he calls me |

101

| | | | |
|---|---|---|---|
| | | | today.  We cannot count on anything until we have it in our hand Avi, and please remember that when we get to crazy over the money, sometimes it goes away.  ***Yala*** by." Text #632 |

1.  <u>Government's Position</u>

Defendant once again does not articulate why this text messages are "irrelevant, inflammatory, prejudicial, cumulative" but merely asserts that it is.  This text message is obviously probative, and there is no need to redact "yala" from it and cause the jury to speculate about what has been excised.

2.  <u>Defendant's Position</u>

For the reasons previously set forth above, the defendant moves to exclude the italicized portion of this message because it is irrelevant, inflammatory, prejudicial, cumulative and does not tend to prove any of the elements for either the obstruction of justice or extortion counts.  *Hitt, supra, Ramirez-Jiminez, supra, Brown, supra.*

| 7/28/09 | 10:17 p | Villalobos text to Avi Angel | "Just getting home from day outside I'm gonna eat dinner and I will call you when I'm done ***yala.***" Text #499 |
|---|---|---|---|

1.  <u>Government's Position</u>

This message follows defendant not taking two calls from Avi Anjel, who was trying to get hold of defendant after an afternoon of email back and forth between defendant and Mr. Gluck.  It is probative of Avi Anjel's involvement in the extortion scheme.  There is no need to redact "yala" from it and cause the jury to

1  speculate about what has been excised.

2      Defendant once again does not articulate why this text

3  message is "irrelevant, inflammatory, prejudicial, cumulative"

4  but merely asserts that it is.

5      2.  <u>Defendant's Position</u>

6      For the reasons previously set forth above, the defendant

7  moves to exclude the italicized portion of this message because

8  it is irrelevant, inflammatory, prejudicial, cumulative and does

9  not tend to prove any of the elements for either the obstruction

10  of justice or extortion counts.  *Hitt, supra, Ramirez-Jiminez,*

11  *supra, Brown, supra.*

12

13

| 7/30/09 | 4:36 p | Villalobos text to Avi Angel | "On the phone with attorney smile we have waiting for us *yala* by" Text #415 |
|---------|--------|------------------------------|------------------------------------------------------------------------------|
|         | 4:37 p | Avi Anjel text to Villalobos | "*F.U. Boboso………….*call.  Me." Text  #431 |
|         | 4:45 p | Villalobos text to Avi Angel | "*Fuck you loco* get off the phone!!!" Text #414 |

18      1.  <u>Government's Position</u>

19      This exchange follows an afternoon meeting and several

20  telephone calls between defendant and Mr. Gluck.  In addition to

21  asking the Court to clean up his own language, moreover,

22  defendant now seeks to have the Court clean up Avi Anjel's

23  language as well.  These text messages are probative of the

24  nature of defendant's relationship with Avi Anjel.

25      Defendant once again does not articulate why these text

26  messages are "irrelevant, inflammatory, prejudicial, cumulative"

27  but merely asserts that they are.

28  //

1      2.   Defendant's Position

2      For the reasons previously set forth above, the defendant

3 moves to exclude the italicized portions of these messages

4 because they are irrelevant, inflammatory, prejudicial,

5 cumulative and do not tend to prove any of the elements for

6 either the obstruction of justice or extortion counts.  *Hitt,*

7 *supra, Ramirez-Jiminez, supra, Brown, supra.*

8

| 8/2/09 | 11:16 a | Villalobos text to Avi Angel | "I moved the meeting because both her and I were scheduled to be on vacation *so F U baboso yala* bye" Text #296 |
| | 11:17 a | Villalobos text to Avi Angel | "We will talk on wed u and me I'm flying home late tomorrow then driving to LA late Tuesday *so F U!*" Text #295 |
| | 11:19 a | Villalobos text to Avi Angel | "Today is my last full day of vacation then back to work for you so leave me A Lone *yala* bye" Text #294 |

15      1.   Government's Position

16      These text messages are probative of the nature of

17 defendant's relationship with Avi Anjel.

18      Defendant once again does not articulate why these text

19 messages are "irrelevant, inflammatory, prejudicial, cumulative"

20 but merely asserts that they are.

21      2.   Defendant's Position

22      For the reasons previously set forth above, the defendant

23 moves to exclude the italicized portions of these messages

24 because they are irrelevant, inflammatory, prejudicial,

25 cumulative and do not tend to prove any of the elements for

26 either the obstruction of justice or extortion counts.  *Hitt,*

27 *supra, Ramirez-Jiminez, supra, Brown, supra.*

28

| 8/4/09 | 9:40 a | Villalobos text to Avi Angel | **"*Fack u* I'm sleeping *dam it baboso* I call u later.  I went to bed 5 4 am!!!!"   Text #48** |
|---|---|---|---|

1.   Government's Position

These text messages are probative of the nature of defendant's relationship with Avi Anjel.

Defendant once again does not articulate why this text message is "irrelevant, inflammatory, prejudicial, cumulative" but merely asserts that it is.

2.   Defendant's Position

For the reasons previously set forth above, the defendant moves to exclude the italicized portion of this message because it is irrelevant, inflammatory, prejudicial, cumulative and does not tend to prove any of the elements for either the obstruction of justice or extortion counts.  *Hitt, supra, Ramirez-Jiminez, supra, Brown, supra.*

|  | 9:59 a | Villalobos to ??? | **"This is my confirm number have bubba pay for my ticket I western union money to her. Please"** Text #46 |
|---|---|---|---|
|  | 10:03 a | Villalobos to ??? | **"Yesw giveme acct number"** Text #45 |
|  | 10:30 a | Villalobos to ??? | **"So u will always have a job in LA!!!"** Text  #36 |
|  | 10:34 a | Villalobos to ??? | **"They know what you said was right now, make sure bubba buys my ticket depositing in 3 mins!!!"** Text  #34 |
|  | 10:39 a | Villalobos to ??? | **"Money is there"** Text  #33 |
|  | 2:41 p | Villalobos to ??? | **"Tell bubba and verbally tell mom I'm about to capture the eagle"** Text  #11 |

1.   Government's Position

These text messages are sent to defendant's family members, including a person who appears to be defendant's daughter, as

1  established by the "contacts" file in defendant's BlackBerry.

2  The "eagle" refers to coded language defendant used with Mr.

3  Gluck in recorded conversations to describe the $53,500 in cash

4  he was to receive from Mr. Gluck.

5       The context in which these messages -- as is apparent from

6  contemporaneous emails with Mr. Gluck -- are sent is defendant's

7  planning a return from the island of Maui to California to

8  receive from Mr. Gluck a package containing $50,000.

9       These messages establish that defendant discussed the

10 extortion/obstruction scheme with members of his family, who he

11 had just left on a vacation in Hawaii to come to California to

12 receive from Mr. Gluck a package containing $50,000.  These

13 messages establish that defendant told his family about his

14 interstate travel to California and the purpose for it.  They are

15 also relevant to defendant's financial condition and, therefore,

16 his financial motive to commit the extortion alleged in the

17 indictment.

18      Defendant, for a final time, provides no analysis and

19 articulates no prejudice.

20      2.   Defendant's Position

21      Unlike defendant's text messages with Avi Anjel, the

22 government does not know to whom the defendant received or sent

23 these text messages.  The government's opinions about the

24 responding party, and the nature of their conversation, are

25 purely speculative.

26      For the reasons previously set forth above, the defendant

27 moves to exclude these messages because they are irrelevant,

28 inflammatory, prejudicial, cumulative and do not tend to prove

1 | any of the elements for either the obstruction of justice or
2 | extortion counts.  *Hitt, supra, Ramirez-Jiminez, supra, Brown,*
3 | *supra.*
4 |                                    V.
5 |        DEFENDANT'S MOTION RE EXCLUSION OF RECORDED CONVERSATIONS
6 |      As noted above, the parties agree to submit this matter to
7 | the Court on the previously filed brief (Docket #84).
8 |
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |