ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JOSEPH N. AKROTIRIANAKIS (Cal. Bar No. 197971)
MARK R. YOHALEM (Cal. Bar No. 243596)
Assistant United States Attorneys
  1300 United States Courthouse
  312 North Spring Street
  Los Angeles, California 90012
  Telephone: (213) 894-2467
  Facsimile: (213) 894-6269
  Email:   joseph.akrotirianakis@usdoj.gov

RICHARD M. STEINGARD
STEPHEN A. SADOWSKY
LIGHTFOOT STEINGARD & SADOWSKY
800 Wilshire Blvd, Suite 1050
Los Angeles, California 90017
  Telephone: (213) 260-9449
  Facsimile: (213) 260-9450
  Email: rsteingard@lsslaw.com

Attorneys for Defendant
ALFRED NASH VILLALOBOS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) NO. CR 09-00824-GHK |
| | ) |
| Plaintiff, | ) JOINT SUBMISSION OF ADDITIONAL |
| | ) BRIEFING RE: (1) CLAIM-OF-RIGHT |
| v. | ) DEFENSE; AND (2) WAIVER OF |
| | ) ATTORNEY-CLIENT PRIVILEGE |
| ALFRED NASH VILLALOBOS, | ) |
| | ) Hearing Date: [NONE SET] |
| Defendant. | ) Trial Date:  August 23, 2011 |
| | ) |
| | ) |

Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California and Assistant United States Attorneys

Joseph N. Akrotirianakis and Mark R. Yohalem, defendant Alfred

Nash Villalobos, through his counsel of record, Richard

Steingard, and Interested Non-Parties Chabad Israeli Center and
Rabbi Amitai Yemini, through their attorney, Gary S. Lincenberg,
hereby file this Joint Submission of Additional Briefing Re: (1)
Claim-of-Right Defense; and (2) Waiver of Attorney-Client
Privilege.

The parties endeavored to keep their respective submissions
to 10 pages.  Despite these attempts, owing in substantial part
to the quoting of email messages and transcripts of conversations
between defendant and Benjamin Gluck, some of the responses
proved to be longer.  The parties respectfully request the
Court's indulgence in permitting this lengthier-than-expected
memorandum.


DATED: June 21, 2011        Respectfully submitted,

                            ANDRÉ BIROTTE JR.
                            United States Attorney

                            ROBERT E. DUGDALE
                            Assistant United States Attorney
                            Chief, Criminal Division


                            *Joseph N. Akrotirianakis*
                            JOSEPH N. AKROTIRIANAKIS
                            MARK R. YOHALEM
                            Assistant United States Attorneys

                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA


DATED: June 21, 2011        LIGHTFOOT, STEINGARD & SADOWSKY


                            /S/ (w/ perm. by email of June 21, 2011)
                            RICHARD STEINGARD

                            Attorneys for Defendant
                            ALFRED NASH VILLALOBOS

2

1  DATED: June 21, 2011          BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                                 DROOKS & LINCENBERG, P.C.
2

3
                                 /S/ (w/ perm. by phone on June 21, 2011)
4                                GARY S. LINCENBERG

5                                Attorneys for Interested Non-Parties
                                 RABBI AMITAI YEMINI and
6                                CHABAD ISRAELI CENTER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

PAGE

I.  DEFENDANT'S ADDITIONAL BRIEFING RE CLAIM-OF-RIGHT
    DEFENSE . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Introduction . . . . . . . . . . . . . . . . . 4

    B.  The Underlying Facts . . . . . . . . . . . . . 5

        1.  The Indictment . . . . . . . . . . . . . 14

        2.  Claim of Right Defense . . . . . . . . . 16

        3.  The Alleged Wrongful Use of Fear" in the
            Instant Case . . . . . . . . . . . . . . 17

        4.  Threat of Criminal Prosecution and a Claim
            of Right Defense . . . . . . . . . . . . 19

    D.  Conclusion . . . . . . . . . . . . . . . . . 25

II. GOVERNMENT'S ADDITIONAL BRIEFING RE CLAIM-OF-RIGHT
    DEFENSE . . . . . . . . . . . . . . . . . . . . . 27

    A.  Introduction . . . . . . . . . . . . . . . . 27

    B.  Fear of Criminal Prosecution Is More Akin to
        Fear of Force than Fear of Mere Economic Harm,
        and an Extortionist Who Exploits Such Fear
        Cannot Raise a Claim-of-Right Defense . . . . . 28

    C.  If the Court Rules That No Claim-of-right Is
        Available When a Defendant Exploits the Fear of
        Criminal Prosecution, the Government Will Not
        Seek to Prove Count Two Through Purely Economic
        Fear and Thus Eliminate the Need for a
        Claim-of-Right "Mini-trial" . . . . . . . . . 33

    D.  No Rational Juror Could Conclude That Defendant
        Intended to Exploit Nothing More Than Rabbi
        Yemini's Fear of Economic Harm . . . . . . . . 34

III. DEFENDANT'S ADDITIONAL BRIEFING RE ATTORNEY-CLIENT
     PRIVILEGE WAIVER . . . . . . . . . . . . . . . . 45

    A.  Introduction . . . . . . . . . . . . . . . . 45

    B.  Waiver By Disclosure . . . . . . . . . . . . 45

    D.  Burden of Proof . . . . . . . . . . . . . . . 54

i

TABLE OF CONTENTS (continued)

PAGE

E.   Need for Evidentiary Hearing  . . . . . . . . . .  56

IV.  ADDITIONAL BRIEFING BY INTERESTED NON-PARTIES RABBI
     AMITAI YEMINI AND CHABAD ISRAELI CENTER RE
     ATTORNEY-CLIENT PRIVILEGE WAIVER . . . . . . . . . .  56

     A.   The Attorney-Client Privilege Does Not Protect
          Underlying Facts, No Matter The Source  . . . . .  56

     B.   Mr. Gluck Did Not Effect A Waiver Of The
          Privilege By Making Statements As Directed By
          The Government  . . . . . . . . . . . . . . . .  58

     C.   Defendant Has The Burden Of Production To Make
          A Prima Facie Showing Of Waiver Of Privilege  . . .  60

TABLE OF AUTHORITIES

FEDERAL CASES                                                              PAGE

In re Allen,
      106 F.3d 582 (4th Cir. 1997) . . . . . . . . . . . . .   57

Arberry v. Illinois,
      244 F.3d 558 (7th Cir. 2001) . . . . . . . . . . . . .   28

Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,
      140 F.3d 494 (3d Cir. 1998) . . . . . . . . . . . . passim

Dahl v. City of Huntington Beach,
      84 F.3d 363 (9th Cir. 1996) . . . . . . . . . . . . .   29

Deck v. Engineered Laminates,
      349 F.3d 1253 (10th Cir. 2003) . . . . . . . . . . .   25

Electro Scientific Industries, Inc. v. General Scanning, Inc.,
      175 F.R.D. 539 (N.D. Cal. 1997) . . . . . . . . 50, 51, 65

Fuentes v. Shevin,
      407 U.S. 67 (1983) . . . . . . . . . . . . . . . . .   28

GTE Directories Service, Corp. v. Pacific Bell Directory,
      135 F.R.D. 187 (N.D. Cal. 1991) . . . . . . . . 55, 61, 62

In re Grand Jury Proceedings,
      727 F.2d 1352 (4th Cir. 1984) . . . . . . . . . . . .   64

In re Horowitz,
      482 F.2d 72 (2nd Cir. 1973) . . . . . . . . . . . . .   54

Hydraflow, Inc. v. Enidine Inc.,
      145 F.R.D. 626 (W.D.N.Y. 1993) . . . . . . . . . . 51, 65

Martin v. American Employers' Insurance Co.,
      115 F.R.D. 532 (S.D. Miss. 1987) . . . . . . . 46, 49, 64

Murdoch v. Castro,
      609 F.3d 983 (9th Cir. 2010) . . . . . . . . . . . . .   57

Pampered Chef v. Alexanian,
      737 F. Supp. 2d 958 (N.D. Ill. 2010) . . . . . . . 53, 64

In re Pioneer Hi-Bred Intern, Inc.,
      238 F.3d 1370 (Fed. Cir. 2001) . . . . . . . . . . . .   46

Solomon v. Scientific American, Inc.,
      125 F.R.D. 34 (S.D.N.Y. 1988) . . . . . . . . . . 59, 65

TABLE OF AUTHORITIES (continued)

FEDERAL CASES                                                    PAGE

Sprint Communications Co. v. TheGlobe.com, Inc.,
     236 F.R.D. 524 (D. Kan. 2006) . . . . . . . . . . . . . 57

Tennenbaum v. Deloitte & Touche,
     77 F.3d 337 (9th Cir. 1996) . . . . . . . . . . . 52, 65

United States v. El Paso,
     682 F.2d 530 (5th Cir. 1982) . . . . . . . . . . . . . 46

United States v. Flores,
     628 F.2d 521 (9th Cir. 1980) . . . . . . . . . . . . . 58

United States v. Billmyer,
     57 F.3d 31 (1st Cir. 1995) . . . . . . . . . . . . passim

United States v. Bump,
     605 F.2d 548 (10th Cir. 1979) . . . . . . . . . . . . 54

United States v. Castor,
     937 F.2d 293 (7th Cir. 1991) . . . . . . . . . . . . . 21

United  States v. Daane,
     475 F.3d 1114 (9th Cir. 2007) . . . . . . . . . . passim

United States v. Enmons,
     410 U.S. 396 (1973) . . . . . . . . . . . . . . . . . 16

United States v. Kattar,
     840 F.2d 118 (1st Cir. 1988) . . . . . . . . . 19, 20, 30

United States v. Landof,
     591 F.2d 36 (9th Cir. 1978) . . . . . . . . . . . . . 54

United States v. Mendelsohn,
     896 F.2d 1183 (9th Cir. 1990) . . . . . . . . . . 52, 65

United States v. Pendergraft,
     297 F.3d 1198 (11th Cir. 2002) . . . . . . . . 24, 25, 30

United States v. Root,
     366 F.2d 377 (9th Cir. 1966) . . . . . . . . . . . . . 15

United States v. Ruehle,
     583 F.3d 600 (9th Cir. 2009) . . . . . . . . . . . . . 54

United States v. Sturm,
     870 F.2d 769 (1st Cir. 1989) . . . . . . . . . . . passim

iv

TABLE OF AUTHORITIES (continued)

FEDERAL CASES                                                    PAGE

United States v. Sturm,
      8709 F.2d 769 (1st Cir. 1989) . . . . . . . . . . . . . 16

United States v. Tobin,
      155 F.3d 636 (3d Cir. 1998) . . . . . . . . . . . 16, 27

United States v. Vigil,
      523 F.3d 1258 (10th Cir. 2008) . . . . . . . . . 20, 30

United States v. Voigt,
      89 F.3d 1050 (3d Cir. 1996) . . . . . . . . . . . . . 56

United States v. Zappola,
      677 F.2d 264 (2d Cir. 1982) . . . . . . . . . . . passim

Upjohn Co. v. United States,
      449 U.S. 383 (1981) . . . . . . . . . . . . . . . passim

U.S. v. Martin,
      773 F.2d 579 (4th Cir. 1985) . . . . . . . . . 49, 50, 63

Weil v. Investment/Indicators, Research & Management,
      647 F.2d 18 (9th Cir.1981) . . . . . . . . . . . . passim

STATE CASES

Allstate Insurance Co. v. Madan,
      1995 WL 313729 (C.D. Cal., Feb. 15, 1995) . . . . . . . 59

Bank Brussell Lambert v. Credit Lyonnais (Suisse) S.A.,
      1995 WL 598971 (S.D.N.Y., Oct. 11, 1995) . . . . . . . 57

Bertschinger v. Campbell,
      99 Wash. 142 (1917) . . . . . . . . . . . . . . . . . 18

Committee On Legal Ethics v. Printz,
      416 S.E.2d 720 (W.Va. 1992) . . . . . . . . . . . 24, 32

Costello v. Norton,
      1998 WL 743710 (N.D.N.Y. 1998) . . . . . . . . . . 21, 28

Decato's Case,
      117 N.H. 885, 379 A.2d 825 (1977)  22, 31

Mann v. State,
      47 Ohio St. 556, 26 N.E. 226 (1890) . . . . . . . . . 22

Pastrana v. Local 9509,
      2007 WL 2900477 (S.D. Cal., Sep. 28, 2007) . . . . . . 56

v

TABLE OF AUTHORITIES (continued)

STATE CASES                                                    PAGE

People v. Asta,
     251 Cal. App. 2d 64 (1967) . . . . . . . . . . . . . .   18

People v. Beggs,
     178 Cal. 79, 172 P. 152 (Cal. 1918) . . . . . . . . .    22

People v. Umana,
     138 Cal. App. 4th 625 ( 2006) . . . . . . . . . . . .    18

In re Sherin,
     27 SD 232 (1911) . . . . . . . . . . . . . . . . . . .   18

Sleep Science Partners, Inc. v. Lieberman,
     2010 WL 4316687 (N.D. Cal., Oct. 26, 2010) . . . . .     61, 66

State v. Burns,
     161 Wash. 362, 297 P. 212 (1931) . . . . . . . . . . .   22

State v. Greenspan,
     92 N.C. App. 563, 374 S.E.2d 884 (1989) . . . . . .      21, 22

United States v. Chevron Corp.,
     1996 WL 444597 (N.D. Cal., May 30, 1996)
     (emphasis in original) . . . . . . . . . . . . . . .     61, 66

United States v. Weissman,
     1996 WL 737042 (S.D.N.Y., Dec. 26, 1996) . . . . . . .   59

United States v. Nestor,
     2010 WL 3191888 (M.D. Pa. 2010) . . . . . . . . . .      passim

Universal Trading & Investment Co. v. Kiritchenko,
     2007 WL 2471432 (N. D. Cal., Aug. 27, 2007) . . . . .    57

In re Wagar,
     2006 WL 3699544 (N.D.N.Y., Dec. 13, 2006) . . . . .      57, 58

**I**

**DEFENDANT'S ADDITIONAL BRIEFING RE CLAIM-OF-RIGHT DEFENSE**

A.   <u>Introduction</u>

The Court has asked the parties to brief whether the extortion count permits the defendant to present evidence of a claim of right to the property at issue, and whether the record is such that a reasonable jury could only find a threat of criminal prosecution.  The starting point to answer the Court's questions is the Indictment.  Count Two charges that the defendant "attempted to obtain property *to which he was not entitled* . . . from [Mr. Gluck and Rabbi Yemini], with their consent, induced by wrongful use of fear, in particular, that if these payments were not made, defendant Villalobos's client, [Orit Anjel], would help to incriminate [Rabbi Yemini] in a federal grand jury investigation." (Indictment, Ct. 2; emphasis added.)  The Indictment thus places at issue whether the defendant's conduct was "wrongful" in that he was not entitled to the property he sought.  Wrongfulness is a necessary element of an extortion or attempted extortion charge and the defendant's claim of right, in turn, is a critical component of that element.[1]

A claim of right defense to an extortion charge is only barred when the conduct at issue is "inherently wrongful," such as force, physical violence or imprisonment.  Whether a "threat of criminal prosecution" to induce consent is *per se* wrongful is

---

[1]   The defense uses the term "extortion" to describe Count Two.  The government alleges that Count Two charges attempted extortion, not extortion.  The actual nature of the charge is currently before the Court, but its resolution does not impact an analysis of the claim of right issue.

unclear, particularly when the alleged "threat" is made in the context of attorneys' settlement negotiations.  In the instant case, the defendant's statements during settlement discussions that his client would soon be attending a preordained meeting with a federal prosecutor do not constitute a "threat of criminal prosecution" and, in any event, were not "inherently wrongful." In fact, the defendant's comments are specifically permissible under the ABA's ethical guidelines.

At least in theory, there may well be cases in which a defendant's "threat of criminal prosecution" is so forceful, clear and unambiguous that it is possible for the court to make a pre-trial determination that the statements are "inherently wrongful" and bar a claim of right defense.  As the facts below make clear, this is not such a case.  Under the circumstances of this case, the defendant should be permitted to present evidence to disprove the claim in the Indictment that he "attempted to obtain property to which he was not entitled."[2]

B.   The Underlying Facts[3]

A rational factfinder could find the following facts:

1.   On *October 17, 2008*, federal agents interviewed Rabbi Yemini about his submission of applications for worker visas and

---

[2]   As alluded to at the motions hearing on May 12, 2011, the defense is also submitting an *in camera* filing as to the claim of right argument only.

[3]   Because of the limitations on the size of this submission, we do not fully quote all of the relevant letters, emails and transcripts of recorded conversations.  However, we are submitting full documents as exhibits to assist the Court in its review.  Also, the defendant has not submitted as exhibits phone records or message notes reflecting the defendant's uncompleted calls to Gluck, but will provide them to the Court should such facts be disputed.

his employment of foreign workers, including Orit Anjel.  The same day, his attorney, Benjamin Gluck, contacted the prosecutor assigned to the investigation of Rabbi Yemini, AUSA Keri Axel, to advise her that he was representing Rabbi Yemini.  (Exhibit 1.) Some time thereafter, Rabbi Yemini met with Avi Anjel (Orit Anjel's husband).  In an attempt to conceal his criminal conduct, Rabbi Yemini had Mr. Anjel place his hand on the Torah and swear that he (and by implication his wife) would not reveal the Rabbi's visa fraud and kickback scheme.  (Exhibit 2.)[4]

2.    On *February 5, 2009*, the defendant sent a letter to Rabbi Yemini stating that he represents Mr. Anjel "regarding the various issues that have arisen from the employment of his wife at Chabad" and asking that Rabbi Yemini "please review your policy and procedures and/or consult with your attorney concerning these issues so that you have a complete scope of the consequences of your current course of action."  (Exhibit 3.)  On *February 23, 2009*, Mr. Gluck responded by asking the defendant to clarify who he represents and the nature of the dispute.  Mr. Gluck also included the following: "[T]hough your letter is not clear, I assume Mrs. Anjel's immigration status is important to her and to her husband.  I therefore offer the following information as a courtesy.  U.S. immigration authorities are looking into at least some of the visas related to the Chabad Israeli Center.  I have been in contact with them for some time and have provided them with documents and information.  In light

---

[4]  Exhibit 2 consists of excerpts from the reports of government interviews with Avi Anjel and Rabbi Yemini, in which both recounted Rabbi Yemini's actions.  If the Court wishes to see the balance of the interview reports, they will immediately be provided.

of these inquiries and discussions, I believe it is unlikely that the authorities will take favorable action in connection with any of the visas any time soon.  I thought you and the Anjels should know this as you plan for the future."  (Exhibit 4.)

3.   On *April 1, 2009*, the defendant replied to Gluck's letter by advising that he also represented Mrs. Anjel.  (Exhibit 5.)

4.   In *March or April, 2009,* the defendant and Gluck had their *first* telephone conversation.  Gluck's notes appear to reflect the defendant's statements that (1) Mrs. Anjel "had a job at [Chabad] center [and] when she earned [a] check, she was required to pay Rabbi," (2) Mrs. Anjel's payments to Rabbi Yemini were "required to keep [her visa] application," (3) his clients "want the money that was given to the Rabbi," and (4) he was proceeding under an "employment law theory."  (Exhibit 6.)

5.   Following this conversation, throughout *April and the beginning of May, 2009,* the defendant attempted to contact Gluck on numerous occasions but, with the exception of the call cited above, it does not appear that they spoke.  During this time, Gluck and one of his partners, Gary Lincenberg, had telephonic and email contact with AUSA Axel regarding the government's issuance of grand jury subpoenas to Rabbi Yemini's children. (Exhibit 7.)

6.   On *May 12, 2009*, the defendant and Gluck had their *second* telephone conversation.  Gluck's notes appear to reflect that the defendant (1) characterized the claim as a "wage and hour violation" (2) explained how he arrived at an amount of $120,000, (3) stated that "all [the Anjels] want is Rabbi to give

them back the money," and (4) suggested they "have lunch" to "show [Gluck] the numbers."  (Exhibit 8.)

7.   On *May 18, 2009*, the defendant and Gluck met at Gluck's office and had their *third* contact.   Gluck's notes indicate that the defendant either showed him or referenced the following materials:  (1) a 2005 letter from Rabbi Yemini stating that Mrs. Anjel worked full time and earned $24,000 per year; (2) 1099s for the years for 2003-2007 issued by Israel Chabad Center to Mrs. Anjel; and (3) copies of Israel Chabad Center's checks to Mrs. Anjel.  (Exhibit 9.)   Although not reflected in the notes of this encounter, Gluck later sent an email to Rabbi Yemini in which he mentioned that during this meeting,  "[the defendant] also said [Mrs. Anjel] was about to meet with [the government]."  (Exhibit 10.)

8.   On *July 2, 2009,* six weeks after their meeting, the defendant and Gluck had their *fourth* contact.   According to Gluck's notes, during their telephone conversation, it appears that the defendant (1) referenced "W-2's" and "tax returns," (2) stated that Mrs. Anjel was scheduled to meet with the prosecutor "this week or next week," (3) repeated Mrs. Anjel's claim ("she worked the 40 hours/week and [] she gave all the money [to Rabbi Yemini]"), and (4) asserted that if they were not going to settle the matter, he would refer it to Keith Fink, an attorney at Baker Hostetler who was an "SOB."  (Exhibit 11.)   That same day, Gluck sent an email to Rabbi Yemini recounting his conversation with the defendant, including the defendant's statements that Mrs. Anjel would soon meet with the prosecutor and that if a settlement was not reached Villalobos would refer the case to Mr.

5

1  Fink, "a nasty, aggressive person."  (Exhibit 10.)

2      9.   On *July 6, 2009*, AUSA Axel called Mrs. Anjel's criminal

3  attorney, Ted Belendorf, to try to schedule a meeting with Mrs.

4  Anjel.   (Exhibit 12.)  On *July 8, 2009*, Ms. Axel contacted Gluck

5  to ascertain whether he would accept service of a subpoena for

6  Yemini to provide handwriting exemplars.  Axel told Gluck that

7  Yemini was a target of the investigation.  Gluck stated that he

8  would get back to her.  (Exhibit 13.)

9      10.  On the morning of *July 13, 2009*, AUSA Axel emailed

10  Gluck to ask whether he would accept the subpoena for handwriting

11  exemplars; Gluck responded that he would accept it.  Axel emailed

12  the subpoena to Gluck calling for the exemplars to be provided on

13  July 22, and adding that if July 22 was inconvenient, they could

14  discuss another date but that "we need to get this done in the

15  next couple of weeks."  Ms. Axel stated that she also wanted

16  Rabbi Yemini to provide fingerprints and asked if a second

17  subpoena was necessary.  (Exhibit 14.)

18      That same morning, the defendant attempted to call Gluck and

19  left another message.  Thereafter, the defendant and Gluck

20  exchanged a series of emails stating, in relevant part:

21  11:34 a.m.     Villalobos to Gluck I hoped that we would have a
                                       chance to get a framework of
22                                     an understanding regarding our
                                       clients today.  My client has
23                                     an appointment with the
                                       investigating office tomorrow
24                                     morning [Tuesday] and it
                                       seemed to be in both of our
25                                     interests to have at least a
                                       clear understanding of how
26                                     your client would accept
                                       responsibility for his
27                                     actions.…  I will be available
                                       to discuss today, otherwise
28                                     tomorrow will be what it is

| | | |
|---|---|---|
| | | for both of our clients.  My clients are prepared to  go wherever the truth takes them (here or Israel) I hope the Rabbi is as well. |
| 12:59 p.m. | Villalobos to Gluck | My apologies.  My client's meeting is Thursday at 1 pm. That gives us a little more time to reconcile his issue... If the Rabbi could care less about a resolution, please inform me so I can adjust my position accordingly. |
| 2:49 p.m. | Gluck to Villalobos | Whatever happens with our discussions should not influence in any way your client's interview with the government.  At that meeting she must tell the truth.  I have repeated this from our very first discussion and our position has not changed.  I have not been able to get an answer from Rabbi Yemini, in part at least because I lack any documentation showing what your client may have actually worked. |
| 3:14 p.m. | Gluck to Villalobos | Following up on my email, I'm meeting with the Rabbi tomorrow morning. |

(Exhibit 15.)

11.  On *July 14, 2009*, the defendant and Gluck had the following email exchange:

| | | |
|---|---|---|
| 10:32 a.m. | Gluck to Villalobos | I met with Rabbi Yemini this morning.  He needs to talk to some people and will get back to me. |
| 10:39 a.m. | Villalobos to Gluck | I will be waiting for his response then. |

(Exhibit 16.)

Later that day, at 5:51 p.m., the defendant sent an email to Gluck advising him as follows:

7

1          FYI It looks like I will be representing Orit in
   front of the US Attorney as well.  Logistically, this
2  makes our opportunity of hashing out a deal more
   difficult.  I will be driving Wed afternoon from South
3  Lake Tahoe, where I was scheduled to play in a
   celebrity golf tournament to LA.  Please urge your
4  client to stop wasting precious time as we have very
   little of it.

5

6  At 8:12 p.m., Gluck responded by email stating, "I didn't know

7  you were a celebrity."

8      At 8:46 p.m., Villalobos replied by email stating, in

9  relevant part:

10         I'm not but my family has played in this tourney
    for many years. . .  I hope we can get  this done
11  tomorrow because as I said it will be impossible as I
    travel US 395 to LA as I have no reception most of the
12  way.  In attending the interview myself I hope this
    gives you a clear understanding of how this will
13  proceed.  If we have an agreement between Israel Chabad
    and my client I would quickly demand to reschedule this
14  interview as I have just recently taken over the case.
    I'm scheduled to be at our family's home in Maui from
15  Friday until August 4 so an interview would need to
    occur after the 4th.  Without an agreement between us
16  there is no need to re-schedule.  Please let me know.

17  (Exhibit 17.)

18      12.  On *July 15, 2009*, the defendant called AUSA Axel to

19  advise her that he was now representing Mrs. Anjel and needed to

20  reschedule her interview until after his return from vacation on

21  August 4.  (Exhibit 18.)  That same day, Gluck called AUSA Axel

22  and told her that he had been contacted by the defendant, who

23  said Rabbi Yemini needed to pay "a bunch of money" or Mrs. Anjel

24  was "going to say a bunch of bad things about Rabbi Yemini"

25  during her meeting with the government.  Gluck also paraphrased a

26  portion of the defendant's prior email about postponing Mrs.

27  Anjel's meeting with the prosecutor if they reached a settlement,

28  but proceeding with it if a settlement could not be reached.

8

(Exhibit 19.)

During the course of the day, Gluck met with the FBI as part of his cooperation with the government.  During this time, the defendant inquired about the status of a settlement and, at one point, displayed impatience at the pace of the settlement negotiations, stating, "I'm a little surprised by your client's arrogance.  I suspect he will not be quite so arrogant with the US Attorney.  So be it."  At the end of the day,  Gluck emailed the defendant to say that "[w]e've made some progress but I won't have clarity until tomorrow morning."  (Exhibit 20.)

13.   On *July 16, 2009*, the defendant and Gluck spoke by telephone.  This was the first of the conversations that Gluck recorded for the government.  Towards the beginning of this conversation, Gluck inquired if Mrs. Anjel was meeting with the prosecutor.  The defendant responded that he had already postponed Mrs. Anjel's meeting.  Gluck suggested they meet to "hash this out" and a meeting was set for the next day.  (Exhibit 21.)

14.   On *July 17, 2009*, the defendant and Gluck met at Gluck's office.  Again, the government recorded their conversation.  Towards the outset, Gluck stated that he "want[ed] to resolve the terms [of an agreement], everything, right now."  Gluck then brought up Mrs. Anjel's meeting with AUSA Axel.  The defendant responded, "[A]ll I need to know is, what we need Orit to say, because Orit is going to say the truth.  If there's anything that can be shaded in the gray area, she's going to say it exactly the way she should say it.  I don't know what it is she could possibly give you to help you, but if there is

1  anything, she'll do it."  (Exhibit 22 at pp. 6-7.)

2      Thereafter, in this conversation and subsequent

3  conversations spanning about three weeks, Gluck and the defendant

4  had numerous oral and written exchanges concerning how the money

5  would be paid, what Mrs. Anjel would say to AUSA Axel, and many

6  other topics.  For the most part, these statements relate to the

7  obstruction of justice charge.[5]

8      C.   Legal Analysis

9      1.   The Indictment:  Almost two years ago, on or about

10  August 21, 2009, the grand jury returned a two-count Indictment

11  against the defendant.  Count Two charges Hobbs Act extortion and

12  alleges that "defendant Villalobos attempted to obtain property

13  to which he was not entitled, namely, at least $100,000 in cash

14  payments, other compensation worth approximately $24,000, and a

15  fraudulent donation receipt in the amount of $6000, from [Mr.

16  Gluck and Rabbi Yemini], with their consent, induced by wrongful

17  use of fear, in particular, that if these payments were not made,

18  defendant Villalobos's client, [Orit Anjel], would help to

19  incriminate [Rabbi Yemini] in a federal grand jury

20

21      [5]  Because of their voluminous nature, the defense is not
quoting or providing all of the emails, notes and transcripts of
recorded conversations that occurred after July 15, 2009, when
22  Gluck first contacted AUSA Axel about the defendant.  In its
section of the brief, the government omits much of what
23  transpired prior to July 15 and focuses instead on selected
snippets of some of the recorded conversations.  On this limited
24  record the government argues that "defendant's conduct here
cannot possibly support [a claim of right] defense."  By only
25  spotlighting discrete portions of the conversations, the
government gives an incomplete and distorted picture of all that
26  transpired.  Yet, even accepting the government's truncated and
one-sided account, there is still an inadequate basis for the
27  Court to find as a matter of law that the defendant made an
"inherently wrongful" "threat of criminal prosecution" and bar
28  the defense from presenting a claim of right.

investigation."  (Indictment, Ct. 2; emphasis added.)

Thus, since the outset of this litigation, the Court and parties have been operating under an Indictment which, by its very terms, raises the issue of defendant's entitlement to the property and therefore clearly allows the defendant to present a claim of right defense.  Consistent with the explicit language of the Indictment, the government has previously acknowledged that at trial it must prove as an element of the offense that the defendant was not entitled to the extortionate funds.

For example, in its response to the defendant's request for a Bill of Particulars (Dkt. 44), the government noted, "The Ninth Circuit model jury instruction phrases the relevant element of proof under the Hobbs Act as a [sic] *requiring the government to establish that defendant was not entitled to the money he demanded*, however, and not that the defendant was not entitled to the money for some particular reason.  Ninth Cir. Model Jury Instr. (Crim.) No. 8.117."  (Dkt. 44 at p.21; emphasis added, footnote omitted.)  Similarly, in opposing the defendant's motion to exclude certain portions of the defendant's tape-recorded statements, the government defended one passage by explaining that it "demonstrates that *defendant knows he has no legitimate claim to the money* he is demanding from [Rabbi Yemini], just as a casino has no *claim of right* to defendant's money."  (Dkt. 84 at p.16; emphasis added.).  And, most recently, in support of the instant motion, the government listed its proof obligations at trial as follows: "[T]he government need only establish: (1) defendant intended to induce Mr. Gluck or Rabbi Yemini to part with property by the wrongful use of fear; (2) *defendant knew he*

11

1   *was not entitled to receive the property*. . . ."  (Dkt. 124,

2   filed March 1, 2011, at p. 16; emphasis added.)[6]

3        Now, approximately six weeks from trial, the government

4   cannot ignore the express wording of the indictment or its

5   obligation to prove at trial that the defendant was not entitled

6   to the property at issue.  Thus, evidence that the defendant

7   attempted to obtain property to which he *was* entitled is relevant

8   and admissible.  Put another way, if a rational factfinder could

9   conclude that the defendant sought property to which he was

10  entitled, evidence of defendant's claim of right is clearly

11  admissible.

12       2.  <u>Claim of Right Defense</u>:  "The claim of right defense to

13  a Hobbs Act violation requires that the government prove that the

14  defendant did not have a legitimate claim to the thing of value

15  that is the subject of the alleged extortionate act and that the

16  defendant knew that he or she did not have such a claim."  *United*

17  *States v. Tobin*, 155 F.3d 636, 640 (3d Cir. 1998) (citing *United*

18

19      [6]  For its part, the government explains that the language of
    the Indictment tracked the former model jury instruction, which
20  has since changed.  But this rather implausible explanation, even
    if accepted as true, does not explain why the government
21  acknowledged *in the instant motion* its obligation to prove that
    "defendant knew he was not entitled to receive the property"
22  (Dkt. 124, filed March 1, 2011, at p. 16), or why this element of
    the charged crime should now be stricken as surplusage.  *United*
23  *States v. Root*, 366 F.2d 377, 381 (9th Cir. 1966) ("Words
    employed in an indictment that are descriptive of what is legally
24  essential to the charge in the indictment cannot be stricken as
    surplusage").  Indeed, in denying the defendant's request for a
25  Bill of Particulars, the Court adopted the government's position
    about the clarity of the charge and stated, "On its face,
26  however, the indictment charges Defendant with attempting to
    obtain property *to which he was not entitled* through the
27  "wrongful use of fear. . . .  The indictment in this case sets
    forth the statutory elements of a Hobbs Act violation and
28  supplements it with factual detail."  (Dkt. 47 at p. 3; citations
    omitted, emphasis added.)

1    *States v. Sturm*, 8709 F.2d 769, 773 (1st Cir. 1989)).

2    The seminal case on a claim of right defense is *United*

3    *States v. Enmons*, 410 U.S. 396 (1973).  There, the Court

4    considered the meaning of "wrongful" as used in the Hobbs Act:

5    "'[W]rongful' has meaning in the Act only if it limits the

6    statute's coverage to those instances where the obtaining of the

7    property would itself be 'wrongful' because the alleged

8    extortionist has no lawful claim to the property."  410 U.S. at

9    400.  Thus, the Court held, a claim of right defense could be

10   asserted in the context of labor disputes.

11   Following *Enmons*, appellate courts have consistently held

12   that a claim of right defense is barred only if the conduct at

13   issue is "inherently wrongful."  Force and violence are

14   "inherently wrongful" because  "you cannot beat someone up to

15   collect a debt, even if you believe he owes it to you." *United*

16   *States v. Daane*, 475 F.3d 1114, 1120 (9th Cir. 2007) (quoting

17   *United States v. Sturm*, 870 F.2d 769, 772-3 (1st Cir. 1989)); see

18   also *United States v. Zappola*, 677 F.2d 264, 270 (2d Cir. 1982)

19   ("two businessmen beat and threatened a third businessman to

20   coerce payment of an alleged debt" is inherently wrongful

21   conduct).  Similarly, locking someone in prison until an

22   extortion payment is made is "inherently wrongful" and bars a

23   claim of right defense.  *United States v. Nestor*, 2010 WL 3191888

24   (M.D. Pa. 2010).   In contrast, "there is nothing inherently

25   wrongful about the use of economic fear to obtain property."  *Id.*

26   (quoting *United States v. Sturm,* 870 F.2d at 772-3")); *Brokerage*

27   *Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir.

28   1998).

3.  <u>The Alleged Wrongful Use of Fear" in the Instant Case</u>:
The allegedly "wrongful use of fear" at issue in the instant case
may not be easily labeled; in denying the defendant's motion to
dismiss the extortion count, the Court referred to it as a "fear
of incriminating testimony." (Dkt. 72 at p.1.)  In its portion
of this brief, the government refers to the fear of "criminal
consequences" or "criminal investigation."  In previous
submissions, the government has asserted that "[t]he fear alleged
here – a public indictment and potential imprisonment – in fact
has both *economic* and physical dimensions." (Dkt. 64 at p.23;
emphasis added.)[7]

Whatever its description, based on the facts presented above
and the defendant's *in camera* submission, the defense submits
that this case does not involve "inherently wrongful" conduct or
a "threat of criminal prosecution."  Threat of criminal
prosecution cases invariably concern a statement by the extorter
that unless he was paid the extortionate amount he would file a
report with the criminal authorities or pursue criminal charges.[8]

---

[7]  In the government's section of this brief it concedes that
economic fear clearly permits a claim of right defense.

[8]  *See e.g.*, *United States v. Nestor*,  2010 WL 3191888, *9
(M.D. Pa. 2010) (finding a threat of criminal prosecution where
defendant, the Chief of Police, placed victim in a holding cell
and threatened a formal arrest unless another person produced
$2,000 in cash to defendant and co-defendants); *People v. Umana*,
138 Cal.App.4th 625, 641 ( 2006) (finding an extortionate threat
of criminal prosecution under California state law where the
defendants sent victims demand letters threatening to pursue
sexual assault charges unless the victims provided money and
motorcycles); *People v. Asta*, 251 Cal.App.2d 64, 75 (1967)
(affirming extortion conviction where appellant routinely
interrogated and threatened employees suspected of embezzlement
with filing criminal charges and imprisonment unless the
employees made restitution, often in amounts exceeding the
amounts embezzled); *Bertschinger v. Campbell*, 99 Wash. 142, 156
(1917) (finding an extortionate threat of criminal prosecution

14

1  Defense counsel (and, we assume, the government) have not found a

2  single case, federal or state, in which an extortion charge was

3  based on the claim that a witness to a crime who had a

4  prescheduled interview with a criminal prosecutor would still

5  participate in the meeting but might postpone it for a couple of

6  weeks if a civil settlement was reached.  Indeed, we have not

7  found a case remotely close or analogous to this scenario, nor

8  has the government.

9      Contrary to all "threat of criminal prosecution" cases that

10 the parties have located, there is no claim that Mrs. Anjel was

11 instituting or pursuing criminal charges.  It must be remembered

12 that Mrs. Anjel was only one witness (and certainly not the sole

13 witness or evidence) against Rabbi Yemini in a government visa

14 fraud investigation that had been ongoing since at least October,

15 2008, and that both Mr. Gluck and Rabbi Yemini were aware of this

16 fact.  Mrs. Anjel and no doubt others like her were going to

17 abide by their commitments to meet with the prosecutor and

18 provide incriminating information about Rabbi Yemini, but that is

19 because he had engaged in criminal conduct with a number of

20 people, including her, for an extended period of time.  For this

21 reason, we say respectfully but emphatically, that this case does

22 not involve a threat of criminal prosecution.  Nonetheless, to

23 answer the Court's inquiry, we next address whether a claim of

24 where defendant, a physician, threatened to have another
   physician arrested for illegally performing an incomplete
25 abortion unless the victim paid $1,000 where the victim never
   even performed such a procedure); *In re Sherin*, 27 S.D. 232
26 (1911) (finding an extortionate threat of criminal prosecution
   where defendant attorney wrote letter threatening to pursue a
27 criminal prosecution for adultery if victim, the husband of
   client's attorney, did not pay a settlement and surrender
28 property over to defendant's client).

right defense might be permitted in response to an extortion charge based on a "threat of criminal prosecution." The answer is "maybe."

4.   <u>Threat of Criminal Prosecution and a Claim of Right Defense</u>: There is little federal law – and no clarity – on whether a claim of right defense may be presented in response to an extortion charge based on a true "threat of criminal prosecution." In *United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988), the defendant engaged in a series of acts which the Court characterized as either "economic" threats or threats of violence. One of the "economic" threats included a demand for money with the proviso that if it was not paid, the "extortioner" would claim that there had been an attempt to bribe him to provide false information about Flynn, an opponent of the Church, which the extortioner threatened "could, in turn, be used as ammunition in Flynn's litigation against the Church." 840 F.2d at 122. In considering whether a claim of right jury instruction should have been given, the Court stated, "A straightforward example of a lawful economic threat is where one party threatens litigation in order to persuade another party to honor a contract which the first party believes it has breached." *Id.* at 123. Along the same lines, other cases have expressly held that "hard bargaining is not wrongful under the Hobbs Act." *United States v. Vigil*, 523 F.3d 1258, 1263 (10th Cir. 2008). *See also Brokerage Concepts Inc. v. U.S. Healthcare, Inc.*, 140 F.3d at 523-24.

By contrast, in *United States v. Zappola*, the defendants physically assaulted the victims while making threats of further

16

violence if the victims did not pay the defendants money they had

lost to the victims' competing business.  The Second Circuit

rejected the defense's contention that it should have been

permitted to present a claim of right.  The Court noted that "by

adopting the states' statutory law of extortion, Congress meant

to punish as extortion any effort to obtain property by

inherently wrongful means, such as force or threats of force or

criminal prosecution, regardless of defendant's claim of right to

property."  However, *Zappola* involved only threats of and actual

use of violence, not a threat of criminal prosecution.  Thus, not

only are the facts of *Zappola* clearly distinguishable from this

case, but the court's isolated reference to threats of criminal

prosecution was dicta and therefore inapposite here.  Further, at

the time it was decided, a claim of right defense was limited to

labor disputes, a position long since rejected.  See *Sturm*, 870

F.2d at 768; *United States v. Castor*, 937 F.2d 293 , 299 (7th

Cir. 1991)

In *United States v. Nestor*, 2010 WL 3191888 (M.D. Pa. 2010),

the court also disallowed a claim of right defense.  The

extortionate conduct in *Nestor* involved a police officer who

locked the victim in prison and threatened an unlawful arrest

unless the officer received $2,000. *Id.* at *9.  The court held

that this conduct was also "inherently wrongful" and barred a

claim of right defense.[9]

---

[9]   Besides *Zappola* (physical violence) and *Nestor*
(imprisonment), the government also cites *Costello v. Norton*,
1998 WL 743710 (N.D.N.Y. 1998).  That case has no meaningful
application here.  *Costello* concerned a civil rights action
against a police officer and others for RICO, false arrest,
extortion and malicious prosecution.  The plaintiff (Costello)
had a personal relationship with the officer (Mahoney) which

State law, including California law, is equally unhelpful. As one court noted, "There is a split of authority on the question whether a defendant's reasonable belief that he is entitled to the property he seeks to obtain constitutes a defense to a charge of extortion." *State v. Greenspan*, 92 N.C.App. 563, 568, 374 S.E.2d 884, 887 (1989) (citations omitted).[10]  For its

ended badly.  Costello assaulted Mahoney, took her truck, and withdrew $5000 from a joint bank account.  Mahoney (who was the sole contributor to the joint account) demanded that the truck and money be returned or she would have Costello arrested for burglary.  Ultimately, a special prosecutor (Martin) was brought in; Martin offered to drop the burglary charge if Costello admitted to disorderly conduct and repaid the $5000.  Costello thereafter accused Martin and Mahoney of extortion.  The court granted summary judgment for Martin, noting that his alleged misconduct was "a lawful plea bargain" and "did not involve force, violence, or fear."  *15 n.7.  And as for Mahoney, the court noted that "threatening criminal prosecution for failure to deliver property constitutes extortion under [New York] state law" – the New York statute explicitly prohibits "accus[ing] some person of a crime or caus[ing] criminal charges to be instituted against him" – and that the state's extortion statute was a proper predicate to Costello's RICO claim.  *Id.* (citations omitted).

[10]  In *Greenspan*, the court noted that several states included a claim of right defense in their statutes, but that the extortion statutes in a majority of the jurisdictions precluded such a defense.  92 N.C.App. at 568-69.  As examples of cases in which state courts permitted a claim of right defense, the *Greenspan* court cited *State v. Burns*, 161 Wash. 362, 297 P. 212, *aff'd per curiam on rehearing*, 161 Wash. 362, 1 P.2d 229 (1931) ("May one demand the return of money embezzled by another, and, if restitution be refused, threaten him with a criminal prosecution without violating the extortion statute, so long as the demand is limited to the specific amount embezzled? We think so"), and *Mann v. State*, 47 Ohio St. 556, 26 N.E. 226 (1890) ("An honest effort on the part of a creditor to collect a just debt, by accusing or threatening to accuse the debtor of a crime with which the debt is connected, or out of which it arose, does not, in our opinion, come within the purview of the statute; nor should the statute be construed as covering the case of an owner who demands from the offender a reasonable compensation for property which he has maliciously and criminally destroyed, and accompanies his demand with a threat to accuse the offender of the crime").  *See also Decato's Case*, 117 N.H. 885, 379 A.2d 825, 827 (1977) (no misconduct in writing letter informing recipient of possibility

part, California disallows a claim of right defense to an
extortion charge based on a threat of criminal prosecution, but
this position is grounded in the fact that, like many state
statutes, the California Penal Code's statutory definition of
"fear" for purposes of extortion explicitly includes a threat
"[t]o accuse [someone] . . . of any crime." *People v. Beggs*, 178
Cal. 79, 172 P. 152 (Cal. 1918) (quoting Calif. Penal Code §
519).[11]

Under the circumstances of this case, it is appropriate to
consider how professional ethics rules address threats by an
attorney during settlement negotiations.  As might be expected,
these rules are also conflicting.  California Rules of
Professional Responsibility, Rule 5-100(A), states, "A member
shall not threaten to present criminal, administrative, or
disciplinary charges to obtain an advantage in a civil dispute."
However, the American Bar Association ("ABA") has repeatedly
stated that an attorney is permitted to use the threat of
criminal prosecution against an opposing party in settlement
negotiations.

In 1992, the ABA's Committee on Ethics and Professional
Responsibility issued Formal Opinion 92-363, which noted that the
ABA Model Rules of Professional Conduct "do not prohibit a lawyer
from using the possibility of presenting criminal charges against

---

of criminal sanctions when attorney never requested payment from
recipient; "The mere mention of possibly filing criminal charges
does not in itself suggest that the statement was made in an
effort to gain leverage in a collection suit").

[11]   The language of Penal Code § 519 has since been amended but
continues to explicitly define "fear" to include a threat "to
accuse the individual threatened . . . of any crime."

an opposing party in a civil matter to gain relief for her client, provided that (1) the criminal matter is related to the civil claim, (2) the lawyer has a well founded belief that both the civil claim and the possible criminal charges are warranted by the law and facts, and (3) the lawyer does not attempt to exert or suggest improper influence over the criminal process." ABA Formal Op. 92-363 (1992).  In 2002, the ABA's Litigation Section again stated that while "a lawyer may not attempt to obtain a settlement by extortionate means, such as by making extortionate or otherwise unlawful threats," a threat of criminal prosecution is not impermissible in the context of a settlement negotiation as long as the three requirements set forth in Formal Opinion 92-362 are met.  ABA Section of Litigation, Ethical Guidelines for Settlement Negotiations § 4.3.2, citing ABA Formal Op. 92-363 (1992); accord *Comm. On Legal Ethics v. Printz*, 416 S.E.2d 720 (W.Va. 1992)."[12]

   Although not a claim of right case, some guidance can be drawn from *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002).  There, an attorney for a physician who performed abortions sent a letter threatening litigation to an attorney for the county where the clinic was located.  The letter included false affidavits by the defendants, Dr. Pendergraft and Mr. Spielvogel, and claimed that an abortion protester, Mr. Cretul,

---

[12]   In *Printz*, the court stated, "Of course, in many jurisdictions (and in the Model Penal Code), even overt threats are not criminally punishable if they are based on a claim of right, or if there is an honest belief that the charges are well founded.  In those jurisdictions, the lawyer's actions could be a crime only if the lawyer sought more of the other party's property than he believed his client was entitled to."  416 S.E.2d at 722.

20

had threatened them.  Based on the false affidavits, the parties held a settlement conference in which the defendants threatened a multi-million dollar lawsuit.  Pendergraft and Spielvogel were thereafter indicted and convicted of attempted extortion.

On appeal, the Court characterized the issues as "whether their threat to file the lawsuit was 'wrongful.'"  The Court stated, "[t]he use of fear can be a wrongful means under the Hobbs Act, and fear includes the fear of economic loss.  But the fear of economic loss is an 'animating force of our economic system,' and, therefore, is not inherently wrongful."  297 F.3d at 1206 (internal citations omitted).  After acknowledging that the defendants intended on being false witnesses, the Court reversed the conviction, stating, "Criminalizing false testimony via the Hobbs Act would expand the scope of witness liability.  Witnesses might decline to provide affidavits in questionable lawsuits against a government, fearing that they could be charged with conspiracy to commit extortion if the lawsuit fails.  Such a possibility is unsettling, and we do not believe that Congress intended to expand the scope of witness liability in this way.  The fabrication of evidence, then, does not make a threat to sue a government 'wrongful' within the meaning of the Hobbs Act."  *Id*. at 1207. If the blatant fabrication of evidence is not an "inherently wrongful" means to secure a settlement, then an attorney's postponement of his client's preordained meeting with a prosecutor  likewise should not be deemed "inherently wrongful."

D.   Conclusion

The test, we submit, in deciding whether a claim of right

21

defense applies to the instant case is whether the defendant's
acts were "inherently wrongful." *United States v. Daane*, 475
F.3d 1114, 1120 (9th Cir. 2007) (quoting *United States v. Sturm*,
870 F.2d 769, 772-3 (1st Cir. 1989)). "Inherently wrongful"
conduct includes force, violence and imprisonment, but not
threats of civil litigation or economic fear. We submit the
emphasis is on "*inherently* wrongful" conduct; thus, some conduct
may be "reprehensible," but unless it is "inherently wrongful" it
does not bar a claim of right defense to an extortion charge.
*Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir.
2003) ("it would be fair. . . to characterize as 'wrongful' the
filing of groundless lawsuits, particularly when the plaintiff
resorts to fraudulent evidence. But we join a multitude of other
courts in holding that meritless litigation is not extortion
under § 1951") (citations omitted).

Here, the government claims the "wrongful use of fear"
stemmed from the defendant's statements about the timing of his
client's preordained interview with the government. If a
settlement could be reached, the prescheduled interview would be
postponed for a short period. Based on the foregoing, we
respectfully submit that the defendant's alleged misconduct is
more akin to an economic threat than one of violence or
imprisonment, and that the defendant should be allowed to present
a claim of right to challenge the charge in the Indictment.
Indeed, it would be paradoxical to conclude that the defendant's
settlement negotiations about the timing of Mrs. Anjel's
interview with the government were so egregious as to call them
"inherently wrongful" under the Hobbs Act, while the ABA would

22

deem the same statements to be proper and ethical.  Certainly,
the term "inherently wrongful" envisions less ambiguous conduct.

Moreover, a rational factfinder could find that Mrs. Anjel's
meeting with the government came as no surprise to Gluck or Rabbi
Yemini.  As noted above, shortly after Rabbi Yemini learned of
the government's investigation, he intentionally attempted to
prevent such a meeting from occurring by having Mr. Anjel swear
on the Torah that he (and by implication, his wife) would not
disclose the Rabbi's misconduct.  In the context of both the
settlement discussions and the extortion charge, it is entirely
illogical and unjust to allow Rabbi Yemini to illegally attempt
to prevent Mrs. Anjel from meeting with the prosecutor, and then
bar (indeed, criminalize) the defendant from even mentioning when
such a meeting might take place.

Further, a rational factfinder could find that the
defendant's conduct is similar to that of Mr. Gluck who, in his
initial letter to the defendant, attempted to dissuade the
defendant and his clients from pursuing the matter.  As noted
above, Gluck wrote that "U.S. immigration authorities are looking
into at least some of the visas related to the Chabad Israeli
Center," he (Gluck) has "been in contact with them for some
time," and he has "provided them with documents and information."
The clear import of Gluck's disclosures about cooperating in the
criminal investigation can be drawn from his final comment on
this point in which he warned, "I thought you and the Anjels
should know this as you plan for the future."  (Exhibit 4.)
Gluck's message was, in effect, that the defendant and his
clients should not pursue a monetary claim based on the terms of

Rabbi Yemini's employment of foreign workers, or else he (Gluck) would steer the government's attention to the Anjels' illegal immigration status.

Thus, based on the foregoing, we submit that a rational factfinder could reasonably find that the defendant's acts and conduct never amounted to a threat of criminal prosecution, and to the extent the defendant made statements to Gluck about the timing of Mrs. Anjel's interview with the government, it was not "inherently wrongful" or extortionate.  Evidence of Mrs. Anjel's claim of right to the funds at issue is relevant and admissible. At the close of the evidence, should the Court permit the jury to consider the extortion count, the jury should be instructed that "the government [must] prove that the defendant did not have a legitimate claim to the thing of value that is the subject of the alleged extortionate act and that the defendant knew that he or she did not have such a claim." *United States v. Tobin*, 155 F.3d at 640 (citing *United States v. Sturm*, 870 F.2d at 773).

## II

### GOVERNMENT'S ADDITIONAL BRIEFING RE CLAIM-OF-RIGHT DEFENSE

A.   <u>Introduction</u>

At the May 12, 2011 hearing in this matter, the Court asked the government to brief two issues:

> (1)  Whether a exploitation of a threat of criminal prosecution is more like the exploitation of the fear of a threat of force or more like the exploitation of the fear of a threat of economic harm;
>
> (2)  Whether the record evidence is such that a rational juror could only find that the fear defendant attempted to exploit included exploitation of the fear of criminal prosecution.

As set forth herein, exploitation of the fear of criminal

prosecution is the exploitation of the fear of force, and it is inherently wrongful.  Defendant's attempts to circumvent the cases so holding by casting the allegations against defendant as "stemm[ing] from the defendant's statements about the timing of his client's preordained interview with the government" are a mischaracterization that is inconsistent with the government's theory of the case and the evidence against defendant.  The evidence referenced and quoted herein make clear that defendant's conduct far exceeded mere reference to the "timing" of Orit Anjel's interview with an Assistant United States Attorney.

Finally, no rational juror reviewing the record evidence in this matter could determine that defendant's attempts to exploit Rabbi Yemini's fear did not include an attempt to exploit Rabbi Yemeni's fear of criminal prosecution.[13]

B.  Fear of Criminal Prosecution Is More Akin to Fear of Force than Fear of Mere Economic Harm, and an Extortionist Who Exploits Such Fear Cannot Raise a Claim-of-Right Defense

"[B]y adopting the states' statutory law of extortion, Congress meant to punish as extortion any effort to obtain property by inherently wrongful means, such as force or threats of force or criminal prosecution, regardless of the defendant's claim of right to the property." United States v. Zappola, 677 F.2d 264, 268-69 (2d Cir. 1982) (emphasis added); accord United States v. Daane, 475 F.3d 1114, 1119-20 (9th Cir. 2007) (quoting Zappola); Costello v. Norton, 1998 WL 743710 (N.D.N.Y. 1998)

_____

[13]  Defendant references an in camera submission, the content of which, according to defendant, establishes that defendant's conduct was not inherently wrongful.  Defendant has not presented this submission to the government, and the government cannot respond to it.

(holding that "[a]ny claim of right to the property by defendants is irrelevant to a determination of whether there has been extortion" where "[p]laintiff alleges that defendants demanded money through threats of criminal prosecution"). This principle makes perfect sense both because the fear of criminal prosecution _is_ the fear of force[14] and because the claim-of-right defense applies only to the narrow category of cases involving nothing more than exploitation of the fear of economic harm because "there is nothing inherently wrongful about the use of economic fear to obtain property."[15]  United States v. Sturm, 870 F.2d 769, 772-73 (1st Cir. 1989).

In contrast, the exploiting the fear of criminal prosecution _is_ inherently wrongful. For that reason, the district court in United States v. Nestor, 2010 WL 3191888 (M.D. Pa. 2010), drew a distinction between cases involving purely economic fear and cases involving fear of criminal consequences, holding that there

---

[14]  Criminal prosecution is the government's "legitimate use of physical force." See, e.g., Max Weber, The Theory of Social and Economic Organization 154 (Talcott Parsons ed., A. M. Henderson & Talcott Parsons, trans., The Free Press 1964) (1947) (state has the "monopoly of the legitimate use of physical force in the enforcement of its" laws); Arberry v. Illinois, 244 F.3d 558, 566 (7th Cir. 2001) ("monopoly of force" is "the definition of government"); Fuentes v. Shevin, 407 U.S. 67, 91 (1983) ("[T]he State has kept strict control over its monopoly of legitimate force."); Dahl v. City of Huntington Beach, 84 F.3d 363, 366 (9th Cir. 1996) (same).

[15]  Because the Ninth Circuit has "declined to extend [the claim-of-right defense] beyond the context of a labor dispute," Daane, 475 F.3d at 1119, it is unclear that such a defense exists even in the run-of-the-mill economic-fear case. See, e.g., United States v. Greer, --- F.3d ---, 2011 WL 1312575 at *9 (9th Cir. April 7, 2011) ("[I]n cases of economic extortion [the Hobbs Act] _may_ require that the defendant know he was not legally entitled to the property he tried to obtain." (emphasis added)).

is no claim-of-right defense in the latter:

> The threatened harm in this case was not economic. Nestor allegedly locked Person # 4 in prison and threatened him with unlawful arrest unless Person # 5 gave him $2,000.  <u>The rationale behind the application of a claim of right defense is that it may be applied in cases of threat of economic harm because the victim does not have a right to be free from threats of economic harm.</u>  The exact opposite is true in this case.  Defendants threatened to arrest Person # 4, a threat to his liberty.
>
> Defendants claim that Nestor had probable cause to arrest Person # 4 and therefore, that Person # 4 did not have a right to be free from threat of arrest. Defendants claim that because of this, the rationale for allowing a claim of right defense in cases only where economic harm is threatened should be extended. However, <u>the dominant rationale behind allowing the defense is that threat of economic harm is a staple of day to day business and bargaining transactions</u>.  It is not something that is facially illegal.  <u>An officer, threatening an arrest to acquire money owed to him, is not such a common or necessary transaction in our society.</u>  Therefore, because it was not economic harm that was threatened in this case, Defendants will be precluded from raising a claim of right defense.

<u>Id.</u> at *9 (emphases added).[16]  For that reason, the claim-of-right defense has been precluded when the extortion involved fear of criminal prosecution.[17]

---

[16]  Although <u>Nestor</u> involved an officer exploiting the fear of criminal process rather than a civilian doing so, that distinction is inconsequential to the decision's logic.

[17]  Defendant has identified no federal cases extending the claim-of-right defense to extortion involving fear of criminal prosecution.  All of the cases he cites involve, at most, civil litigation.  In <u>United States v. Kattar</u>, 840 F.2d 118, 119, 122-23 (1st Cir. 1988), the defendant attempted to exploit the victim's fear of a civil dispute with a third party in probate court.  In <u>United States v. Vigil</u>, 523 F.3d 1258, 1261 (10th Cir. 2008), the defendant merely threatened not to give the victim a government contract; it has nothing to do with civil or criminal litigation or witness testimony in any way.  <u>Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.</u>, 140 F.3d 494, 503 (3d Cir. 1998), simply involved one company's use of "economic leverage" against another.  <u>United States v. Pendergraft</u>, 297 F.3d 1198 (11th Cir.

1      As the district court explained in Nestor, the rationale

2  behind the claim-of-right defense in the purely economic context

3  shows why that defense is not available to defendant here.   The

4  defense is available in cases of purely economic extortion

5  because "many legitimate business transactions" are driven by one

6  side's "fear of economic loss."   Brokerage Concepts, 140 F.3d at

7  523.   By contrast, business deals are not typically motivated by

8  one side's fear of the other side presenting unfavorable grand

9  jury testimony if not paid off.   Blackmail based upon a threat of

10  inculpatory grand jury testimony is no more "a common or

11  necessary transaction in our society" than is a wrongful arrest;

12  indeed, in California, where defendant's extortion took place,

13  _____

14  2002), is not only "not a claim of right case" -- as defendant
   concedes -- but also had nothing to do with criminal process;
15  rather, it involved a "threat to file [civil] suit against a
   government" and whether "the fabrication of evidence makes a
16  threat to sue a government 'wrongful.'"   Id. at 1207.   Defendant
   here did not fabricate evidence to support Orit Anjel's purported
17  civil suit against Rabbi Yemini; rather, he threatened to have
   her give unfavorable testimony before a criminal grand jury such
18  that Rabbi Yemini would end up in prison like Tony Alamo and
   Bernie Madoff.   (7/17/09 Tr. 14.)
19
20      Finally, defendant asserts that there is a "split" on the
   claim-of-right defense in state courts.   "Although there are
21  decisions to the contrary, by the weight of authority it is a
   criminal offense for a creditor to obtain money or property from
22  a debtor by means of a threat to accuse the latter of a crime,
   although the creditor believes that the money or property is
23  actually due him, and although he believes the debtor guilty of
   the crime as to which exposure is threatened."   American Law
24  Reports, "Extortion predicated upon statements or intimations
   regarding criminal liability, in connection with attempt to
25  collect or settle a claim which defendant believed to be valid,"
   135 A.L.R. 728 (2011) (collecting cases).   It is notable that the
26  two cases defendant has been able to find date from 1890 and
   1931, respectively; the third, Decato's Case, 117 N.H. 885, 379
27  A.2d 825, 827 (1977), is inapposite here because it is clear that
   defendant's threats were made to gain leverage over his victims.
28

                                30

such conduct is both criminally and ethically forbidden.  <u>See,</u>
<u>e.g.</u>, Cal. Pen. Code § 519(3) ("Fear, such as will constitute
extortion, may be induced by a threat . . . [t]o expose . . . any
. . . disgrace or crime"); Cal. R. Prof. Conduct 5-100(A) ("A
member shall not threaten to present criminal, administrative, or
disciplinary charges to obtain an advantage in a civil
dispute.").[18]

        Thus, while defendant is correct that the parties have
located no case addressing precisely the same facts as are at
issue here, defendant has failed utterly to explain why -- based
on the rationale of the claim-of-right defense -- the Hobbs Act
should be read to permit threats of "shaded" grand-jury testimony
so long as such threats are made to recover money the victim owes
the extorter.  Indeed, to unpack what defendant is insinuating is
to refute it; plainly Congress would never have intended to allow
a grand jury witness (or her lawyer) to use her testimony as a
means to frighten others into paying her.  Defendant's conduct
here is thus far <u>worse</u> than merely threatening to go to the

---

        [18]  Defendant cites ABA Formal Op. 92-363 (1992), and
suggests that his conduct would have been permissible under its
standard.  This is both irrelevant and wrong.  It is irrelevant
because defendant was subject to California's ethical rules, and
the fact that California forbids lawyers to engage in exactly
defendant's conduct shows that such conduct is neither "common"
nor "necessary" to our society.  It is wrong because even under
the ABA rule, a lawyer may "not attempt to exert or suggest
improper influence over the criminal process," which is precisely
what defendant did by, for example, stating that his client would
"say what ever it is that we need to say" if Rabbi Yemini paid
the blackmail defendant demanded.  (7/17/09 Tr. 12.)  Likewise,
<u>Comm. On Legal Ethics v. Printz</u>, 416 S.E.2d 720 (W. Va. 1992),
which defendant cites, made clear that "seeking any payments in
exchange for not testifying at a criminal trial" is "clearly
prohibited," and there is no plausible distinction to be drawn
between criminal trial and a criminal grand jury.

31

1  authorities unless a civil payment is made.  While one can

2  imagine why Congress might permit a victim to settle for cash

3  instead of complaining to the police (e.g., "Pay me for the

4  things you stole from my store or I will report you for

5  shoplifting."), defendant's threat here -- in essence "Pay me and

6  my client will testify favorably for you, but if you don't,

7  you'll be sorry" -- could never be anything but outrageous.

8  Thus, the pendency of the federal investigation and the fact that

9  Orit Anjel had been called before the grand jury aggravate,

10  rather than mitigate, the wrongfulness of defendant's conduct.

11      For that reason, and because the claim-of-right defense is

12  limited, at most, to cases of purely economic fear, no claim-of-

13  right defense should be permitted here.[19]

14  _____

15      [19]  Defendant's contention that he is entitled to such a
   defense, even if one is not generally available, based on
16  language of the indictment and prior filings by the government is
   without merit.  The government's indictment tracked the then-
17  applicable version of Ninth Circuit Model Jury Instruction No.
   8.142 (Hobbs Act Extortion), which required that "defendant acted
18  with the intent to obtain property that the defendant knew [he]
   [she] was not entitled to receive."  9th Cir. Model Crim. Jury
19  Instr. 8.117 (2003) (Extortion or Attempted Extortion by Force,
   second element).  Since then, the Ninth Circuit has revised the
20  instruction to read "defendant acted with the intent to obtain
   property."  9th Cir. Model Crim. Jury Instr. 8.142 (2011).  The
21  surplus language in the indictment should be stricken;
   alternatively, the government will supersede the indictment to
22  remove it.  (Defendant characterizes the government's explanation
   as implausible.  The motion that gave rise to the discussion of
23  defendant's claim-of-right defense was originally filed January
   18, 2011.  The revised jury instruction was promulgated January
24  27, 2011.  The motion was subsequently re-filed March 1, 2011,
   pursuant to this Court's order, with reference to the newly-
25  revised jury instruction and unintentional omission of its
26  substantive change.)

27      Finally, although defendant claims that the government did
   not indicate its opposition to the claim-of-right defense until
28  "six weeks from trial," in fact the parties have been litigating

C.  <u>If the Court Rules That No Claim-of-right Is Available When a Defendant Exploits the Fear of Criminal Prosecution, the Government Will Not Seek to Prove Count Two Through Purely Economic Fear and Thus Eliminate the Need for a Claim-of-Right "Mini-trial"</u>

If the Court concludes, as the courts discussed above have, that no claim-of-right defense is available where a defendant exploits a victim's fear of criminal prosecution, the government would agree to have the jury instructed that it may find defendant guilty of count two <u>only</u> if it finds that the defendant intended to induce Benjamin Gluck or Rabbi Yemini to part with property by the use of fear that includes, at least in part, a fear of criminal investigation or prosecution (<u>i.e.</u>, not merely through fear of a patently frivolous lawsuit).  With the jury so instructed: (1) defendant would not be entitled to argue or present evidence of a claim-of-right defense, even if there were merit to Orit Anjel's purported civil claim against Rabbi Yemini; and, therefore, (2) the jury, the Court, and the parties would be spared a confusing and time-consuming sideshow regarding the merits of Ms. Anjel's purported civil claim.

Even in the absence of such a limiting instruction on the scope of conduct that could support a guilty verdict on count two, however, defendant would still not be entitled to present a claim-of-right defense here because no rational jury could conclude that defendant intended to exploit only Rabbi Yemini's fear of a legitimate civil claim.  As set forth below, defendant repeatedly invoked the criminal investigation into Rabbi Yemini

_____

the issue since at least February 28, 2011 -- almost six <u>months</u> before trial, <u>see, e.g.</u>, Dkt. 123 at 25-26, if not the initial filing of this motion over one year ago.  Defendant can claim no surprise.

1   and the Chabad Israeli Center ("CIC") as a reason why Rabbi

2   Yemini should pay off defendant and his client.

3   D.   <u>No Rational Juror Could Conclude That Defendant Intended to
        Exploit Nothing More Than Rabbi Yemini's Fear of Economic</u>

4       <u>Harm</u>

5        Beginning in 2003, the Chabad Israeli Center sponsored R-1

6   religious worker visas for Orit Anjel and others.  The CIC made

7   inconsistent and unscheduled payments to Ms. Anjel, by check, to

8   unable her to demonstrate continued eligibility for the visa that

9   was the sole basis for her entire family's ongoing legal

10  residency in the United States.  Ms. Anjel's husband would pick

11  up the checks from the CIC, negotiate them, and return the money

12  to Rabbi Yemini in cash.

13       The first grand jury subpoena to the CIC was issued in late

14  2008.  In December 2008, Mr. Anjel and Rabbi Yemini met at CIC,

15  and Rabbi Yemini informed Mr. Anjel that he (Rabbi Yemini) was

16  being investigated and that he had to fire Ms. Anjel.

17       Mr. Anjel informed defendant of his conversation with Rabbi

18  Yemini, including Rabbi Yemini's statement that he the target of

19  investigation.  On February 5, 2009, defendant informed Rabbi

20  Yemini, by letter, that defendant had "been retained to counsel

21  Mr. Anjel regarding the various issues that have arisen from the

22  employment of his wife with your Chabad Israel [sic] Center."

23  Defendant suggested that Rabbi Yemini "consult [his] attorney

24  concerning these issues so that [he could] understand the

25  complete scope of consequences of [his] current course of

26  action."

27       On February 23, 2009, Rabbi Yemini's attorney, Benjamin

28  Gluck, wrote defendant and indicated that he represented the CIC.

                                34

1   Mr. Gluck also politely informed defendant, by reference to

2   California Penal Code section 518 et seq., that he understood

3   defendant's letter to be an extortionate demand.

4       In May 2009, defendant and Mr. Gluck met, and defendant

5   demanded $120,000 -- "repayment" of all monies paid to Ms. Anjel

6   by the CIC and returned to Rabbi Yemini by Mr. Anjel.

7       On July 2, 2009, defendant and Mr. Gluck had a telephone

8   conversation.  To Mr. Gluck, defendant seemed eager if not

9   desperate for a settlement offer.  Mr. Gluck informed defendant

10  that, apart from the lack of merit in any wage claim by Orit

11  Anjel against the CIC, Rabbi Yemini -- then the target of a

12  federal criminal investigation -- was not in a position to make

13  any type of payment to a potential witness/co-conspirator.

14  Defendant informed Mr. Gluck that Ms. Anjel had a meeting at the

15  United States Attorney's Office within two weeks and that they

16  needed to resolve the matter prior to that meeting.

17      A week and a half later, defendant and Mr. Gluck exchanged

18  email messages, beginning with defendant's July 13, 2009 email

19  (emphasis added):

20      Benjamin, I hoped that we would have a chance to get a
        framework of an understanding regarding my client and
21      your client today.  My client has an appointment with
        the investigating office tomorrow morning and it seemed
22      to be in both of our interests to have at least a clear
        understanding of how your client would accept
23      responsibility for his actions.  If I have been unclear
        or imprecise about that I apologize.  Our inability to
24      obtain any response from your client is discouraging.
        But, what can I do but attempt to offer a branch.  I
25      will be available to discuss today, otherwise tomorrow
        [i.e., Ms. Anjel's statement to the United States
26      Attorney] will be what it is for both or our clients.
        My clients are prepared to go wherever the truth takes
27      them (here, or Israel) I hope the Rabbi is as well.

28

                                35

1  Later the same day, after several telephone calls with Mr. Anjel,

2  defendant again emailed Mr. Gluck:

3      Benjamin, My apologies please.  My client's meeting is
       Thursday [July 16, 2009] 1 PM.  That gives us a little
4      more time to reconcile this issue.  So, unless your
       client has no interest, please let's get something
5      resolved before Thursday.  If the Rabbi could care less
       about a resolution, please inform me so I can adjust my
6      position accordingly.  . . .

7  Mr. Gluck responded:

8      Dear Mr. Villalobos, Whatever happens with our
       discussions should not influence in any way your
9      client's interview with the government.  <u>At that
       meeting, she must tell the truth.</u>  I repeated this from
10     our very first discussions and our position on this has
       not changed.  I have not yet been able to get an answer
11     from Rabbi Yemini, in part at least because I lack any
       documentation showing what your client may have
12     actually worked.  . . .

13  The next morning, Mr. Gluck wrote defendant:

14     I met with Rabbi Yemini this morning.  He needs to talk
       with some people and will get back to me.
15

16  Later that morning, defendant wrote:

17     . . . Just let me know where we are as soon as you have
       progress because that will help me focus my client.
18

19  Having received no response from Mr. Gluck, defendant emailed

20  again, on July 14, 2009:

21     Benjamin, . . . I hope we can get this done tomorrow .
       . . .  In attending this interview [with the
22     government] myself, I hope this gives you a clear
       understanding of how this will proceed.  If we have an
23     agreement between Israeli Chabad and my client I would
       quickly demand to reschedule this interview as I have
24     just recently taken over the case.  . . . <u>Without an
       agreement between us there is no need to re-schedule.</u>
25     Please let me know.

26  Still having received no response from Mr. Gluck, defendant

27  emailed again on July 15, 2009:

28     Benjamin, So we haven't made any progress.  I'm a

                                    36

1    little surprised by your client's arrogance.  I suspect
     he will not be quite as arrogant with the US Attorney.
2    So be it.

3  Mr. Gluck responded to defendant[20]:

4    Alfred,  I apologize.  I've been putting out a fire in
     another matter all morning.  It's got me completely
5    jammed and I just haven't been able to return Rabbi
     Yemini's message.  Can you give me a couple of hours?

6

7  Defendant responded, "OK I'll wait," and, two and a half hours

8  later, "Do we have any progress to report?"  Defendant then left

9  a voicemail message for Mr. Gluck and then an email that read,

10 "Benjamin:  Please let me know whether we have made any progress

11 with Rabbi."  At the time, Mr. Gluck was being interviewed by FBI

12 agents.  The next day, at the government's direction, Mr. Gluck

13 wrote defendant that he had made "some progress" and requested a

14 meeting.  Defendant and Mr. Gluck had the first of several

15 recorded telephone conversations that morning, followed by a

16 meeting the next day, July 17, 2009.  Like defendant's previous

17 email messages, defendant's recorded statements make very clear

18 that defendant intended to exploit more than Rabbi Yemini's fear

19 of economic harm, and no reasonable juror could conclude

20 otherwise.

21      During his July 17, 2009 meeting with Mr. Gluck, at the Bird

22 Marella law firm's offices, defendant informed Mr. Gluck that, as

23 part of a "settlement" of an alleged employment claim against the

24 CIC, Orit Anjel would "help" the Rabbi by "say[ing] exactly the

25

26      [20]  On the morning he received the foregoing message, Mr.
   Gluck contacted Assistant United States Attorney Keri Axel and
27 informed her of defendant's blackmail scheme.  Ms. Axel notified
   the Chief of the Criminal Division, and an undercover
28 investigation of defendant ensued.

1  way she should say" "anything that can be shaded in the gray

2  area." (7/17/09 Tr. 4.)  "I don't know what it is she could

3  possibly give you to help you, but if there is anything, she'll

4  do it." (7/17/09 Tr. 4.)

5         A few moments later, after Mr. Gluck explained that Rabbi

6  Yemini would also be giving a statement to the government,

7  defendant stated that Orit Anjel would inform the government that

8  the nature of her employment relationship with the CIC would be

9  based upon whatever characterization Mr. Gluck chose to give that

10  relationship in a "settlement agreement":

11         B.G.:  Finish, I gotta hear this, because my guy's
12                gonna go in as well.

       A.V.:  Okay, so, she, what she's gonna say is: She
13              worked there full time, and she got paid.  And
              that's it.
14
       B.G.:  Okay, but, so she's not gonna say that she got
15              paid later?

16         A.V.:  She's not gonna say anything.  Number one --

17         B.G.:  No, I'm saying, she's gonna say --

18         A.V.:  She's going to say that she worked, she got
              paid.

19         B.G.:  Is she going to say that she gave the money
              back?  Or is she going to say that she got
20              paid and that was it?

21         A.V.:  Well, it depends on how we are going to have
              this settlement agreement.  Is it gonna be
22              that she was reimbursed for donating as she
              went along?  Or, is it going to be a straight
23              up payment for money that he, the, the center
              needed to function, and he asked, and she
24              voluntarily gave? . . .  She'll do it any way
              we need to do it. . . .  She'll say what ever
25              it is that we need to say.

26  (7/17/09 Tr. 12 (emphasis added).)  Defendant then reverts to

27  extortion -- the exploitation of Rabbi Yemini's fear of criminal

28  prosecution -- when Mr. Gluck seeks to clarify that what Ms.

                                  38

1  Anjel will tell the government is tied to whether Rabbi Yemini

2  agrees to pay the blackmail defendant demanded:

3          B.G.:   Okay, help me convince the Rabbi that he needs
                   to do this.
4
        A.V.:   That's going to be your job.
5
        B.G.:   That's what I'm asking you.
6
        A.V.:   He owes her the money. She is --
7
        B.G.:   What if he does not --
8
        A.V.:   -- part of the flock.
9
        B.G.:   -- if he doesn't bend to moral persuasion.
10
        A.V.:   He's gonna be, he's gonna be doing, what I
                   tell the people is, he's going to be throwing
11                 the dice when we get in front of Keri [Axel] .
                   . . . He's going to have to run the risk.  I'm
12                 not gonna tell you what she's going to say.
                   He's going to have to run the risk, I'm not
13                 gonna give it to you.  He can't have it both
                   ways.  It wouldn't be right, Benjamin.
14  (7/17/09 Tr. 13-14 (emphases added).)  In the next breath,

15  defendant informs Mr. Gluck that Rabbi Yemini could end up like

16  other Jewish public figures then imprisoned serving or awaiting

17  the imposition of long sentences of imprisonment:

18          A.V.:   . . . This is the risk you're running.  But
                   he's not that type of person.  A man of the
19                 cloth doesn't fuck over his flock.  This is
                   like the total <unint> --
20
        B.G.:   Well, look. I understand.
21
        A.V.:   -- of Israeli, of, of Judaism.
22
        B.G.:   Look, look, mean I gotta say. I, I hear what
23                 you're saying, okay; I gotta say I'm not.  You
                   know, he, he does not agree with every way
24                 that this has been characterized.

25          A.V.:   Okay.

26          B.G.:   Okay.  I mean, that's not, that's probably not
                   a surprise.
27

28

                                    39

A.V.:   <u>Neither does Tony Alamo</u>,[21] he's sitting in
        custody.

B.G.:   There ya' go. (Villalobos laughs.) There ya'
        go.

A.V.:   <u>Neither does Mr. Madoff</u>.[22] [REDACTED PURSUANT
        TO COURT ORDER]

(7/17/09 Tr. 14 (emphases added).)

Later in the same conversation, defendant and Mr. Gluck
continued to discuss different ways that the blackmail/extortion
payment could be disguised as the settlement of an employment law
claim.  Defendant again suggested that the payment could be
masked as the settlement of a sexual harassment claim.  Mr. Gluck
expressed that this would not be palatable to Rabbi Yemini, as a
married, family man and the head of the CIC, a religious
organization.  In his response to Mr. Gluck's comment about the
effect sexual harassment allegations would have on the CIC,
defendant again attempts to exploit Rabbi Yemini's fear of a
criminal investigation and prosecution and, specifically, the
execution of a search warrant at the CIC, and the unwanted public
interest that would accompany a search and seizure raid and a
federal investigation becoming public:

---

[21]  Tony Alamo, who was born Bernie Lazar Hoffman to Jewish-Romanian parents, was the leader of Tony Alamo Christian Ministries, a cult.  In July 2009, Alamo was convicted of interstate transportation of minors for illegal sexual purposes, rape, sexual assault, and related child sex offenses.  He later received a sentence of 175 years imprisonment.  The case received substantial pretrial publicity.

[22]  Bernard Madoff is the admitted architect of the largest known Ponzi scheme in history.  He pleaded guilty in March 2009 and, on June 29, 2009, was sentenced to 150 years imprisonment.  The case received sustained nationwide media attention.

40

B.G.:   Okay, do, do you have something else?  Do you
        have another suggestion?  Because I'll tell
        you, I can't do sexual harassment.  That's
        just, that's just, I mean, the Rabbi, I mean,
        if it ever --

A.V.:   That's a personal issue with the Rabbi, it's
        not a practical issue.  That's becoming a
        personal issue.

B.G.:   No, no, I understand. But it, it, it's the
        institution, the institution runs.  It, you
        know, I mean, he --

A.V.:   <u>The head of the institution has the
        government, Uncle Sam's foot up its ass right
        now.</u> . . . <u>And, actually, that's going to get
        out also.</u>

B.G.:   I understand, and I, and I'll tell you
        something.  This will get out, uh, and this
        would be less devastating, not penalties for
        it.

A.V.:   No, no.  <u>What will happen is they'll pull up
        trucks</u> . . . And, just now, everyone will be
        forced out and everything will be taken.
        Everybody will be, <u>"What's going on? . . .
        That was the FBI, they just took everything
        here."</u>

(7/17/09 Tr. 19 (emphases added).)[23]

On July 27, 2009, Mr. Gluck informed defendant that he was
nervous about participation in a scheme to obstruct justice,

_____

[23]   In a footnote following his description of his July 17,
2009, recorded conversation with Mr. Gluck, defendant accuses the
government of "only spotlighting discrete portions of the
conversations" and "giv[ing] an incomplete and distorted picture
of all that transpired."  Quite to the contrary, it is, in fact,
defendant who, in summarizing the July 17 meeting, ignores the
last more than 30 pages of the transcript of the recording, over
the course of which defendant told Mr. Gluck that Ms. Anjel would
say "whatever" she was told to say, and on at least four
occasions attempted to exploit Rabbi Yemeni's fear of criminal
prosecution, as described in the text.  Defendant also does not
address at all defendant's subsequent attempts to exploit Rabbi
Yemeni's fear of criminal prosecution on July 27, as described
below, instead summarizing all of post-July 17 recordings with
the statement "[f]or the most part, these statements relate to
the obstruction of justice charge."

based on the government's scrutiny of the CIC.  Defendant stated

that it was Rabbi Yemini -- not Mr. Gluck -- who should be scared

of the government, and that, although Jews would ordinarily not

cooperate with the government in an investigation of another Jew,

his clients would "go forward and cooperate one hundred percent"

against Rabbi Yemini.  In giving Mr. Gluck "the bottom line,"

defendant stated that Rabbi Yemini had "troubles" and was "in

jeopardy," and that only way for Orit Anjel's cooperation with

the government to "go away" would be for Rabbi Yemini "to do what

he has to do . . . pay and be done with it":

> B.G.:   Here's the last thing, and it's a bit of a
>         hurdle, okay?  And this is coming from me, Al,
>         because you and I have met many times, I don't
>         know if you have met the Rabbi.  This is not
>         coming from the Rabbi; it's coming from me.
>         Uh, uh, and 'cause like I said, the Rabbi,
>         he's going to have money here on Wednesday.
>         But here's the, here's the, here's the thing
>         that's coming from me.  Okay.  Um, in light of
>         this new, uh, I don't know what it is, non-
>         development with Keri, in other words putting
>         off the meeting.  Um, I, I'm very nervous, Al;
>         I got to tell you, I'm very nervous, um, when,
>         uh, when, uh, when you and I first talked I
>         told you that I didn't want to do this, and I
>         wasn't just negotiating, I, you know, I'm, I'm
>         nervous about this, Al.  Um, uh, it's not just
>         the Rabbi.  Um, let me be honest with you,
>         Okay?  I don't know if, well, you probably
>         have no way of knowing this, but the way the
>         Rabbi comes to me, you know, he's known my
>         family, I've known his family.  I, the first
>         time I met him I was probably twelve years
>         old.  Okay?
>
> A.V.:   Okay.
>
> B.G.:   I would never be having a discussion about
>         this subject with anyone else on behalf of any
>         of my other clients.  Alright, so I'm very
>         worried about this here and frankly, over the
>         weekend, I spent a lot of time thinking about
>         it and, um, well, I don't know what else to
>         say other than this whole thing scares me.

A.V.:   Well, it ought to scare the Rabbi, I'm not
        sure how much it ought to scare you.  He is
        your client and, understand now, you have a
        personal connection to him for a long time.   I
        guess what I have done in the last three or
        four days is spoken to some friends of mine
        who are Jewish.  And I have a lot of friends
        who are Jewish, some of them who are Israeli.
        And what I have been able to understand from
        my discussions with them is that, in general,
        the issue can be taken to another Rabbi.  A
        Rabbi who is held in very high esteem.

B.G.:   What, what issue?  I'm not sure what you mean.

A.V.:   How to proceed with the Rabbi and how this
        should happen in terms of a Jewish person
        dealing with their Rabbi.  And what, what
        could happen, or what could've happened was:
        He could have gone to another Rabbi and asked
        the Rabbi how to handle a situation with a
        conflict with his Rabbi.  And most likely in
        this situation, my understanding, after having
        three or four discussions is, is that, in
        general, an Israeli and his Rabbi have a
        dispute he would be counseled not to cooperate
        in any way against the Rabbi.  Because the
        people who may be holding him responsible will
        be non-Jewish.  However, in this situation
        where the Rabbi has clearly gone over, bent
        over backwards to be a bad guy, most likely
        the counsel would be to go forward and
        cooperate one hundred percent.  So I think,
        what I'm trying to say is that, you know, you,
        you feel uncomfortable, I understand that, my
        guy's very uncomfortable, my guy's
        uncomfortable because he staunchly Israeli-
        Jewish.

B.G.:   Alright.

A.V.:   So, we're both uncomfortable.  The bottom line
        is: The only way for this to go away is he has
        to do what he has to do, and in this situation
        the only right thing to do is, is to pay and
        be done with it.  Now, however, you want to
        deal with that part is fine with me.  Like I
        said before, I have no problem coming into a
        room, taking a bag, being done.  People
        understand what will or will not be said.  Uh,
        my word is good.  I've never had somebody go
        back against my word.  The bottom line is that
        the Rabbi has, has troubles.  I can deal with
        the troubles with my client, I cannot help him
        beyond what we've discussed and that's his

43

> problem.  So, you know, coming back to your issue, I understand that he, he, he may be in some jeopardy.  I can only help you with my client, and I can do what I have already agreed to do.  And as long as you keep your end of the bargain, I will keep my end of the bargain.

Defendant's repeated invocation of the criminal investigation concerning Rabbi Yemini and the CIC -- especially when coupled with defendant's offers to control the content of Ms. Anjel's grand jury testimony depending on whether or not he was paid off by the rabbi -- are an unmistakable effort to exploit Rabbi Yemini's fear of criminal prosecution.  Because a claim-of-right defense is permitted, at most, only in cases involving purely economic threats, defendant's conduct here cannot possibly support such a defense.

### III

### DEFENDANT'S ADDITIONAL BRIEFING RE

### ATTORNEY-CLIENT PRIVILEGE WAIVER

A.  Introduction

The Court has asked the parties to brief whether the attorney-client privilege is waived if the attorney reveals facts which were made known to him by his client even though there are other sources of that information, or whether a waiver is effected when the disclosed facts could only have come from the client, such that the revelation of facts is tantamount to the revelation of the client's statements.  As a corollary to this issue, the Court also asked the parties to brief whether a waiver of the privilege occurred if the attorney did not intend to effect a waiver by making statements that reveal privileged

communications but only made the statements in furtherance of
some other purpose, such as to perpetuate a sting operation.  If
the answer to this latter question is yes, the Court asked the
parties to consider whether an evidentiary hearing is needed to
establish the factual predicates for this contention.

B.   Waiver By Disclosure

As a general matter, an attorney's limited disclosure of
information contained in privileged communications, rather than
the communication itself, may not be sufficient to waive the
privileged status of the communications. *See e.g., U.S. v. El
Paso*, 682 F.2d 530, 538 n.10 (5th Cir. 1982) (stating that public
disclosure of certain facts does not destroy attorney-client
privilege with respect to attorney-client communications about
those facts); *In re Pioneer Hi-Bred Intern, Inc.*, 238 F.3d 1370,
1374 (Fed. Cir. 2001) (citing *El Paso*); *Martin v. American
Employers' Ins. Co.,* 115 F.R.D. 532, 536 (S.D. Miss. 1987)
("Although the public disclosure of facts which underlie a
confidential communication protected by the attorney-client
privilege does not destroy the privilege with respect to that
communication about those facts, the disclosure of an otherwise
privileged communication to a third person-particularly an
opposing litigant-eliminates the intent for confidentiality on
which the privilege rests.")

However, in *United States v. Billmyer*, 57 F.3d 31, 37 (1st
Cir. 1995), the Court concluded that this distinction "has little
to do" with the Court's consideration of waiver given the factual
scenario at hand. *Billmyer* involved two defendants, Billmyer and
Josleyn, who were on trial, charged with several violations

45

arising from an alleged commercial bribery scheme involving Honda
dealers.  Id. at 33.  Josleyn served a *subpoena duces tecum* on
Honda, demanding that they produce a file consisting of
information received from the company's outside counsel.  Honda
objected to producing the file, claiming the file was protected
by the attorney-client privilege.  While it appears that the
contents of the file ostensibly contained attorney-client
communications, the defendants argued that Honda had waived the
privilege by disclosing considerable portions to the United
States government of the information (not the communications
themselves) acquired through their own attorney-directed internal
investigations.  *Id.* at 36.  The documents at issue set forth
information gathered from unnamed sources consisting of evidence
or allegations of payments made by Honda dealers to employees,
and reflected the communication of these allegations to outside
counsel or Honda executives.  *Id.*  The information was then
disclosed to the government.

    Like the Interested Non-Parties in this case, Honda asserted
that waiver had not occurred by this disclosure, and that it
could not have waived the privilege merely "by revealing to the
government the allegations or evidence recorded in the notes or
memoranda," since they had only revealed "information" contained
in privileged communications, not the communications themselves.
*Id.* at 36-37.  The Court noted that this distinction, while
"useful in some circumstances," was not determinative ; the Court
focused on the following proposition:

        Here, the gist of the matter is that counsel informed the
        client of detailed evidence and allegations concerning
        possible bribes of its employees, and the client chose to

46

1      make this same information available to the government. What
2      is sought by the defense in the criminal trial is merely the
     recordations by or for the client of this same information.
3      The information now having been disclosed by the client to
     the government, it is unclear what damage to the attorney-
     client privilege can occur from making the corresponding
4      portions of the file available.

5 *Id.* at 37.  The Court continued:

6      Indeed, American Honda's disclosure to the government of the
     factual information received from its law firm not only
7      reveals that information, and American Honda's knowledge of
     it, but makes an inquiry into the source and basis for the
8      information hard to avoid. A risk of unfairness is evident
     where information is provided to one side in a case (here,
9      the United States) and then an inquiry into its origin is
     shielded by a claim of privilege. In a variety of contexts,
10     the affirmative use of privileged information has been held
     to be a waiver of privilege.

11

12 *Id.*  Further, the Court noted that the "[w]aiver doctrine has

13 only a few hardedged rules; as to many permutations, it is a

14 fluid body of precedent reflecting a variety of concerns,

15 including an insistence on real confidentiality and limitations

16 based on fairness."  *Id.*  Any notion of confidentiality had

17 largely been dissolved by Honda's own actions in disclosing the

18 information to the government; accordingly, the district court's

19 finding of waiver was proper.

20     In *Billmyer,* the Court did not discuss the source of the

21 disclosed information and its potential impact on the waiver

22 determination.  The outside counsel's investigations did not

23 identify the sources of information, meaning that information

24 could have come from the client, Honda, any of its employees,

25 internal documents, or numerous other sources.  Given that the

26 Court did not discuss the relevance or import of the source of

27 the information – that it did not necessarily come solely from a

28 privileged source (i.e., the client) – the actual source of the

47

1  information contained in a privileged communication does not
2  appear to be a relevant consideration in the waiver analysis.

3      Rather, the Court was concerned with whether the privilege
4  holder's actions reflected an "insistence on real
5  confidentiality," which, as indicated by Honda's disclosure of
6  the information to the government, it did not.  Further, the
7  Court also noted, under the circumstances, that "a risk of
8  unfairness is evident," given that the information was made
9  available to the government, no doubt to assist in the
10  government's investigation and reap any supplemental benefits
11  from the privilege holder's cooperating with the investigation,
12  but was then denied to the defendants on a claim of privilege.

13      The Fourth Circuit's decision in *United States v. Martin*,
14  which involves the disclosure of confidential information to a
15  third party, also does not appear to discuss the implications of
16  the origin of the disclosed information on the waiver
17  determination.  In *Martin*, the defendant was convicted of tax
18  evasion charges, and challenged the district court's admission of
19  statements made by an attorney who had represented him in an IRS
20  audit based on privilege grounds.  773 F.2d 579, 580 (4th Cir.
21  1985).  During the course of the attorney's representation of the
22  defendant in an IRS audit, the attorney had allegedly informed
23  the IRS that the defendant had made additional unreported income
24  by selling chickens.  *Id.* at 583.  The Court noted that, to the
25  extent that confidentiality of this information was intended, the
26  defendant "waived the privilege by authorizing [the attorney] to
27  represent him before the auditor." *Id.* at 584.

28      Notably, in *Martin*, the disclosure appears to be of

48

1  information, and not of privileged communications, yet the court

2  nonetheless found a waiver.  In addition, the attorney presumably

3  could have obtained the information about his client's unreported

4  income from documentation or other sources.  For example, during

5  the trial, the government called the defendant's former mistress,

6  who testified that the defendant had told her that he sold

7  chickens and made $50,000 a year tax free.  She also testified to

8  seeing the defendant leave a farmer's market with an envelope of

9  money on several occasions.  *Id.* at 581.  As such, the attorney

10 could have potentially obtained the information from a source

11 other than the client.  This factor, however, did not appear to

12 have any bearing on the Court's determination on confidentiality

13 or of waiver.

14      As such, case law does not appear to distinguish between the

15 disclosure of information that could only have been obtained from

16 a client and the disclosure of information obtained from a

17 client, but feasibly obtained elsewhere.  The source of the

18 information does not appear to be a relevant or prominent

19 consideration in a court's waiver determination.  It appears from

20 the Interested Non-Parties' portion of this brief that they (and,

21 *sub silencio*, the government) agree.

22 C.   Motivation For Disclosure and the Lack of Intent to Waive

23      When courts consider whether a given disclosure amounts to a

24 waiver, the rationale or reason behind such a disclosure does not

25 feature prominently in a court's analysis.  Where it does factor

26 in, however, it appears to be part of the court's determination

27 as to the purposefulness of the disclosure.  For example, in

28 *Electro Scientific Industries, Inc. v. General Scanning, Inc.,* a

patent infringement case, the privilege holder had issued a "News Release" disclosing communications, and later claimed the "News Release" was privileged.  175 F.R.D. 539, 542 (N.D. Cal. 1997). The court ascertained that the purpose of the disclosure was to advance the privilege holder's commercial interest and stated that a "sophisticated party who intentionally discloses the most significant part of an otherwise privileged communication, in an act calculated to advance that party's commercial interests, cannot establish, as the law would require, that the party reasonably believed that it would be able to preserve the confidentiality of the other parts of that communication." *Id.* at 543.  This statement again reveals the court's concern for fairness and the insistence of confidentiality when considering waiver.

     The same can be said of Gluck and his voluntary and strategic decision to make confidential information available to the government and subsequently, to Villalobos.  These disclosures were, as indicated by Lincenberg, part of an effort to assist the government and obtain a favorable result for his client.  Furthermore, the disclosures demonstrate that Gluck did not intend to preserve the confidentiality of other parts of the communication.

     Further, it makes no difference that the disclosures were made by the privilege keeper (Gluck) rather than the privilege holder (Rabbi Yemini).  Because Gluck was acting with the express or implied consent of the client, he can waive the privilege in the same manner as his client. "While it is a general rule that the privilege is personal to the client and may be voluntarily

1  waived only by action of the client, it is also clear that the
2  client's attorney can be held to possess implied authority as an
3  agent to effect a waiver whether voluntary or inadvertent." 
4  *Hydraflow, Inc. v. Enidine Inc.*, 145 F.R.D. 626, 636 (W.D.N.Y.
5  1993). Further, in discussing whether disclosures made by an
6  attorney waive a client's attorney-client privilege, Wigmore
7  says:

> Since the attorney has implied authority from the client ...
> to make admissions and otherwise to act in all that concerns
> the management of the cause, all disclosures (oral or
> written) voluntarily made to the opposing party or to third
> persons in the course of negotiations for settlement, or in
> the course of taking adverse steps in litigation ... are
> receivable as being made under an implied waiver of
> privilege, giving authority to disclose the confidences when
> necessary in the opinion of the attorney. This is so unless
> it appears that the attorney has acted in bad faith toward
> the client.

14  8 Wigmore, Evidence § 2325 (McNaughton rev. 1961).

15      Turning next to the related question of an individual's
16  intent to waive attorney client privilege, courts have noted that
17  this intent has little bearing on the waiver determination.
18  Rather, "the focal point of privilege waiver analysis should be
19  the holder's disclosure of privileged communications to someone
20  outside the attorney-client relationship, not the holder's intent
21  to waive the privilege." *Tennenbaum v. Deloitte & Touche*, 77 F.3d
22  337, 341 (9th Cir. 1996).  In fact, "waiver may be effected by
23  implication." *Weil v. Investment/Indicators, Research &*
24  *Management*, 647 F.2d 18, 24 (9th Cir.1981).  As further stated by
25  the Ninth Circuit, "the subjective intent of the party asserting
26  the privilege is only one factor to be considered in determining
27  whether waiver should be implied." *Id.*   Thus, in *Weil*, despite
28  the privilege holder's "bare assertion that it did not

subjectively intend to waive the privilege" when it disclosed privileged communications, the court concluded that the disclosure nonetheless waived the holder's right to claim the privilege as to communications about the matter actually disclosed. *Id.* at 25. *See also United States v. Mendelsohn*, 896 F.2d 1183, 1188-89 (9th Cir. 1990) (a client's disclosure of the purported legal advice received from his lawyer waived his right to claim the privilege to prevent his lawyer from testifying as to the actual advice given, and his "intent or lack of intent to waive the attorney-client privilege is not dispositive").

While Gluck's counsel now claims that he did not intend for his disclosure to waive the privilege, there is no doubt that he knowingly and voluntarily decided to disclose the information.  A "knowing" or voluntary disclosure of privileged communications "to a third-party almost invariably surrenders the attorney-client privilege." *Pampered Chef v. Alexanian*, 737 F.Supp.2d 958, 964 (N.D. Ill. 2010); *Weil*, 647 F.2d at 24 (stating that "it has been widely held that voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other communications on the same subject.") Because Gluck voluntarily disclosed the privileged information, his alleged lack of "intent" to waive the privilege does not preclude a finding of waiver.

The Interested Non-Parties assert that Gluck's statements to the defendant "were made at the instruction of government agents, and do not derive from attorney-client communications."  However, these and prior similar assertions are not accompanied by any declarations or supporting documents and, therefore, fail to

1  establish a factual predicate upon which the Court could make
2  such a finding.

3      Defendant concedes that, if the information Gluck disclosed
4  to the defendant was a complete fabrication, invented by Gluck or
5  by the government and not having its source in Rabbi Yemini, no
6  privilege would be attached to the communication and no viable
7  argument for waiver could be made.  If, however, Gluck disclosed
8  to the defendant information he learned from Rabbi Yemini, the
9  fact that the disclosure was "made at the instruction of the
10 government agents" has no bearing on the waiver determination.
11 As discussed above, case law makes clear that a party's
12 motivation for disclosing privileged information does not play a
13 role in a court's waiver analysis.  Further, as discussed in our
14 portion of the Joint Submission and above, the disclosure of
15 information to the government and to the defendant was part of a
16 knowing and strategic decision to cooperate with the government
17 in hopes of obtaining a benefit.  *See* Joint Submission (Dkt. 123,
18 p. 35.)   Accordingly, whether Gluck made statements at the
19 direction of the government has no bearing on the Court's waiver
20 determination.

21      D.   Burden of Proof

22      The Court also asked the parties to clarify who bears the
23 burden of demonstrating that there has been a waiver. The law is
24 clear that, "[a]s with all evidentiary privileges, the burden of
25 proving that the attorney-client privilege applies rests not with
26 the party contesting the privilege, but with the party asserting
27 it."  *Weil*, 647 F.2d at 25  (citing *United States v. Bump*, 605
28 F.2d 548, 551 (10th Cir. 1979); *United States v. Landof*, 591 F.2d

36, 38 (9th Cir. 1978); *In re Horowitz*, 482 F.2d 72, 82 (2nd Cir. 1973)).  This burden requires the asserting party to prove "each essential element," *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009), including that it has not waived the privilege. *Weil,* 647 F.2d at 25; *Landof*, 591 F.2d at 38.  Accordingly, Gluck bears the burden of demonstrating that a waiver has not occurred, and, as in *Weil*, a holder's assertion that it did not intend to waive the privilege "is insufficient to make out the necessary element of nonwaiver."  *Weil*, 647 at 25.

Here, the Interested Non-Parties argue that the defendant bears the burden of establishing a waiver because Gluck's disclosures were not privileged:  they were made at the direction of the government and during a sting operation.  However, Gluck's counsel's naked claim that his client did not intend to waive the privilege is, as discussed above, irrelevant to the waiver analysis, and, furthermore,  "is insufficient to make out the necessary element of nonwaiver." *Weil,* 647 F.2d at 25.  Thus, if the Court finds that the communications between Gluck and the defendant of information Gluck learned from Rabbi Yemini are privileged, Gluck bears the burden of demonstrating that the disclosure of this information was *not* a waiver.

The Interested Non-Parties argue that, in cases where the party seeking discovery is asserting that the privilege attached and then was waived by the party resisting discovery, "the burden of showing the existence of the privilege is, at best, apportioned between the parties." *GTE Directories Service, Corp. v. Pacific Bell Directory*, 135 F.R.D. 187, 192, n.2 (N.D. Cal. 1991).  Even if the Court is inclined to adopt this apportionment

of the burden, the defendant submits that he satisfied his burden by providing Gluck's numerous representative statements in the Joint Submission.  *See* Joint Submission [Dkt. 123], pp. 35-37.[24]

    E.   <u>Need for Evidentiary Hearing</u>

Rule 12, Federal Rules of Criminal Procedure, requires the Court to hold an evidentiary hearing on a defendant's motion if the claim is colorable and material facts are in dispute.  *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996).  Neither the government nor the Interested Non-Parties have presented the Court with a declaration or evidence on any claimed fact, including Gluck's intent or state of mind at the time he disclosed privileged information.  If the Court finds that Gluck's mindset to be relevant to a determination of this issue, an evidentiary hearing would be required.

**IV**

**ADDITIONAL BRIEFING BY INTERESTED NON-PARTIES RABBI AMITAI YEMINI AND CHABAD ISRAELI CENTER RE ATTORNEY-CLIENT PRIVILEGE WAIVER**[25]

A.   <u>The Attorney-Client Privilege Does Not Protect Underlying Facts, No Matter The Source.</u>

As noted by Interested Non-Parties in the Joint Submission,

---

[24]  We also note that prior to cooperating with the government, on July 14, 2009, Gluck emailed the defendant to say, "I met with Rabbi Yemini this morning.  He needs to talk with some people and will get back to me."  (Exhibit 16.)  In this example, Gluck disclosed to the defendant information which he learned in a privileged communication from his client (*e.g.*, Rabbi Yemini to Gluck, "I will need to talk to some people").

[25]  Interested Non-Parties incorporate by reference herein the arguments made in their sections of the Joint Submission filed on February 28, 2011 (hereinafter, the "Joint Submission"), to the extent such arguments may be of assistance to the Court's consideration of the issues.  *See* Joint Submission [Dkt. 123], pp. 40-49, 53-61.

the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981); *Pastrana v. Local 9509*, 2007 WL 2900477 at *3 (S.D. Cal., Sep. 28, 2007) (finding the attorney-client privilege "does not protect facts communicated to an attorney").  Thus, while a client may refuse to describe what he said or wrote to the attorney, underlying facts within his knowledge do not become privileged simply because he shared the information with his attorney.  *Upjohn*, 449 U.S. at 395-96; *see also In re Allen*, 106 F.3d 582, 604 (4th Cir. 1997) ("[A] client cannot possibly hide information simply by communicating it to his lawyer.").

 "Discovery of the underlying facts of a communication depends entirely on its nature, rather than the source." *In re Wagar*, 2006 WL 3699544 at *15 (N.D.N.Y., Dec. 13, 2006) (*citing Bank Brussell Lambert v. Credit Lyonnais (Suisse) S.A.*, 1995 WL 598971, at * 11 (S.D.N.Y., Oct. 11, 1995)).  Underlying facts are outside of the privilege, regardless of the source of the information.  *Id.* (permitting deposition of witness concerning "relevant knowledge [he] possesses, no matter the source."); *see also Murdoch v. Castro*, 609 F.3d 983, 995 (9th Cir. 2010) ("Because the attorney-client privilege protects only a communication between an attorney and a client, not the facts that are communicated, a defendant would remain free to question the witness about the underlying facts."); *Universal Trading & Inv. Co. v. Kiritchenko*, 2007 WL 2471432 at *3 (N. D. Cal., Aug. 27, 2007) (overruling objections to deposition questions and contention that privilege was implicated because attorney would

56

have necessarily been the only source of the information sought); *Sprint Communications Co. v. TheGlobe.com, Inc.*, 236 F.R.D. 524, 529 (D. Kan. 2006) (requiring employee designated under Fed. R. Civ. P. (30)(b)(6) to testify and "provide responsive underlying factual information even though such information was transmitted through or from corporate lawyers.").

Because underlying facts are not privileged, federal courts permit deposition and questioning of witnesses concerning their knowledge of pertinent information, but "[t]he actual communication between [witness] and [counsel] are outside the scope of this permitted inquiry." *In re Wagar*, 2006 WL 3699544 at *15; *see also U.S. v. Flores*, 628 F.2d 521, 526 (9th Cir. 1980) (holding that an attorney may be required to affirm or deny his authority to file documents on behalf of his client, but such "affirmation or denial cannot be tested by cross-examination regarding the confidential communications to him by his client that led him to conclude that authority did, or did not, exist.").

Here, neither Rabbi Yemini nor his attorney, Benjamin Gluck, waived privilege by discussing underlying facts with government agents.  Their sources for the underlying facts do not matter.  Rabbi Yemini and Mr. Gluck are both willing to testify as to their knowledge about the underlying facts, but "[t]he actual communication between [them] are outside the scope of this permitted inquiry." *In re Wagar*, 2006 WL 3699544 at *15.

B.   Mr. Gluck Did Not Effect A Waiver Of The Privilege By Making Statements As Directed By The Government.

As both the Government and Interested Non-Parties have

already pointed out, many of Mr. Gluck's statements to the

Defendant – made in the course of a government undercover

operation – were made at the instruction of government agents,

and do not derive from attorney-client communications.

More importantly, even if Mr. Gluck had discussed with

Defendant matters other than as instructed by government agents,

such discussion of the underlying facts of a dispute does not

implicate, much less waive, the attorney-client privilege.

"[J]ust as facts cannot be invested with privilege merely by

communicating them to an attorney, *so the confidentiality of the*

*communication is not destroyed by disclosure of the underlying*

*facts.*" *Solomon v. Scientific American, Inc.*, 125 F.R.D. 34, 37

(S.D.N.Y. 1988) (internal citations omitted) (emphasis added).

Any other outcome would render the privilege a nullity:

> If the confidentiality of a client's communication to
> an attorney about possible litigation were to be
> destroyed by the intention that the attorney use the
> information conveyed in order to assert his client's
> rights, the privilege would have no meaning.  To say
> that the communication is not privileged unless the
> attorney's lips are thereafter sealed concerning the
> facts of the case serves no societal purpose and in
> fact would seriously impede settlement of disputes
> prior to commencement of litigation.

*Id.* at 37-38.  Thus, in *Solomon*, the court found that a client's

"disclosure of the facts that were subject of the [privileged]

memo did not waive his right to object to disclosure of the

confidential *communication* itself."  *Id.* at 38 (emphasis in

original); *see also Allstate Ins. Co. v. Madan*, 1995 WL 313729 at

*2 (C.D. Cal., Feb. 15, 1995) ("proper disclosure of some of the

underlying facts contained in the privileged communication does

not constitute a waiver of the privilege."); *U.S. v. Weissman*,

1  1996 WL 737042 at *18 (S.D.N.Y., Dec. 26, 1996) (finding

2  attorney's "disclosure to regulatory authorities of the

3  information conveyed by [client], without attribution of that

4  information to him, would not violate any privilege.").

5  Neither Mr. Gluck nor Rabbi Yemini ever disclosed any privileged

6  attorney-client communications to the Government or Defendant.

7  Specifically, while Mr. Gluck may have discussed the underlying

8  facts of the dispute with Defendant, he never disclosed any of

9  his confidential communications with Rabbi Yemini.  Defendant's

10  bare conjecture that Mr. Gluck "must have" obtained the

11  information from Rabbi Yemini is, in light of the above-cited

12  authorities, irrelevant.

13  C.   Defendant Has The Burden Of Production To Make A Prima Facie
        Showing Of Waiver Of Privilege.
14

15       None of the statements made by Rabbi Yemini or Mr. Gluck

16  disclosed attorney-client communications or implicated the

17  attorney-client privilege.  Indeed, Rabbi Yemini and Mr. Gluck

18  are prepared to testify as to any statements they made to

19  Defendant and the Government, and as to the underlying facts of

20  the case.  Defendant, however, claims that Rabbi Yemini and Mr.

21  Gluck disclosed privileged communications to Defendant and to the

22  Government  and, as a result, waived privilege as to all

23  attorney-client communications between Interested Non-Parties and

24  Mr. Gluck, including communications that have never been

25  disclosed to third parties outside the attorney-client

26  relationship.

27       As with other evidentiary privileges, "the burden of proving

28  that the attorney-client privilege applies rests . . . with the

party asserting it." *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 25 (9th Cir. 1981).  Where, as here, the party asserting the attachment of the privilege and its subsequent waiver is not the holder of the privilege, "the burden of showing the existence of the privilege is, at best, apportioned between the parties." *GTE Directories Service, Corp. v. Pacific Bell Directory*, 135 F.R.D. 187, 192, n. 2 (N.D. Cal. 1991).  In practice:

> The party asserting the attorney-client privilege bears the initial burden of proving that the communication in question is privileged.  If the party seeking discovery asserts that the privilege which initially attached to the communication in question was subsequently waived, that party must bear the burden of *production* on the issue of waiver.  Once the opponent has proffered evidence that the claimed privilege has been waived, the party asserting attorney-client privilege bears the ultimate burden of proving that the privilege was not waived.

*United States v. Chevron Corp.*, 1996 WL 444597 at *4 (N.D. Cal., May 30, 1996)(emphasis in original).  This "shared burden" approach "alleviates the onerous burden on a client asserting the attorney-client privilege to prove a negative, i.e. that the privilege has not been waived." *Id.* at *4.

In order to meet the burden of production, the proponent of waiver must make a prima facie showing "that the [holders of the privilege] shared the actual content of the legal advice they received from their attorneys with third parties." *Sleep Science Partners, Inc. v. Lieberman*, 2010 WL 4316687 at *1 (N.D. Cal., Oct. 26, 2010).  Unless this prima facie showing is supported by declarations or affidavits, "the ultimate burden does not shift back to [the privilege holders] and they do not need to establish there was no waiver." *Id.* at *2.

1    Here, there is no dispute that attorney-client
2    communications between Interested Non-Parties and Mr. Gluck that
3    were neither intended to be nor actually disclosed to third
4    parties are privileged.  As detailed above and in the Joint
5    Submission, Defendant cannot point to any disclosures by Rabbi
6    Yemini or Mr. Gluck beyond *underlying facts*, which are not
7    privileged in any event.[26]  Defendant has not presented and
8    cannot present any evidence to show that either Rabbi Yemini or
9    Mr. Gluck ever disclosed the "actual content of legal advice . .
10   . with third parties."   Thus, Defendant has not met his burden
11   of production and the waiver argument fails.

12       Finally, courts "approach contentions that a party has
13   waived the protections of privilege or work product doctrine
14   cautiously, resolving doubts against finding waiver." *GTE*
15   *Directories Service, Corp.*, 135 F.R.D. at 192.  To the extent
16   that the Court has any doubts whether privilege has been waived
17   in this case, such doubts should be resolved in favor of
18   upholding the privilege.

19   D.   Response to Defendant's Supplemental Statement.

20       Defendant agrees that neither the source of information nor
21   the intent to waive privilege are of much importance in analyzing
22   waiver.  Rather, the focal point of any waiver analysis is
23   whether *privileged* communications have been *actually* disclosed.
24   Unable to identify any *privileged* communication between Mr. Gluck
25   and Rabbi Yemini that has been disclosed to third parties, much

26

27   [26]  Statements made by Mr. Gluck as a "conduit" of information
     also do not implicate the privilege.  *See* Joint Submission [Dkt.
28   No. 123], pp. 42-45.

of Defendant's Supplemental Statement simply *assumes* a privileged communication has been disclosed.  Neither the facts nor the cases cited by Defendant, however, support a finding that a privileged communication has been disclosed when counsel merely discusses underlying facts or serve as a conduit of information.

Defendant suggests that while "some" courts differentiate between disclosure of underlying information (which does not waive privilege) and disclosure of confidential attorney-client communications (which does waive privilege), that distinction is currently in question.  This is incorrect.  The U.S. Supreme Court has unequivocally held that the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981).  Thus, while a client may be compelled to disclose relevant facts within his knowledge, he "cannot be compelled to answer the question, 'What did you say or write to the attorney?'" *Id.*  To the extent that lower courts question the distinction, they do not overrule binding precedent from the U.S. Supreme Court.

More to the point, the cases cited by Defendant – *U.S. v. Billmyer*, 57 F.3d 31 (1st Cir. 1995) and *U.S. v. Martin*, 773 F.2d 579 (4th Cir. 1985) – do not challenge or undermine *Upjohn*.  In *Billmyer*, the First Circuit Court of Appeal declined to reverse a District Judge's finding of waiver, finding that the applicant for writ had failed to meet its burden to show manifest error. The Court of Appeal observed that it was unclear whether the order below was based on the disclosure of privileged communications or non-privileged information, and noted that

1   "[o]ne might ask why there is any basis for a claim of privilege

2   in the first instance."  57 F.3d at 36.  The Court of Appeal

3   concluded that, "in any event," since the information at issue

4   had already been disclosed by the client to the government,

5   disclosing the same information to an additional party was

6   unlikely to cause any damage to the attorney-client privilege,

7   especially since the court below "carefully limited the

8   disclosures to the factual allegations, excluding any commentary

9   on their legal implications." *Id.* at 37.   In *Martin*, an

10  attorney retained to represent the client in an IRS audit made

11  statements to the IRS auditor concerning the client's unreported

12  income. 773 F.3d at 583.  The Fourth Circuit Court of Appeal

13  affirmed the trial court's admission of those statements over the

14  client's objections because the privilege does not extend to

15  "information given with the intent that it be used… to compromise

16  tax liability." *Id.* at 584 (citing *In re Grand Jury Proceedings*,

17  727 F.2d 1352 (4th Cir. 1984) ("privilege does not apply to the

18  situation where it is the intention or understanding of the

19  client that the communication is to be made known to others.")).

20  *Billmyer* and *Martin* confirm Interested Non-Parties' position that

21  the attorney-client privilege is not implicated when counsel

22  discusses underlying facts with or serves as conduit of

23  information to third parties.

24       Defendant cites *Pampered Chef v. Alexanian*, 737 F. Supp. 2d

25  958, 964 (N.D. Ill. 2010), for the general rule that disclosure

26  of privilege information to a third party waives the privilege.

27  Defendant conveniently omits the holding of the case – the court

28  found *no* waiver because the third-party communication did not

include any privileged information, and "waiver cannot stem from
an unprivileged communication." *Id.* at 968 (internal quotation
marks and citation omitted).   In *Hydraflow, Inc. v. Enidine Inc.*,
145 F.R.D. 626, 634-36 (W.D.N.Y. 1993), also cited by Defendant,
the court took great care to note that while discovery is
permitted as to "the facts or information which are the subject
of a confidential communication," under *Upjohn*, the privilege
continues to protect undisclosed confidential communications.
Similarly, in *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340
(9th Cir. 1996), the court held that no waiver results from a
mere promise to waive the privilege in the absence of *actual
disclosure* of privileged communications.   These authorities are
entirely consistent with Interested Non-Parties' position that
"the confidentiality of [privileged attorney-client]
communication is not destroyed by disclosure of the underlying
facts."   *Solomon v. Scientific American, Inc.*, 125 F.R.D. at 37.

        In the cases cited by Defendant where waiver was found, the
finding of waiver was based on the client's disclosure of the
attorney's legal advice or opinion.   In *Weil*, 647 F.2d at 25,
waiver was found "only as to communications about the matter
actually disclosed, namely, the substance of… counsel's advice."
In *U.S. v. Mendelsohn*, 896 F.2d 1183, 1188-89 (9th Cir. 1990), a
limited waiver of the privilege was found based on the client's
disclosure of the legal advice provided by his attorney.   In
*Electro Scientific Industries, Inc. v. General Scanning, Inc.*,
175 F.R.D. 539, 543 (N.D. Cal. 1997), a limited waiver was found
because "the otherwise confidential opinion of counsel" was
disclosed in a news release.   These cases stand in sharp contrast

to the example cited in a footnote in Defendant's Supplemental

Statement: Mr. Gluck's July 14, 2009 email disclosed non-

privileged factual information (i.e., Rabbi Yemini needed to talk

with some people), and not legal advice or other privileged

communication, while the statement attributed to Rabbi Yemini is

a product of Defendant's speculation.

Here, there is no evidence that either Mr. Gluck or Rabbi

Yemini disclosed legal advice or other privileged communications

to third parties.  As discussed above, Defendant's bare assertion

that privileged communication has been disclosed is insufficient

to require the Interested Non-Parties to prove a negative – i.e.,

that no waiver has occurred.  Instead, as the proponent of

waiver, *Defendant* must make a prima facie showing "that the

[holders of the privilege] shared the *actual content of the legal

advice* they received from their attorneys with third parties."

*Sleep Science Partners, Inc. v. Lieberman*, 2010 WL 4316687 at *1

(emphasis added); *United States v. Chevron Corp.*, 1996 WL 444597

at *4.  Defendant does not even come close to meeting his burden

of production.