Richard M. Steingard (State Bar No. 106374)
Stephen B. Sadowsky (State Bar No. 90862)
LIGHTFOOT STEINGARD & SADOWSKY LLP
800 Wilshire Boulevard, Suite 1050
Los Angeles, California 90017
Telephone: (213) 260-9449
Facsimile: (213) 260-9450
Email: RSteingard@LSSLaw.com
Email: SSadowsky@LSSLaw.com

Attorneys for Defendant
ALFRED NASH VILLALOBOS

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALFRED NASH VILLALOBOS,<br>Defendant. | CASE NO. CR-09-0824-GHK<br><br>**DEFENDANT'S EXHIBITS IN SUPPORT OF JOINT SUBMISSION OF ADDITIONAL BRIEFING RE: CLAIM OF RIGHT DEFENSE** |

Defendant Alfred Nash Villalobos, by and through his attorneys of record Richard M. Steingard and Stephen B. Sadowsky, hereby submits the attached exhibits in support of the Joint Submission of Additional Briefing Re: Claim of Right Defense.

///

///

**EXHIBIT LIST**

1. October 27, 2008 e-mail from B. Gluck to AUSA Axel

2. FBI-302 Reports of Interviews with Avi Anjel and Rabbi Amitai Yemini, January 21, 2010 and January 28, 2010, respectively

3. February 5, 2009 letter from defendant to Rabbi Yemini

4. February 23, 2009 letter from B. Gluck to defendant

5. April 1, 2009 letter from defendant to B. Gluck

6. Undated (March or April 2009) notes of B. Gluck telephone conversation with defendant

7. May 2, 2009 e-mail from B. Gluck to AUSA Axel

8. May 12, 2009 notes of B. Gluck telephone conversation with defendant

9. May 18, 2009 notes of B. Gluck meeting with defendant

10. May 18, 2009 e-mail from B. Gluck to Rabbi Yemini

11. July 2, 2009 notes of B. Gluck telephone conversation with defendant

12. July 6, 2009 notes of AUSA Axel telephone conversation with T. Belendorf

13. July 8, 2009 notes of AUSA Axel telephone conversation with B. Gluck

14. July 13, 2009 e-mail exchanges between AUSA Axel and B. Gluck

15. July 13, 2009 e-mail exchanges between B. Gluck and defendant

16. July 14, 2009 e-mail exchanges between B. Gluck and defendant

17. July 14, 2009 e-mail exchanges between B. Gluck and defendant

18. July 15, 2009 notes of AUSA Axel telephone conversation with defendant

19. July 15, 2009 notes of AUSA Axel telephone conversation with B. Gluck

20. July 15, 2009 e-mail exchanges between B. Gluck and defendant

21. July 16, 2009 transcript of telephone conversation between B. Gluck

1      and defendant

2      22. July 17, 2009 transcript of meeting between B. Gluck and defendant

3

4                            Respectfully submitted,

5    Dated:  June 21, 2011           LIGHTFOOT STEINGARD & SADOWSKY LLP

6

7                          By: */S/ - Richard M. Steingard*

8                             Richard M. Steingard

9                             Attorneys for Defendant
                                 Alfred Nash Villalobos

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

**From:**    Benjamin N. Gluck

**Sent:**    Friday, October 17, 2008 5:35 PM

**To:**    keri.axel@usdoj.gov

**Cc:**    Benjamin N. Gluck

**Subject:** Chabad Israeli Center/Rabbi Amitai Yemini

Dear Ms. Curtis Axel,

I just left you a voicemail informing you that I represent the Chabad Israeli Center and Rabbi Amitai Yemini. I have a copy of your subpoena and would like to discuss it with you as well as discuss the case in general. I'll try you again on Monday.

Since they are now represented by counsel, please ensure that all communication with the center, its employees, or Rabbi Yemini go through me.

I look forward to working with you.

Benjamin

Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

2/2/2010

17-0913

**Exhibit 2**

FD-302 (Rev. 10-6-95)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription     01/28/2010

AVARAHAM ANJEL (ANJEL), date of birth 08/31/1968,
residence address 23427 Schoolcraft Street, West Hills, California
91307, was interviewed at the United States Attorney's Office
located at 312 North Spring Street, Los Angeles, California.  Also
present was Assistant United States Attorney (AUSA) Joe
Akrotirianakis.  Presenting and representing ANJEL was Attorney
James Spertus.  ANJEL was advised of the official identities of all
the individuals present.

---

Investigation on   01/21/2010   at Los Angeles, California

File # 72-LA-253706                    Date dictated   28-jm02.10

     SA Lucas L Bauers
by   SA Joy Mitchell:jm

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

4837

FD-302a (Rev. 10-6-95)

72-LA-253706

Continuation of FD-302 of ____AVARAHAM ANJEL_____ , On _01/21/2010_ , Page ___2___

      ANJEL recalled a conversation that he had with Rabbi Yemeni which he believed took place in December 2008. ANJEL remembered the conversation clearly although couldn't remember the exact date. ANJEL stated that Rabbi Yemeni called ANJEL and said he had a problem with the IRS or the INS and that it was an emergency. Rabbi Yemeni asked ANJEL to meet him immediately and ANJEL went to the Chabad Center to meet with Rabbi Yemeni.

      ANJEL met Rabbi Yemeni at the Chabad Center. ANJEL stated that Rabbi Yemeni was not acting normal, and was very nervous. Rabbi Yemeni quickly closed his office door and checked to make sure that there was nobody else around. Speaking in Hebrew, Rabbi Yemeni told ANJEL that he had a big problem and said that there was an investigation. The word "investigation" was the only word in this conversation that Rabbi Yemeni spoke in English, the rest of the conversation was in Hebrew. ANJEL could not recall if Rabbi Yemeni said the investigation was by the INS or the IRS. Rabbi Yemeni then took ANJEL into the temple and instructed ANJEL to place his hand on the Torah and swear that ANJEL would "not say anything". Rabbi Yemeni instructed ANJEL to "not say anything" referring to the investigation. ANJEL later understood that Rabbi Yemeni was committing a fraud.

      Rabbi Yemeni did not say anything about money when he instructed ANJEL to swear on the Torah. After the swearing on the Torah, Rabbi Yemeni told ANJEL that he had to fire ANJEL's wife, ORIT ANJEL(ORIT)

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___01/29/2010___

      On January 28, 2010, Rabbi AMITAÏ YEMINI ("YEMINI") of the Chabad Israel Center was interviewed at the Federal Court House located at 312 Spring Street, Los Angeles, CA.  Also attending the interview were YEMINI's attorney, BENJAMIN GLUCK, and Assistant United States Attorney (AUSA) Joe Akrotirianakis.  After being advised of the purpose of the interview, YEMINI provided the following information:

Investigation on ___1/28/2010___ at ___Los Angeles, CA___

File # ___72-LA-253706___        Date dictated ___not dictated___

by ___Gary Bennett___

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

004900

FD-302a (Rev. 10-6-95)

72-LA-253706

Continuation of FD-302 of ___ Rabbi Yemini _____ , On 1/29/2010 , Page ___2___

        In about September 2008, YEMINI received a visit from
Immigration and Customs Enforcement (ICE) Special Agent Brian
Johnson, who came to serve a subpoena to YEMINI.  Shortly after
this visit, YEMINI, who was admittedly emotional and frightened
after the ICE visit, contacted AVI ANJEL.  AVI ANJEL and YEMINI
met, and AVI ANJEL assured YEMINI that he would not hurt YEMINI (by

FD-302a (Rev. 10-6-95)

72-LA--253706

Continuation of FD-302 of ___ Rabbi Yemini _____, On 1/29/2010. , Page ___3__

assisting any government investigation into YEMINI).  AVI ANJEL
said that he understood that he and YEMINI were in this situation
together (with regards to the fraudulent employment and pay of ORIT
ANJEL over the last several years).  YEMINI then took AVI ANJEL to
the temple to have AVI ANJEL swear on the Torah that he would not
harm YEMINI (legally).

**Exhibit 3**

**ALFRED N. VILLALOBOS II**
Attorney at Law
23705 Vanowen Street #252
West Hills, CA. 91307
818-634-5986
818-773-9348 fax
Nashville333@yahoo.com

February 5, 2009

Rabbi Yemini
Chabad Israel Center
1520 S. Robertson Blvd.
Los Angeles, CA  90035

Dear Rabbi:

I have been retained to counsel Mr. Anjel regarding the various issues that have arisen from the employment of his wife with your Chabad Israel Center.  Please review your policy and procedures, and/or consult with your attorney concerning these issues so that you understand the complete scope of consequences of your current course of action.  I hope that we can resolve this employment issue in a simple effective manner so that Mrs. Anjel may continue her employment with your firm without any further undue stress, anxiety, and/or frustration.

If you have any questions please feel free to contact me at your convenience at the number listed above.

Truly,

Alfred N. Villalobos II

00004

**Exhibit 4**

# BIRD | MARELLA

### BIRD ∘ MARELLA ∘ BOXER ∘ WOLPERT ∘ NESSIM ∘ DROOKS & LINCENBERG

A PROFESSIONAL CORPORATION

Benjamin N. Gluck
bng@birdmarella.com

1875 Century Park East, 23rd floor
Los Angeles, California 90067-2561
Telephone (310) 201-2100
Facsimile (310) 201-2110
www.BirdMarella.com

File 3531.2

February 23, 2009

Alfred Nash Villalobos, II
23705 Vanowen Street, #252
West Hills, CA 91307

Re:     Chabad Israeli Center

Dear Mr. Villalobos:

This office represents the Chabad Israeli Center and I received a copy of the February 5, 2009, letter you sent Rabbi Amitai Yemini. Unfortunately, I am confused about some of the issues and thus must ask that you clarify them.

First, you state that you have been retained "to counsel Mr. Anjel regarding the various issues that have arisen from the employment of his wife." While Mr. Anjel may be understandably interested in his wife's employment, the fact that you apparently do not represent Mrs. Anjel means that we cannot engage in a discussion with you of Mrs. Anjel's employment. If you do indeed represent Mrs. Anjel, please confirm this to me in writing.

Second, assuming that you will confirm your representation of Mrs. Anjel and as an effort to expedite this matter, I must note that I simply do not understand your letter. Thus, please include in your written confirmation of representation more detail about the following portions of your letter:

You say "please review your policy and procedures." What policies and procedures are you referring to? What about these policies and procedures is at issue relative to Mrs. Anjel's employment?

You refer to "the complete scope of consequences of your current course of action." What consequences are you asking us to make sure we understand? Please be specific. And what "current course of action" are you referring to? Again, please be specific.

| | | | | |
|---|---|---|---|---|
| Sharon Ben-Shahar | Jennifer S. Chang | Jason D. Kogan | Ronita D. Moore | Ekwan E. Rhow |
| Terry W. Bird | Orly Degani | Lisa H. Lawrence | Ronald J. Nessim | John K. Rubiner |
| Joel E. Boxer | Mark T. Drooks | Benjamin D. Lichtman | Angela E. Oh | Peter J. Shakow |
| Eric E. Bronson | Thomas R. Freeman | Gary S. Lincenberg | Thomas V. Reichert | Dorothy Wolpert |
| Paul S. Chan | Benjamin N. Gluck | Vincent J. Marella | Jean Y. Rhee | Steven K. Yoda |
| | | Marc E. Masters | | |

BIRD | MARELLA

BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Alfred Nash Villalobos, II
February 23, 2009
Page 2


You say that you hope we can resolve this "in a simple effective manner." What do you mean by that? What is the simple effective manner you are referring to?

Third, though your letter is not clear, I assume that Mrs. Anjel's immigration status is important to her and to her husband. I therefore offer the following information as a courtesy. U.S. immigration authorities are looking into at least some of the visas related to the Chabad Israeli Center. I have been in contact with them for some time and have provided them with documents and information. In light of these inquiries and discussions, I believe it unlikely that the authorities will take favorable action in connection with any of the visas any time soon. I thought you and the Anjels should know this as you plan for the future.

Fourth, while I am sure that you did not so intend, the less-than-precise references in your letter could be misconstrued as running afoul of California Penal Code Section 518, *et seq.* Again, I am sure that you did not so intend but please keep this in mind when you clarify your request.

Lastly, all future communications on this subject *must* go through me. Please instruct your client (or clients) not to discuss this matter directly with Rabbi Yemini or anyone else at the Center. I look forward to your response.

Very truly yours,

Benjamin N. Gluck

BNG:ale


260210.1

00006

# Exhibit 5

ALFRED N. VILLALOBOS II
Attorney at Law
23705 Vanowen Street #252
West Hills, CA  91307
(818) 634-5986
(818) 773-9348
Nashvilla333@yahoo.com

April 1, 2009

Benjamin Gluck
Bird, Marella
1875 Century Park Easte, 23rd floor
Los Angeles, CA  90067-2561

Re:    Chabad Israeli Center/Mrs. Anjel

In response to your letter dated February 23, 2009, let me clarify my status concerning the Anjels and your client.  This office does now represent Mrs. Anjel.  Since it appears that your firm specializes in federal criminal defense, and you have admitted that your client is the subject of an investigation by the Federal Bureau of Investigation and/or related agencies, it would be a waste of our of time to address the non-issue you raise regarding CPC 518.

FYI, I am going to be on vacation from Thursday April 9, through Monday April 19th.  I look forward to your cooperation as we strive to resolve this matter in a manner mutually satisfactory to all of us.

Truly,

Alfred N. Villalobos II

00007

# Exhibit 6

Chabad Israeli
Center

Villalobas

- she had job at center, when she
cashed check, she was required
to pay Rabbi - required to keep
application

- hand. the money that was given to
the Rabbi

- Employment Law Theory

00111

**Exhibit 7**

Axel, Keri (USACAC)

| | |
|---|---|
| **From:** | Benjamin N. Gluck [bng@birdmarella.com] |
| **Sent:** | Saturday, May 02, 2009 10:33 AM |
| **To:** | Axel, Keri (USACAC) |
| **Cc:** | Benjamin N. Gluck |
| **Subject:** | Chabad Israeli Center - Yemini |

Keri,

I've been in trial in Riverside all week.  I'm back in trial on Tuesday.  I understand you talked with my partner Gary Lincenberg but I'm wondering if we can just agree to deal with this as soon as I'm done?  We'll be going all through next week but by the following week (5/11) things should be calming down.

Please let me know.  Obviously, subpoenaing three sons in connection with an investigation of their father is a little delicate and I simply can't do that right now.

B.

Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

37

04108

**Exhibit 8**

Chabad
Israeli
center

Villalobos 5/12/09

wage and hour violation

fees - penalties - vi

$120k

1099's for last four years
copies of checks

4 x 28 - 32

Position - gave back $100 on dollar

- All Rey want is Rabbi
to give them ~~bac~~ back
the money

- word some settlement
agreement

- Have buck - show me the
numbers

- Convention - worked for 4 years,
never kept anything

# Exhibit 9

C L L

meet
A. Lolulakas
5/18/09

Orit
Angel

- started 2004

all money that
went to her, went
back to Gemini

9/28/05 - letter w/
24, 000/year
full time

2003   1099
        24,000

marked full
time for
- full time since
2005 -

24
19
28
30
25

2004   19,000

2005   28,800

2006   30,000

2007   25,0000

12/6/06
check for
30,000

- copies of checks

Timecards

00113

**Exhibit 10**

**Alicia L. Eastman**

| | |
|---|---|
| **From:** | Benjamin N. Gluck |
| **Sent:** | Thursday, July 02, 2009 4:12 PM |
| **To:** | Amitai Yemini (yemini@sbcglobal.net) |
| **Cc:** | Benjamin N. Gluck |
| **Subject:** | Attorney Client Privileged |

**Follow Up Flag:** Follow up

**Flag Status:** Red

Rabbi Yemini,

I got a call today from Al Villalobos.                    REDACTED                    I told him that I'd talk with you but that I wasn't optimistic that we would offer anything.  He said:

1) That Orit has a meeting with the government scheduled.  (                REDACTED                He first said it was this week.  Then he said it was next week.  And the last time we talked he also said she was about to meet with them.)

2) That he's leaving town and the case will be passed to a new lawyer named Keith Fink.  According to Villalobos, Fink is a nasty, aggressive person.  Even his friends think he's nasty.  So we should settle now before Fink gets involved.

3) That Orit's husband is a good man and he's not greedy.  He really "believes in this Jewish stuff" and his father just passed away.        REDACTED                    REDACTED
REDACTED

4) He does not have any more documents about how much Orit worked.  (I had previously told him we need proof she worked 40 hours a week.  I asked him if she did work that much and he said that she stayed at home "on call.")

                                                                REDACTED
Give me a call if you want to discuss further.
REDACTED


B.

Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T: +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

**Exhibit 11**

Chabad Israeli crr

T/C  Villalobos                    7/2/09

- W2's, Tax Returns

USAO - This week - Then Next
                            week

- on call

- Her position was that she would
  Tie 40 hours/week and
  That she gave all the money

- If were not going make a
  deal, will hand it to The
  SOB

* Keith Fink @ Baker Hostetler

- My guy is not unreasonable
  → cut to chase
  - $120K

Going on vacation from tomorrow
until September — Then relocating
to Nevada.

- What pay to get rid of ?

00114

# Exhibit 12



7/6/09

① call ███████
② call ███████
③ ███
④ finish ██████ report
⑤ Schedule ████
⑥ Bob — get Complaint done
⑦ ██████
⑧ ██████
⑨ + SBA ██████

███████ 10/26/09  8:00 a.m.
███████ Judge We
Aug 3  is fine
████████ Spitzer?
████████ 3:30 p.m.

(313)
███-470

X5633 —

(818) 720-4112

Ted Behrendorf  Dirt Angel
- Thurs. the 9th
- She wants him to be there
- Wed. the 8th after 10-11
- next week?

██████ ████ either of them
is a waste of time

**Exhibit 13**

7/8/09 – TC to Ben Stuck
— let him doublecheck to see if he
has authority for accepting the
subpoena (he confirmed entity not a target) your
→ "anything else I want to tell him?"
No

**Exhibit 14**

subpoena

| | |
|---|---|
| **From:** | Axel, Keri (USACAC) [Keri.Axel@usdoj.gov] |
| **Sent:** | Monday, July 13, 2009 10:48 AM |
| **To:** | Benjamin N. Gluck |
| **Subject:** | RE: subpoena |
| **Attachments:** | Amitai Yemini GJ Subpoena 7-7-09.pdf |

Ben:  Pursuant to your agreement to accept a subpoena on behalf of your client, Amitai Yemini, please find a subpoena requiring him to provide handwriting exemplars on July 22.  I can negotiate a mutually convenient date if July 22 does not work, but we need to get this done in the next couple of weeks.  I just realized that the subpoena does not reference fingerprints, which we also should get at the same time.  I assume he will provide them voluntarily, but if you need them also to be subpoenaed, let me know and we'll send another.

Keri

*Keri Curtis Axel*
Assistant United States Attorney
1300 U.S. Courthouse
312 N. Spring Street
Los Angeles, CA  90012
Phone:  (213) 894-5421
Fax:  (213) 894-6436

**From:** Benjamin N. Gluck [mailto:bng@birdmarella.com]
**Sent:** Monday, July 13, 2009 10:37 AM
**To:** Axel, Keri (USACAC)
**Subject:** Re: subpoena

Keri,

Send it over. I'll accept it for him. Thanks. B.

Benjamin N. Gluck
Bird Marella
310.201.2100
Sent from my Blackberry

**From:** Axel, Keri (USACAC) <Keri.Axel@usdoj.gov>
**To:** Benjamin N. Gluck
**Sent:** Mon Jul 13 10:17:24 2009
**Subject:** subpoena

Ben:  Please confirm whether you have authority to accept a subpoena on Amitai Yemini's behalf.  Thank you.

*Keri Curtis Axel*

Assistant United States Attorney

1300 U.S. Courthouse

312 N. Spring Street

Los Angeles, CA  90012

Phone: (213) 894-5421

2/2/2010

subpoena

Fax:  (213) 894-6436

# Exhibit 15

-----Original Message-----
From: Benjamin N. Gluck
Sent: Monday, July 13, 2009 3:14 PM
To: Benjamin N. Gluck; nashvilla333@att.blackberry.net
Subject: RE: Israeli Chabad

00980

Following up on my below email: I'm meeting with the Rabbi tomorrow morning.

B.

Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

-----Original Message-----
From: Benjamin N. Gluck
Sent: Monday, July 13, 2009 2:49 PM
To: nashvilla333@att.blackberry.net
Cc: Benjamin N. Gluck
Subject: RE: Israeli Chabad

Dear Mr. Villalobos,

Whatever happens with our discussions should not influence in any way your client's
interview with the government. At that meeting, she must tell the truth. I have repeated
this from our very first discussions and our position on this has not changed.

I have not yet been able to get an answer from Rabbi Yemini, in part at least because I
lack any documentation showing what your client may have actually worked.

I'm sorry to hear that you were ill and I hope you feel better quickly.

Benjamin

Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

-----Original Message-----
From: alfred villalobos [mailto:nashvilla333@att.blackberry.net]
Sent: Monday, July 13, 2009 12:59 PM
To: Benjamin N. Gluck
Subject: Israeli Chabad

Benjamin,

My apologies please. My client's meeting is Thursday 1 PM. That gives us a little more
time to reconcile this issue. So, unless your client has no interest, please let's get
something resolved before Thursday. If the Rabbi could care less about a resolution,
please inform me so I can adjust my position accordingly.

I'm on vacation now and recuperating from an illness but I have access to computer,
assistant, and fax if necessary.

Truly,

Alfred N. Villalobos II
Sent via BlackBerry by AT&T

3

00981

## Benjamin N. Gluck

| | |
|---|---|
| From: | alfred villalobos [nashvilla333@att.blackberry.net] |
| Sent: | Monday, July 13, 2009 11:34 AM |
| To: | Benjamin N. Gluck |
| Subject: | Chabad Israell |

Benjamin,

I hoped that we would have a chance to get a framework of an understanding regarding my client and your client today. My client has an appointment with the investigating office tomorrow morning and it seemed to be in both of our interests to have at least a clear understanding of how your client would accept responsibility for his actions. If I have been unclear or imprecise about that I apologize. Our inability to obtain any reponse from your client is discouraging. But, what can I do but attempt to offer a branch. I will be available to discuss today, otherwise tomorrow will be what it is for both of ouir clients. My clients are prepared to go wherever the truth takes them (here, or Israel) I hope the Rabbi is as well.

Truly,

Alfred N. Villalobos II
Sent via BlackBerry by AT&T

1

# Exhibit 16

-----Original Message-----
From: "Benjamin N. Gluck" <bng@birdmarella.com>

Date: Tue, 14 Jul 2009 10:41:40
To: nashvilla333@att.blackberry.net<nashvilla333@att.blackberry.net>
Cc: Benjamin N. Gluck<bng@birdmarella.com>
Subject: RE: Israeli Chabad


Thanks.  You know how these things are.

B.


Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

-----Original Message-----
From: alfred villalobos [mailto:nashvilla333@att.blackberry.net]
Sent: Tuesday, July 14, 2009 10:39 AM
To: Benjamin N. Gluck
Subject: Israeli Chabad

Benjamin,

I will be waiting for his response then.


Truly,
Alfred N. Villalobos II
Sent via BlackBerry by AT&T

-----Original Message-----
From: "Benjamin N. Gluck" <bng@birdmarella.com>

Date: Tue, 14 Jul 2009 10:32:23
To: Benjamin N. Gluck<bng@birdmarella.com>; nashvilla333@att.blackberry.net<nashvilla333
@att.blackberry.net>

1

Subject: RE: Israeli Chabad

I met with Rabbi Yemini this morning.  He needs to talk with some people and will get back to me.

B.

Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

# Exhibit 17

## Benjamin N. Gluck

| | |
|---|---|
| **From:** | alfred villalobos [nashvilla333@att.blackberry.net] |
| **Sent:** | Tuesday, July 14, 2009 8:46 PM |
| **To:** | Benjamin N. Gluck |
| **Subject:** | Israeli Chabad |

Benjamin,

I'm not, but my family has played in this tourney for many years now and my father is very much a home town celebrity here.

I was scheduled to play with NFL coach Jack DelRio (a great linebacker from my alma mater, USC). However, an illness and this interview have required some shuffling so someone now has my spot.

I hope we can get this done tomorrow because as I said it will be impossible as I travel the US 395 to LA as I have no reception most of the way.

In attending the interview myself, I hope this gives you a clear understanding of how this will proceed.

If we have an agreement between Israeli Chabad and my client I would quickly demand to reschedule this interview as I have just recently taken over the case.  I'm scheduled to be at our family's home in Maui from Friday until August 4th so an interview would need to occur after the 4th.

Without an agreement between us there is no need to re-schedule.

Please let me know.

Alfred N. Villalobos II
Sent via BlackBerry by AT&T

-----Original Message-----
From: "Benjamin N. Gluck" <bng@birdmarella.com>

Date: Tue, 14 Jul 2009 20:12:31
To: 'nashvilla333@att.blackberry.net'<nashvilla333@att.blackberry.net>
Subject: RE: Israeli Chabad


I didn't know you were a celebrity.  ;-)

-----Original Message-----
From: alfred villalobos [mailto:nashvilla333@att.blackberry.net]
Sent: Tuesday, July 14, 2009 5:51 PM
To: Benjamin N. Gluck
Subject: Israeli Chabad

Benjamin,

FYI, it looks like I will be representing Orit in front of the U.S. Attorney as well. Logistically, this makes our opportunity of hashing out a deal more difficult.  I will be driving Wednesday afternoon from South Lake Tahoe, where I was scheduled to play in a celebrity golf tourney, to Los Angeles.

Please urge your client to stop wasting precious time as we have very little of it.

Truly,

Alfred N. Villalobos II
Sent via BlackBerry by AT&T

1

**Exhibit 18**



Bruckamer

X0000 = Shakira Tillman

- at least someone employed / someone
  (will need a Hebrew interpreter)
- Would be some funds  Aug. 4 ⇒ 1pm
→ leaving on Sunday to Aug. 3 - Maui ⇒ will cooperate ⇒
Alfred Villalobos = Ted Behlendorf - criminal
experience - She has the light to pick her
 lawyer of family had discomfort

# Exhibit 19



310 - 201 -
2100

7.18.5/09

— his claim is that OC
worked for Rabbi Yemini & he
never paid her
— when did she work?
— At Villalobos says no documents
but they want $120,000   1:00 A.M.
— he's badgered him over the next 2 days — e-mails — he's sending

Ben Bluck ← → Off. Anjel — been in
Contact — At.Villalobos — what he's been
telling

① Rabbi Yemini = need to pay him a bunch
of $, $120,000 — she's going to say
a bunch of bad things about
Rabbi Yemini
— he came to Ben's office a couple of times —
Ben said now not a good time then
there's a
settlement of a sexual
harassment suit?

927
1441



- why does the claim have anything to do w/the interview/testimony?

- if you call me + tell me that the Rabbi will settle this, I'll put off the interview
- if not, will go ahead w/the meeting/letter/e-mails

- happened w/Connie Woodhead/Anthony Montero =

- this guy is still pushing this thing =
  - At some points, his thought was that we'd talk about things -
  put a rush on it
  = Doesn't know what she will say = does push up the timeline sometimes

- Rabbi trying to figure out what she's doing, but what, if anything, should not influence her interview



Ben —      Re Yemin

— there is some info he
can provide us ⇒
— he'd rather do it quicker
rather than later
— will purpose dat

Re Villalobos
— after sending him a letter
meeting w/ Rabbi Yemmi (Thurs)
— in attending the interview
myself

— send them to Christine — will take

# Exhibit 20

**Benjamin N. Gluck**

| | |
|---|---|
| From: | Benjamin N. Gluck |
| Sent: | Wednesday, July 15, 2009 7:33 PM |
| To: | 'joseph.akrotirianakis@usdoj.gov' |
| Cc: | Benjamin N. Gluck |
| Subject: | FW: Israeli Chabad |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Red |


-----Original Message-----
From: Benjamin N. Gluck
Sent: Wednesday, July 15, 2009 6:40 PM
To: 'nashvilla333@att.blackberry.net'; Benjamin N. Gluck
Subject: Re: Israeli Chabad

Thanks

B.


Benjamin N. Gluck
Bird Marella
310.201.2100
Sent from my Blackberry

----- Original Message -----
From: alfred villalobos <nashvilla333@att.blackberry.net>
To: Benjamin N. Gluck
Sent: Wed Jul 15 18:33:26 2009
Subject: Israeli Chabad

Great, the earlier the better.

Al
Sent via BlackBerry by AT&T

-----Original Message-----
From: "Benjamin N. Gluck" <bng@birdmarella.com>

Date: Wed, 15 Jul 2009 18:33:45
To: 'nashvilla333@att.blackberry.net'<nashvilla333@att.blackberry.net>; Benjamin N.
Gluck<bng@birdmarella.com>
Subject: Re: Israeli Chabad


Alfred,

We've made some progress but I won't have any clarity until tomorrow morning. I'll let you
know early.

And I do appreciate your patience.

B.


Benjamin N. Gluck
Bird Marella
310.201.2100
Sent from my Blackberry

268

17-0920

----- Original Message -----
From: alfred villalobos <nashvilla333@att.blackberry.net>
To: Benjamin N. Gluck
Sent: Wed Jul 15 17:28:57 2009
Subject: Israeli Chabad

Benjamin:

Please let me know whether we have made any progress with the Rabbi.

Truly
Alfred N Villalobod II
Sent via BlackBerry by AT&T

-----Original Message-----
From: "Benjamin N. Gluck" <bng@birdmarella.com>

Date: Wed, 15 Jul 2009 14:04:17
To: nashvilla333@att.blackberry.net<nashvilla333@att.blackberry.net>
Cc: Benjamin N. Gluck<bng@birdmarella.com>
Subject: RE: Israeli Chabad


Thanks

Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor
Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

-----Original Message-----
From: alfred villalobos [mailto:nashvilla333@att.blackberry.net]
Sent: Wednesday, July 15, 2009 2:01 PM
To: Benjamin N. Gluck
Subject: Israeli Chabad

OK Ill wait.

Sent via BlackBerry by AT&T

-----Original Message-----
From: "Benjamin N. Gluck" <bng@birdmarella.com>

Date: Wed, 15 Jul 2009 13:58:04
To: nashvilla333@att.blackberry.net<nashvilla333@att.blackberry.net>
Cc: Benjamin N. Gluck<bng@birdmarella.com>
Subject: RE: Israeli Chabad


Alfred,

I apologize.  I've been putting out a fire in another matter all morning.  It's got me
completely jammed and I just haven't been able to return Rabbi Yemini's message.  Can you
give me a couple of hours?

B.


Benjamin N. Gluck
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg
1875 Century Park East
23rd Floor

269

17-0921

Los Angeles, CA 90067
T. +1.310.201.2100
F. +1.310.201.2110
www.birdmarella.com

-----Original Message-----
From: alfred villalobos [mailto:nashvilla333@att.blackberry.net]
Sent: Wednesday, July 15, 2009 1:54 PM
To: Benjamin N. Gluck
Subject: Israeli Chabad

Benjamin,

So we haven't made any progress.  I'm a little surprised by your Client's arrogance.  I
suspect he will not be quite as arrogant with the US Attorney.

So be it.

Truly,

Alfred N. Villalobos II
Sent via BlackBerry by AT&T

# Exhibit 21

July 16, 2009
9:30 a.m.

<u>LEGEND</u>

B.G.: BENJAMIN GLUCK
A.V.: ALFRED VILLALOBOS
AS:   AUTOMATED SPEAKER

<u>TRANSCRIPT</u>

Agent:   Alright, Special Agent Bennett, Special Agent Ryan. Date is July 16th, 2009.  Time is approximately 9:30 a.m.  With a witness, about to make a consensual phone call to Alfred Villalobos at area code (818)634-5986.

AS:     Your call has been forwarded to an automatic voice message system, (818)634-5986 is not available. To page this person press 5 now.

B.G.:   Hey Al, its Benjamin Gluck, calling you back.  Um ... I apologize I've been so hard to reach lately, but I'm completely jammed on some stuff.  I'm in meetings all morning, uh, I'll try you again in a little while um, or if your free give me a call, um and I, I hope I'm calling you are[check] the right number.  Um, I may have to call you back though, just because I'm in with some people.  Uh, but do try me again.  (310)201-2100.

Agent:   Alright, the time now is approximately 9:31, uh no answer, left voice mail message.

Agent:   Time is approximately 9:40, continue recording.

B.G.:   This is Benjamin.

A.V.:   Hey Ben.  Al Villalobos.

B.G.:   Hey Al, how are ya?

A.V.:   I'm okay, how are you?

B.G.:   I'm okay.  Are you...

A.V.:   I'm not as busy as you I think.

B.G.:   Nah, you know, you know, well you know how it is, as these things go.  When you least expect it like the shit hits the fan on something. (Villalobos laughs) And the worst part about it is, is it's some that's like not in our time zone so I keep getting ...

A.V.:   Oh great.

1

B.G.:    Well, yeah, it's great except that everything is like can, can you look at this and, and get me an answer, by close of business our time. (Villalobos laughs) Which doesn't really work. So, I'm sorry. I've been really scattered lately.

A.V.:    No problem.

B.G.:    So, so, so, so where, where, where are we at Al?

A.V.:    Where, what I want to know is, give me a bottom line. I want to know if he's going to pay. If he's not going to pay, nothing you can say is gonna ... make me happy.

B.G.:    Okay, okay well look, I, I talked to him, alright.

A.V.:    Okay.

B.G.:    Uh, so, several times. Um, I told you from the beginning he doesn't have a hundred and twenty thousand dollars. Okay.

A.V.:    Okay.

B.G.:    Um, so, you know, that number as I told you before ain't gonna work, but I understand, you know, uh, uh kind of, what's going on here essentially, um, uh in, in the sense of how important all this is. And I've explained, I've explained that to him. So, but, but I need to know from you in order to, to you know to, to move this forward to make some progress is, is first of all, do you have a bottom line?

A.V.:    Well no, I'm not going to negotiate with myself, that wouldn't be right.

B.G.:    Okay I can't say that I'm shocked. I can't say that I'm shocked, to hear you say that. (Villalobos laughs) Um, but I thought I'd try.

A.V.:    Yeah.

B.G.:    Um, but okay, and second, and, and second...

A.V.:    He needs to start, the bidding here needs to start with the Rabbi.

B.G.:    Okay.

A.V.:    Not with me.

B.G.:    Okay. Well, Al are, are you meeting at one o'clock today?

A.V.:   Uh, no.

B.G.:   Okay, so how much, how much time do we have?

A.V.:   You have time to get the money. I wanna wrap this up
        ...

B.G.:   Uh, Okay, Al, I..

A.V.:   Today.

B.G.:   Okay, are you ...

A.V.:   <unint> have time to get the money so, I mean, I told
        you what I was going to do.  I took over the case from
        this immigration knucklehead.

B.G.:   Right.

A.V.:   So I am now dealing with Keri Axel.

B.G.:   Okay, I know that name.

A.V.:   So ...

B.G.:   Okay, so ...

A.V.:   The other guy didn't really understand what was going
        on at all.

B.G.:   Right.

A.V.:   Had no criminal law experience in anyway.

B.G.:   Okay.

A.V.:   He didn't even bother to make sure they had an
        arrangement for a Hebrew translator.

B.G.:   Oh, that would have been interesting.

A.V.:   So getting Orit to speak in front of somebody without
        a Hebrew translator would be, would have been
        completely retarded.

B.G.:   Right, we, we'll ...

A.V.:   I don't want to hear the, I don't want to have, you
        know, the Rabbi dragging his feet for the next three
        or four days because he knows that I can't meet yet
        with, uh, Keri Axel.

3

B.G.: Well okay look, as far as, as far as I'm concerned ...
my, my question is geared more towards enough time for
you and I to, to sit down and hash this out.  Because
as I, I've told you before, um, I have uh uh, certain
concerns, not concerns is the wrong word, but we need
to structure this properly.

A.V.: Right.  I agree.

B.G.: Okay and we've discussed that before and I think that
you and I need to sit down and, and, and think this
through.  It's not something that, uh, I feel we
should just do, kind of, on the fly.

A.V.: Now that part I agree with.  We do have a little bit
of a logistical problem, kind of like your client in a
different time zone.

B.G.: Oh.

A.V.: I'm, I'm going to be in Hawaii time zone.

B.G.: Oh.

A.V.: And yeah, in a couple days.  <unint>

B.G.: Are you around today?

A.V.: I am not around.

B.G.: Oh.

A.V.: The question I have is, do we have to actually see
each other to hash it out?

B.G.: I would feel much more comfortable.

A.V.: I see.  Okay, then I'll come down.

B.G.: Okay can you...

A.V.: I made arrangements with Keri Axel.  I told her look –
I just came on this case, with a person that had no
experience...

B.G.: Uh huh.

A.V.: Who is very pissed off.

B.G.: Who was pissed off?

A.V.: Keri.

B.G.: Oh.

4

A.V.:   Because, apparently this other guy had hemmed and hawed for about sixty days.  And she said you know what, this is a lot of bullshit, blah, blah, blah, blah, blah.  And I said, hold on, wait a minute, she has the right to pick her own lawyer.  That guy had no criminal law experience in any way, shape, or form.  Didn't even bother to tell you you're going to have to have a translator, so ...  I'm starting fresh here.  I have no understanding at all of what you are looking for from my client.  So she backed off and said okay.  And I said I promise I will not be like this ... other lawyer.  If I tell you I'm gonna do something I'll do it, et cetera.

B.G.:   Well, the last thing I want is Keri Axel being angry, so ...

A.V.:   (Laughs) You know what? What do they get?  They get the power of the FBI.  Yeah, me too.  (Laughs)  But at the same time I'm not just going to bend over cause she's the U.S. Attorney.

B.G.:   Right.

A.V.:   That's something they have to know right off the bat.  We have rights too.  Shit, anyway ...

B.G.:   Uh.

A.V.:   I got a delay from her.

B.G.:   Uh, okay.  So, so look, I'm, I am, I don't know where you are right now but uh, um, you know if you can, if you're any where in the neighborhood and you can come over.  I think we can hash this out today.

A.V.:   Okay.  Uh, let me see if I can make that arrangement.

B.G.:   Alright, why don't you ...

A.V.:   And then if not, I'll call you back and let you know right away.

B.G.:   Okay, fine.

A.V.:   It may have to be tomorrow.

B.G.:   I can, uh, what day's tomorrow, Friday?  I can do it tomorrow morning.

A.V.:   Okay.  Before what time?

B.G.:   I am meeting someone at noon.  So any time before noon.

A.V.:  Okay before noon.

B.G.:  Any time before noon.

A.V.:  Okay let me call you back.  Let me see if I can make it.

B.G.:  Alright, that's fine, If I can't, because I'm all jammed up, you can, if, if you want, just, just schedule a time, uh or just suggest a time, uh, and or you can even shoot me an email.

A.V.:  Okay, but you know what.  Let me be clear about this Benjamin.

B.G.:  Yeah.

A.V.:  I like you.  You're straightforward.  Don't make me waste a trip!

B.G.:  I ...

A.V.:  When I can be watching, you know, my dad play with Ben Rothlisberger, to go jack around for ten thousand dollars, cause that will piss me off.  I'll just walk right out.

B.G.:  Okay, the last thing I want to do is piss you off (Villalobos laughs), and I understand, I understand the value of your time, I mean, from one lawyer to another, I understand.

A.V.:  Alright, I appreciate it Benjamin.

B.G.:  Alright.

A.V.:  I'll call you back or I'll, I'll shoot you an email.

B.G.:  Okay, great!  Thank you.

A.V.:  Thanks.

B.G.:  Bu-bye.[check]

A.V.:  Bye.

Agent:  Time now is approximately 9:46 a.m., that was incoming call from Al Villalobos to the, uh, law firm Bird Marella and that's the end of recording.

# Exhibit 22

July 17, 2009
11:26 a.m.


<u>LEGEND</u>


B.G.: BENJAMIN GLUCK
A.V.: ALFRED VILLALOBOS


<u>TRANSCRIPT</u>


Agent:   Test test test.  Special Agent Richard Ryan, the time
         is approximately 11:26 a.m.  On Friday July 17th.  The
         following is a consensually recorded conversation with
         Benjamin Gluck and Al Villalobos.

B.G.:    Al?  Hey.

A.V.:    Hey.

B.G.:    What's the matter?  I didn't know you were walking with
         a cane?

A.V.:    Yeah.

B.G.:    What happened?  You alright? Are we in this *<unint>*

A.V.:    I let something go untreated for a while.

B.G.:    Oh.

A.V.:    Next thing I know, I couldn't walk.

B.G.:    Oh, that's lousy.

A.V.:    So then I had a misdiagnosis with one doctor (unint)

B.G.:    Do you want something to drink, some coffee?  Some
         water?

A.V.:    Yeah, can I have a diet coke?

B.G.:    Yeah, 'til[check] get some.  I'll be right back.
         Penny? Could you have 'em bring in a Diet Coke.
         Please.  Thank you.  They'll bring one in.

A.V.:    So then I continue to suffer because the doctor
         misdiagnosed me.  Went to a second doctor, orthopedic
         surgeon specializing in feet.  He gave me the right
         diagnosis, the right medication.

B.G.:    Right

A.V.:    Six days later I can finally walk.

B.G.:    Yikes.  (Both laugh)

1

A.V.:   It was a real pain in the ass, I'll tell ya.

B.G.:   A pain in the foot.

A.V.:   It was really a pain.  You know, not being mobile.

B.G.:   Are things getting better though?

A.V.:   Yeah, much better. I can walk.  Yesterday I walked the course a little bit.

B.G.:   Oh yeah.  This is up in Tahoe?

A.V.:   Yeah, I got a picture right here, I don't, you probably don't watch this much.

B.G.:   Watch what?

A.V.:   You may recognize ...

B.G.:   I'm not a, I only follow very obscure sports.

A.V.:   Oh.

B.G.:   So, I'm a complete ...

A.V.:   Maybe you'll recognize this though.

B.G.:   I'm not, is ...

A.V.:   The guy in the middle.

B.G.:   No, who is he?

A.V.:   He was the uh, UFC Champion, Chuck Ladel.

B.G.:   Oh, alright. Aw, no I, I don't follow..

A.V.:   The Iceman

B.G.:   I believe you.

A.V.:   That's my dad in the back and these are my two kids.

B.G.:   And so what is this like a fund-raiser?

A.V.:   It's a celebrity pro-am

B.G.:   For fun ...

A.V.:   American Century puts it on, every year

B.G.:   American Century the, the, the ..

A.V.:   Insurance Company, they put it on every year, so they get a lot of basketball, football, baseball ...

B.G.:   Is it a fund-raiser for something?

2

A.V.:   No its just a pro-am its actually, you know, there's a tournament ...

B.G.:   Oh, it's a ... okay

A.V.:   It starts on uh today, pro-am and there's a purse, and on Sunday somebody wins.

B.G.:   Cool.

A.V.:   Yeah, but on Tuesday, Wednesday, and Thursday we all play with the celebrities, (unint) so everybody's there getting autographs and ...

B.G.:   Oh, uh huh.

A.V.:   You know, we are hitting with the celebrities

B.G.:   So I pulled you away from that?

A.V.:   Well, I couldn't this year because of the foot.

B.G.:   Oh, right.  Right.

A.V.:   So I had to cancel, I had Jack Del Rio, Chuck Ladel, um, Jack Del Rio is a coach for um, I think Jacksonville, head coach NFL. He was a linebacker a[check] SC, my alma-mater.  Anyway. Yeah, So ...

B.G.:   Well, uh, first of all I appreciate you coming down here.

A.V.:   Yeah. Yeah. Yeah. No problem

B.G.:   Especially with this.  Now I feel terrible.  Maybe I, you know, should drag myself up to see you there.  Um well listen, I uh, uh, I talked to the Rabbi.  I mean, I told you lawyer to lawyer, I'm not dragging you down here to jerk you around.

A.V.:   Sure, sure.

B.G.:   So, uh when I, when we talked several times in the past, I told you, that ... the Rabbi doesn't have money.  Okay.

A.V.:   Right.  Which is a standard answer.

B.G.:   No, no, no, I understand, (Villalobos laughs) but here comes what's not standard ...

A.V.:   Okay.

B.G.:   The Rabbi has now told me uh that he can get access to some money.

3

A.V.:   Okay.

B.G.:   Okay, so, I'm telling you and, and, and just let me
        tell you, the issue, the things that I'm concerned
        about, okay, that we have to figure this out.

A.V.:   Okay.

B.G.:   Is not, is, is ... the dollar amount, anyone who tells
        you money is no object is lying.

A.V.:   Sure, I know.  It's bullshit.

B.G.:   Money's an object.  Money's an object.

A.V.:   Yeah.

B.G.:   Okay, but I can uh, um, get or he can get money.

A.V.:   Okay.

B.G.:   Okay.  The concerns that I have, alright, are how we're
        going to work this.

A.V.:   Okay.

B.G.:   Okay. Uh, uh, so I, I'll start, I'm starting off by
        telling you that I'm not just, you know, that I didn't
        drag you down here from Tahoe to say, you know, uh, uh,
        you know, I don't ... to say, you know, that, that,
        that we've got nothing, you know.

A.V.:   Right.

B.G.:   Exactly.  Or offer you a hundred dollars or five
        thousand dollars.

A.V.:   Right, right, right

B.G.:   Or ten thousand dollars.  Okay.  Because I wouldn't
        waste your time or my time on that.

A.V.:   I appreciate that Benjamin. (Laughs)

B.G.:   Ah, good, good.

A.V.:   I got up at five o'clock, I rolled out of the bed at
        five o'clock..

B.G.:   Yeah, again, jeez I feel bad.

A.V.:   <unint>

B.G.:   You want a drink of scotch now?  Or maybe ...

A.V.:   Well actually the condition I suffer from is ah, I
        don't drink alcohol.

4

B.G.:   Is it gout?

A.V.:   Yeah. Yeah, I have gout, so I left it untreated for
        nineteen straight days.  Thinking that I took a couple
        Ibuprofen it would be no problem.

B.G.:   Did you know it was gout?

A.V.:   Yes, I felt it was gout but the doctor I went to at
        Kaiser, which is my HMO, she said this is not gout,
        this is arthritis. Can't do anything for arthritis.
        She didn't take an x-ray.  I'm like, I trusted her,
        I've seen her before.  I'm like, fine.  But the thing
        is, all the precursors were there.  My daughter
        graduated from high school and we had a big, giant
        party. I drank like four shots of tequila.  I never
        drink ...

B.G.:   Uh huh.

A.V.:   I danced all night long. (Gluck laughs)  We cleaned up
        all Father's Day the next day.  I was wearing my shoes
        that I hate to wear when I wear my suit ...

B.G.:   Right.

A.V.:   That I'm not wearing today of course,

B.G.:   That's alright.

A.V.:   ... for six hours, and so, I knew it had to be ...

B.G.:   Thanks <unint>.

A.V.:   That's what it had to be ...

B.G.:   Yeah you can put it right here ... <unint>

A.V.:   But the doctor, she says, you know, this is more like
        some plantar fascitis of the heel, maybe you
        osteoarthritis in the toe.  You, this is not a gout
        attack.

B.G.:   There's six diet cokes there.  So ... (laughs)

A.V.:   So the doctor who's a foot specialist, and orthopedic
        surgeon in Tahoe said, "No this is classic gout.  I'm
        telling you right now this is gout.  I'm gonna give you
        the medication that I give for people that have gout.
        Its not going to work right away because you let this
        go a long time."  It was swollen up, I couldn't put my
        shoe on.  Sandals, nothing. It was like this big.

B.G.:   Yikes.  Well at least you got to someone that could
        help you.

5

A.V.:      Yeah.

B.G.:      You were on the right road.

A.V.:      And I didn't expect the mountains, you don't usually
           get the best service in the mountains.  I mean ...

B.G.:      Oh you mean the doctor?

A.V.:      Yeah. People want to be ski bums and practice medicine.

B.G.:      Yeah. (Laughs) The are worse things to do.  There are
           worse things you can do.  But, anyway, look I mean,
           here's here's what I got.  Alright, uh, I can't
           remember who who it was who said

A.V.:      Keri Axel?

B.G.:      Right, this is from Keri Axel.

A.V.:      Okay.

B.G.:      This is a subpoena for, um, for my guy for next
           Wednesday.

A.V.:      Okay.

B.G.:      Okay.  So I've obviously got a deadline staring me in
           the face.

A.V.:      Sure.

B.G.:      So, frankly, I want to resolve something before next
           Wednesday.  And Al I want to resolve something right
           now.

A.V.:      Now, because I'm going to be on a plane on Tuesday on
           Monday to Maui ...

B.G.:      Right, I want to resolve the terms, everything, right
           now.

A.V.:      Okay, so I'm willing ...

B.G.:      Now I'm sittin here, I'm, I, I ...

A.V.:      Interest free.

B.G.:      I, I.  No.  No, I'm saying, I'm saying terms in terms
           of well, in terms of, I understand.  We're talking the
           same, we're on the same page here.

A.V.:      Yeah.

B.G.:      I don't have uh, uh, a cashier's check in my office.

A.V.:   Which is fine.

B.G.:   Okay.

A.V.:   Not a problem for me.

B.G.:   Alright um, here's here's here's, I, I, I got some.
        You've got a meeting scheduled with her.  Keri's ...

A.V.:   All I need to know is, all I need to know is, what we
        need Orit to say, because Orit is going to say the
        truth, if there's anything that can be shaded in the
        gray area, she's going to say it exactly the way she
        should say it.  I don't know what it is she could
        possible give you to help you, but if there is anything
        she'll do it.

B.G.:   Okay, cause, let me tell you why it's complicated.
        Alright?

A.V.:   Okay.

B.G.:   Its complicated because, my guy's going to talk to her
        too.

A.V.:   Okay.

B.G.:   Okay. She's getting, you know, this is a subpoena for
        handwriting, okay. But I'm not g ...   There's no way
        I'm gonna get out of this.

A.V.:   Right.

B.G.:   Without her talking to my guy.

A.V.:   Okay.

B.G.:   Okay.  Orit worked for my guy, okay.

A.V.:   Yes.

B.G.:   Um, now you and I talked about uh, you know, uh she
        worked there.  I don't know, we don't know exactly how
        many hours.

A.V.:   Right.

B.G.:   I mean my guy is, you know, she wasn't there forty
        hours a week.  But doesn't, doesn't matter.

A.V.:   Right.

B.G.:   Okay, um I'm out of my league here a little bit, a lot
        of bit.  And its kind of why this has taken so long to
        get here.

A.V.:   Okay.

B.G.:   Okay, because, uh, you know, I'm not a, I, I, I don't know; oh let me, I'm sorry, let me tell you the next, uh, the next, uh ...

A.V.:   Complicating factor?

B.G.:   Wrinkle, Complicating factor.

A.V.:   Okay.

B.G.:   Rabbi doesn't have any money personally.

A.V.:   I know.

B.G.:   He's got, he's got people who will ...

A.V.:   Donate.

B.G.:   Who will donate, exactly.  He's got some people who he went to, and he didn't tell them, you know, exactly what its for..

A.V.:   Sure.

B.G.:   ..but hey there's a crisis, we need some money.

A.V.:   Right.

B.G.:   Those people are going to donate the money to the center ...

A.V.:   Right.

B.G.:   Because they want a deduction.

A.V.:   Deduction.

B.G.:   A deduction. A deduction to the, okay.  They're not gonna, give him cash.

A.V.:   Right.

B.G.:   Keri Axel has been asking for documents about the center.  So ...

A.V.:   Okay.

B.G.:   However this, my, my, what I want to know is how, how can we ma ... do this, he's gonna make the payment ...

A.V.:   Right.

B.G.:   Assume at some point uh, uh, uh, the books and records of the center are reviewed by Keri Axel and her people.

8

A.V.:   What books and records does he have?

B.G.:   Well, there's gonna be some donation receipt to the people ...

A.V.:   The problem is he keeps very shotty records.  What does what does he have?

B.G.:   What do you mean?  In terms of, in terms of the people who worked?

A.V.:   How does he does he keep track of the donations that come in and out and all ...

B.G.:   I mean, there's a ledger.  There's a[check] accountant. The accountant writes the receipts. So we ...

A.V.:   CPA?

B.G.:   I don't know if it's a CPA or a bookkeeper.

A.V.:   Is it a lawyer CPA?

B.G.:   Uh, I don't think it's a lawyer, I mean, it's a bookkeeping service.

A.V.:   Bookkeeping service, that's not good. Bookkeeping services are scared of the government.

B.G.:   I know, that's why I'm scared of the government.

A.V.:   Okay.  So ...  I understand he has thirteen kids and a wife.  I understand he has the wife and several of the adult children all work there.

B.G.:   Okay.

A.V.:   Do any of the kids have access to any of this information?

B.G.:   Which information?

A.V.:   The ledger, who donates, who doesn't.  Who comes in, who doesn't.

B.G.:   I don't, I don't know.  I mean if they do, what good does it us?

A.V.:   Well, if there's not[check] set policy and procedure about how he does all of this, it's all I have a box here, I have a box there.  When I find it you have the duty to give it, if it's required.  But if you haven't found it yet, there's no duty to give it.

B.G.:   Right

9

A.V.:   You know.  I mean, so what's you concern in terms of
        having the transaction?

B.G.:   Well, I mean, to be honest. I mean my, I, I, I'm not
        sure if I quite understand what your saying.  But, but
        my concern is that, ok, let's say we figure a number,
        alright?

A.V.:   Okay.

B.G.:   Lets say the number is $70,000. Okay?

A.V.:   Lets not say that number. (Laughs)  But, go ahead ...

B.G.:   Let's use that number as a, a, seventy thousand euros
        ...

A.V.:   Yeah, exactly.

B.G.:   Whatever, let's just say, alright fine, I don't want to
        get into that yet.

A.V.:   Yeah.

B.G.:   We're gonna solve this.

A.V.:   The number, it's a buck.

B.G.:   We're going to solve this, okay?

A.V.:   Yeah, it's a buck.

B.G.:   Alright, let's say the seventy thousand, a hundred
        thousand, lets call it a million dollars, what ever it
        is.

A.V.:   Yeah.

B.G.:   Alright.  So the million dollars is donated by three
        supporters okay.

A.V.:   Okay.

B.G.:   One guy donates five hundred and the other two donate
        two fifty.

A.V.:   Okay.

B.G.:   They each want a receipt.

A.V.:   Okay.

B.G.:   They're going to put that down on their tax returns.

A.V.:   Yeah.

10

B.G.:   Okay. The, the center is going to, it's going to show that the money came in to the Chabad Israeli Center.

A.V.:   Right.

B.G.:   Now. Um, because we know that at some point we're going to be under some kind of scrutiny, because we are already ...

A.V.:   Right.

B.G.:   These people are breathing down our necks.

A.V.:   Right.

B.G.:   Here's the question, if whatever that money is, the million dollars, it's going to wind up with you.

A.V.:   Right.

B.G.:   Okay. My concern that I told you about, from the beginning, which is, you know, she's talking to the government. I can't be seen to be paying a witness.

A.V.:   Humm. He owes her the money as an employee. She's an employee. He owes her the money as an employee. My whole take on this situation would be, he's reimbursing her for money he asked her to donate to the center because the center was ... not making it.

B.G.:   Say, say that again. He's reimbursing her for money ...

A.V.:   For the money she donated because the center wasn't making it. My theory on this whole case, I don't know if you ever thought about it, is that, not that these people made an agreement ahead of time prospectively to give the money back so they can stay here. Is that, he went to these people and said hey, we're not making it. Work here, but then help me donate some of this money back so we can continue to exist. If I have ten or fifteen people doing that, that's a lot of working capital each month, to get over some bad months and humps.

B.G.:   Right.

11

A.V.:   It's an idea, it makes sense.  People do it all the
        time.  My Catholic Church comes to me when we have no
        more money and says openly, we have no more money.  We
        have this coming up.  We, my church that I was in, in
        West Hills. The archdiocese came out and said, I know
        your church has "x" number of dollars in reserve.  It
        was one million dollars.  We are about to settle with
        these plaintiffs for all of these alleged abuses.  We
        are asking you to donate something, we are not telling
        you how much.  Our monsignor wrote a check for nine
        hundred and ninety-nine thousand dollars.  And gave
        that money up.  Then came to the rest of us and said,
        "Look I know ... Some if you aren't going to agree with
        me, I took our reserves and we are down to zero now.  I
        gave it all for this, to pay off.  Now please, I'm
        asking you to come help me build the reserve again."
        And people started sending money again. So it's not
        implausible to have ...

B.G.:   Well I mean, well look ...

A.V.:   Paritioners, workers, et cetera, do this.  These are
        the people you go to first.  The people who are there.

B.G.:   I[check] is, you know more, I mean, you're a lawyer
        like I am.  I mean, you know that uh, the last place
        sometimes you ever learn anything is from your clients.

A.V.:   Yeah.

B.G.:   Uh, uh, is that what happened?

A.V.:   Yes, that's what happened.  That's what happened with
        my catholic church.

B.G.:   No, no, no, no, no, with Rabbi Yemeni?

A.V.:   No, that wasn't, he was a straight, he was straight
        pimp'n them.  He was straight going boom.  Work here, I
        give you the money, give it back to me.  And not only
        did he do that, what he did was added insult to injury.
        Because my client's husband is a technician for air
        conditioning, so anytime he had an air conditioning
        problem, what did he do? Avi, get over here, fix it for
        me.  Avi, it's broken again get it ...

B.G.:   Did he pay him for it?

A.V.: No! Fix it.  The unit needs to be rehabbed, okay fix it, rehab it, do it for your Rabbi.  And in the beginning it's okay because you're doing it for your church.  But when my catholic priest starts treating me like a servant, eventually you get to the breaking point.  The Rabbi could have gotten away with this if he would have been a little nicer.  All he had to do was be a little nicer and these people would have taken it in the ass, and never said a thing.  Just a tiny bit less arrogant.

B.G.: Okay. Bu-but, I'm uh, I'm, I'm just trying to figure out the, the, the, the way we, you know, the way we, the way we structure it ...

A.V.: I understand we have a lot of employees here.

B.G.: Right, and that's the other thing.  That's the other thing.

A.V.: A lot.

B.G.: That's the other thing that uh ...

A.V.: Which means he much have a rolling, a substantial amount of money coming in, because he has a school, teachers are getting paid.

B.G.: Well ...

A.V.: Administrators, people are getting paid.  I know that. And these people, thirteen children don't go on, you know,

B.G.: Here, let me ask you this.  Let me be, lets be frank with each other, okay.  um, your saying that we settle this, alright.  Then uh uh, your gonna have this meeting at some point.

A.V.: Oh yeah.

B.G.: Keri Axel is never ...

A.V.: Can't avoid it.

B.G.: Exactly.  Okay, so ...

A.V.: And she didn't even get that threatening with me.  She apparently got threatening with the other lawyer.

B.G.: Yeah look, I mean, she can be nice.. she can be nice and she can be nasty.

A.V.: With me she didn't get very threatening at all.

B.G.:   But in the end of the day she's gonna have her meeting.
        I mean she does work for the government.

A.V.:   Yeah, let her.

B.G.:   Uh, okay. We settle this, alright.  You go into that
        meeting, alright.  Your gonna be there?

A.V.:   Oh yeah.

B.G.:   Okay. Orit's gonna be there?

A.V.:   I pushed the other lawyer to the side and now it's
        going to be just her, and I, and an interpreter.

B.G.:   How, how do I know what Orit's gonna say in that
        meeting?

A.V.:   I'm gonna tell ya.  She's gonna say she worked full-
        time. She was on call.  She got paid.  He had other
        people working there.  She didn't work eight hours a
        day there every single day, but she was, lets say she
        could work six hours and then be on call for six hours.
        And it could happen, it was sporadic even on Sundays or
        I don't know if they broke the Sabbath or what, but I
        know ...

B.G.:   Probably not.

A.V.:   ... on Sundays.

B.G.:   They don't break the Sabbath, we aren't going to say
        that.

A.V.:   Well, yeah.  I don't think they did but, I have seen
        them do it.  Where I asked her specifically was she on
        call on the Sabbath.  And she said she was on call and
        it was on the Sabbath.  And that's the Israeli Chabad
        Center.  So ...

B.G.:   Okay.  Anyways ...

A.V.:   The bottom line is ...

B.G.:   Finish, I gotta hear this, because my guys gonna go in
        as well.

A.V.:   Okay, so, she what she's gonna say is, she worked there
        full time, and she got paid.  And that's it.

B.G.:   Okay but, so she's not gonna say that she got paid
        later?

A.V.:   She's not gonna say anything.  Number one..

B.G.:   No, I'm saying she's gonna say ...

14

A.V.: She's going to say that she worked, she got paid.

B.G.: Is she going to say that she gave the money back?  Or is she going to say that she got paid and that was it.

A.V.: Well, it depends on how we are going to have this settlement agreement.  Is it gonna be that she was reimbursed for donating as she went along.  Or, is it going to be a straight up payment for money that he, the, the center needed to function and he asked and she voluntarily gave. She's not under any legal duty not to voluntarily give up anything that's her's.

B.G.: Okay, so, so ...  she's gonna, she's gonna ...

A.V.: She'll do it any way we need to do it.

B.G.: I'm still a little confused.  No, I understand, Al ... I'm trying to figure out ...

A.V.: <unint> give to help the center out.  She'll say that it was donated a little at a time.  She'll say what ever it is that we need to say.  Because technically, she, in her mind, felt that she was helping her center.

B.G.: Okay, so well..

A.V.: We can go anywhere with that.  Mentally she's speaking ...

B.G.: Let me ask you another question.

A.V.: Yeah.

B.G.: Alright.  Um, let let me, well we got to hold that thought a second.

A.V.: Okay.

B.G.: So we're gonna, we're gonna talk about that a second.  Um, uh, if, if I've only got $70,000, and you're telling me that number doesn't work, what's going to happen in that meeting?

A.V.: No, no, no.  He's gonna get a hundred grand, he's going to give her some type of tax deduction and some receipt for the other twenty.

B.G.: Okay what if I can't get a hundred?  What's she going to say in that meeting?

A.V.: We got to think about what her adjusted gross income is, <unint> it's the maximum ...

15

B.G.:   No, I'm saying, you're telling me, you're telling me
        ...

A.V.:   It's got to be a hundred and twenty.

B.G.:   If it doesn't work, what if the deal doesn't work?

A.V.:   No, it has to be.  It has to be a hundred and twenty.
        Either with cash and a charitable donation amount he
        can go back and get on his taxes.  We can't ...

B.G.:   Or else?

A.V.:   It's just the right thing to do.  Come on.  The Rabbi
        cannot "F" his people over it, it's just not right.
        It's the wrong thing ...

B.G.:   But what if he doesn't have money?

A.V.:   The Rabbi? I know the Rabbi's house was rebuilt two
        years ago.  He lives in a big beautiful giant house
        that was perfectly built for him to spec.  For him and
        his thirteen children.  He has you guys working on his
        case, you have the whole twenty-third floor.  You can't
        convince me that he can't come up with the hundred
        grand.  I can piss away a hundred grand in ten hours at
        the casino.  The Rabbi can piss away a hundred grand in
        a weekend.

B.G.:   Okay, help me convince the Rabbi the he needs to do
        this.

A.V.:   That's going to be your job.

B.G.:   That's what I'm asking you.

A.V.:   He owes her the money. She is ...

B.G.:   What if he does not ...

A.V.:   ... part of the flock.

B.G.:   If he doesn't bend to moral persuasion.

A.V.:   He's gonna be, he's gonna be doing, what I tell the
        people is, he's going to be throwing the dice when we
        get in front of Keri.

B.G.:   That ...

A.V.:   He's going to have to run the risk.  I'm not gonna tell
        you what she's going to say.  He's going to have to run
        the risk, I'm not gonna give it to you.  He can't have
        it both ways.  It wouldn't be right, Benjamin.

B.G.:   I, let ...

A.V.: It wouldn't be right.

B.G.: I understand.  You're representing a client.

A.V.: It's not right to give both ways.  If he was fair and reasonable, it'd be one thing.  He's not that type of person.  If it was me on the other side I would say this is exactly what I'm gonna do.  This is the risk your running.  But he's not that type of person.  A man of the cloth doesn't fuck over his flock.  This is like the total <unint>..

B.G.: Well look, I understand ...

A.V.: ... of Israeli, of ... of Judaism.

B.G.: Look, look, mean I gotta say. I, I hear what your saying okay, I gotta say I'm not, you know, he, he does not agree with every way that this has been characterized.

A.V.: Okay.

B.G.: Okay.  I mean, that's not, that's probably not a surprise.

A.V.: Neither does Toni Alamon, he's sitting in custody.

B.G.: There ya go. (Villalobos laughs) There ya go.

A.V.: Neither does Mr. Maddoff. And he didn't get his little upstate New York place like the rest of his Jewish friends, did he?  No, he didn't.

B.G.: Yeah. Yeah. Okay ...

A.V.: Bottom line is ...

B.G.: Alright, let's hash this out.

A.V.: Let's hash it out.

B.G.: Let's hash this out.  Hold on a second.  Go back to the issue though, 'cause I'm ... number one,

A.V.: We need to make the number.  What ever it was, dollar for dollar. <unint>

B.G.: Okay, you want to talk about that first?

A.V.: Yeah, lets, dollar for dollar..

B.G.: Uh, in ...

A.V.: I'll structure it anyway you want as long as they are compensated dollar for dollar what they're owed.

17

B.G.:    Okay.

A.V.:    And it makes sense ...

B.G.:    Well ...

A.V.:    ... is adjusted gross income for their remaining
         balance for some type of donation.  I can't show them
         donating ...

B.G.:    How's he going to show, I don't understand what you
         mean by that.

A.V.:    So, lets say, hypothetically he's going to agree to
         give them a hundred thousand dollars.

B.G.:    Okay.

A.V.:    There's twenty grand roughly, because we came up with a
         hundred and twenty, that's only four years.  That was
         an employment issue.  There is a year that's missing
         and we didn't talk about that.

B.G.:    Alright.

A.V.:    But let's say a hundred and twenty grand.  The twenty
         grand, we are going to have to have some type of
         receipt for a charitable donation.

B.G.:    What, what charit ... I don't understand.  They're
         gonna ...

A.V.:    They gave money to him.

B.G.:    They're gonna give it back?

A.V.:    No, they gave the money to him.

B.G.:    They gave what money to him?

A.V.:    The hundred and twenty grand they gave to him.  If
         they're going to give him a hundred in cash they're
         gonna have, he's gonna have to give them the balance.
         But it has to make sense with their adjusted gross
         income based on, you know, their tax bracket, on what's
         gonna fly.  We can't have them using a charitable
         donation that's too much.  Based on their adjusted
         gross income.

B.G.:    Yeah, I don't know what their adjusted gross income
         will be.  Especially if they get ...

A.V.:    Like twenty-five thousand dollars, thirty thousand
         dollars a year.

18

B.G.:   Then they can't make a donation of twenty five thousand
        ...

A.V.:   But we can go back three years.

B.G.:   Oh, so he can give them ...

A.V.:   Yeah, you can amend your tax returns up to, I think ...
        three years.

B.G.:   So he can, give em, but how, if he gives it to them
        now, how do they get it on to their ...

A.V.:   They're going to go ahead and use it on their, we'll
        let their accountant deal with it.  And they're going
        to amend their tax returns.  They'll either use it for
        this year and the next year and the next year.  Or if
        their accountant says they can, this year, the last
        year and the last year.

B.G.:   But doesn't he have to give it, I'm not a tax expert as
        you can tell.  Uh, doesn't he have to um, give it
        during those years?

A.V.:   Well see that's, I don't know exactly.  Lets say you
        only had "X" number of dollars and were going to get
        the receipt in 2009.

B.G.:   Right.

A.V.:   I don't know how your gonna, if you can treat it, I
        don't know if you can go backwards.  I don't ...

B.G.:   I mean ...

A.V.:   I'm not a tax lawyer ...

B.G.:   I always understood that if you are doing it in 2009 it
        goes on your 2009 return.

A.V.:   Okay, so ...

B.G.:   You can't carry it over.

A.V.:   There's no carry over for the next year and the next
        year, I'm wondering?

B.G.:   No, not for, not for do ... I mean for things like
        deprecation and stuff I think there is, but not for
        like, donations.

A.V.:   If he gives them a charitable donation receipt as part
        of the agreement in 2010 and 2011.

B.G.:   Maybe, honestly though ...

19

A.V.:   That doesn't have to be in writing.  If that can't be in writing, it doesn't have to be in writing.

B.G.:   Well and that's another thing you're pointing out. Because here's the other thing, alright.  The government's coming to see the money coming in to the center.

A.V.:   Right.

B.G.:   Alright, so I gotta worry that the government's going to see the money going out of the center and there's going to have to be, we're talking about a lot of money here.  If it was five thousand bucks, I don't care.

A.V.:   Yeah.

B.G.:   But you're not gonna talk about five thousand bucks.

A.V.:   No.

B.G.:   I know. I'm, I'm, I know your not. (Villalobos laughs) Well let me just say ...

A.V.:   Benjamin, Benjamin.

B.G.:   Yeah?

A.V.:   I'm a very reasonable person. In other cases when people have needed to do something like hand me a bag ...

B.G.:   Uh huh.

A.V.:   ... with $80,000.  I've taken it.

B.G.:   Uh huh.

A.V.:   And dealt with it.

B.G.:   Uh huh.

A.V.:   I just don't see him being that type of guy.

B.G.:   Well, I can ... I, I, I ... Well look, honestly even if I wanted, or had a bag of $80,000 sitting around, the problem's going to be, the money's coming in, and the government's going to say, where did this money go, okay?

A.V.:   Pay expenses, pay people back that you owe.

B.G.:   <unint> I gotta have documentation.

A.V.:   People threatened to sue you for sexual harassment, who knows what?

B.G.:   Well okay, you mention that once before, but here's the thing.  The Rabbi's a married guy with thirteen kids, I can't, I can't ...

A.V.:   That proves one thing, he's got a sex drive. (Both laugh)

B.G.:   Maybe, he, okay, he's got thirteen kids ...

A.V.:   Unless it was artificial insemination, Benjamin. (Laughs)

B.G.:   Alright, I'm not going there.  Um, but I can't, I can't, he can't settle a sexual harassment case.

A.V.:   What else?  You can have ...

B.G.:   I don't know.

A.V.:   <unint>, you can have a sexual harassment, you can have um ...

B.G.:   Well that, okay, I don't like either one of those things because it is too close.  You know what I'm saying?

A.V.:   Lets look at their relationship.  You have an employer and an employee.

B.G.:   Right, but it's too ...

A.V.:   That's all we have.

B.G.:   But we ...

A.V.:   If we have another area, let me know.  I'm thinking that's what ... That's all I see. We ca ... And the farther we get out of the universe.

B.G.:   Yeah.

A.V.:   The more implausible it becomes.

B.G.:   Well, but the problem is ...

A.V.:   The closer we keep it the more possible it is.

B.G.:   Okay, do, do you have something else.  Do you have another suggestion?  Because I'll tell you, I can't do sexual harassment.  That's just, that's just, I mean, the Rabbi, I mean, if it ever ...

A.V.:   That's a personal issue with the Rabbi, it's not a practical issue.  That's becoming a personal issue.

21

B.G.:   No, no, I understand. But it, it, it's the institution, the institution runs.  It, you know, I mean, he ...

A.V.:   The head of the institution has the government, Uncle Sam's foot up it's ass right now.

B.G.:   I understand that but ...

A.V.:   And actually that's going to get out also.

B.G.:   I understand, and I, and I'll tell you something.  This will get out, uh, and this would be less devastating, not penalties for it.

A.V.:   No no , what will happen is they'll pull up trucks ...

B.G.:   I understand.

A.V.:   And, just pow, everyone will be forced out and everything will be taken, everybody will be what's going on?

B.G.:   I understand.

A.V.:   That was the FBI, they just took everything here.

B.G.:   I hear what your saying, but, I, I, I can't do sexual harassment.  I admire the creativity.  But I just can't do it.  And I, you know ...

A.V.:   You come up with it.  He's your guy.

B.G.:   I don't, I don't, I don't know.

A.V.:   You're creative.  You like obscure sports.

B.G.:   Yeah, exactly.

A.V.:   (Laughs) I'm just wondering, what is an obscure sport?

B.G.:   Uh, I follow, uh, cycling.

A.V.:   That's not obscure.

B.G.:   Well, okay.

A.V.:   That's very mainstream now.  Everyone cycles.

B.G.:   Aright good.  Well then I'm a mainstream guy then.

A.V.:   What else?

B.G.:   Triathalon

A.V.:   Very mainstream.

B.G.:   Alright, that's it.

22

A.V.:   You did a triathalon?  Holy moley.

B.G.:   Well you know.  They come in different lengths so.

A.V.:   Wow, you do the Ironmam?

B.G.:   Half. I've never done an Ironman.  Do halves.

A.V.:   Wow, that's an endurance.

B.G.:   Although I haven't done one in a couple years now.  Too much work.  Takes so much time.

A.V.:   How long it take you to get in shape for that.

B.G.:   Uh, it takes a good, you really got to start planning a year in advance.

A.V.:   And already be in shape to begin with.

B.G.:   Yeah, you can't just do it, uh, out of the blue. Because you get off the bike and you got to start the run it, uh, you know ...

A.V.:   Twenty six miles.

B.G.:   No, no, it's a half. So ...

A.V.:   Thirteen miles.

B.G.:   Yeah, so its ...

A.V.:   How long is your swim?

B.G.:   Uh, the swim is one point two.

A.V.:   Still, in the ocean?

B.G.:   Yeah, 1.2 mile swim, 56 mile bike, uh 13 mile run ...

A.V.:   Yeah.

B.G.:   Last one I did was in La Jolla, you go over Torry Pines and you go over Torry Pines.

A.V.:   Yeah, yeah, yeah, yeah, and you go up the ...

B.G.:   It's tough, like riding a bike straight up a wall.

A.V.:   Nice!

B.G.:   After that, you totally, you can't move for a week. But anyway.  Okay so, I, I , see, my problem is ...

A.V.:   How else you want to do it?  It's going to have to be a straight up then, employment disagreement, maybe over her rate, it doesn't make sense to me.

23

B.G.:   What do you mean over her rate?

A.V.:   Lets say he said, she's a specialist, I don't even know, I honestly don't even know what it is she does that's so special.  I don't know.  But let's say she's a super specialist.  And a super specialist is paid $58 dollars an hour out in the world.  She's being paid $13 an hour.  The difference was supposed to be made up, but it never did.

B.G.:   Okay

A.V.:   Even that would be plausible.  I don't even know that she is even, I don't even know what that would require.

B.G.:   Well, I just ...

A.V.:   A Ph.D. in Hebrew something ...

B.G.:   Ah, well, she came from Israel for a reason.

A.V.:   But I don't even know that it is plausible.  Mine are more plausible ...

B.G.:   What are yours?

A.V.:   I'm telling you the sexual harassment is much more plausible.

B.G.:   The guy never even sexually harassed her.  Have you seen the man?

A.V.:   No.  He sexually harassed someone, he's got thirteen kids, come on.

B.G.:   Please.  Have you seen his wife?

A.V.:   No. (Laughs)

B.G.:   They're a, they're a very, they're a very cute couple, actually.

A.V.:   Ok, well ...

B.G.:   No, no, I'm serious.  Look I don't like that.  I really don't like that.  Um, it's got all kinds of problems with it.  Uh, I mean, let's, look, here, here's what's happening.  I'm going to be across the table from Keri.

A.V.:   What else do we have.  I mean we have a hostile work environment.  It doesn't have to be sexual.

B.G.:   Okay, hostile in terms of?

A.V.:   Hostile in terms of ...

24

B.G.:   You mean anti-Semitic?

A.V.:   No, he could just be a son of a bitch.  Changing her hours, changing her requirements, changing her strategies.  Always riding her all of the time, being a son of a bitch.

B.G.:   Yeah, okay.

A.V.:   She's totally stressed out.  Which, she is. This is a very troubling issue for her, because she's religious.

B.G.:   Right, I mean, look, I mean, just to be clear the guys not a son of a bitch, but okay.

A.V.:   That's what I'm saying.  We don't have to go sexual harassment.  Hostile work environment, I mean, her break down, completely emotionally and mentally. Physically, emotionally, and mentally, totally broken down.

A.V.:   As a result, he agreed to pay.

B.G.:   'Cause she's going to look at that agreement.

A.V.:   Oh, is she.

B.G.:   Huh?

A.V.:   She is?

B.G.:   I think so, no, don't you think she's going to end up seeing that agreement?

A.V.:   How's she going to get that agreement?

B.G.:   She's going to ask Orit Anjel.

A.V.:   Let's look for a second at how she could possible get the actual agreement.

B.G.:   She sits across from Orit Anjel and she's going to say, okay, tell me about your relationship with Rabbi Yemeni.

A.V.:   That would be if Orit signed agreement.  You see ...

B.G.:   Now I'm confused.

A.V.:   In, in, in, if the Rabbi were the type of person who would just take care of his business ...

B.G.:   Right.

A.V.:   And just do what he should do.  Why would we have to have a written agreement?  I, in between parties ...

25

B.G.:    I got two responses to that, and I understand what your saying, you know. I, I'm not, by the way, I, I'm trying to think this through. I'm not trying to challenge you or cross-examine you or anything like that. I'm trying to reach, well, we both know what we are trying to do. Um, uh, two responses to that. Uh, response number one. I hear what you're saying on the na ... on written whatever, but Orit Anjel is still going to be sitting across from Keri Axel.

A.V.:    Okay.

B.G.:    Okay, we know that, that's a given.

A.V.:    Okay.

B.G.:    And Keri Axel is going to say to her, uh, uh, you know, we're the government, you have to tell us, uh blah, blah, blah, you know. Um, uh, how is your relationship with Rabbi Yemeni. Tell me about Rabbi Yemeni, what kind of person is he?

A.V.:    Okay, I still don't get anything.

B.G.:    Well, well, is she, going to decline to answer that question?

A.V.:    She is going to say he's a very difficult boss. Forces her to work in a very difficult environment. Or she can just say, he's just a very strict person. Or, I don't even know the words in Hebrew. This is something I haven't even thought about.

B.G.:    No, I understand, I understand, but I'm saying is she going to tell the government that she is recently settled a claim with him? Because if she has, right ...

A.V.:    Right.

B.G.:    Then the fact that it is, we paid a hundred thousand dollars and there's nothing in writing, scares the shit out of me.

A.V.:    It doesn't prove anything. But, you're concerned with the writing part.

B.G.:    Well that's why I'm a little concerned, because, we're talking about a lot of money.

A.V.:    If we're going to make payments how are we going to be in ...

B.G.:    What do you mean make payments?

A.V.: Well, you said earlier that the Rabbi didn't have the money right now. I assumed you meant he was going to make payments.

B.G.: I don't, I don't, no. I, I, I think it would be good news for you. I think he can get most of the money right away.

A.V.: Okay, we'd like that.

B.G.: I suppose, I assumed you would. (Laughs)

A.V.: I would.

B.G.: I didn't think I was going to get a lot of push-back.

A.V.: No, no, no!

B.G.: He can get most of the money right away.

A.V.: Okay, that would be great.

B.G.: Okay, um. And when I say right away, I need to have a resolution before the twenty-second.

A.V.: Which, would be fine.

B.G.: Which is next Wednesday. Which I'm sure you're not going to have a problem with either.

A.V.: Well, we can do two things, we can the corporate way, which is we have an 87 page settlement agreement.

B.G.: Okay, but, but, let's ...

A.V.: Which says basically, nothing.

B.G.: Right bu-but ...

A.V.: Or we can have a one paragraph.

B.G.: But ...

A.V.: Dispute claim between the Rabbi ...

B.G.: Let's get to the question before that though. She's sitting there with the government.

A.V.: Okay ...

B.G.: Uh, Uh, Keri Axel says to her uh, um, tell me about Rabbi Yemeni, do you get along? How is your work, what did you work, how much did you work.

A.V.: Do you know Keri Axel?

B.G.: I, I, I've met her, I know her.

A.V.:   Okay, how old is she?

B.G.:   Uh, Keri's probably in her late thirties.

A.V.:   Where did she go to law school?

B.G.:   Uh, I do not know.

A.V.:   Now, in my culture you could ask me a question like
        that and I could spend nine hours talking about things
        related to that Rabbi and never actually have an
        opinion on him.  Because I am Mexican.  And the way we
        Latins deal with each other, is we could spend eight
        days, never get a damn thing done, and have talked
        about the same subject 87 ways until Sunday.

B.G.:   She's not Latin, I know that.

A.V.:   So we're going to be dealing with her in Hebrew.  Her
        husband, who I know very well, I hear him on the phone
        all the time, blah, blah, blah, blah, blah, blah, blah,
        blah, blah, blah, blah, blah, blah, blah, blah.  Then
        when him and I talk it's blah blah blah, blah blah
        blah, blah, blah, blah, blah, blah, blah, blah.  Not a
        damn thing gets done!  Their talking around the
        subject, through the subject, on the subject.

B.G.:   Okay.

A       Keri Axel doesn't get a definitive, he's a son of a
        bitch, et cetera.  What's she going to do?  She can
        force the lady to talk bad against him.

B.G.:   Well, I, I don't even know whether I care about good or
        bad, uh, as much as I care about, kinda, I need to know
        because, um she's going to talk to my guy.  And she's
        going to say to my guy, how'd you get along with Orit
        Anjel?  Did Orit Anjel ever complain to you?  Did she
        come to work?  I mean, its not just going to be Orit
        Anjel obviously they're going to ask a bunch of people.
        But among that ...

A.V.:   What's the biggest, worst thing he could have done?

B.G.:   What do you mean?

A.V.:   The Rabbi.  What's the worst thing.

B.G.:   In terms of what?

A.V.:   In terms of whatever it is they're looking for.  What's
        the worst thing he could have done.

B.G.: Well, we both know what their looking at here.  They're looking at whether these people came to America, uh, and got these visas.  Um, uh, legitimately or not.  That's what they're looking at.

A.V.: How many of them?

B.G.: I, I don't know exactly.  I know of two or three people.  Uh, but I know absolutely there are more.  I don't know their names.

A.V.: She's going to say he is the number one super great guy.  He's very tough, he's very good at business.  She's not very good at business.  He requires her to work her ass off.  And she's going to use Hebrew language and it's going to take forever to say that.

B.G.: Is she going to say, what is she going to say about when she was paid?

A.V.: She is going to say she was paid every year according to what she reported on her taxes.  And she does have tax returns.

B.G.: Right.  And is she going to say that she gave the money back?

A.V.: No.  Not if we don't want her to.

B.G.: I understand.  I understand.  No, I'm, I, I gotcha.

A.V.: She'll do what ever it is we need her to do.

B.G.: Your going to be there with her?

A.V.: I'm going to be there.  Trust me, she's not going to make a mistake, cause I'm gonna hear, she speaks English.  Her first language is Hebrew.  She speaks better than her husband.

B.G.: Okay.  She, she does speak English you say?

A.V.: Yeah, better than her husband.

B.G.: Okay.

A.V.: They're not going to be comfortable speaking to the government in English.

B.G.: I understand.  Is he going in too, to talk?

A.V.: No.  He doesn't have anything to say.

B.G.: Alright, um. Okay.

A.V.: And that's why I like this idea of paying her more than she's supposed to because it could have been a long standing grievance between him an her, where she thought she was entitled to "X" but she never got paid "X" she only got paid "Y" and the difference is he's now paying her. Nobody on earth can prove it wasn't. Nobody.

B.G.: Okay.

A.V.: I don't give a shit what Keri Axel threatens me ...

B.G.: I gotcha.

A.V.: ... or her. And that woman will never say a frickin' thing. And neither will I.

B.G.: Okay, and what I'm, obviously from my, when this guy goes in to talk to her, I don't want him contradicting, it wouldn't make any sense. Right?

A.V.: Right.

B.G.: If he contradicts, uh ...

A.V.: Orit.

B.G.: Exactly. And that's happening next Wednesday.

A.V.: On a bigger issue ...

B.G.: Yeah.

A.V.: ... how are you, I hope you're being very aggressive with Keri. Because what Keri's doing here is, she is, putting the microscope on somebody who lives off of the donations of her own, their own community. To bring other people to this country. From a country that is our ally. That is not our enemy.

B.G.: No, I, I look, I, I agree with you and I, I, I, you know, my ...

A.V.: I can't believe that Obama's person who came in, is making this type of case a priority.

B.G.: He doesn't have somebody in yet.

A.V.: So this is a holdover.

B.G.: We'll no, I mean, th-th-there's no change. Tom O'Brien is still the U.S. Attorney. I mean right now, they've been, they haven't, still the guy that was here from Bush.

A.V.:   Well, see, I don't understand.  We had a big policy
        shift on these um, immigrants.  We had a big policy
        shift on medical marijuana.  You know ...

B.G.:   I hear ya.  You're not gonna, you're not gonna get me
        uh, uh arguing with you on any of the ...

A.V.:   I'm just wondering?

B.G.:   I  don't know, but uh look, I got to prepare for the
        worst.  I hope you're right.

A.V.:   Yeah.

B.G.:   I hope you're right.  I got to prepare for the worst
        and, my issue is that I'd like to, obviously, you know,
        we all want the same thing here.  We all want to head
        her off, right.  In other words cut this, get this
        thing finished.  And I have, I'm, my concern is that,
        or not concern, but my, at the end of the day, just
        like she's going to end up talking to your client.

A.V.:   Yeah.

B.G.:   I gotta assume, at the end of the day, I'm not getting
        out of this without some ...

A.V.:   Scrutiny.

B.G.:   Of my client, exactly.  Now she could subpoena him and
        I could say I'm not cooperating.  I'm pleading the
        Fifth, I, uh, you know, go pound sand, whatever.  It's
        not gonna, go away that way.

A.V.:   Well, don't you usually always do that first?

B.G.:   Oh, I do, that's what, look, she first contacted me a
        long time ago.

A.V.:   Oh, okay.

B.G.:   And I was at trial.

A.V.:   So she's pissed off at you, she's not just pissed of at
        me.

B.G.:   Oh, I think she's pissed off at everyone.

A.V.:   Yeah, because everybody stonewalled her.

B.G.:   Absolutely.  She first call me, God, it was like
        February.

A.V.:   Oh, rightie.

31

B.G.:   And I was in trial and uh you know my partner called her back.  And I was traveling.  And I was finally like hey, you know what.  Uh, like last week I was like hey you know she called me uh uh left me, she actually my uh wonderful receptionist sometimes doesn't get names' right ...

A.V.:   Right.

B.G.:   And so uh, uh ...

A.V.:   She didn't get her name right?

B.G.:   Ex ... No it wasn't the woman sitting there now, it was this other guy and he announced it was a guy named Gary. (Villalobos laughs)  I took the call, I took the call.  And it was like, "Hi, it's Keri Axel," and I was like, "Oh, Keri."

A.V.:   Good thing you didn't say, "Hey Gary."

B.G.:   No she says, you sound surprised to hear from me. (Villalobos laughs)  I think she knew what was going on.  And I said, "No, it's just, you know, our receptionist sometimes get names wrong or something." But anyway, so anyway, that's why I have a subpoena here and you know now that we've, kind of, delayed this so long, um, you know, she's gonna resist even if I say oh, I, I mean, I can't come in on Wednesday or something.  She's like, "Hey you know what, enough of this."

A.V.:   She wanted to get my person in first though.

B.G.:   I don't know.  Maybe she still will.

A.V.:   No, she's not.

B.G.:   Right, because you, you, you talked to her already.

A.V.:   He has a, she has a fundamental right to her own lawyer.  A guy had no experience with, in any way, criminal law.

B.G.:   But where do you stand with her right now in terms of you've told her already that, well it was supposed to be yesterday.

A.V.:   Yeah, yeah.

B.G.:   So you're, she's got to come in after.

A.V.:   Yeah, we're gonna be not until August.

32

B.G.:   Okay.  Well my guy's got this subpoena for handwriting.
        I don't know, you know, it all depends on what she
        wants to talk about.  I mean, she can't force him to
        talk, obviously.

A.V.:   Yeah.

B.G.:   Uh, and I may try to take a page from you know, from
        you and just not answer, uh, you know.  Okay.

A.V.:   How many of these reports does he have to sign off on
        for her?  Because this whole immigration ...  In other
        words does he have to sign somewhere ...

B.G.:   No, it's uh, it's, uh, I'm not a I'm not an immigration
        expert but it's a, uh, it's a, uh, what do you call it,
        it's a, uh, it's a, uh, application where they
        basically say ...

A.V.:   The first one, five years ago.

B.G.:   Exactly. I don't know if you have to resign it, I just
        don't know.  But it's in the application where you have
        to say like, "oh this person is coming from Israel and
        it's for religious work and they're really needed, and
        ...  You know, I can't find someone else locally."
        Some, something like that, I I'm ...

A.V.:   What else could it be?

B.G.:   I'm not an immigration..

A.V.:   Handwriting.

B.G.:   Oh, no, I don't know.  I don't know.  I terms of the
        handwriting it might be checks.  I, I, I have no idea.
        I have no idea.

A.V.:   I'll let you know because I'm going to call her and she
        said she'd like to give me a substantive overview of
        what ...

B.G.:   Keri?

A.V.:   Yeah, she's looking for me.  So as soon as I find out
        from her ...

B.G.:   Okay.

A.V.:   ..anything, I'll let you know.

B.G.:   I appreciate it.  Alright then so at the end of the
        day, alright ...

33

A.V.:   A hundred grand. $20,000 in charitable donation
        receipts.

B.G.:   Nice round number.  I ...

A.V.:   But they won't come out looking like they were
        perfectly bud ... Perfect buddies.  But they'll look
        like they worked together.  There was some friction,
        but they worked hard together.  She was qualified.  He
        was a tough boss.

B.G.:   Is this hundred and twenty, or this hundred really,
        okay, and the twenty in, in what you, whatever.  Um,
        for purpose ...

A.V.:   <unint> of the tax return.

B.G.:   No, I understand. (unint)  For purposes of our
        accounting, okay.  Um, this is the settlement of this,
        whatever we will call it, the hostile, or the difficult
        ...

A.V.:   Either.

B.G.:   ... environment.

A.V.:   Or environment.

B.G.:   Underpaid her.

A.V.:   Underpayment.

B.G.:   Okay, the underpayment, the underpayment, which is
        fine, that, that's fine with me.  Um, the underpayment
        ... I'm trying to think of the way I'm trying think
        this through here.  She, uh, her tax returns that she
        got until now, right, and the payments that she got
        until now.  Um, uh, is all accurate.

A.V.:   Yup.

B.G.:   Okay.  So the way this is accounted in our books, this
        is over and on top of ...

A.V.:   Yes, it's an extra expense.

B.G.:   Got it.  Cause like I said, I need to ...

A.V.:   How they're going to deal with it ...

B.G.:   Well, I, I don't know how they're going to deal with
        getting their accounting.

A.V.:   Yeah.

34

B.G.:   But in terms, but look, at the end of the day the government, the govern ... Well let's be, let's play this out.  Government comes in with their big trucks one day and they pull up our, they dump our filing cabinets in to their, into their office.

A.V.:   The agreement is not going to help them prove shit.

B.G.:   Agreement's not going to help them prove shit.  Do you have an agreement somewhere?

A.V.:   Oh my God, a giant one a little one.  <unint> two paragraphs.

B.G.:   You tell me what you think. You tell me what ever you think.

A.V.:   She will never sue you guys.

B.G.:   Okay.  Send me that.

A.V.:   She will never ever ... Okay?

B.G.:   Okay, because I gotta get a signature on it.   Alright?

A.V.:   Well, you want me to do it?

B.G.:   Do you have one?

A.V.:   For this specific case, I don't have one.

B.G.:   No.

A.V.:   I was assuming you had ...

B.G.:   I don't do ...

A.V.:   ... the framework.

B.G.:   I don't do, I don't do, I don't do any transactions, I don't do civil litigation.

A.V.:   Oh, at all?

B.G.:   No.  You want to write it down or you want to email it to me?  I don't do any of this.

A.V.:   Yeah, let me email it to you.

B.G.:   Email it to me.

A.V.:   Yeah.

B.G.:   Save us all a lot of time.

A.V.:   Yeah, yeah.

B.G.:   I mean I could go to <unint> and try to learn
        something.

A.V.:   No, no, no.

B.G.:   I last did civil settlements, like a long time ago.
        But going back to my point, okay.  Uh, uh, but in the
        books, okay, uh, we assume they get the books.
        Hopefully they never will, but assume they get the
        books.  The books are going to show a total of how much
        payment to Orit Anjel.  Including her work and her
        settlement.

A.V.:   It will be the one twenty plus the one twenty.

B.G.:   Okay, okay.  And when Orit Anjel meets with the
        government, right, that's what's going to be what she
        tells ...

A.V.:   Well, if she's been paid, yes.

B.G.:   Ah, ah ...

A.V.:   Assuming she's been paid, yes.

B.G.:   We're on the same page.

A.V.:   Yes.

B.G.:   Alright, um, when are you on a plane?  You said you're
        leaving Tuesday?

A.V.:   Sunday night.

B.G.:   You're leaving Sunday night.

A.V.:   I was trying to push it, but I don't want to push it if
        I don't need to.

B.G.:   I understand, okay.  Give me one hour.

A.V.:   Okay.

B.G.:   Alright.  I will, uh ...

A.V.:   Somebody's picking me up here because they want to have
        lunch with me.

B.G.:   Alright.

A.V.:   She's downstairs now.

B.G.:   Okay.

A.V.:   And uh, then she's, her and I are going to eat
        somewhere.

36

B.G.:    Okay.

A.V.:    And then call me.

B.G.:    I will call you.

A.V.:    And let me know.

B.G.:    I will call you in one hour ...

A.V.:    Okay.

B.G.:    ... with our plan.

A.V.:    Okay.

B.G.:    Alright.  Um, we're going to figure this out.

A.V.:    And then, lets do this by phone no texting.  No, I
         mean, no emailing.

B.G.:    Okay, I apologize for that, it's just that when I'm
         sitting in these meetings ...

A.V.:    Yeah.

B.G.:    ... it's just when I'm sitting in these meetings it's
         uh, i-i-it's, I can sneak away and email ...

A.V.:    Yeah.

B.G.:    ... because if I get on the phone they're like, "Hey,
         I'm paying for this time.  I'm paying for this time
         ..."

A.V.:    You can't subpoena a telephone conversation. You're on
         a hard line, I'm on a cell phone.  There's no way
         anyone's going to know what you are I are talking
         about.

B.G.:    Gotcha.  Alright sir, you want another diet coke?

A.V.:    No, no, no.  If I drink too many diet cokes then I
         won't be hungry and she'll be pissed off.

B.G.:    Well we don't want ...

A.V.:    You know how people are.

B.G.:    You don't want to get anyone pissed off.  Alright ...

A.V.:    Alright.

B.G.:    It's 12:15, I'll call you.

A.V.:    Okay, thanks Benjamin.  Appreciate it.

B.G.:   Did you park in the building?

A.V.:   You know what, I had someone pick me up from the airport and drive me here.

B.G.:   Oh, okay, I was going to get your parking.

A.V.:   <unint> I appreciate that.

B.G.:   Alright, I'll give you a call.

A.V.:   Thanks Benjamin.

B.G.:   Take it easy.

Agent:  This is Special Agent Richard Ryan.  The time is approximately 12:16 and the date is Friday July 17th 2009. The preceding was a consensually recorded conversation between Benjamin Gluck and Alfred Villalobos.  Stopping communications.