1  Richard M. Steingard (State Bar No. 106374)
2  LIGHTFOOT STEINGARD & SADOWSKY LLP
   800 Wilshire Boulevard, Suite 1050
   Los Angeles, California 90017
3  Telephone: (213) 260-9449
   Facsimile: (213) 260-9450
4  Email: RSteingard@LSSLaw.com

5  Attorneys for Defendant
   ALFRED NASH VILLALOBOS
6

7              IN THE UNITED STATES DISTRICT COURT

8        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

9

10  UNITED STATES OF AMERICA,        )   Case No.: CR-09-0824-GHK
                                     )
11              Plaintiff,           )   **DEFENDANT'S MOTION TO**
                                     )   **DISMISS INDICTMENT FOR**
12         vs.                       )   **DELIBERATE DECEPTION OF**
                                     )   **GRAND JURY; MEMORANDUM**
13  ALFRED NASH VILLALOBOS,          )   **OF POINTS AND AUTHORITIES;**
                                     )   **EXHIBITS**
14              Defendant            )
                                     )
15

16         Defendant Alfred Nash Villalobos, by and through his attorney of record,

17  Richard M. Steingard, hereby moves the Court to dismiss the indictment due to the

18  prosecutor's misconduct in deliberately deceiving the grand jury in this matter.  As

19  shown herein, in presenting the evidence to the grand jury, the prosecutor

20  intentionally misquoted the defendant's recorded statements in order to make

21  exculpatory evidence seem inculpatory and thereby secure an indictment.

22  ///

23  ///

24

25

26

27

28

                                        1

1        This motion is based on the memorandum of points and authorities, exhibits,

2   all files and records in this matter and any other evidence or arguments as may be

3   presented at the hearing on this motion.

4

5                          Respectfully submitted,

6   Dated:  August 16, 2011            LIGHTFOOT STEINGARD & SADOWSKY LLP

7

8

9                          By: */S/ - Richard M. Steingard*

10                             Richard M. Steingard

11                             Attorneys for Defendant

                             ALFRED NASH VILLALOBOS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTORITIES**

## I.

## INTRODUCTION

On this past Friday, August 12, 2011, with trial just ten days away, the government produced to the defense a transcript of the grand jury testimony of FBI Special Agent Joy Mitchell.  This is the only grand jury transcript produced to the defense.  Agent Mitchell testified before the grand jury on August 21, 2009, and the indictment was returned and filed the same date. (Dkt. 12)

As best can be determined, Agent Mitchell was the sole witness testifying before the grand jury deliberating Mr. Villalobos' case.  The prosecutor, using leading questions, guided Agent Mitchell through defendant's interactions with Mr. Gluck, the government's investigation of Mr. Villalobos commencing on July 15, 2009, and Mr. Villalobos' arrest on August 4, 2009.  While the prosecutor's presentation of many of these events is distorted, it is the prosecutor's deliberate misrepresentation of the defendant's statements to Mr. Gluck on July 17, 2009, during a seminal moment in their conversation, which warrants dismissal of the indictment.

## II.

## RELEVANT FACTS

A.   The Criminal Charges

The indictment charges Mr. Villalobos, with two crimes: attempted extortion and obstruction of justice.  The charges relate to claims of Avi and Orit Anjel against Rabbi Yemini and the Chabad Israel Center for wages owed on account of Ms. Anjel's prior employment by the Center.  Mr. Villalobos, an attorney, represented Mr. and Mrs. Anjel.  Benjamin Gluck, also an attorney, represented Rabbi Yemini and the Center.  According to the indictment, Mr. Villalobos, in dealing with Mr. Gluck, demanded payment from the Rabbi and the Center of $120,000 or so to settle Mrs. Anjel's employment claims.  The Rabbi was at that

3

1    point in time a target of a federal criminal investigation.  According to the

2    government, Mr. Villalobos threatened the Rabbi to the effect that: if you do not

3    pay the money demanded by the Anjels, Mrs. Anjel will provide truthful

4    information to the government which will implicate Rabbi Yemini in criminal

5    activity; however, if you pay the money as demanded, I will have Mrs. Anjel lie

6    and provide the government with information helpful to the Rabbi.  It is this offer

7    by Mr. Villalobos to have Mrs. Anjel lie to help the Rabbi in exchange for the

8    payment of the money, that the government claims is extortionate and amounts to

9    an endeavor to obstruct justice.

10            B.      The Grand Jury Testimony of Agent Mitchell

11           The transcript of Agent Mitchell's grand jury testimony is attached as

12   Exhibit A.[1]  At the outset, the prosecutor asked Agent Mitchell questions which

13   summarized the investigation of Rabbi Yemini for immigration fraud.  (7308-11)

14   Agent Mitchell  then testified to the defendant's initial interactions with Rabbi

15   Yemini's attorney, Mr. Gluck, including letters exchanged between the two

16   attorneys. (7312-22)  Agent Mitchell explained that on July 15, 2009, Mr. Gluck

17   advised the FBI "that he believed that his client was being blackmailed" (7322),

18   and that the government promptly initiated an investigation of Mr. Villalobos.

19   (7323-28)  Agent Mitchell recounted that on July 16, 2009, at the agent's direction,

20   Mr. Gluck spoke by telephone with Mr. Villalobos and a meeting was arranged for

21   the next day "to try to resolve the situation." (7329)

22           The prosecutor then questioned Agent Mitchell about the recorded meeting

23   between the defendant and Mr. Gluck on July 17, 2009.  Neither the audio

24   recording of this meeting, nor a transcript of the conversation, were provided to the

25   grand jury.  Thus, the grand jurors had to rely on the prosecutor's recitation of Mr.

26

27   [1]      The transcript is presented in the form produced by the government to the

28   defense.  The citations are to the transcript's Bates stamp numbers.  All redactions
     in the transcript are the government's, not the defense.

Villalobos' statements, and the agent's affirmations of those quotations, in making

its determination.

Most specifically, the prosecutor asked Agent Mitchell the following leading

question:

> "Q:    During that meeting did Villalobos say, quote, 'All
> I need to know is what we'll need' – referring to his
> client, Ms. Anjel – 'to say to Ms. Axel.  If there's
> anything that can be shaded in a gray area' – and again
> referring to his client – 'that she is going to say it exactly
> the way she should say it.  If there's anything that Orit
> Anjel could do to help the rabbi, that she would do it.'
>
> A:     Yes." (7329)

After the prosecutor questioned Agent Mitchell about a few more of Mr.

Villalobos' statements during the July 17 meeting (7329-31), in order to reinforce

the incriminating nature of the defendant's statements, the prosecutor asked the

agent, "When you were reviewing the recording of this meeting, did you interpret

all of the statements that we've now discussed and that you've testified to as an

offer by Villalobos to have his client say false or misleading things to the Assistant

United States Attorney if Villalobos was paid off?"  The agent answered, "Yes."

(7331)

The prosecutor questioned Agent Mitchell about the balance of that meeting

and subsequent conversations leading to the defendant's arrest.  In doing so, the

prosecutor frequently conflated lengthy conversations, condensed the actual

conversation or provided quotes to the grand jury out of context. (7329-68).  Many

of these distortions are problematic, and may be further addressed at the hearing on

this motion, but it is the  above-quoted interchange between the prosecutor and its

witness that forms the basis for this motion.

C.      The Actual Transcript of the Meeting on July 17, 2009

Early on in the discovery process, the government produced the transcripts and audio recordings of the conversations between the defendant and Mr. Gluck. Those transcripts have changed over time as the recordings were reviewed and clarified; the latest iteration of the transcript of the July 17, 2009 conversation is attached as Exhibit B.  The critical part of the July 17, 2009 conversation, from which the prosecutor quoted when questioning Agent Mitchell, has never changed.

At the beginning of this meeting, after discussing personal matters, Mr. Gluck stated that the Rabbi would in fact pay Ms. Anjel the money he owed her. Gluck said that he had received a grand jury subpoena for the Rabbi, and that he (Gluck) "want[ed] to resolve the terms, everything, right now." (Ex. B at 4)  When Gluck raised Orit Anjel's upcoming meeting with AUSA Keri Axel, Villalobos responded, "All I need to know is, all I need to know is, what we need Orit to say, **because Orit is going to say the truth.**  If there's anything that can be shaded in the gray area, she's going to say it exactly the way she should say it.  **I don't know what it is she could possibly give you to help you,** but if there is anything, she'll do it."  (Ex. B at 4) (emphasis added)

Incredibly, in presenting this quote to the grand jury, the prosecutor deliberately omitted the highlighted portions, thereby dramatically altering the nature of this evidence, from innocent to incriminating.  Further, to compound the misconduct, the prosecutor inveigled Agent Mitchell, and had her unwittingly affirm his purportedly precise recitation of the defendant's statement.

A side-by-side comparison of the grand jury transcript and the Mr. Villalobos actual statement, with the omitted portion highlighted, clearly illuminates the misconduct:

///

///

| Prosecutor's Quote to Grand Jury | Actual Transcript of Conversation |
|---|---|
| "'All I need to know is what we'll need' – referring to his client, Ms. Anjel -- 'to say to Ms. Axel.  If there's anything that can be shaded in a gray area' – and again referring to his client -- 'that she is going to say it exactly the way she should say it.  If there's anything that Orit Anjel could do to help the rabbi, that she would do it.'" | "All I need to know is, all I need to know is, what we need Orit to say, **because Orit is going to say the truth.**  If there's anything that can be shaded in the gray area, she's going to say it exactly the way she should say it.  **I don't know what it is she could possibly give you to help you, but** if there is anything, she'll do it." |

This was a seminal moment in Gluck's interactions with Villalobos.  It occurred immediately after Gluck stated, for the first time, that the Rabbi would pay Ms. Anjel what she claimed in unpaid earnings.  In response, Mr. Villalobos articulated the substance of his and his client's intentions: "Orit is going to say the truth."  In a proceeding to determine whether Mr. Villalobos committed obstruction of justice, the prosecutor made sure the grand jury never learned this.

Because this was an investigation of an alleged attempted extortion and an alleged obstruction of justice, and was based on the core allegation that Mr. Villalobos was intent on having his client lie to help the Rabbi unless payment were to be made, this exchange should have been most illuminating.  Was the defendant threatening that his client would relate negative information regarding the Rabbi if payment were not made and did the defendant intend to obstruct justice by having his client present false information to the government?  In presenting the answer to this question to the grand jury, the prosecutor intentionally and deceitfully manipulated the defendant's words, excising the statement, "because Orit is going to say the truth," and related comments.  By carefully editing the defendant's actual statement, the prosecutor transformed the defendant's exculpatory remarks into inculpatory evidence, all the while assuring the grand jury that he was accurately reciting the defendant's words.  Shortly thereafter, the prosecutor underscored the incriminating nature of the defendant's

1  "statement" by having the agent affirm that the quoted excerpt was evidence of "an

2  offer by Villalobos to have his client say false or misleading things to the Assistant

3  United States Attorney if Villalobos' was paid off."

4      Deliberate misconduct such as this is inexcusable.  Where, as here, the

5  misconduct skews a critical fact under consideration by the grand jury, dismissal of

6  the charges is warranted.

7                                    **III.**

8                                **THE LAW**

9      Dismissal of a case prior to trial is appropriate where a prosecutor's

10  affirmative deception of the grand jury  effectively transmutes exculpatory

11  evidence into inculpatory evidence.  *E.g.*, *United States v. Cerubo,* 604 F.2d 807

12  (3d Cir. 1979); *United States v. Lawson*, 502 F.Supp. 158 (D.Md. 1980); and

13  *United States v. Ciambrone,* 601 F.2d 616 (2d Cir. 1979).  Dismissal for

14  prosecutorial misconduct pursuant to the court's supervisory powers is warranted

15  where the misconduct substantially influenced the grand jury's decision to indict or

16  if there is a grave doubt that the decision to indict was free from substantial

17  influence of the misconduct.  *Bank of Nova Scotia v. United States*, 487 U.S. 250,

18  254 (1988);  *see also See United States v. Samango,* 607 F.2d 881 (9th Cir. 1979)

19  (stating that "[i]f the grand jury is to accomplish either of its functions,

20  independent determination of probable cause that a crime has been committed and

21  protection of citizens against unfounded prosecutions, limits **must be set** on the

22  manipulation of grand juries by over-zealous prosecutors") (emphasis added).

23      Granted, a prosecutor may exercise discretion and some selectivity as to the

24  evidence to be presented to a grand jury.  *See generally Bank of Nova Scotia,*

25  *supra*.  That discretion, however, does not allow a prosecutor, as here, to

26  **knowingly** mislead the grand jury.  *Bank of Nova Scotia*, 487 U.S. at 261; *see also*

27  United States Attorneys' Manual § 9-11.233 (stating that "[i]t is the policy of the

28  Department of Justice ... that when a prosecutor conducting a grand jury inquiry is

personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person").

An indictment should be "returned by a legally constituted and unbiased grand jury." *Samango*, 607 F.2d at 881 (emphasis added). A district court, in the exercise of its supervisory power, can properly dismiss an indictment if the prosecutor's behavior in obtaining the indictment "represented a serious threat to the integrity of the judicial process." *Samango*, 607 F.2d at 884. The Court stated that "[t]he right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away." *Id.* (citing *Stirone v. United States*, 361 U.S. 212, 218-19 (1960)) (footnote omitted) (emphasis added). The government cannot infringe upon this right by "depriving the grand jury of its opportunity to evaluate the credibility of witnesses [or] by making prejudicial remarks to sway the grand jury." *Id.* (citation omitted). This is true even when there is no allegation that any witness committed perjury before the grand jury. *Id.* at 884.

In *Samango,* the Court pointed out that "[a]lthough deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, **even if unintentional**, can also cause improper influence and usurpation of the grand jury's role." 607 F.2d at 882 (emphasis added). Here, the prosecutor's **intentional** revision of the defendant's own words at a critical juncture of the grand jury proceeding was no different in substance and effect than the knowing presentation of perjured testimony before the grand jury. *See United States v. Basurto,* 497 F.2d 781, 785 (9th Cir. 1974). In either instance, the prosecutor presents as true what he knows to be untrue. In either instance, the prosecutor's misconduct mocks the grand jury's historical role in our constitutional system as an impartial, unbiased buffer between the awesome power of the

9

government and one of its citizens. *See Costello v. United States*, 350 U.S. 359, 363 (1956). Surely, the state of federal grand jury practice has not devolved to the point where a prosecutor may tell a grand jury, with impunity, that he is quoting a recorded statement of the defendant on a significant point, omit the exculpatory portions of the statement, recite the now incriminating balance of the statement and then solicit the case agent's confirmation that it is entirely inculpatory.

Through its gross misconduct here, the prosecution elicited testimony before the grand jury which, in no uncertain terms, demonstrated that the defendant was intent on having his client lie. The misleading testimony went to the heart of the obstruction and extortion charges. Mr. Villalobos had just been told that the Rabbi would pay Ms. Anjel to settle the employment dispute. In response, Mr. Villalobos stated that there was <u>no</u> *quid pro quo* for the Rabbi's payment because "*Orit is going to say the truth*. If there's anything that can be shaded in the gray area, she's going to say it exactly the way she should say it. *I don't know what it is she could possibly give you to help you,* but if there is anything, she'll do it."

Given that the testimony in question went to the essence of each of the two counts later set forth in the indictment, the false and misleading testimony created by the prosecution must have substantially influenced the grand jury's decision to indict; alternatively, under these circumstances, there is grave doubt that the decision to indict was free from the misconduct's substantial influence. Either way, prejudice has been shown.

///

///

1    The indictment should be dismissed.

2

3                                    Respectfully submitted,

4    Dated:  August 16, 2011         LIGHTFOOT STEINGARD & SADOWSKY LLP

5

6

7                                    By: /S/ - Richard M. Steingard

8                                        Richard M. Steingard
                                         Attorneys for Defendant
9                                        ALFRED NASH VILLALOBOS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11