ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JOSEPH N. AKROTIRIANAKIS (Cal. Bar No. 197971)
MARK R. YOHALEM (Cal. Bar No. 243596)
Assistant United States Attorneys
  1300 United States Courthouse
  312 North Spring Street
  Los Angeles, California 90012
  Telephone: (213) 894-2467
  Facsimile: (213) 894-6269
  Email:   joseph.akrotirianakis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,        )  No. CR 09-824-GHK
                                 )
                 Plaintiff,      )  GOVERNMENT'S OPPOSITION TO
                                 )  DEFENDANT'S MOTION TO DISMISS
            v.                   )  INDICTMENT; DECLARATION OF
                                 )  ASSISTANT UNITED STATES
ALFRED NASH VILLALOBOS,          )  ATTORNEY JOSEPH N.
                                 )  AKROTIRIANAKIS
                 Defendant.      )
                                 )  Pretrial Conf.
                                 )      Date: August 22, 2011
                                 )  Pretrial Conf.
                                 )      Time: 4:00 p.m.
                                 )
                                 )  Trial Date: August 23, 2011
                                 )  Trial Time: 8:30 a.m.
                                 )
                                 )  Courtroom of the Honorable
_____ )  George H. King


     Plaintiff, United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California and Assistant United States Attorneys

Joseph N. Akrotirianakis and Mark R. Yohalem, hereby files the

attached memorandum of points and authorities in opposition to

defendant's Motion to Dismiss Indictment.

This Opposition is based upon the attached Memorandum of Points and Authorities, the attached declaration, the pleadings filed and prior proceedings herein, and such additional evidence and argument as may be presented at any hearing on the motion.

DATED: August 18, 2011     Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

*Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
MARK R. YOHALEM
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

-ii-

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . .   ii

I.   INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . .   1

II.  FACTUAL BACKGROUND.. . . . . . . . . . . . . . . . . . . .   2

III. LEGAL ARGUMENT... . . . . . . . . . . . . . . . . . . . .   5

     A.   Applicable Law. . . . . . . . . . . . . . . . . . . .   5

          1.   Defendant Must Prove Flagrant and
               Systematic Deception of the Grand Jury,
               Resulting in Actual Prejudice, to
               Justify Dismissal of the Indictment. . . . . . .   5

          2.   Inaccurate Summary Testimony is
               Insufficient to Dismiss an Indictment. . . . . .   7

          3.   Even the Failure to Present Exculpatory
               Evidence is Insufficient to
               Dismiss an Indictment. . . . . . . . . . . . . .   8

     B.   Defendant Has Not Established Misconduct,
          Let Alone Misconduct Justifying Dismissing
          the Indictment. . . . . . . . . . . . . . . . . . . .   10

IV.  CONCLUSION... . . . . . . . . . . . . . . . . . . . . . .   12

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES:**

<u>Bank of Nova Scotia v. United States</u>,
    487 U.S. 250 (1988).. . . . . . . . . . . . . . . . .  7, 8

<u>Costello v. United States</u>,
    350 U.S. 359 (1956).. . . . . . . . . . . . . . . . .  7, 8

<u>Reyes v. United States</u>,
    417 F.2d 916 (9th Cir. 1969). . . . . . . . . . . . . . . 7

<u>United States v. Al Mudarris</u>,
    695 F.2d 1182 (9th Cir. 1983).. . . . . . . . . . . 9, 10, 12

<u>United States v. Basurto</u>,
    497 F.2d 781 (9th Cir. 1974). . . . . . . . . . . . . . . 10

<u>United States v. Benjamin</u>,
    852 F.2d 413 (9th Cir. 1988). . . . . . . . . . . . . . . 6

<u>United States v. Chanen</u>,
    549 F.2d 1306 (9th Cir. 1977).. . . . . . . . . . . . . . 8

<u>United States v. De Rosa</u>,
    783 F.2d 1401 (9th Cir. 1986).. . . . . . . . . . . . . . 6

<u>United States v. Fritz</u>,
    852 F.2d 1175 (9th Cir. 1988).. . . . . . . . . . . .  8, 9

<u>United States v. Gonzalez</u>,
    800 F.2d 895 (9th Cir. 1986). . . . . . . . . . . . . . . 8

<u>United States v. Isgro</u>,
    974 F.2d 1091 (9th Cir. 1992).. . . . . . . . . . . . passim

<u>United States v. Kearns</u>,
    5 F.3d 1251 (9th Cir. 1993).. . . . . . . . . . . . . 7, 12

<u>United States v.  Samango</u>,
    607 F.2d 877 (9th Cir. 1979). . . . . . . . . . . . .  7, 9

<u>United States v. Sears, Roebuck & Co.</u>,
    719 F.2d 1386 (9th Cir. 1984).. . . . . . . . . . . . . . 6

<u>United States v. Seifert</u>,
    648 F.2d 557 (9th Cir. 1980). . . . . . . . . . . . . . . 8

<u>United States v. Spillone</u>,
    879 F.2d 514 (9th Cir. 1989). . . . . . . . . . . . . . . 8

**TABLE OF AUTHORITIES (CONT'D)**

**PAGE(S)**

**FEDERAL CASES:**

United States v. Tucker,
    8 F.3d 673 (9th Cir. 1993). . . . . . . . . . . . . . . . 7

**FEDERAL STATUTES:**

18 U.S.C. § 1503(a) 12

MEMORANDUM OF POINTS AND AUTHORITIES

I

INTRODUCTION

Defendant alleges prosecutorial misconduct before the grand jury. Even if one were to view the government's conduct as did here as improper (which it was not),[1] defendant cannot meet the high burden he faces to justify dismissal of the indictment because defendant has not even alleged, let alone shown, any conduct that is was "pervasive," "systematic," and "flagrant." Moreover, there is no reasonable possibility that the inclusion of the omitted phrases defendant references would have altered the grand jury's finding of probable cause -- even assuming those words are given the meaning defendant prefers -- because the entirety of the evidence presented to the grand jury clearly shows that (1) the omitted portions of the quote at issue were not truly exculpatory; and (2) the evidence presented to the

---

[1]   The lynchpin of defendant's motion is a contention that defendant's self-serving, boilerplate statement that "Orit is going to say the truth" should not have been omitted because it constitutes "substantial evidence that directly negates" defendant's guilt. (Mot. at 8-9.)  From both the immediate context and the entire course of defendant's conversations with Mr. Gluck, it is very clear that defendant's self-serving statement is nothing more than "a wink and a nod" to Mr. Gluck's earlier insistence, made both orally and in writing, that Orit Anjel had to tell the truth to the government and the grand jury. Its omission is not misleading in any respect, let alone flagrant misconduct that deceived the grand jury or significantly impaired its ability to exercise independent judgment.  The prosecutor did not selectively quote from defendant's statement to exclude exculpatory evidence but rather to provide a concise statement that reflected the clear and unambiguous meaning of what defendant was saying. (Declaration of Assistant United States Attorney Joseph N. Akrotirianakis ¶¶ 3-4.)  At best, defendant's statement is falsely exculpatory, and defendant has identified no case requiring such a statement to be given to the grand jury.

1   grand jury overwhelmingly supported the grand jury's decision to

2   return the indictment.  As a result, defendant cannot demonstrate

3   any prejudice based upon the government's presentation to the

4   grand jury, let alone "substantial prejudice."

5                                   II

6                          FACTUAL BACKGROUND

7        As the facts this matter are well known to the Court and, in

8   any event, are fully set forth in the government's trial

9   memorandum filed August 16, 2011 (Dkt. No. 161), they are not

10  restated here, except as they relate specifically to defendant's

11  motion.

12       As the Court is aware, the first recorded conversation

13  between defendant and Mr. Gluck was on July 16, 2009.  At that

14  point, defendant and Mr. Gluck had, however, been in contact with

15  one another sporadically since February 23, 2009, and with

16  increasing frequency in the first half of July 2009.

17       On July 2, 2009, defendant and Mr. Gluck had a telephone

18  conversation.  To Mr. Gluck, defendant seemed eager if not

19  desperate for a settlement offer.  Mr. Gluck informed defendant

20  that, apart from the lack of merit in any wage claim by Orit

21  Anjel against the Chabad Center, Rabbi Yemini -- then the target

22  of a federal criminal investigation -- was not in a position to

23  make any type of payment to a potential witness/co-conspirator.

24  Defendant informed Mr. Gluck that Ms. Anjel had a meeting at the

25  United States Attorney's Office within two weeks and that they

26  needed to resolve the matter prior to that meeting.

27       A week and a half later, defendant and Mr. Gluck exchanged

28  the first of many email messages, beginning with defendant's July

13, 2009, email (emphasis added):

> Benjamin, I hoped that we would have a chance to get a framework of an understanding regarding my client and your client today.  <u>My client has an appointment with the investigating office tomorrow morning and it seemed to be in both of our interests to have at least a clear understanding of how your client would accept responsibility for his actions.</u>  If I have been unclear or imprecise about that I apologize.  Our inability to obtain any response from your client is discouraging.  But, what can I do but attempt to offer a branch.  I will be available to discuss today, otherwise tomorrow [<u>i.e.</u>, Ms. Anjel's statement to the United States Attorney] will be what it is for both or our clients.  <u>My clients are prepared to go wherever the truth takes them (here, or Israel) I hope the Rabbi is as well.</u>[2]

Later the same day, after several telephone calls with Mr. Anjel,

defendant again emailed Mr. Gluck:

> Benjamin, My apologies please.  My client's meeting is Thursday [July 16, 2009] 1 PM.  That gives us a little more time to reconcile this issue.  So, unless your client has no interest, please let's get something resolved before Thursday.  If the Rabbi could care less about a resolution, please inform me so I can adjust my position accordingly.  . . .

Mr. Gluck responded (emphasis added):

> Dear Mr. Villalobos, Whatever happens with our discussions should not influence in any way your client's interview with the government.  <u>At that meeting, she must tell the truth.</u>  I repeated this from

---

[2]  Defendant appears to be suggesting that Ms. Anjel was prepared to tell AUSA Axel that she had returned the amount of her paychecks to Rabbi Yemini as part of a scheme to obtain a fraudulent religious worker visa.  This is based, in part, on defendant's reference to Israel.  That is, defendant and Ms. Anjel are aware that informing the government that Ms. Anjel had returned the amount of her paychecks to Rabbi Yemini as part of a scheme to obtain a fraudulent religious worker visa would result in Ms. Anjel's religious worker visa being rescinded because it had been procured by fraud.  In other words, informing AUSA Axel about a scheme to obtain a fraudulent religious worker visa would negatively impact the Anjels because it would subject them to deportation back to Israel, but would negatively impact Rabbi Yemini even more so, because it would subject him to criminal liability.)

-3-

1    our very first discussions and our position on this has
2    not changed.  I have not yet been able to get an answer
     from Rabbi Yemini, in part at least because I lack any
     documentation showing what your client may have
3    actually worked.  . . .

4    This response (and the earlier statements it references) is

5    the origin of the "she's gonna tell the truth" line.  Despite of

6    Mr. Gluck's statements, however, defendant continued his

7    extortion efforts.

8    Defendant's July 16, 2011, telephone conversation with Mr.

9    Gluck was recorded.  Defendant began the conversation by asking

10   Mr. Gluck:

11   What I want to know is -- give me a bottom line.  I
     want to know if [Rabbi Yemini is] going to pay.  If
12   he's not going to pay, nothing you can say is gonna  --
     make me happy.
13

14   Defendant and Gluck then agreed to meet the next day to

15   "hash [it] out."  Near the outset of the meeting, defendant gave

16   one of his disclaimers that defendant now characterizes

17   "substantial evidence that directly negates" defendant's guilt.

18   (Mot. 8-9.)  Mr. Gluck, like the government, interpreted this

19   statement as a facetious placation to Mr. Gluck's concern

20   previously expressed.  Like Mr. Gluck, the government interpreted

21   (and interprets) defendant's statements as false "cover" and the

22   flimsiest of protections against any official that might inquiry

23   grow out of the blackmail payments defendant repeatedly suggested

24   be guised as the settlement of varying sorts of employment-

25   related legal claims.  The "truth" Orit Anjel was going to tell

26   was whatever "truth" defendant and Mr. Gluck agreed upon,

27   assuming that Rabbi Yemini would pay the blackmail.

28   The statement defendant makes in his next breath

                                    -4-

1  demonstrates, as does every other statement presented to the

2  grand jury -- and many that were not -- that he had no intention

3  to have Orit Anjel present the unvarnished truth (or any truth)

4  to the government or the grand jury, and that the government's

5  interpretation is in fact the correct one.

6      Given the record as a whole, it is simply impossible to

7  conclude that not presenting defendant's false exculpatory

8  statement to the grand jury resulted in any prejudice to

9  defendant.

10                              III

11                        LEGAL ARGUMENT

12  A.    Applicable Law

13      1.    Defendant Must Prove Flagrant and Systematic Deception
14            of the Grand Jury, Resulting in Actual Prejudice, to
            Justify Dismissal of the Indictment

15      A district court has the authority to dismiss a grand jury

16  indictment upon a finding of constitutional or due process error,

17  or under the court's inherent supervisory power to supervise

18  grand juries in the administration of justice.  See United States

19  v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992) (reversing district

20  court's dismissal of indictment).  Dismissal of an indictment on

21  either constitutional or supervisory grounds is rare, given the

22  wide prosecutorial discretion afforded in grand jury proceedings,

23  and the separation of powers concern for maintaining

24  prosecutorial and grand jury independence.  See United States v.

25  De Rosa, 783 F.2d 1401, 1404 (9th Cir. 1986).

26      A defendant challenging an indictment carries a difficult

27  burden.  He must demonstrate that "the prosecutor engaged in

28  flagrant misconduct that deceived the grand jury or significantly

                              -5-

1   impaired its ability to exercise independent judgement" before a

2   court may consider the remedy of dismissal.  United States v.

3   Benjamin, 852 F.2d 413, 415-16 (9th Cir. 1988) (affirming

4   district Court's refusal to dismiss indictment for multiple

5   allegations of misconduct, including failure to disclose source

6   of witness bias) (emphases added).

7          To establish a constitutional violation, defendant must

8   prove (a) pervasive and systematic misconduct that (b) undermines

9   and infringes upon the grand jury's independent judgment and

10  impartiality.  See United States v. Isgro, 974 F.2d 1091, 1094-95

11  (9th Cir. 1992) (reversing district court's dismissal of

12  indictment for government failure to present exculpatory

13  evidence); United States v. Sears, Roebuck & Co., 719 F.2d 1386,

14  1391-92 (9th Cir. 1984) (holding that presentation of biased

15  witness, expression of personal belief of guilt by the prosecutor

16  to the grand jury, and aggressive questioning of defendant's

17  employees, failed to support dismissal of the indictment).  The

18  prosecutor's "conduct must be so grossly shocking and outrageous

19  as to violate the universal sense of justice." United States v.

20  Kearns, 5 F.3d 1251, 1254 (9th Cir. 1993) (reversing dismissal of

21  indictment and finding no "flagrant behavior" where erroneous

22  representation was due to incompetence and other non-insidious

23  factors rather than intentional deception).

24         To warrant dismissal under the court's supervisory powers,

25  defendant must make essentially the same showing.  He must show

26  that the prosecutor engaged in "flagrant behavior," and defendant

27  has demonstrated "substantial prejudice." Kearns, 5 F.3d at

28  1253; accord Bank of Nova Scotia v. United States, 487 U.S. 250,

255 (1988) (requiring "substantial influence"); United States v. Tucker, 8 F.3d 673, 674 (9th Cir. 1993) (requiring defendant to show he was "actually prejudiced"); Isgro, 974 F.2d at 1094 (same).  Dismissal of an indictment in the presence of misconduct, but the absence of substantial prejudice, would result in an unwarranted "windfall" to an otherwise unprejudiced defendant.  Isgro, 974 F.2d at 1098-99.  The Ninth Circuit has made clear that a district court's authority to exercise its supervisory powers to dismiss an indictment is "substantially limited."  Tucker, 8 F.3d at 674.

   2.   Inaccurate Summary Testimony is Insufficient to Dismiss
        an Indictment

   "It has been repeatedly stated and well established that an indictment cannot be attacked on the ground that evidence before the grand jury was incompetent or inadequate."  Reyes v. United States, 417 F.2d 916, 919 (9th Cir. 1969) (citing Costello v. United States, 350 U.S. 359 (1956)).  In United States v. Samango, 607 F.2d 877, 880 n.6 (9th Cir. 1979), for example, the Ninth Circuit suggested that dismissal is appropriate "only in a flagrant case, and perhaps only where knowing perjury, relating to a material matter, has been presented."

   Thus, an indictment may be based solely on hearsay summary evidence.  Costello, 363 U.S. at 363; United States v. Chanen, 549 F.2d 1306, 1311 (9th Cir. 1977).  Moreover, challenges to the accuracy and reliability of evidence presented to a grand jury (which is really the essence of defendant's motion) are insufficient to require dismissal of the indictment.  See Bank of Nova Scotia, 487 U.S. at 260-61 (holding that alleged misleading

-7-

1   and inaccurate summary testimony by investigative agents before

2   the grand jury fall short of requiring dismissal).  Inaccurate

3   grand jury testimony by investigative agents is insufficient to

4   warrant dismissal where substantial influence of the inaccuracies

5   on the grand jury has not been established.  See United States v.

6   Spillone, 879 F.2d 514, 524 (9th Cir. 1989) (erroneous agent

7   testimony before grand jury insufficient to support dismissal of

8   charges); United States v. Gonzalez, 800 F.2d 895, 899 (9th Cir.

9   1986) (same); United States v. Seifert, 648 F.2d 557, 564 (9th

10  Cir. 1980)(same).

11          3.   Even the Failure to Present Exculpatory Evidence is
                 Insufficient to Dismiss an Indictment
12

13       A defendant "has no right to have exculpatory evidence

14  presented" to the grand jury, United States v. Fritz, 852 F.2d

15  1175, 1178 (9th Cir. 1988), and for that reason, "the prosecutor

16  has no duty to present to the grand jury all matters bearing on

17  the credibility of witnesses or any exculpatory evidence."

18  United States v. Al Mudarris, 695 F.2d 1182, 1185 (9th Cir.

19  1983); accord Isgro, 974 F.2d at 1095.  For that reason, a "claim

20  that there was misconduct in not presenting [exculpatory

21  evidence] is baseless."  Fritz, 852 F.2d at 1178.

22       Defendant ignores these precedents altogether, and instead

23  relies on United States v. Samango, 607 F.2d 877 (9th Cir. 1979),

24  which he asserts effectively requires a prosecutor to disclose to

25  the grand jury all evidence that might undercut the credibility

26  of the prosecutor's case.  (Mot. 9.)  Defendant's argument

27  inverts the general rule, set forth in the later Al Mudarris

28  decision; it is only in exceptional cases where the prosecutor is

                                    -8-

1   required to disclose credibility issues.  Defendant also omits

2   completely the particular and unique facts of Samango -- a grand

3   jury hearing in which the "key testimony" came from a

4   "suggestible, drug-addicted, and possibly biased informant," and

5   the prosecutor disclosed none of these credibility problems.  Al

6   Mudarris, 695 F.2d at 1185-86 (describing Samango, 607 F.2d at

7   884 (9th Cir. 1979)).

8       Defendant's reliance upon Samango is misplaced for a more

9   fundamental reason as well: as in Al Mudarris, this is not a case

10  where the credibility of any witness was at issue.  There is no

11  question that Special Agent Mitchell is a credible witness, and

12  there is no question that the device that recorded defendant's

13  conversations with Mr. Gluck is accurate.  Rather, defendant is

14  arguing that a credible witness, though testifying accurately,

15  omitted theoretically exculpatory statements made by defendant.

16  Samango is thus irrelevant; the relevant cases are Fritz, Al

17  Mudarris, and Isgro, all of which unequivocally state that a

18  prosecutor need not present any exculpatory evidence whatsoever,

19  let alone "exculpatory" evidence of the sort defendant suggests.

20      For the same reason, United States v. Basurto, 497 F.2d 781,

21  785 (9th Cir. 1974), which forbids putting on knowingly perjured

22  testimony, is equally unavailing.  There is no question that the

23  agent testified truthfully.  Defendant simply argues that by

24  omitting exculpatory evidence,[3] the agent's testimony was

25

26      [3] As explained herein, defendant's statements were not
    actually exculpatory.  Rather, they were "a wink and a nod" to
27  Mr. Gluck's prior admonition that Ms. Anjel would have to testify
    truthfully.  Only when taken entirely out of context could they
28  possibly seem arguably exculpatory.

1  "misleading" and, therefore, "perjured," (Mot. at 9), and thus

2  grounds for dismissing an indictment under <u>Basurto</u>.  Defendant's

3  argument proves far too much, for it would be no less applicable

4  in <u>any</u> case where a case agent provided summary testimony and

5  omitted potentially exculpatory evidence.  Yet the clearly

6  established rule is that summary testimony that omits exculpatory

7  evidence is permissible.  See <u>Al Mudarris</u>, 695 F.2d at 1185

8  (holding that defendants' argument that the government's use of

9  "only the summary hearsay testimony of a BATF agent . . .

10 prevented the grand jury . . . from hearing possible exculpatory

11 evidence" and therefore justified dismissing the indictment "must

12 fail").

13 B.  <u>Defendant Has Not Established Misconduct, Let Alone</u>
        <u>Misconduct Justifying Dismissing the Indictment</u>
14

15      Defendant's motion fails because its factual premises are

16 false and because its legal analysis is wrong.  As a threshold

17 matter, the testimony elicited by the prosecutor's questions was

18 not misleading.  Taken in context, it is simply not plausible

19 that defendant's "exculpatory" statement actually meant that Ms.

20 Anjel would tell the unvarnished truth whether Rabbi Yemini paid

21 her or not.  Defendant repeatedly told Mr. Gluck that Ms. Anjel

22 would say whatever she needed to about when she was paid and why

23 she was paid; indeed, immediately after the supposedly

24 exculpatory statement he flatly told Mr. Gluck that she would

25 "shade" her statement based on whether she was paid or not.

26 Defendant's "exculpatory" statement was not a moral stand, but

27 rather a sly acknowledgment of Mr. Gluck's earlier warning that

28 the Rabbi could not pay Ms. Anjel to lie and that Ms. Anjel must

1  tell the truth in her meeting with AUSA Axel.[4]

2      Even setting aside this fundamental flaw with defendant's

3  motion, defendant cannot prevail because he cannot satisfy any of

4  the requirements for dismissal of an indictment.  As set forth

5  above, an indictment cannot be dismissed merely because of

6  inaccurate summary testimony or because of the omission of

7  exculpatory evidence.  E.g., Al Mudarris, 695 F.2d at 1185.

8      Defendant fares no better under first principles.  He has

9  not even alleged that there were "systematic" misstatements made

10 to the grand jury, Isgro, 974 F.2d at 1094; he instead quibbles

11 with the omission of two phrases from a single piece of testimony

12 relating to one of defendant's numerous threats and offers to

13 have Ms. Anjel lie -- one of many, many statements defendant made

14 in hours of recorded conversations.  Nor can defendant establish

15

16     [4] As in every grand jury presentation conducted in this
   district in which summary witness testimony is given, the grand
17 jury was informed that it had the right to call any witness whose
   testimony was being summarized and hear the testimony of that
18 witness.  The grand jury was likewise invited to question Agent
   Mitchell.  (Akrotirianakis Decl. 4.)  Such advisements are
19 standard because in most, if not all, grand jury hearings, the
   presentation of evidence is selective.  It was with these caveats
20 in place that defendant's statements were presented selectively,
   i.e., not in their entirety.  As the record makes clear, however,
21 had they been presented in their entirety, it would have been
   perfectly clear to the grand jury that defendant was offering to
22 have Ms. Anjel lie.  An exhaustive presentation would therefore
   have been no different in substance or consequence; it would only
23 have been more complete.  And "[i]t has been repeatedly stated
   and well established that an indictment cannot be attacked on the
24 ground that evidence before the grand jury was incompetent or
   inadequate."  Reyes, 417 F.2d at 919.  Grand jury hearings are
25 not to be nitpicked with the benefit of hindsight; they can be
   questioned only where there is "flagrant" misconduct that (a) is
26 "pervasive" or "systematic" and (b) had a "substantial" impact on
   the grand jury's deliberation.  Here, the prosecutor's
27 presentation of incomplete statements was not misconduct, let
   alone misconduct justifying dismissal of the indictment.
28

-11-

1   that there was "flagrant" misconduct in not eliciting defendant's

2   self-serving "exculpatory" testimony, Benjamin, 852 at 415,

3   because, as explained above, there is no obligation to present

4   exculpatory testimony at all.  Even if, somehow, the failure to

5   elicit exculpatory testimony were problematic here, a

6   prosecutor's adherence to the established rule permitting

7   exclusion of exculpatory testimony cannot be deemed "flagrant"

8   misconduct.  A fortiori, neither is it conduct that is "so

9   grossly shocking and outrageous as to violate the universal sense

10  of justice."  Kearns, 5 F.3d at 1254.

11      Finally, defendant cannot demonstrate prejudice, let alone

12  substantial prejudice.  Id.  Defendant's offer -- made in his

13  next breath -- to have Ms. Anjel "shade" the truth is just as

14  illegal under 18 U.S.C. § 1503(a) as his later offers to have her

15  lie outright so long as defendant got paid the blackmail he had

16  demanded.  The notion that the grand jury would not have returned

17  an indictment if defendant's "wink-and-nod" disclaimer had been

18  included is absurd; in any event, it is defendant's burden to

19  demonstrate substantial prejudice, and he has established none.[5]

20                              IV

21                          CONCLUSION

22      Defendant's motion should be denied.

23

24

25      [5]  Even if, somehow, defendant established "flagrant" and

26  "substantially prejudicial" misconduct with respect to the
    obstruction count -- which he has not and cannot do -- that would

27  still be no basis for dismissing the entire indictment because he
    has made no showing whatsoever with respect to the attempted

28  extortion count.

                              -12-

1                    DECLARATION OF JOSEPH N. AKROTIRIANAKIS

2          I, Joseph N. Akrotirianakis, state and declare as follows:

3          1.    I am an Assistant United States Attorney for the

4    Central District of California and, in that capacity, I am

5    responsible for the prosecution of Alfred Nash Villalobos.  I

6    make this declaration in support of the government's opposition

7    to defendant's motion to dismiss the indictment on the basis of

8    prosecutorial misconduct.

9          2.    Prior to filing the defendant's motion to dismiss the

10   indictment, defense counsel Richard Steingard contacted me by

11   email and telephone to discuss a "draft" version of the motion.

12   In the last of these conversations, Mr. Steingard admitted that

13   he did not think that the court would dismiss the indictment with

14   prejudice but that had sent the draft to me in order to make me

15   settle the case on terms favorable to his client, and that he

16   would file the motion unless the government agreed to a favorable

17   plea disposition.  I informed Mr. Steingard that I would not

18   engage in any plea negotiations with him against a backdrop of

19   his allegation that I had engaged in prosecutorial misconduct.

20         3.    I have reviewed defendant's motion to dismiss and the

21   grand jury transcript attached to it.  Neither at the time of the

22   grand jury nor today did I consider defendant's statement that

23   "Orit is going to say the truth" to be "exculpatory."  I

24   considered it then (and today I consider it) to be a self-serving

25   statement made as a "wink and nod" disclaimer made in response to

26   Benjamin Gluck's earlier statement to defendant that, no matter

27   what, Orit Anjel's statements to AUSA Keri Axel had to be

28   truthful.  In his next breath, defendant stated that Ms. Anjel

                                    -1-

1   would "shade" the truth and on several occasions between the

2   self-serving statement and his acceptance of an expandable folder

3   containing $50,000 cash, defendant stated very frankly that Orit

4   Anjel would either make false statements to AUSA Axel or would

5   conceal the truth from her if Mr. Gluck and Rabbi Yemini paid the

6   backmail he was demanding.

7       4.   I very obviously had no intention to "poison" the grand

8   jury against defendant, inasmuch as I gave the grand jury at

9   least one cautionary instruction about not improperly considering

10  the fact that defendant had been placed under arrest at the time

11  he gave his statement to investigating agents.  I also solicited

12  questions from all the grand jurors, and either allowed the

13  witness to answer or prompted her with questions that addressed

14  each of the issues raised by the grand jurors' questions, and

15  invited the grand jury to request the testimony of any witness

16  that was being summarized by the witness.

17      I declare under penalty of perjury, under the laws of the

18  United States of America, that the foregoing is true and correct.

19      Executed August 18, 2011, at Los Angeles, California.

20

21                        *Joseph N. Akrotirianakis*
                          JOSEPH N. AKROTIRIANAKIS
22                        Assistant United States Attorney

23

24

25

26

27

28

                                -2-